**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

L&L CONSTRUCTION ASSOCIATES, INC          :
                                          :
                         Plaintiff,       :
                                          :
v.                                        :          Civil No. 1:05CV01289
                                          :          Judge Royce C. Lamberth
SLATTERY SKANSKA, INC.                    :
                                          :
                         Defendant.       :

**PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANT'S**
**RULE 12(B)(6) MOTION TO DISMISS THE COMPLAINT**

Plaintiff L&L Construction Associates, Inc. ("L&L"), by and through its counsel, hereby

files its Sur-Reply in Opposition to the Motion by Defendant Slattery Skanska, Inc. ("Slattery")

to Dismiss the Complaint under Fed.R.Civ.12(b)(6) for failure to state a claim. In support

thereof, the following is stated.

**I.      Introduction.**

In its Reply in Support of its Motion to Dismiss, Slattery has raised for the first time an

entirely new argument in support of its Motion to Dismiss, contending that the Complaint must

be dismissed based upon the integration clause found in the Subcontract executed by L&L and

Slattery. This entirely new substantive argument, not previously raised in its Opposition, requires

that L&L file this Sur-Reply in order to address this new contention advanced by Slattery.

Slattery offers no credible explanation as to why it did not realize the potential

significance of the Subcontract at the time it filed its Motion to Dismiss. Paragraph 12 of the

Complaint specifically referred to the Subcontract, stating that: "Slattery only awarded contract

work to L&L in the amount of approximately $1.1 million, which amount was approximately

$3.1 million dollars short of its commitment under the Agreement." Slattery, in its Motion to

Dismiss, specifically acknowledged the existence of the Subcontract by stating that pursuant to ¶12 of the Complaint "the parties eventually assented to terms and conditions for a binding contract." Motion at p. 6, n.1. Thus, Slattery obviously knew about the Subcontract at the time it filed its Motion to Dismiss.

It is inconceivable that anyone experienced in the construction industry would not have recognized and understood that in any contractual dispute between a subcontractor and prime contractor, arising out of or related to a request for proposal issued by a quasi-governmental authority, that the request for proposal, the documents referenced in the request for proposal, the prime contract, and any subcontract actually executed by the subcontractor, would be potentially significant to any contractual claim raised by a subcontractor. Everyone in the industry knows that subcontracts are always subject to and bound by the terms and conditions of the request for proposal and prime contract. Thus, it is inexplicable how Slattery can maintain that it was not aware of the potential significance of the Subcontract at the time it filed its Motion to Dismiss. As such, there is no excuse for failing to raise the integration clause argument in a timely manner as part of its Motion to Dismiss.[1] Having done so belatedly, L&L is obliged to further burden the Court with this additional filing so as to respond to this new argument.

---

[1] In view of the fact that the Subcontract was disclosed in the Complaint, and was known to Slattery as being a document potentially relevant to this case, Slattery was under an obligation to raise any objection to venue as part of its initial response to the Complaint. Having failed to do so, Slattery has waived any objection to venue and is barred from filing its contemplated motion to change venue to New York City, New York. See Fed.R.Civ.P. 12(g) ("If a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted.") Clearly, any venue objection Slattery wanted to raise was available to Slattery at the time its response to the Complaint was due and having failed to raise a venue objection in its motion to dismiss, Slattery "shall not thereafter make a motion based on the [venue] objection." Even if the Subcontract had not been mentioned in the Complaint the venue defense was still available since Slattery was certainly aware of the Subcontract it had executed with L&L.

**II.    The Court May Consider Documents Central to Plaintiff's Claim in a 12(b)(6) Motion.**

Presumably, at the time Slattery filed its Opposition it was aware of the precedent in this Circuit which holds that in ruling upon a 12(b)(6) motion the Court may consider documents referenced in the Complaint which are central to Plaintiff's claim even though not attached to the Complaint.[2] Indeed, L&L assumed Slattery had relied upon this case authority in discussing in detail selected portions of the October 3, 2001 document in its Motion to Dismiss and therefore, L&L had not objected to that discussion in its Opposition. Therefore, it could hardly come as a surprise that L&L, in response, discussed at length in its Opposition the relevancy of the Request For Proposal ("RFP") issued by WMATA (See ¶6 of the Complaint), the Prime Contract entered into between Slattery and WMATA (See ¶10 of the Complaint), the Subcontract (See ¶12 of Complaint), and the October 3, 2001 document.

Now that Slattery has attached only selected portions of the documents referenced in the Complaint which are potentially central to L&L's claim, L&L has no choice but to respond by submitting the remaining documents in order to make a complete record as possible at this time. However, as noted below, L&L does not have all of the relevant documents in its possession cited in the Complaint. Moreover, as discussed *infra* at p. 7-16, judicial interpretation of these documents can not be completed without the benefit of discovery. Nevertheless, attached hereto as Exhibit No. 1 is the entire Subcontract. Attached hereto as Exhibit No. 2 is the RFP. With respect to the RFP, however, it should be noted that L&L does not have in its possession the entire RFP. Specifically, the specifications for the design of the New York Avenue Station

---

[2] See U.S. Office Products Co. Securities Litigation, 251 F.Supp. 2d 58, 71 (D.D.C. 2003) (In a 12(b)(6) motion, "the court may also consider . . . documents that are both referenced in the complaint and central to the plaintiff's claim."); Torello v. U.S. Office Products Co., 251 F.Supp.2d 58, 66-67 (D.D.C.2003) ("While the court must generally limit its review to facts alleged within the complaint, the court may consider ... documents that are both referenced in the complaint and central to the plaintiff's claim."); New York State Bar Ass'n v. F.T.C. 276 F.Supp.2d 110, 114 (D.D.C. 2003) (same).

Project (with the exception of the limited work set forth in the Subcontract), itemized in the Table of Contents starting at TOC 4, entitled Division 1 "General Requirements" and continuing to the end on TOC 13, and all the plans and drawings created in furtherance of these specifications, are not in L&L's possession. Similarly, although the RFP does contain the "form" of the Prime Contract that was to be executed by Slattery and WMATA starting at page 00500, L&L does not have a copy of the actual Prime Contract that was executed. Thus, the record of documents cited in the Complaint and potentially central to L&L's claim is incomplete at this time and will have to await production during discovery.[3]

III.    **L&L's Complaint is Not Governed by The Subcontract.**

Slattery erroneously states that "the dispute is governed by the Subcontract" and that "L&L has now modified its position". (See Reply at p. 2). The dispute is not governed by the Subcontract and L&L has not modified its position. Rather, as made abundantly clear in L&L's Opposition, L&L's claim is based upon the contention that the October 3, 2001 document is an enforceable agreement which on its face contains sufficient material terms agreed to by L&L and Slattery so as to render the agreement enforceable. Alternatively, however, in the event it becomes necessary to establish an agreement as to other material terms not specifically set forth in the October 3, 2001 document, then reference can be made to not only the Subcontract, but also the RFP, the documents referenced in the RFP, the Prime Contract, and plans and specifications, as evidence of the other material terms and conditions agreed to by Slattery and L&L at the time the October 3, 2001 document was executed. Only portions of the Subcontract are potentially relevant to the extent needed to provide evidence as to the agreement by L&L and

---

[3] Completely contrary to Slattery's statement, L&L never said that the Court was not "capable of absorbing a one page document and Subcontract". (See Reply at p. 6) To subscribe such disrespectful comments to one's adversary – when completely untrue – is hardly characteristic of proper and professional advocacy. What L&L said was that when filing the Complaint there was no need to burden the Court with documents that are "hundreds of pages in length" in view of the policy reasons behind notice pleading.

Slattery to other material terms and conditions. As stated in the Opposition, "[A]lthough the October 3, 2001 document is sufficient by itself to create an enforceable agreement, there are other documents referred to in the Complaint that can, ***if need be***, provide other material terms agreed to by Slattery and L&L. [Emphasis added]." (See Opposition at p. 17; See Also Opposition at p. 15, n. 1; "As in Arok, the breach by Slattery was total and therefore the material terms set forth in the October 3, 2001 document are indeed sufficient for purposes of creating an enforceable contract for which the Court can provide the appropriate remedy.")

Slattery has chosen to ignore the decision in Arok Construction vs. Indian Construction Services, 174 Ariz. 291, 848 P.2d 870 (1993) discussed at length in L&L's Opposition. As held in Arok, "there was evidence of a course of dealing involving a standard form contract which could be used to supply any missing terms." 848 P.2d at 876. Therefore, as in Arok, the Subcontract entered into between L&L and Slattery may provide evidence of a course of dealing which can be used, if needed, to supply any missing terms from the October 3, 2001 document. The Subcontract, however, is not the basis of L&L's claim. L&L has not filed suit for any breach arising from the Subcontract. L&L seeks no remedy for non-performance of the contractual commitments set forth in the Subcontract.[4]

L&L has not "modified its position" as asserted by Slattery, but has simply responded to Slattery's challenge that the Complaint failed to allege an agreement as to an undefined requisite number of material terms and conditions in order to state a cause of action for breach of contract. Ironically, if anyone has "modified its position", it is Slattery who appears to have abandoned completely its contention that the failure to allege in the Complaint each and every material term

---

[4] Although the parties have casually referred to the Subcontract as being between L&L and Slattery, this is not correct in that the Subcontract was also executed by entities that were not parties to the October 3, 2001 Agreement and October 3, 2001 document. The Subcontract was executed by L&L and "SL, A Joint Venture", an entity comprising both Slattery and The Lane Construction Corporation. SL, a Joint Venture, and The Lane Construction Corporaton did not execute the October 3, 2001 document.

agreed to by the parties renders a complaint for breach of contract deficient. Significantly, Slattery made no effort to counter the case law and argument set forth in L&L's Opposition which demonstrated that the basis for Slattery's Motion to Dismiss was without merit and contrary to the principle of notice pleading embodied by the Federal Rules of Civil Procedure. In fact, Slattery seems to now concede that the Complaint does state a cause of action that the October 3, 2001 document is an enforceable agreement, stating that "even granting L&L's position that the October 3 document is enforceable, *as we must at this stage* . . . ." (See Reply at p. 10).

Slattery continues to confuse and misstate the relevancy of the RFP, Prime Contract and Subcontract, by arguing that L&L was not a party to the Prime Contract and the Prime Contract "does not confer any right on L&L." Again, however, the relevancy of the RFP and Prime Contract is limited to the fact that those two documents do provide evidence as to the required and thus agreed upon terms and conditions of the October 3, 2001 document. The RFP specifically states that "the [Prime] Contract consists of this RFP and its amendments . . . [and] all documents referenced or attached to the RFP." (See Exhibit No. 2 at p. 00500-1.) Moreover, the RFP specifically states that Slattery "shall incorporate the obligations of this contract into its respective subcontracts, supply agreements, and purchase orders." (See Exhibit No. 2 at p. 00700-4). Thus, the RFP dictated that the October 3, 2001 Agreement would have to be bound by the terms and conditions of the Prime Contract, RFP and all other documents referenced in the RFP. L&L never argued or suggested, as contended by Slattery, that it had the right "to enforce the terms of the Prime Contract against WMATA or Slattery." (See Reply at p. 11). Rather, these "many, many documents" are relevant to the extent needed to establish any other necessary material terms agreed to by L&L and Slattery as part of the October 3, 2001 document.

6

**IV.    The Integration Clause Does Not Apply to the October 3, 2001 Agreement.**

    *1.    The Court Must Consider Extrinsic Evidence In Interpreting the Impact of the Integration Clause Upon the October 3, 2001 Agreement.*

L&L's claim is not based upon nor does it arise out of a breach of the Subcontract and therefore the integration clause found in Article 32 of the Subcontract does not apply to the instant dispute.[5] The analytical framework in which the Court must determine whether the Subcontract is a fully integrated document and whether the parties intended the Subcontract to supercede the October 3, 2001 Agreement is well summarized by Judge Attridge in <u>Piedmont Resolution, L.L.C. v. Johnston, Rivlin & Foley</u>  999 F.Supp. 34 (D.D.C.1998) as follows:

> A completely integrated agreement is one adopted by the parties as the complete and exclusive statement of the terms of the agreement. The Court's first step in determining whether [the agreement] exclusively establishes the rights and duties of the parties is to address whether that was what [the contracting parties] intended of the Agreement. If so, the contract is completely integrated, and no additional terms may be considered; if not, the agreement is partially integrated and *consistent* additional terms may be shown. [Emphasis in original] This preliminary question of fact, that courts have long called a question of law for the trial court, focuses on the intent of the parties at the time they entered into the agreement. ***This intent must be sought where always intent must be sought, namely, in the conduct and language of the parties and the surrounding circumstances. The document alone will not suffice. In addition to the written Agreement, the Court reviews agreements or negotiations prior to or contemporaneous with the adoption of a writing to determine whether the contract is completely or only partially integrated. A merger clause-the presence or absence thereof, is only a factor in discerning the parties' intent.*** In this preliminary assessment, the parol evidence rule does not apply; it will only come into play after (and if) the Court determines that the Agreement is completely integrated. Thus, the inquiry into whether the contract is completely integrated includes a review of extrinsic-parol-evidence that will have to be excluded at trial if the court concludes the contract indeed is completely integrated. [Citations omitted; emphasis added].

---

[5] For the same reason, Article 21, entitled "Governing Law and Venue", of the Subcontract does not apply to the instant dispute.

Id. at 50. Thus, the Court must engage in a multi-layered analysis in interpreting the Subcontract for purposes of determining the applicability of the integration clause to L&L's stated claim in the Complaint.

First, the Court must determine whether the Subcontract is a fully integrated agreement extending to all matters arising from and related to the New York Avenue Station Project. Parol evidence that would otherwise be excludable at trial shall be considered for purposes of determining whether the Subcontract was intended to be a fully integrated agreement with respect to all the Underground Utility Work at the New York Avenue Station Project. The presence or absence of a merger clause is but one factor in discerning that intent. See Howard University v. Good Food Services, Inc., 608 A.2d 116, 127 (D.C. 1992) ("In considering such evidence and in determining the preliminary factual issue of whether the parties intended a writing to be integrated, the trial court does not apply the parol evidence rule."). The "types of evidence that the court may consider are the circumstances before and contemporaneous with the making of the contract, all habitual and customary practices which either party knows or has reason to know, the circumstances surrounding the transaction, and the course of conduct of the parties to the contract." Potomac Elec. Power Co. v. Mirant Corp., 251 F.Supp.2d 144, 150 (D.D.C.2003).

Second, if the Court determines that the Subcontract was not fully integrated, than consistent additional terms may be introduced. See Howard University v. Good Food Services, Inc. 608 A.2d 116, 126 (D.C. 1992) ("If, however, the parties did not intend for the 1987 agreement to be exclusive on all matters of their contractual relationship, the agreement was "partially integrated" and "consistent additional terms may be shown".")

Third, even if the Court determines that the Subcontract is fully integrated, it does not preclude the existence of any collateral agreement between L&L and Slattery. See Howard University v. Good Food Services, Inc., 608 A.2d 116, 127 (D.C.1992) ("even the finding of a completely integrated agreement does not preclude a showing of a 'collateral agreement,' as long as it does not contradict the main agreement.") As noted by one Court, "even where there is a complete integration, the rule will not rise up to bar the admission of evidence in support of a prior oral agreement if the terms of the prior agreement are not inconsistent with the terms of the written integration. This latter statement is true despite the fact that both agreements touch on the same or similar subject matter." Lee vs. Joseph E. Seagram & Sons, Inc., 413 F.Supp. 693, 701 (S.D.N.Y. 1976).

Finally, assuming *arguendo* that the Subcontract is deemed fully integrated and not collateral to the October 3, 2001 Agreement, the Court is then required to make a determination as to whether the phrase "subject matter" is ambiguous or not. In making the threshold legal determination as to whether the phrase "subject matter" is ambiguous or not, the Court must consider extrinsic evidence regarding all the circumstances surrounding the execution of the Subcontract. See Potomac Electric Power Co. vs. Mirant Corporation, 251 F.Supp. 2d 144, 151 (D.D.C. 2003) ("[W]hen contract is ambiguous, the court can consider extrinsic evidence.")

Thus, it is not possible simply based upon the submission of the Subcontract to determine whether the parties intended the Subcontract to be a fully integrated agreement, and if so, the meaning of the phrase "subject matter". The presence of a merger clause is only a factor in discerning the parties' intent, and the Court must consider the extrinsic circumstances

surrounding the execution of the Subcontract. This is not a determination that can be made in the context of a Rule 12(b)(6) Motion.[6]

### 2. The Limited Extrinsic Evidence Available from the Documents Demonstrates that the Integration Clause Unambiguously Does Not Apply to the October 3, 2001 Agreement.

The plain language of Article 32 of the Subcontract clearly provides that the Subcontract was not intended to supersede the October 3, 2001 Agreement.  As quoted by Slattery, the pertinent portion of the integration clause simply states that "all prior negotiations and understandings with respect to the *subject matter* are merged herein. [Emphasis added]". However, the term "subject matter" is not defined in the Subcontract as consisting of all the Underground Utility Work for the New York Avenue Station Project, but refers only to the work that was to be performed *as defined and set forth in the Subcontract* – and did not extend to other matters outside the four corners of the Subcontract. Had Slattery and L&L intended the Subcontract to represent their complete and final agreement as to any and all work for the New York Avenue Station Project, including the Underground Utility Work, then it would have been a simple enough matter to have clearly and expressly stated such a broad and sweeping scope of the integration clause by defining the phrase "subject matter" in that matter. In the absence of doing so, it is not reasonable to subscribe such a sweeping and overly broad interpretation of the phrase "subject matter" which according to Slattery's proffered interpretation would be unlimited in scope.

---

[6] In its Reply, Slattery has now requested that the Complaint be dismissed with prejudice, whereas in the Motion to Dismiss Slattery recognized that a grant of that Motion would certainly result in leave being granted to L&L to amend to the Complaint to cure any pleading deficiency found by the Court to exist in the Complaint. This drastic change in the nature of the relief being sought by Slattery its Motion to Dismiss being raised for the first time in a reply pleading illustrates the procedural problems created by Slattery's motion practice. Having failed to request in its Motion to Dismiss dismissal of the Complaint based upon the integration clause the only proper way to have proceeded to seek such new relief would have been to file a motion for summary judgment.

In that regard, it is important to understand that the entire scope of work for the Underground Utility Work promised in the October 3, 2001 Agreement for the New York Avenue Station Project consisted of (i) Water Distribution Systems (item #02515 in the RFP); (ii) Sanitary Sewer (item #02535 in the RFP); (iii) Underground Electrical and Communication Distribution Systems (item #02585 in the RFP); (iv) Subway Drainage Systems (item #02625 in the RFP); and (v) Storm Sewer (item #02635 in the RFP). (See Exhibit No. 2 at TOC-6). The Subcontract was only for work pertaining to the Storm Sewer and did not include the other four components of Underground Utility Work. The Subcontract also included work for the Retaining Walls, which was not part of the Underground Utility Work and not the subject of the October 3, 2001 Agreement. Specifically, Article 2 of the Subcontract entitled "Scope of Work", states that the "scope of services to be provided" consists of the following: "Furnish, Provide, Install the Complete Storm Runoff and Wall Systems throughout the Project Site as Shown on the Construction Plans provided, as outlined below." Thus, the "scope of work" for the Subcontract, which is the "subject matter" of the Subcontract, related only to the Storm Sewer (which is part of the Underground Utility Work) and the retaining wall (which is not part of the Underground Utility Work), and did not include the remaining four components of the Underground Utility Work.

It is equally important to understand that the Prime Contract was a design-build project and at the time the Prime Contract was executed the five components of the Underground Utility Work still needed to be designed before any written subcontract could be executed. At the time the Subcontract was executed, only the plans and specifications for the Storm Sewer portion of the Underground Utility Work were completed and ready for contracting. As noted previously, supra at p. 3, L&L does not have the plans and specifications for the (i) Water Distribution

Systems; (ii) Sanitary Sewer; (iii) Underground Electrical and Communication Distribution Systems; and (iv) Subway Drainage Systems. Thus, the "subject matter" of the Subcontract was the Storm Sewer and Retaining Wall to be built as part of the New York Avenue Station Project which was the only portion of the Underground Utility Work that was ready for a subcontract to be executed. The "subject matter" did not include the remaining components of the Underground Utility Work for which the plans and specifications had yet to be finalized and for which a subcontract could not have been executed.

In light of the fact that the design and plans for the remaining Underground Utility Work had yet to be completed, and therefore was not ready to be contracted for under a subcontract, it was understood that at the time the Subcontract was executed it pertained only to the work to be performed under the Subcontract (i.e. the "subject matter" of the Subcontract) and did not extend to all of the remaining Underground Utility Work. It would not have been typical to understand that by executing the Subcontract that the parties were referring to the remaining components of the Underground Utility Work for which the design and plans had yet to be completed and which were not ready for formal subcontracting. This understanding is consistent with industry practice and custom, the circumstances of the transaction, and the course of conduct of the parties.

Finally, and equally significant to the determination that the Subcontract is not a fully integrated agreement which nullifies the October 3, 2001 Agreement, is the incorrect statement by Slattery that the "parties to the Subcontract are the same as those who signed the October 3, document." (See Reply at p.8). The Subcontract was executed between L&L and "SL, a Joint Venture", an entity comprising both Slattery and The Lane Construction Corporation. This new entity "SL, a Joint Venture", and The Lane Construction Corporation, did not execute and were not parties to the October 3, 2001 document and agreement. Indeed, L&L has not sued "SL, a

Joint Venture" or joined The Lane Construction Corporation as a defendant since neither entity was a party to the October 3, 2001 Agreement. The very fact that different parties signed the October 3, 2001 document and Subcontract provides compelling evidence in support of the position that Article 32 was not intended by L&L and Slattery to extend to their agreement embodied by the October 3, 2001 document which had signed by different parties.

In Thayer v. Dial Indus. Sales, Inc., 85 F.Supp.2d 263, 269 (S.D.N.Y. 2000) cited by Slattery, the integration clause stated that: "This Agreement represents the entire agreement between the parties with respect to employee's employment with the Corporation." As held by the Court: "The merger clause here states that the Employment Agreement is the entire agreement between the parties regarding plaintiff's employment. Therefore, plaintiff cannot state a claim for breach of an oral agreement regarding the terms of plaintiff's employment." Thus, in Thayer the integration clause specifically defined the "subject matter" of the integration clause to be the employment relationship. In stark contrast, the Article 32 of the Subcontract does not define the "subject matter" to be the Underground Utility Work or any other work relating to the New York Avenue Station Project other then the work set forth in the Subcontract. In the absence of such specificity, and in view of the circumstances of the transaction, it makes no sense to construe the "subject matter" of the Subcontract to include work not specifically referred to and set forth in the Subcontract.

In sum, the Subcontract was not intended to be a fully integrated agreement regarding the parties' intent and understanding with respect to the October 3, 2001 Agreement that L&L would be awarded all of the Underground Utility Work once it was ready for construction. The parties understood and agreed that the phrase "subject matter" was limited to the scope of the work to be

performed under the Subcontract and did not extend to the other yet to be designed components of the Underground Utility Work.[7]

### 3.  The Subcontract is Collateral to the October 3, 2001 Agreement.

As noted by the D.C. Court of Appeals, "even the finding of a completely integrated agreement does not preclude a showing of a collateral agreement, as long as it does not contradict the main agreement." Howard University vs. Good Food Services, Inc., 608 A.2d 116, 127, n. 7, (1992). In Lee vs. Joseph E. Seagram & Sons, Inc., 413 F.Supp. 693 (S.D.N.Y. 1976), the Court explained that: "A collateral agreement is one which is separate, independent and complete . . . although relating to the same object." Whether an agreement is collateral is a decision which "must, of course, turn upon the type of transaction involved, the scope of the written contract and the content of the oral agreement asserted." Seelson v. Rackfay Const. Co. 300 N.Y. 334, 338, 90 N.E.2d 881, 882-883 (1950).

In Lee, plaintiff Lee, owner of a wholesale liquor distributorship, sold its business to defendant Seagram, a distiller of alcoholic beverages, pursuant to a written agreement. Plaintiff alleged that there was an oral agreement which conditioned the agreement to sell upon defendant's promise to relocate plaintiff to a new distributorship. Following the sale, the plaintiff brought suit on the oral promise. The defendant filed a motion for summary judgment, contending that plaintiff's proof of the alleged oral agreement is barred by the parol evidence rule. The Court denied the motion and found the oral agreement to be collateral to the written agreement. In so holding, the Court pointed out that one of the main considerations in reaching this determination is that agreement "must be one that parties would not ordinarily be expected to embody in the writing." Id. at 702. In the instant case, as discussed above, it would not have

---

[7] Alternatively, if the Court determines that the limited extrinsic evidence derived from a review of a portion of the operative documents available at this time is insufficient to reach a determination as to whether the Subcontract was a fully integrated agreement, then the issue must await final adjudication pending discovery in this proceeding.

been expected that L&L and Slattery would have set forth in the Subcontract -- which discussed only the work for the Storm Sewer and Retaining Wall for which the design and plans had been completed -- their collateral agreement for the remaining work for the (i) Water Distribution Systems; (ii) Sanitary Sewer; (iii) Underground Electrical and Communication Distribution Systems; and (iv) Subway Drainage Systems, for which the designs and plans had yet been finalized and was not ready for a formal subcontract. Further, the Court in Lee was persuaded by the additional consideration that "the parties to the two agreements were different." Id. at 703. As noted above, the signatories to the Subcontract were different from the signatories to the October 3, 2001 document. Thus, although the two agreements at issue in Lee arose out of the same transaction they concerned sufficiently different matters so as to be deemed agreements collateral to each other. It is also pertinent to note that in Lee, the Court was persuaded by the consideration that the relationship between plaintiff and defendant had existed for thirty years and "the often expressed mutual regard which the parties had for each other lead to the conclusion that the agreement to relocate was more likely to be sealed with a handshake then with a pen." Id. The point being that the Court was obliged to consider extrinsic evidence of the transaction and relationship of the parties for purposes of reaching a fair and full understanding of the agreement between the parties.

Similarly, in Gem Corrugated Box Corporation vs. Kraft Container Corp., 427 F.2d 499, 503 (2nd Cir. 1970), plaintiff had entered into a written agreement with defendant to purchase its paper products from defendant, which plaintiff alleged had been entered into in reliance upon an oral agreement to sell to plaintiff a stock interest in defendant. A judgment had been entered in favor of plaintiff, and on appeal the defendant had argued that the integration clause and parol

evidence rule should have barred proof of the oral agreement to sell the stock. The U.S. Court of

Appeals for the Second Circuit affirmed, holding as follows:

> The proposed sale of stock was not merely an ancillary, contemporaneous
> agreement; it was the vital element of the overall transaction. Viewed in this
> proper perspective, it is plain that the provision in the requirements contract that it
> contains the entire agreement of the parties means that the writing contains the
> entire agreement as to its limited subject matter alone; and it is equally plain that
> the parties ordinarily would not embody the stock purchase agreement in a writing
> concerned only with box materials purchase terms. In short, defendants' reliance
> upon the parol evidence rule is misplaced, for the stock agreement and not the
> requirements contract was the 'principal transaction.

427 F.2d at 503. The Court explained that the "principal transaction" was the stock agreement

not the purchase agreement, and held that: "the parol evidence rule simply has no application in

these circumstances; the oral agreement does not serve to vary or modify the engagement of the

parties with respect to the terms of purchase of box materials." Id. Similarly, in the instant case,

the "principal transaction" was the promised work for all of the Underground Utility Work set

forth in the October 3, 2001 Agreement. The agreement to allow L&L to perform the work for

the yet to be finalized design for the (i) Water Distribution Systems; (ii) Sanitary Sewer; (iii)

Underground Electrical and Communication Distribution Systems; and (iv) Subway Drainage

Systems does not seek to vary or modify the engagement of L&L and Slattery with respect to the

Sewer System and Retaining Wall. The October 3, 2001 Agreement does not alter the

consideration to be paid for that work, the manner in which the work was to be performed, or any

of the other terms and conditions pertaining to the performance of the work. See Also Primex

International Corp., 89 N.Y.2d 594, 679 N.E. 2d 624 (1997) ("the fact that this other contract

relates to what is, in important aspects, the same transaction, does not extend this merger

paragraph to the destruction of that other contract. Its effect is limited to the contract sued

upon."); Frohman Amusement Corp. vs. Blinkhorn, 178 A.D. 431, 165 N.Y.S. 509 (1917)

(verbal contract being as to sale of pictures, produced and to be produced, reduction in writing of part as to pictures produced will not prevent proof of oral contact as to pictures to be produced.)

Thus, although the scope of work under the Subcontract which is the subject thereof relates to an important aspect of the New York Avenue Station Project, the merger clause does not extend to the "destruction" of the October 3, 2001 Agreement between Slattery and L&L and the promise to provide the work for the other four components of the Underground Utility Work for which the design and plans had not been finalized and was not ready for formal subcontracting.

> **4.     *Parol Evidence is Admissible to Interpret the Phrase "Subject Matter".***

Alternatively, at a minimum, the phrase "subject matter" is ambiguous and under well settled principles of contract law parol evidence is admissible to construe the meaning of the term. See Thayer v. Dial Indus. Sales, Inc. 85 F.Supp.2d 263, 269 (S.D.N.Y. 2000) ("A contractual provision is ambiguous as a matter of law if it is capable of "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."); Potomac Electric Power Co. vs. Mirant Corporation, 251 F.Supp. 2d 144, 148 (D.D.C. 2003) ("a contract is ambiguous when it or its provisions are reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings.") As discussed above, the limited extrinsic evidence available from the limited evidence available certainly demonstrates, at a minimum, that the circumstances of this transaction in conjunction with the customs, practices and usages, raises a bona fide issue of whether the term "subject matter" was intended to be limited to only the work for the Storm Water and Retaining Wall, or was intended to extend to

the yet to be finalized work for the (i) Water Distribution Systems; (ii) Sanitary Sewer; (iii) Underground Electrical and Communication Distribution Systems; and (iv) Subway Drainage Systems.

        As noted in L&L's Opposition, there were discussions between L&L and Slattery before and concurrently with the execution of the Subcontract wherein it was understood and agreed that the Subcontract and the "subject matter" thereof was not intended to include all of the other Underground Utility Work that which the plans had not been finalized as promised under the October 3, 2001 Agreement. Further, in view of the fact that the Subcontract is a form contract prepared by Slattery, any ambiguity in the clause should be construed against Slattery. Slattery complains that these facts regarding the discussions and representations that occurred between Slattery and L&L should not be considered in the context of a Rule 12(b)(6) motion since the facts were not specifically alleged in the Complaint. Putting aside the issue of whether these facts can be fairly inferred from the allegations in the Complaint, this point by Slattery simply demonstrates conclusively that it is improper to seek dismissal of the Complaint with prejudice in the context of a Reply pleading filed in support of a Rule 12(b)(6) motion. Without considering the extrinsic circumstances surrounding the negotiations and execution of the Subcontract it is impossible to make a definitive determination as to whether the Subcontract is fully integrated and the meaning of the term "subject matter". The very fact that Slattery requests the Court to disregard these material facts in ruling upon the 12(b)(6) motion demonstrates that dismissal of the Complaint with prejudice at this early juncture without considering all of the relevant extrinsic evidence would be premature and improper.

5.    *Slattery Agreed Subsequent to the Subcontract that L&L Would Perform the Remaining Underground Utility Work.*

In addition, as noted in the Opposition, there were continued discussions and promises made after the execution of the Subcontract repeating the agreement to award all of the underground utility work to L&L. Based upon those promises and representations, L&L continued to decline to undertake new business in the expectation of receiving the remaining underground utility work promised by Slattery, so as to be in the position of having adequate resources to perform when Slattery had finished the design of the rest of the Underground Utility Work. Thus, these discussions either serve as the basis for an entirely new agreement entered into subsequent to the execution of the Subcontract, or a subsequent modification of the Subcontract, either of which provides another independent reason why the integration clause is not dispositive of this case at this early juncture. See, e.g., Howard University v. Good Food Services, Inc., 608 A.2d 116, 127 (D.C.1992) citing Clark v. Clark, 535 A.2d 872, 877 (D.C.1987) ("oral modification of term in written agreement still binding even if subsequent negotiations to modify agreement in writing do not result in further modification of the orally modified term. An oral modification to a written contract may be binding even if the written agreement includes a provision, as in this case, expressly prohibiting oral modification.")

6.    *The Integration Clause May Be Invalidated Based Upon Fraud in the Inducement.*

Finally, to the extent it is determined that Article 32 applies as an integration clause to the October 3, 2001 Agreement, then that integration clause may still be invalidated based upon the false promises and representations made by Slattery that the remaining yet to be designed Underground Utility Work would be awarded to L&L after execution of the Subcontract. See Sabo vs. Delman, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957) ("the parol evidence rule has no

application in a suit brought to rescind a contract on the ground of fraud. In such a case, it is clear that evidence of the assertedly fraudulent oral misrepresentation may be introduced to avoid the agreement."). Further, the disclaimer language in Article 32 is far too vague to bar any claim for fraud in the inducement. See Cirillo vs. Slomnmni, 196 Misc.2d 759, 768 N.Y.S.2d 759 (2003) (clauses which disclaim reliance upon any oral representation which "do not identify any particular subject matter" do not bar fraud in the inducement claims). Finally, a disclaimer clause will not bar a fraud in the inducement claim when "the facts alleged to have been fraudulently concealed could not be discovered through the exercise of reasonable diligence." Rodas vs. Manitaras, 159 A.D. 2d 341, 552 N.Y.S.2d 618, 621 (1990). Slattery's false representation that it intended to perform under the October 3, 2001 Agreement was not a fact that L&L could have discovered through the exercise of reasonable diligence.

### 7.   *Conclusion*

Although L&L submits that it is clear that Article 32 of the Subcontract was not intended to supercede the October 3, 2001 Agreement, at a minimum it is evident that Slattery's interpretation of Article 32 can not be decided in the context of a Rule 12(b)(6) motion. Discovery must be conducted in order for the Court to have a proper record to make a decision that either (i) the Subcontract is not a fully integrated agreement and the facts and circumstances surrounding the transaction demonstrate that the parties intended the phrase "subject matter" to only mean the scope of work to be performed under the Subcontract; and/or (ii) the Subcontract was collateral to the October 3, 2001 Agreement; and/or (iii) if ambiguous, the phrase "subject matter" was intended by the parties to mean only the scope of work under the Subcontract; and/or (iv) there was a subsequent agreement and/or oral modification of the Subcontract whereby Slattery promised to award L&L the remaining yet to be designed components of the

Underground Utility Work; and (v) there was fraud-in-the-inducement by Slattery which would invalidate the application of Article 32 to the instant dispute. Accordingly, disposition of these important issues in a 12(b)(6) motion, which is dependant upon the consideration of extrinsic evidence, would be improper.

## V.    Conclusion

It is not surprising that Slattery continues to press so strenuously to treat its Rule 12(b)(6) Motion as a motion for summary judgment – going as far as changing the basis for its Motion and relief sought in its Reply -- in an effort to dispose of the case before discovery is conducted. Despite having several opportunities thus far, Slattery has not bothered to reassure the Court that it in fact fulfilled its legal obligation to WMATA to have 25% of the Prime Contract work performed by DBE contractors. In would have been a simple enough matter to state such compliance if true. The equitable considerations relevant to the claims of promissory estoppel and unjust enrichment plead in L&L's pending Motion for Leave to file an Amended Complaint will be greatly influenced by any disclosure that Slattery failed to follow through on its representations and legal obligation that 25% of the work under the Prime Contract would be performed by DBE contractors.[8]

The fact that Slattery's advocacy is mired in the discarded art of code pleading, rather than notice pleading, is perfectly illustrated by its lament that "absent the Motion to Dismiss filed by Slattery, L&L would not have revealed its reliance" on the RFP, Prime Contract, plans and specifications and Subcontract. (See Reply at 4.) This, of course, is nonsense, since all will be revealed and disclosed during discovery and debated in the inevitable motions for summary

---

[8] If Slattery in fact failed to honor this legal obligation it must certainly recognize the likely risk that such disclosure would trigger additional inquiries and a likely legal action from the second placed bidder, Clark Construction Group, Inc., who would have secured the lucrative Prime Contract if Slattery had been unable to satisfy the 25% requirement for DBE participation as part of its bid. It is no wonder Slattery now intends to file a motion to transfer venue to New York, even though the venue objection has clearly been waived.

judgment that will be filed once discovery is concluded and/or at trial. Until then, however, Slattery's papers bring to mind a comment by another Judge in response to similar advocacy, who noted that: "It is readily apparent that counsel for defendant has lost sight of the modern function of the pleadings. The information he requests would be more properly obtained via discovery, rather then a Rule 12(e) motion." <u>Charles E. Beard, Inc. Cameronics Technology Corporation</u>, 120 F.R.D. 40 (E.D.Texas 1988). Such is the case here.

August 23, 2005                                   **RESPECTFULLY SUBMITTED**


                                   _____/s/_____
                                   Bradshaw Rost, Esq. (D.C. Bar #376064)
                                   ***Tenenbaum & Saas, P.C.***
                                   4330 East-West Hwy., Ste. 1150
                                   Bethesda, Maryland 20814
                                   (301) 961-5300
                                   (Fax) 961-5305
                                   Counsel for Plaintiff L&L Construction
                                   Associates, Inc.
                                   **Email to be noticed: *BRost@tspclaw.com***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 23, 2005, I electronically filed the foregoing Sur-Reply in Opposition to Motion to Dismiss with the Clerk of the District Court using its CM/ECF System. Service of these papers was perfected electronically, as provided for under Local Civil Rule 5.4(d), on the following:

Val S. McWhorter
Edmund M. Amorosi
W. Stephen Dale
SMITH, PACHTER, MCWHORTER & ALLEN, PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182


_____
Bradshaw Rost