FULLY EXECUTED AGREEME



Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

# SUBCONTRACT AGREEMENT

## BETWEEN

## SL, a JOINT VENTURE

### OF

### SLATTERY SKANSKA, INC.

**1616 Whitestone Expressway**
**Whitestone, NY 11357**
**and**

### THE LANE CONSTRUCTION CORPORATION

**965 East Main Street**
**Meriden, CT 06450**

*and*

### L & L CONSTRUCTION ASSOCIATES

**6300 Dowerhouse Road**
**Upper Marlboro, Maryland 20772**



RECEIVED
SEP 29 2003
Slattery Skanska, Inc.
Virginia Office

**PROJECT:**   **NEW YORK AVENUE "POCKET" STATION**
**PHASE 2: GLENMONT ROUTE**
**CONTRACT NO. 1B0035, SECTION JDC**
Washington Metropolitan Area Transit Authority
Main Construction Package For New Station, Trackwork, & Systems
Slattery Job No.  SC458
Subcontract #458-12

**ORIGINAL**

## TABLE OF CONTENTS:

| ARTICLE: | | PAGE |
|---|---|---|
| 1 | Contract Documents | 1 |
| 2 | Scope of the Work | 3 |
| 3 | Contract Price | 4 |
| 4 | Payment | 4 |
| 5 | Scheduling and Prosecution of the Work | 7 |
| 6 | Claims and Notices | 9 |
| 7 | Insurance | 10 |
| 8 | Guarantee | 13 |
| 9 | Indemnities | 13 |
| 10 | Termination | 14 |
| 11 | Termination of Prime Contract | 15 |
| 12 | Suspension | 15 |
| 13 | Extension of Time | 16 |
| 14 | Subcontractor's Responsibility for Owner Assessment of Damages | 16 |
| 15 | Certified Field Payroll Reports | 17 |
| 16 | Permits | 17 |
| 17 | Taxes, Assessments, Premiums and Fringes | 17 |
| 18 | Assignments and Subletting | 17 |
| 19 | Bonds | 18 |
| 20 | Work Place Safety | 18 |
| 21 | Cumulative Rights and Remedies of Contractor | 18 |
| 22 | Final Cleanup | 19 |
| 23 | Changes and Extras | 19 |
| 24 | Inspection of Records | 20 |
| 25 | Patent Infringement | 20 |
| 26 | Subcontractor's Obligations to Cooperate | 21 |
| 27 | Bankruptcy | 23 |
| 28 | Authority Consent | 24 |
| 29 | Year 2000 Compliance | 24 |
| 30 | Miscellaneous | 24 |
| 31 | Governing Laws and Venue | 25 |
| 32 | Complete Agreement and/or Modification | 25 |
| Signature Page and Acknowledgments | | 26 |
| Appendix "A" Additional Terms for Subcontractors | | A-1 |
| Appendix "B" Scope of Work & Schedule of Payment | | B-1 |
| Appendix "C" Equal Employment Opportunity | | C-1 |
| Appendix "D" Safety | | D-1 |
| Exhibit A - Partial Release/Waiver of Lien | | PLW-1 |
| Exhibit B - Full and Final Release/Waiver of Lien | | FLW-1 |
| Exhibit C – Contract Modification | | CM-1 |

*EXHIBIT D- MODIFICATIONS TO ARTICLES 1 THROUGH 32*

i

SL
Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

## SUBCONTRACT AGREEMENT

AGREEMENT, made and entered into this _26_ day of April, 2003, in the City and State of New York, by and between **SL, a JOINT VENTURE OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION,** of 1616 Whitestone Expressway, Whitestone, New York 11357, hereinafter referred to as **"SL" JOINT VENTURE** or "Contractor", and **L & L CONSTRUCTION ASSOCIATES** of 6300 Dowerhouse Road, Upper Marlboro, Maryland 20772, hereinafter referred to as "Subcontractor".

## W I T N E S S E T H :

WHEREAS, the WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY (the "Owner") advertised for bids and requested proposals to construct a certain public improvement described as New York Avenue Station Construction, Project 1B0035, Section JDC, Phase 2, Glenmont Route (the "Project"); and

WHEREAS, following the submission of proposals, the Owner contracted with **"SL" JOINT VENTURE** to design and construct the new station and associated work in accordance with and pursuant to a contract known and designated as Contract 1B0035, Section JDC, Phase 2, Glenmont Route, (the "Prime Contract"); and

WHEREAS, **"SL" JOINT VENTURE**, subject to the approval of the Owner, has agreed to retain Subcontractor to perform a part of the Prime Work included within the scope of work, and Subcontractor has agreed to be so retained to perform and supply the portions of such work, labor, services and materials as hereinafter detailed and defined in Article 2 as the "Work".

NOW THEREFORE, **"SL" JOINT VENTURE** and Subcontractor, upon the terms and conditions hereinafter set forth and for the consideration hereinafter specified, enter into this Subcontract Agreement (the "Subcontract"), and in so doing mutually covenant and agree as follows:

## ARTICLE 1 - CONTRACT DOCUMENTS

1.1     The contract documents (collectively the "Contract Documents"), which are incorporated by reference herein insofar as each and every part thereof is applicable to this Subcontract and the Work to be undertaken by Subcontractor hereunder, shall consist of the following:

(a)     This Subcontract Agreement, including any Riders, Progress Schedules and Exhibits annexed to it and made a part of it;

(b)     The Prime Contract; along with all plans, specifications, drawings for the project, and schedules of work.

Initials

1

Initials

(c)    The shop drawings approved by the Owner or its Architect/Engineer and any coordination drawing issued;

(d)    Site surveys, soil boring tests and logs, and other examinations prepared by or for the Owner regarding the applicable site conditions;

(e)    Change Orders, Field Changes, Requests for Information, Field Clarifications and Amplification Drawings, as such terms are generally used and understood in the construction trade; and

(f)    The Progress Schedule for the Performance of Subcontractor's Work hereunder as reflected and provided for in the overall Project Construction Progress Schedule prepared by **"SL" JOINT VENTURE** and approved by the Owner for the construction and completion of the Project, as the same may be updated, modified or extended, subject to the Owner's approval, in accordance with the Prime Contract (the "Progress Schedule").

1.2    Subcontractor expressly assumes to **"SL" JOINT VENTURE** all of the obligations and responsibilities applicable to his Work which by the Prime Contract and other Contract Documents, **"SL" JOINT VENTURE** assumes toward the Owner, and Subcontractor agrees that **"SL" JOINT VENTURE** shall have the same rights and remedies against it insofar as the Work of Subcontractor is concerned, as the Owner has against **"SL" JOINT VENTURE** under the Prime Contract and other Contract Documents.

1.3    The intent of the Contract Documents is to include in Subcontractor's Work all labor, materials and taxes, approvals, transportation, inspection and testing, field surveying and other services and items required in connection with the satisfactory performance, execution and completion of Subcontractor's Work in strict accordance with the Contract Documents.  Matters not expressly included in the Contract Documents but which are reasonably inferable therefrom as being necessary to produce the intended results shall be deemed included as a part of Subcontractor's Work under this Subcontract.

1.4    The Contract Documents are complementary and cumulative and what is called for by one shall be as binding as if called for by all.

1.5.    Words and abbreviations that have well known technical or trade meanings are used in this Subcontract in accordance with such recognized meanings.

1.6    If any conflicts or ambiguities are found by, or are apparent to, Subcontractor in or between any of the Contract Documents and existing conditions at the Project Site, Subcontractor immediately shall bring the same to the attention of **"SL" JOINT VENTURE** for resolution in accordance with the terms of the Prime Contract.  Any of Subcontractor's Work relating to any such conflict or ambiguity that is performed by Subcontractor prior to such resolution shall be at Subcontractor's sole risk, cost and expense.

1.7    Addenda and modifications to parts of the Contract Documents are for the purpose of varying, modifying, rescinding or adding to the Contract Documents.  All addenda and modifications should be read together with the portions of the Contract Documents to which they pertain.



Initials

2



Initials

1.8     The Owner's detailed construction drawings and technical specifications that are part of the Prime Contract are complementary. Anything shown in any of the drawings and not mentioned in the specifications, or mentioned in any of the specifications and not shown in the drawings, shall have the same effect as if shown or mentioned in both.

1.9     ~~A typical or representative detail indicated on the detailed construction drawings shall constitute the~~ standard for workmanship and materials throughout corresponding parts of Subcontractor's Work, unless otherwise shown. Should an item of Subcontractor's Work appear specifically in a detail relating to a particular area, installation or section of the Prime Work, no assumption shall be made or entertained by Subcontractor that the item of Subcontractor's Work shown in detail is not also required in other areas of the Prime Work, even though not specifically shown in a similar or parallel detail.

1.10     It is understood and agreed that the Owner's or Contractor's designated representatives, as may be changed from time to time, shall have the authority to direct, judge, approve or reject any matter or thing connected with the performance of the Subcontract work, and Subcontractor shall comply with all such decisions.

## ARTICLE 2- SCOPE OF THE WORK

2.1     Subcontractor shall faithfully, and in a good and workmanlike manner in strict accordance with the applicable Contract Documents furnish and perform the following Work required thereunder:

<div style="border:1px solid">

SEE APPENDIX "B" ATTACHED

</div>

All of the foregoing is herein referred to as the "Work".

2.2     Subcontractor shall provide all labor, supervision, materials and equipment necessary for, or incidental to, the successful prosecution and completion of Subcontractor's Work in the most expeditious and economical manner, consistent with the best industry accepted standards, lawful construction practices and the interests of the Project relating to quality, timely completion, in strict accordance with the Contract Documents. The enumeration of particular items in this Subcontract or in the specifications shall not be construed to exclude other items. The intention of the Contract Documents is to include all labor, materials, ~~engineering,~~ equipment, transportation, tools, plant, appliances, appurtenances and other facilities, whether specified herein or not, necessary for the proper execution and completion of Subcontractor's Work. Subcontractor must refer any questions respecting the Contract Documents about which it is in doubt, or which seem to admit to a dual interpretation, to **"SL" JOINT VENTURE** for resolution, by which Subcontractor shall abide. 

2.3     Subcontractor recognizes the relation of trust and confidence established between it and **"SL" JOINT VENTURE** by this Subcontract Agreement, and it agrees to furnish its best skill and judgment in connection with the performance of Subcontractor's Work. Subcontractor covenants with **"SL" JOINT VENTURE** to furnish its best skill and judgment and to cooperate with **"SL" JOINT VENTURE** in forwarding and promoting the best interests of the Project. **"SL" JOINT VENTURE** shall have the right to exercise complete supervision and

Initials

3

Initials

control over Subcontractor's Work but such supervision and control shall not, in any way limit, or diminish the obligations of Subcontractor to perform the same in strict accordance with the Contract Documents.

## ARTICLE 3 - CONTRACT PRICE

**"SL" JOINT VENTURE** shall pay to Subcontractor for satisfactory performance and completion of the Work and of all of the duties, obligations and responsibilities of carrying out this Agreement the following compensation (the "Contract Price"):

> SEE APPENDIX "B" ATTACHED

Said Contract Price shall be subject to additions or deductions as may be herein provided or agreed upon in writing by **"SL" JOINT VENTURE**

3.2      The Contract Price shall be paid in current funds by **"SL" JOINT VENTURE** to Subcontractor and includes all applicable taxes, surcharges and fees, if any.

## ARTICLE 4 - PAYMENTS

4.1      Prior to submitting its first application for payment, Subcontractor shall submit to **"SL" JOINT VENTURE,** for its approval, a proposed Price Breakdown or Schedule of Values, showing the various items making up the total amount of the Contract Price specified herein which Price Breakdown shall be used as a basis for making Progress Payments to Subcontractor, subject, however, to the quantities allowed, certified and paid for by the Owner.

4.2      Progress Payments shall be made to Subcontractor, from time to time, as and when payments are received by **"SL" JOINT VENTURE** for Subcontractor's items of Work based on the quantities approved and paid for by the Owner, and on the basis and in the manner stipulated in the Prime Contract (which Subcontractor shall accept as agreed). Such payment by the Owner shall be a condition precedent to **"SL" JOINT VENTURE's** obligation to make payment to Subcontractor. Progress Payments shall be made on the basis of ninety (90%) percent of the value of Subcontractor's items of Work at the prices stipulated. When the quantities approved by the Owner for payment consist of items of Work on which Subcontractor has performed only a portion of the Work approved for payment, then quantities of Work for which Subcontractor shall receive payment shall be determined by **"SL" JOINT VENTURE**



*Payment by contractor shall be made to subcontractor within five (5) days of receipt of payment from owner (WMATA).*



95%

4.3      Subcontractor is required to submit its application for payment no later than three (3) business days following the last day of the current pay period accompanied, if required, by a forecast of the amount of the next month's expected application for payment. Subcontractor's application for payment shall be on forms and in content acceptable to **"SL" JOINT VENTURE** and the Owner, and they shall be calculated on the basis of the agreed upon estimated value of Work performed or delivered by Subcontractor during the current month.

Initials                                                                                      Initials

4.4     In consideration of each payment and as a condition precedent to the receipt thereof, Subcontractor shall execute a Partial Release and Partial Waiver of Liens, in affidavit form, for all labor performed and materials furnished as of the last day of the preceding month, in the form attached hereto as EXHIBIT A. In the event of any disputes between Subcontractor and its laborers, subcontractors, suppliers or others, Subcontractor shall except it from such certification and furnish complete details as to the nature of such disputes. Should Subcontractor refuse or neglect to furnish such affidavit, no payments shall be made or be deemed to be due to Subcontractor. At **"SL" JOINT VENTURE's** option and demand, Subcontractor agrees to furnish a good and sufficient waiver of lien from its suppliers, vendors, materialmen, sub-subcontractors or others furnishing labor or materials in connection with the Project.

4.5     Final payment to Subcontractor shall be made within sixty (60) days after completion of Subcontractor's Work and the Owner's acceptance of and payment for such Work; after receipt of Subcontractor's general release, material certifications, warranties, guarantees, and other required close-out documentation; after satisfactory proof of payment by Subcontractor of each and every obligation owed by it to laborers, materialmen, suppliers and others furnishing labor, materials or services under this Subcontract; and after satisfactory proof that all claims and demands in connection with Subcontractor's Work have been discharged. Subcontractor agrees to pay all bills, expenses and other indebtedness incurred by it in the performance of the Work called for herein. In consideration of final payment and as a condition precedent to the receipt thereof, Subcontractor shall execute, in accordance with the form annexed hereto as EXHIBIT B, a general release and waiver of all liens or rights of lien for Work or labor performed or materials supplied together with a written certification that it has paid all outstanding obligations to laborers, subcontractors, suppliers or others for which it is a trustee of contract funds under any statute, and has satisfied all of its payroll tax obligations in connection with the Project. In the event of any disputes between Subcontractor and any of its laborers, subcontractors, suppliers and others, Subcontractor shall except same from such certification and furnish complete details as to the nature of such disputes. Should Subcontractor refuse or neglect to duly execute and furnish the aforesaid Documents and certifications, final payment shall not be made or deemed to be due to Subcontractor. Subcontractor agrees to furnish a good and sufficient waiver of lien on said Work from every person and corporation furnishing labor or materials in connection with the Subcontract. Subcontractor further agrees to exonerate, indemnify and save **"SL" JOINT VENTURE** harmless from any and all demands, claims, liens, and the like against Subcontractor for services or labor performed, or materials furnished in connection with said Work.

4.6     If, at any time before final payment, there shall be any lien, claim, suit, attachment, notice or any other encumbrance filed against Subcontractor or presented to **"SL" JOINT VENTURE** by any lower-tier subcontractors or suppliers of Subcontractor, **"SL" JOINT VENTURE** shall have the right to retain out of any payments then due, or which may thereafter become due to Subcontractor, an amount sufficient to indemnify **"SL" JOINT VENTURE** against any loss, cost or expense arising from any such lien, claim, suit, attachment, notice or any other encumbrance. In the event any such encumbrance shall be asserted, Subcontractor shall, within seven (7) days of receipt of notice thereof, cause it to be discharged by payment, bonding, or otherwise. In the event that Subcontractor fails to discharge such encumbrance within seven (7) days, **"SL" JOINT VENTURE,** at its option, may pay or otherwise discharge such encumbrance and withhold the costs incurred in doing so from any amounts owed Subcontractor. The rights contained in the preceding provisions are absolute, and are not dependent upon the eventual validity of such lien, claim, suit, attachment, notice or any other encumbrance filed against Subcontractor or presented to **"SL" JOINT VENTURE** by any claimant or lienor of Subcontractor, and any amounts retained by **"SL" JOINT VENTURE,** as aforesaid, shall not bear interest and shall not be released

Initials                                    5                                    Initials

to Subcontractor until the invalidity of any such lien, claim, suit, attachment, notice or any other encumbrance filed against Subcontractor or presented to **"SL" JOINT VENTURE** by any claimant or lienor of Subcontractor, has been finally determined by a tribunal of competent jurisdiction, or said lien, claim, suit, attachment, notice or any other encumbrance filed against Subcontractor or presented to **"SL" JOINT VENTURE** by any claimant or lienor has been properly paid and satisfied, and Documents evidencing such disposition have been presented to **"SL" JOINT VENTURE**.

4.7     In addition to, and not in diminution of, the foregoing, in the event that **"SL" JOINT VENTURE** shall determine that Subcontractor is delinquent in the payment of any monies due and owing for labor, materials, supplies or equipment related to or incorporated in the Project, and if **"SL" JOINT VENTURE** determines, in its sole discretion, that it would be beneficial to, and in the interests of, the prosecution of the Work under the Contract Documents, it shall have the right, upon forty-eight (48) hours' written notice to Subcontractor, to pay or satisfy any such amounts due and owing and deduct any such sum paid from the proceeds of any payments then due or to become due Subcontractor. Any such payments made will be by joint check, payable to Subcontractor and the person or entity to which the money is determined to be owed, or by direct payment to the person or entity to which the money is determined to be owed; provided, however, that if within forty-eight (48) hours after written notice of such alleged delinquency by **"SL" JOINT VENTURE** to Subcontractor, Subcontractor submits evidence deemed by **"SL" JOINT VENTURE**, in its sole judgment, to satisfactorily show that there is a good faith dispute concerning said alleged delinquency, **"SL" JOINT VENTURE** will not exercise its rights under this Paragraph provided that adequate assurances are given it that the progress of the Work and the costs of performance will not be adversely affected. **"SL" JOINT VENTURE's** rights under this Paragraph shall be in addition to all other legal remedies and rights that it may have, and at its option, a breach by Subcontractor of the covenants contained in this paragraph shall be deemed a material breach of this Subcontract.

4.8     Payment Use Restriction. No payment received by Subcontractor shall be used to satisfy or secure any indebtedness other than one owed by Subcontractor to a person furnishing labor or materials for use in performing services for, or the incorporation of materials into, Subcontractor's work on the Project. Subcontractor agrees that all actual funds received by Subcontractor are to be held in trust, and Subcontractor further agrees to be bound as a fiduciary to Contractor and to Subcontractor's Subcontractors and suppliers to apply the Trust Funds properly to payment of labor, services and materials for the Project. Subcontractor and its officers and directors shall be personally liable to Contractor for any violation of this fiduciary duty.

4.9     Payment to Subcontractor is specifically agreed not to constitute or imply acceptance by Contractor or Owner of any portion of Subcontractor's work.

4.10     Stored Materials. Unless otherwise provided in the Contract, if approved in advance by Owner, applications for progress payments may include requisitions for materials and equipment not incorporated in Subcontractor's work but delivered and suitably stored at the site or at some other location agreed upon in writing. Approval of applications for payment for such stored items on or off the site shall be conditioned upon submission by the Subcontractor of bills of sale and applicable insurance or such other documents satisfactory to Owner and Contractor to establish Owner's title to such materials and equipment, or otherwise protect owner's and Contractor's interests therein, including transportation to the site. The risk of loss for such materials at all times shall remain upon Subcontractor until final acceptance of the Project by the Owner.



Initials



Initials

SL  Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

## ARTICLE 5 - SCHEDULING AND PROSECUTION OF THE WORK

5.1    Construction progress and operations for the Project will be scheduled and monitored using a Critical Path Method (CPM) Progress Schedule prepared and maintained by **"SL" JOINT VENTURE,** and subject to the ~~approval of the Owner. Subcontractor, and its subcontractors, as and when required, shall furnish all scheduling~~ information requested by **"SL" JOINT VENTURE** at such time and in such form and detail as requested for its particular trade. Unless otherwise indicated, such scheduling information shall be furnished within five (5) days of the request and shall be revised from time to time, when requested, either prior to and/or at any time during performance of Subcontractor's Work.

5.2    Information submitted by Subcontractor or others, its acceptance or approval by **"SL" JOINT VENTURE,** and the scheduling that may be developed and implemented by **"SL" JOINT VENTURE** and reflected in the Progress Schedule shall not constitute the basis of any claim by Subcontractor or its sub-subcontractors for damage or delay, or excuse Subcontractor from performing on a timely basis and as otherwise required herein.

5.3    Subcontractor shall commence and prosecute all of its Work and its deliveries of equipment and material at such times, in such order and in such manner as **"SL" JOINT VENTURE** shall direct consistent with the completion of Subcontractor's Work in compliance with the Progress Schedule, subject to any adjustments thereto, to the extent applicable to this Subcontract Agreement. Where the dates for the commencement or completion of aspects or items of Subcontractor's Work or the making of deliveries are not specified, such aspects of the Work or deliveries shall be commenced on three (3) days' notice from **"SL" JOINT VENTURE** and shall be prosecuted and completed with all possible diligence and speed or as otherwise directed by **"SL" JOINT VENTURE.** ALL TIME PERIODS SET FORTH IN THIS SUBCONTRACT AGREEMENT OR IN THE PROGRESS SCHEDULE APPLICABLE TO SUBCONTRACTOR'S WORK, FOR THE COMMENCEMENT, PROSECUTION AND COMPLETION OF SUBCONTRACTOR'S WORK AND THE DELIVERY AND INSTALLATION OF MATERIAL SHALL BE DEEMED OF THE ESSENCE OF THIS SUBCONTRACT AGREEMENT.

5.4    It is the responsibility of Subcontractor to maintain the portion of the Progress Schedule applicable to Subcontractor's Work. If Subcontractor delays the progress of any portion of **"SL" JOINT VENTURE's** Prime Work or Subcontractor's Work, Subcontractor (I) with respect to delays to other portions of the Prime Work, shall be responsible for the same as herein provided and (ii) with respect to Subcontractor's Work, shall increase the number of men, the number of shifts, the days of work and, to the extent permitted by law, institute overtime operations, all at the sole cost and expense of Subcontractor and without any addition to the Subcontract Price, in order to regain any time lost and maintain the Progress Schedule.

5.5    Subcontractor must keep itself informed of the conditions of the Project Site, so as not to delay the delivery of materials or the installation of Subcontractor's Work or other portions of the Prime Work. It is expressly agreed that Subcontractor must cooperate with and extend every possible facility to **"SL" JOINT VENTURE,** the Owner and the Owner's Architect/Engineer, and other contractors employed at the Project Site, and must afford all other contractors reasonable opportunity for the introduction and storage of their materials and the execution of their work. Subcontractor recognizes that efficient construction of the Project requires that all work thereon be coordinated and therefore agrees to accept the determination of **"SL" JOINT VENTURE** as to

Initials                7                Initials

the time when Subcontractor's work shall begin and the manner in which it shall progress in connection with other work involved in the performance of the Prime Work or other work at the Project Site. It further agrees that the direction of **"SL" JOINT VENTURE** with respect thereto shall be complied with fully and promptly.

5.6    Notwithstanding anything to the contrary stated herein, **"SL" JOINT VENTURE** does not assure Subcontractor that it shall be able to commence, prosecute or complete the Work at the time stated, or in the sequence, manner or duration provided for in any Progress Schedule that **"SL" JOINT VENTURE** may provide to Subcontractor, or that the entire Work shall be completed at the time fixed in such Progress Schedule, **"SL" JOINT VENTURE** reserving the right to alter or modify any such Progress Schedule. Subcontractor further agrees to promptly comply with all orders and directions given by **"SL" JOINT VENTURE**, irrespective of whether Subcontractor shall dispute the same in any particular and without awaiting a determination by the Owner or by any other body or tribunal with respect to any such dispute.

5.7    Subcontractor shall not employ men or means or use materials which may cause strikes or other labor disharmony, disputes or trouble with workmen employed by **"SL" JOINT VENTURE** or other contractors, subcontractors or persons on any work in connection with the Project and shall conform to the labor policies of **"SL" JOINT VENTURE**. Subcontractor agrees to save **"SL" JOINT VENTURE** harmless from all loss and damages resulting from labor troubles or disputes occasioned by the men or means or materials employed by Subcontractor on the Project. The failure of Subcontractor to employ labor, or furnish material agreeable to **"SL" JOINT VENTURE** and other trades employed on the Project shall be a ground for justifiably canceling this Subcontract.

5.8    Subcontractor recognizes and understands that there may be a quality assurance program implemented to ensure that quality products are provided in a cost effective and timely manner. Subcontractor agrees to accept responsibility for establishing appropriate programs to inspect and monitor the Work to verify it is in compliance with the Contract Documents. Subcontractor also agrees to maintain and make available for **"SL" JOINT VENTURE's** review, daily reports, inspection and testing data and other similar records for monitoring work performance to ensure the acceptability of the Work.

5.9    Subcontractor expressly assumes toward **"SL" JOINT VENTURE** all of the obligations, responsibilities and duties with respect to time for completion of performance of the Work and damages for delay, which by the prime Contract, **"SL" JOINT VENTURE** assumes toward the Owner, and Subcontractor agrees that **"SL" JOINT VENTURE** shall have the same rights and remedies against it insofar as time for completion of performance of the Work and damages for delay as the Owner has against **"SL" JOINT VENTURE** under this Prime Contract.

5.10    Schedule changes. Subcontractor recognizes that changes will be made in the Schedule of Work and agrees to comply with such changes.

5.11    Priority of Work. Contractor shall have the right to determine and decide the time, order and priority in which the various portions of Subcontractor work shall be performed, and all other matters relative to the timely performance and completion of Subcontractor's work.



Initials



Initials



5.12    Sufficient Work Force Requirements. Subcontractor shall, from time to time, on demand of Contractor, give adequate evidence to Contractor to substantiate the planned performance and progress of the Contract and the various parts thereof. Subcontractor shall promptly increase its work force, accelerate its performance, work overtime, work Saturdays, Sundays and holidays, all without additional compensation, if, in the opinion of Contractor, such work is necessary to maintain proper progress. Subcontractor shall conform to Contractor's hours of work. No premium time will be acknowledged or paid for such additional hours worked unless pursuant to a written authorization by Contractor. Subcontractor shall neither delay nor adversely affect the performance of Contractor.

## ARTICLE 6 - CLAIMS AND NOTICES

6.1    Subcontractor shall, within forty-eight (48) hours after the commencement of any condition claimed to be grounds for an increase in the Subcontract Price, give **"SL" JOINT VENTURE** a written statement of any such condition which is causing or may cause such claims, together with a statement of the details and the amount of money claimed and the reason(s) therefor. Unless Subcontractor as required hereunder gives such statements, Subcontractor shall be conclusively deemed to have waived any such claim, and **"SL" JOINT VENTURE** shall be released from any and all liability arising from or related to any such condition.

6.2    If Subcontractor shall claim to have sustained any damages by reason of delays or by reason of the performance of additional or different work, or for any other cause whatsoever, which claimed damage is or may be due to any act, omission, direction or order of the Owner, Subcontractor shall not have or assert any claim or prosecute any suit, action or proceeding therefor against **"SL" JOINT VENTURE,** but, provided that such claim is prepared by Subcontractor and delivered to **"SL" JOINT VENTURE** in proper form for presentation to the Owner, so that the same may be presented to the Owner in the manner and within the time specified in the Prime Contract, **"SL" JOINT VENTURE** agrees to present such claim to the Owner, either in its own name or in the name of Subcontractor. The procedure provided for in the Prime Contract for the determination of claims shall govern any claim presented by Subcontractor under this Paragraph. **"SL" JOINT VENTURE's** sole liability to Subcontractor on account of any such claims shall be to turn over to Subcontractor whatever compensation is derived from such claim or claims on behalf of Subcontractor. Subcontractor shall pay all costs and disbursements including legal fees incurred by **"SL" JOINT VENTURE** in the presentation of such claim or claims.

6.3    Any dispute resolution procedures set forth in the Prime Contract shall be fully binding upon Subcontractor and applicable to the resolution of any and all disputes that may arise under this Subcontract. Subcontractor specifically agrees to accept such procedures and be conclusively and finally bound by the determinations and decisions rendered under such procedures. Subcontractor agrees to cooperate completely with these procedures and with the notice requirements, documentation and substantiation requirements and other requirements set forth in the Prime Contract applicable to dispute resolution. The failure of Subcontractor to comply with all such requirements will be conclusively deemed to be a waiver by Subcontractor of any claim which has not been presented in strict compliance with the requirements of the Prime Contract and will relieve **"SL" JOINT VENTURE** of all responsibility to present any such claim.

6.4    Subcontractor agrees to make no claim against **"SL" JOINT VENTURE** for extra or additional costs or damages attributable to delay, disruption, interference or inefficiency in the performance of the Work occasioned by any act or omission on the part of **"SL" JOINT VENTURE** or any of its agents or representatives, and

9

Initials                                                                                                    Initials

specifically agrees that any such claim shall be fully satisfied and compensated for by an extension of time as provided for herein.

6.5     No action or proceeding shall be maintained by Subcontractor, or anyone claiming under it, against **"SL" JOINT VENTURE** upon any claim arising out of or based on this Subcontract or by reason of any act, omission or requirement imposed on **"SL" JOINT VENTURE** unless such action is commenced within one (1) year after the filing and acceptance of a Certificate of Completion with the Owner, or within one (1) year after Final Payment has been made to **"SL" JOINT VENTURE,** whichever event occurs first.

## ARTICLE 7 - INSURANCE

7.1     Before commencing any Work hereunder, Subcontractor shall, at is own cost and expense, procure, maintain and keep in full force and effect the following insurance coverage in the limits specified below:

(a)     Subcontractor shall provide Comprehensive General Liability insurance with a combined limit for bodily injury, personal injury and property damage of at least Five Million ($5,000,000.00) Dollars per occurrence and in the aggregate. The limit may be provided through a combination of primary and umbrella/excess liability policies.

(b)     Subcontractor shall, by specific endorsements to its primary and umbrella/excess liability policy, cause the following to be named as Additional Named Insured hereunder:

(i)     **"SL" JOINT VENTURE;**

(ii)     Washington Metropolitan Area Transit Authority, Owner;

(iii)     Slattery Skanska Inc.; and

(iv)     The Lane Construction Corporation

(c)     Subcontractor shall, by specific endorsement to its primary liability policy, cause the coverage afforded to the Additional Insured thereunder to be primary to and not concurrent with other valid and collectible insurance available to the Additional Named Insured.

(d)     Subcontractor shall, by specific endorsement to its umbrella/excess liability policy, cause the coverage afforded to the Additional Insured thereunder to be first tier umbrella/excess coverage above the primary coverage afforded to the Additional Insured and not concurrent with or excess to other valid and collectible insurance available to the Additional Named Insured.

Certificates evidencing the foregoing insurance coverage must be furnished by Subcontractor to, and be approved by, **"SL" JOINT VENTURE,** before Subcontractor will be permitted to do any work under this Subcontract. Certificates, Notices of Cancellation, or changes, etc., are to be sent by Subcontractor, directly to **"SL" JOINT VENTURE.** Subcontractor and Subcontractor's insurance carrier must reconcile all policy requirements to the satisfaction of **"SL" JOINT VENTURE.**


Initials

10


Initials

7.2    Before commencement of work, Subcontractor shall furnish **"SL" JOINT VENTURE** with certificates from Subcontractor's insurance carriers showing that Subcontractor has complied with the above list and that said insurance policies will not be cancelled or changed except upon thirty (30) days prior written notice to **"SL" JOINT VENTURE**. Subcontractor further agrees that the aforesaid insurance will be maintained until the entire work to be performed by Subcontractor under this Subcontract is completed and accepted. Subcontractor shall indemnify and save **"SL" JOINT VENTURE** harmless against all injury to, or death of any and all persons and from any and all damage to property caused by or resulting from or arising out of any act or omission on Subcontractor's part, or Sub-Subcontractor's part and shall pay all Subcontractor's bills in connection with the Work, and shall reimburse **"SL" JOINT VENTURE** for all delay and expense which **"SL" JOINT VENTURE** may incur in making good any default. If, at any time during the term of this Subcontract, Subcontractor does not provide insurance coverage as aforesaid, **"SL" JOINT VENTURE** shall have the right, at its option, to procure same, and deduct from any sums due or to become due to Subcontractor hereunder the cost of such coverage procured by **"SL" JOINT VENTURE**.

7.3    Insurance as described herein and shall maintain such insurance in full force and effect throughout the term of this Agreement, and thereafter as applicable. All insurance is to be placed with insurers admitted as such in the State in which the work is to be performed with an A. M. Best and Company rating of not less than A: V or A plus, or as otherwise approved by the Contractor in its sole direction.

**The Owner provides an OCIP wrap up insurance for all employees associated with the contract that are physically located (working) on the project. Off-site employees are not covered by this policy. The Subcontractor agrees to be a part of this Owner provided plan as it may pertain to their employees and to comply with all OCIP provisions applicable to Subcontractor as a subcontractor.**

**This insurance, for the benefit of the Subcontractor among others, is as set forth in the Washington Metropolitan Area Transit authority's Wrap-Up Contractual Attachment Version 1. Subcontractor shall abide by requirements of Design Builder's contract with Owner as regards to record keeping, notification and reporting.**

**The Subcontractor specifically obligates itself to indemnify, protect and hold harmless the "SL" JOINT VENTURE and Owner from any and all claims, suits or liabilities, including attorney fees, for injuries to property, injuries to persons, including death, and from any other claims, suits or liabilities arising out of the performance of the work or in any way occasioned by any act or omission of the subcontractor and any of its officer, agents, employees or servants or any Subcontractor or other person directly or indirectly engaged by it. All of the insurance policies provided under this section shall name "SL" JOINT VENTURE as an additional insured.**

      a.    Liability Insurance. Subcontractor shall procure and maintain liability insurance as specified below to protect Subcontractor, Contractor, Owner and their respective employees and agents against claims to persons or damage to property which may arise from or in connection with the performance of the work by Subcontractor, its employees, officers, agents, or subcontractors (including design professionals) or any other person for whom Subcontractor


Initials


Initials

11

Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

may be contractually or legally responsible.  (This requirement may be modified as to be consistent with the WMATA OCIP Program.)

b.      Minimum Scope and Limits. Liability insurance shall include the following (minimum) coverage provisions with limits under its liability insurance policies of no less than the amount stated.

(i)      Commercial General Liability coverage, specifically including coverage for liability arising out of any agreement or contract in connection with the Design contemplated by this Agreement, with no exclusion for explosion, collapse or underground hazards. Such Insurance shall be extended to include the Contractor, its JV members and Owner, and their parent' s subsidiaries, employees, and agents as additional insured as respects the work to be performed by the Subcontractor but only to the extent of the Subcontractor' s negligence. General Liability (for bodily injury, property damage, personal injury, and advertising injury); $5,000,000 per occurrence; with any general aggregate limit per location. Policy shall be endorsed to stipulate that this insurance shall apply as primary for the additional insureds and shall not conflict with any insurance maintained by the additional insureds. (unless enrolled in WMATA OCIP Program and as may be modified with approval).

(ii)      Automobile Liability coverage. Automobile Liability (for bodily injury and property damage) $1,000,000 per accident combined single limit. Such insurance shall be extended to include the Contractor, its JV members, and the Owner and their parent subsidiaries, employees, and agents as additional insured as respects the work to be performed by the Subcontractor, but only to the extent of the Subcontractor' s negligence. Policy shall be endorsed to stipulate that this insurance shall apply as primary for the additional insureds and shall not conflict with any insurance maintained by the additional insureds.

(iii)     Worker' s Compensation Insurance for all employees of Subcontractor, as required by the state of operations, and Employer' s Liability Insurance. Employer' s Liability (for bodily injury or disease) $1,000,000 per accident (unless enrolled in WMATA OCIP Program).

All insurance required to be maintained by Subcontractor shall be primary to any insurance carried by Contractor.

Subcontractor shall furnish Contractor all Certificates of Insurance that include the provision that the insurance can not be cancelled without at least thirty (30) days notice to Contractor.



Initials

12

Initials

SL
Lane Construction Corporation
A Joint Venture

## ARTICLE 8 - GUARANTEE

Subcontractor expressly assumes towards **"SL" JOINT VENTURE** all of the obligations and responsibilities that **"SL" JOINT VENTURE** assumes toward the Owner with respect to maintaining and guaranteeing the Work, and Subcontractor shall perform any and all necessary and required maintenance and guarantee work at Subcontractor's own expense. Subcontractor shall also be fully responsible: (1) to repair or replace any defective or improper work or material, (2) to repair or correct any damages caused thereby, and (3) to undertake at its sole cost and expense, the repair or replacement of such work, materials or equipment, which are found by the Owner to be unacceptable, unsatisfactory or otherwise not in accordance with the standards and requirements of the Contract Documents as same are applicable to Subcontractor's Work. The provisions of the Prime Contract regarding retention of amounts as guaranty for maintenance or repair of the Prime Work to be performed, shall be applicable to this Subcontract with respect to the Work to be performed by Subcontractor.

## ARTICLE 9 - INDEMNITIES

9.1     Notwithstanding the requirements of insurance to be effected by Subcontractor under Paragraph "7" hereof, Subcontractor, to the fullest extent permitted by law, agrees to assume the entire responsibility and liability for, the defense of and specifically agrees to pay, indemnify and hold **"SL" JOINT VENTURE** and the Owner harmless from and against:

(a)     All claims for damages or injury (or death resulting therefrom) to any and all persons, including Subcontractor's employees, agents and servants, and all claims for damages to property whether resulting from, or arising out of the Owner's negligence (whether active or passive), or its other acts, omissions or fault, or by reason of any provisions of the Prime Contract, making **"SL" JOINT VENTURE** liable for damages or injuries to person or property (which obligations Subcontractor assumes as to all work and/or the performance thereof, under this Subcontract) or by reason of any liability imposed upon **"SL" JOINT VENTURE** under any statute, ordinance or regulation, including OSHA, or deemed as, or resulting from, or arising out of any negligent, act, omission, fault or breach of statutory duty or obligation on the part of Subcontractor in connection with this Subcontract, or resulting or arising out of the prosecution of the Work hereunder or in connection therewith, and all damage, direct or indirect, of whatever nature resulting from the performance of Work hereunder or resulting to the Work from whatever cause, including acts or omissions and supervisory acts of the Owner, and Subcontractor shall save **"SL" JOINT VENTURE** and the Owner harmless from, and against any cost and/or expense or damage which **"SL" JOINT VENTURE,** and the Owner, or either, may suffer, or pay as a result of claims or suits due to, or arising out of, any such injuries, deaths or damages and shall indemnify and save harmless **"SL" JOINT VENTURE,** and the Owner from any claims or suits by Subcontractor's employees against **"SL" JOINT VENTURE** or the Owner, seeking recovery for personal injury or death, whether such claims or suits are based on negligence, passive or active, of the Owner, or otherwise. Subcontractor, if requested by **"SL" JOINT VENTURE,** shall assume and defend, at Subcontractor's own cost and expense, any such suit, or action or other legal proceeding arising therefrom. If **"SL" JOINT VENTURE** shall defend any such suit, action or other legal proceeding, the cost and expense thereof shall be included within the meaning of the words "cost and/or expense or damage" for which Subcontractor shall be liable as provided for hereunder.



Initials

13

Initials

SL
Blattery's Material Incorporated
Lane Construction Corporation
A Joint Venture

(b)     All loss or damages, and to reimburse **"SL" JOINT VENTURE** for any loss, cost, damage and expense, including attorneys' fees, to which **"SL" JOINT VENTURE** or the Owner may be put as a result of claims made, or litigation begun on account of any alleged violation or infringement of any letters patent or patent rights arising out of the work or methods, materials or things used by Subcontractor.

9.2     The foregoing provisions for the benefit of **"SL" JOINT VENTURE** shall be in addition to any other rights and remedies of **"SL" JOINT VENTURE** and shall not be deemed or construed to diminish or change **"SL" JOINT VENTURE**'s legal rights and remedies in the event of an abandonment by Subcontractor of the Work under this Subcontract or Subcontractor's failure to complete the Work hereunder by the time fixed for its completion, or by any other breach of this Subcontract by Subcontractor, nor shall the preceding paragraph be deemed to obligate **"SL" JOINT VENTURE** to act under it, except at its option.

9.3     The indemnification provided for in this Article 9 does not extend to that part of any claims, damages, losses, liability or expenses arising from the negligent acts or omissions of **"SL" JOINT VENTURE**. If the indemnity provided herein is made void or otherwise impaired by any law controlling the construction thereof, such indemnity shall be deemed to conform to the fullest indemnity permitted by law.

## ARTICLE 10 - TERMINATION

10.1     In the event that the Work shall not be commenced or prosecuted by Subcontractor as provided in this Subcontract; or if the Subcontractor shall fail or refuse to comply with any of the written orders or directions of **"SL" JOINT VENTURE**, or the Owner, either as to rate of progress, manpower, quantity of material or equipment, performance of extra or additional work, omission of work, or as to any other matter affecting the progress or prosecution of the Work; or if Subcontractor shall cause, by any of its acts or omissions, the stoppage, delay or interference with the work of **"SL" JOINT VENTURE** or of any other subcontractors, or shall fail to make, when due, payments to its subcontractors, laborers, materialmen, or others to whom it may be indebted; or in the event that Subcontractor files any petition in bankruptcy, whether for an arrangement of creditors or otherwise, or should any such petition be filed by others affecting Subcontractor, or should Subcontractor become insolvent, make an assignment for the benefit of creditors or should a Receiver of its property be appointed and should Subcontractor fail to immediately give **"SL" JOINT VENTURE** written notice of the happening of any such event, or should Subcontractor, after due demand, fail to furnish what **"SL" JOINT VENTURE**, in its sole judgment, considers adequate assurances of Subcontractor's ability to duly and timely complete the Work remaining to be performed, or if Subcontractor in the opinion of **"SL" JOINT VENTURE**, shall materially violate any of the terms of this Subcontract, then **"SL" JOINT VENTURE** shall, after three (3) days' written notice to Subcontractor of default hereunder and upon Subcontractor's failure within that time to cure such default, have the right to take over this Subcontract and complete the Work under it or, at its option, employ others to complete the Work to be done under it and charge the cost thereof to Subcontractor. In any such completion, the completing contractor shall have the right to use any plant, equipment, materials or supplies provided by Subcontractor for performance of this Subcontract until all Work hereunder has been completed. And Subcontractor shall not be entitled to any further payment until all of its Work shall be finished, at which time, if the amount which would have been paid to Subcontractor for the completion by Subcontractor of all Work hereunder, less all previous payments made to Subcontractor, shall exceed the actual and necessary expense of finishing, including as a part of such cost and expense attorneys' fees, damages incurred through the default of Subcontractor and ten (10%) percent for overhead if **"SL" JOINT VENTURE** shall complete the Work itself,

14

Initials                                                                                      Initials

Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

such excess shall be paid by **"SL" JOINT VENTURE** to Subcontractor. However, if such cost and expense shall exceed the amount which would have been paid to Subcontractor for completion by Subcontractor of all Work hereunder, less all previous payments to Subcontractor, Subcontractor shall be liable for and shall pay the difference to **"SL" JOINT VENTURE**. **"SL" JOINT VENTURE** shall have the right to setoff against any other subcontract balances and obligations due or to become due under other subcontracts between **"SL" JOINT VENTURE** and Subcontractor, and this term shall be deemed to be included and incorporated in every other subcontract between **"SL" JOINT VENTURE** and Subcontractor as an amendment in writing thereto. After Subcontractor's Work has been completed, it may remove such materials, supplies, equipment, tools and appliances as remain, but **"SL" JOINT VENTURE** shall not be liable for anything that has been lost, stolen, destroyed or worn out and used up.

10.2    The foregoing provisions for **"SL" JOINT VENTURE's** benefit shall be in addition to any other rights and remedies of **"SL" JOINT VENTURE** and shall not be deemed or considered in any way to diminish or change **"SL" JOINT VENTURE's** right and remedies in the event of the default or abandonment by Subcontractor of the Work under this Subcontract or any other breach of this Subcontract by Subcontractor. Moreover, nothing contained in this preceding paragraph shall be deemed to obligate **"SL" JOINT VENTURE** to take any affirmative action except at **"SL" JOINT VENTURE's** option.

## ARTICLE 11 - TERMINATION OF PRIME CONTRACT

11.1    In the event the Owner terminates or cancels the Prime Contract for any cause whatsoever at any time after the date hereof, this Subcontract shall likewise be deemed canceled and terminated, and it is understood that Subcontractor shall have no claim against **"SL" JOINT VENTURE** for breach of this Subcontract. Subcontractor shall not be entitled to make claim for, and specifically waives any right to recover on account of, loss of anticipated profits on the uncompleted Work or any aspect of it.

11.2    It is understood that **"SL" JOINT VENTURE** reserves to itself the same rights against Subcontractor as regards terminating or canceling this Subcontract as the Owner may exercise against **"SL" JOINT VENTURE** under any provision of the Prime Contract.

## ARTICLE 12 - SUSPENSION

12.1    In the event performance of the Prime Contract is suspended in whole or in part by the Owner, Subcontractor understands and agrees that its Work, at the option of **"SL" JOINT VENTURE,** may be similarly suspended in which case, its rights will be limited to such extension of time for completion of the Work as may be allowed to **"SL" JOINT VENTURE** by the Owner. Subcontractor shall be entitled to no compensation or damages from **"SL" JOINT VENTURE** on account of such suspension, unless, and only to the extent that, the Owner compensates **"SL" JOINT VENTURE** for additional costs incurred by Subcontractor on account of such suspension.

12.2    Subcontractor further understands that **"SL" JOINT VENTURE** reserves the right to temporarily suspend execution of the whole or any part of the Work herein, if it shall deem it to be in its best interests to do so,


Initials

15


Initials

SL Glenn Construction Company, Inc.
Lane Construction Corporation
A Joint Venture

in which event Subcontractor shall not be entitled to any additional compensation for such suspension, and it shall not be entitled to make any claim against **"SL" JOINT VENTURE** on account of any such suspension whether caused by **"SL" JOINT VENTURE** or any of its agents or representatives, other than a claim for an extension of time within which to complete its Work, corresponding to the period of such suspension. Subcontractor further agrees that it shall have no claim for any loss or damage it may sustain through delay, disruption, suspension, stoppage interruption or acceleration of Subcontractor's work caused or directed by **"SL" JOINT VENTURE**, pursuant to the Prime Contract, to meet the Progress Schedule for any other reason, and all such claims shall be fully compensated for by **"SL" JOINT VENTURE** granting Subcontractor such time extensions as it is entitled to as a result of any such suspensions, delays, or interruptions to the extent applicable to the Subcontractor's Work.

## ARTICLE 13 - EXTENSION OF TIME

13.1     The time provided for the completion of the Subcontract shall be extended only if it is determined by the Owner that the Subcontractor has been, or will be, necessarily delayed in completing his Work solely and directly by a cause(s) which meets all the conditions and requirements specified in the provisions of the Prime Contract regarding Extensions of Time. As a condition precedent to being granted an extension of time, Subcontractor must give **"SL" JOINT VENTURE** written notice within twenty-four (24) hours after the time when it knows or should know of any cause which might under any circumstances result in delay for which it claims or may claim an extension of time (including those causes for which the Owner is responsible or has knowledge of), specifically stating that an extension is or may be claimed, identifying such cause(s) and describing, as fully as practicable at the time, the nature and expected duration of the delay and its effect on the Work . The giving of such written notice, as above required, is an essential obligation of Subcontractor and failure of Subcontractor to give written notice as above required shall be a conclusive waiver of an extension of time.

13.2     Subcontractor acknowledges the Contract Price is based on the premise that Contractor is not liable to Subcontractor, absent any actual fraud or intentional tortuous act, for any damages, or costs due to any delays, acceleration, non-performance, interference with performance, suspensions, or changes in the performance or sequence of Subcontractor's work which results in increased overhead, loss of productivity, loss of efficiency, increased total costs or any other damage. Should Subcontractor's performance, in whole or in part, be interfered with or delayed, or be suspended in the commencement, prosecution or completion, for reasons beyond Subcontractor's control, and without any fault or negligence on its part contributing thereto, Subcontractor shall be entitled to an extension of time in which to complete its contract, but only if Subcontractor shall have notified Contractor, in writing, of the cause of the delay within two (2) days of the occurrence of the event, and provided a similar extension of time, if needed, is given to Contractor by the Owner.

## ARTICLE 14 - SUBCONTRACTOR'S RESPONSIBILITY FOR OWNER ASSESSED LIQUIDATED DAMAGES.

Subcontractor's obligations for the performance and completion of the Work within the time provided for in this Subcontract are of the essence of this Subcontract. Subcontractor guarantees that it can and will complete the performance of the Work within the time provided herein or within the time as extended in accordance with the Provisions of the Prime Contract relating to "Extensions of Time." Subcontractor acknowledges that its failure to complete performance of its Work within the time provided or within the time as extended will expose **"SL"**

16

Initials

Initials

**JOINT VENTURE** to severe financial hardship including the potential assessment of liquidated damages by the Owner. In the event liquidated damages are assessed against **"SL" JOINT VENTURE** by the Owner, then Subcontractor agrees that **"SL" JOINT VENTURE** may assess against it any such damages in proportion to Subcontractor's share of the responsibility for such delay and resulting assessment of liquidated damages. Nothing contained herein, however, shall limit **"SL" JOINT VENTURE's** rights to claim against Subcontractor for any and all actual damages or extra or additional costs that are sustained by **"SL" JOINT VENTURE** as the result of Subcontractor's delay.

## ARTICLE 15 - CERTIFIED FIELD PAYROLL REPORTS

Subcontractor shall furnish **"SL" JOINT VENTURE** with certified copies of Subcontractor's field job payroll up to and including superintendents. **"SL" JOINT VENTURE** will exercise this provision at all times with respect to all past, present and future payrolls on this Project. Subcontractor's failure to furnish certified field payrolls, upon request, shall be grounds for termination of this Subcontract by **"SL" JOINT VENTURE.**

## ARTICLE 16 - PERMITS

Subcontractor agrees to obtain, as its sole cost and expense, any and all permits, approvals and licenses that may be required in connection with the performance of the Work embraced within this Subcontract.

## ARTICLE 17 - TAXES, ASSESSMENTS, PREMIUMS AND FRINGES

Subcontractor shall pay all federal, state and local taxes, assessments and premiums under the Federal Social Security Act, any applicable Unemployment Insurance, Workmen's Compensation, Disability Benefits, Old Age Benefits, Sales & Use Tax, Personal Property Tax, Transportation Tax, or other applicable taxes now or hereafter in effect, payable by reason of or in connection with any part of Subcontractor's Work, and furnish reports and information to all appropriate federal, state and local agencies, as required, the same as though Subcontractor was in fact **"SL" JOINT VENTURE.** Subcontractor will furnish **"SL" JOINT VENTURE** with its Employer's Registration Number assigned to it by the state and federal agencies having the authority to issue such registration numbers.

## ARTICLE 18 - ASSIGNMENTS AND SUBLETTING

Subcontractor shall not assign or sublet the Work or any part of it, or make any assignments of any money due or to become due to it hereunder, or give any orders to **"SL" JOINT VENTURE** for payments to third parties, without the prior written consent of **"SL" JOINT VENTURE.** If any such assignment order for payment is made or given by Subcontractor, without prior written consent, the same shall be absolutely void and of no effect, and **"SL" JOINT VENTURE,** in addition to its other rights hereunder, shall have the right, at its option, to terminate this Subcontract and shall thereafter be under no further obligations to Subcontractor. Should Subcontractor, after having received the written consent and approval of **"SL" JOINT VENTURE,** sublet any of


Initials

17


Initials



its Work, it shall provide to **"SL" JOINT VENTURE** proof that its sub-subcontractor has obtained all the insurance required by Article 7, including Contingent Liability Insurance with limits as provided for in said Article.

## ARTICLE 19 - BONDS

Subcontractor shall procure and furnish to **"SL" JOINT VENTURE** performance and payment bonds in the amounts, form, and with a surety company or companies that are acceptable to **"SL" JOINT VENTURE.**

## ARTICLE 20 - WORK PLACE SAFETY

Subcontractor is required to perform the Work in a safe and reasonable manner, and it shall seek to avoid injury, loss or damage to persons or property by taking all reasonable steps to protect: (a) its employees and other persons at the site; (b) materials and equipment stored at the site or at off-site locations for use in the performance of the Subcontract Work; and (c) all property and structures at the site and adjacent to work areas, whether or not said property or structures are part of the project site or involved in the Work. Subcontractor shall comply with all applicable rules, regulations, orders and other lawful requirements and standards established to promote worker safety and health at the work site, including compliance with all applicable provisions of the Occupational Safety and Health Act of 1970. Subcontractor shall be responsible for establishing and implementing a safety program complying with all safety measures, policies and standards required by any governmental authorities having jurisdiction over worker and work place safety, as well as all such standards required by the Prime Contract. Subcontractor shall submit a written Safety Program outlining safety measures it will implement when performing the Work. The Safety Program and applicable material safety data sheets must be submitted prior to Subcontractor commencing its on-site Work. Subcontractor will appoint a Safety Representative for the duration of the Project. Subcontractor shall indemnify **"SL" JOINT VENTURE** for any fines, or penalties imposed on **"SL" JOINT VENTURE** as a result of any safety or health violations to the extent that any such fines or penalties are the result of the Subcontractor's willful failure to comply with applicable safety or health requirements, rules, regulations, orders or other lawful requirements, and it shall give prompt notice thereof to **"SL" JOINT VENTURE** and promptly provide **"SL" JOINT VENTURE** with copies of any citations and other related Documents it has received in connection with any such violations.

## ARTICLE 21 - CUMULATIVE RIGHTS AND REMEDIES OF CONTRACTOR

None of the rights and remedies granted to, conferred upon, or reserved by **"SL" JOINT VENTURE** under this Subcontract shall be deemed exclusive or impose any limitations upon, or be in derogation of any right or remedy of **"SL" JOINT VENTURE** now existing, or hereafter to exist, at law, in equity or by statute, or in the manner or time for the exercise thereof; but each and every right and remedy of **"SL" JOINT VENTURE** under this Subcontract shall be cumulative, and in addition to all other rights and remedies of **"SL" JOINT VENTURE** under this Subcontract, now existing or hereafter to exist, at law, in equity, or by statute; and breach of any covenant or covenants herein contained may, at **"SL" JOINT VENTURE's** option be deemed a material breach of this Subcontract.


Initials


Initials

## ARTICLE 22 - FINAL CLEANUP

Upon completion of the Work, Subcontractor shall remove all its tools, materials, rubbish, debris and other articles from the work site and shall leave its portion of the Work and the area occupied or used by it broom clean. Should it fail to take prompt action to this end, the Owner, or **"SL" JOINT VENTURE** (at its option and without waiver of such other rights as it may have) may on ten (10) days' notice treat them as abandoned property and shall charge Subcontractor the costs for removal of Subcontractor's tools, materials, rubbish, debris and other articles of property.

## ARTICLE 23 - CHANGES AND EXTRAS

23.1    **"SL" JOINT VENTURE,** without invalidating the Subcontract, may, at any time require changes in Subcontractor's Work consisting of additions, deletions or other revisions, with the Contract Price being adjusted accordingly.  All such required changes shall be requested in a signed writing and shall be submitted to Subcontractor for its signature.  If not otherwise provided for herein, the provisions of the Prime Contract with respect to pricing, approval and performance of extra or change order work or additions, deletions and modifications for the Work shall be applicable to this Subcontract and fully binding upon the Subcontractor with regard to any such work.  Subcontractor will render bills for any additional work at such times and in such form as directed by **"SL" JOINT VENTURE.**  For the purpose of checking such bills and any other claims and determining the correctness of the charges, Subcontractor shall also permit **"SL" JOINT VENTURE** to audit its books and hereby authorizes **"SL" JOINT VENTURE** to check directly with the suppliers of labor and materials to confirm the accuracy and correctness of the charges for labor, materials or other items appearing in the Subcontractor's bill to **"SL" JOINT VENTURE.** Any modification or change of the Agreement providing for the omission of work shall be computed, and the value, when so determined, shall be deducted from the Contract Price as herein provided.

23.2    The Subcontractor shall not be entitled to receive any extra compensation of any kind whatsoever, regardless of whether the same was ordered by **"SL" JOINT VENTURE** or any of its representatives, unless such extra order is given in writing and signed by the Project Manager of **"SL" JOINT VENTURE,** or other representative of **"SL" JOINT VENTURE,** who is duly authorized to act in his place and stead.

23.3    Prior to the issuance of any change order, Contractor may require Subcontractor to furnish a detailed itemization showing the difference in value of the work, labor, services, and materials altered, added, omitted or changed by the proposed change order.  If an agreement as to a monetary allowance or other term in the change order cannot be reached, Contractor may direct Subcontractor in writing to perform the work under a reservation that the final adjustment in price shall be reserved until final completion of the Project.  The monetary amount for the performance of any change order shall not exceed the allowances set forth in Subcontractor's prior price breakdown.

23.4    The failure of Subcontractor to immediately commence performance of any change order when so directed in writing by Contractor shall constitute a material breach of the contract.

23.5    Any extension of time needed as a result of a proposed alteration, addition or change in the Work shall be requested in writing by Subcontractor prior to the issuance of the change order, and shall be incorporated therein.

Initials

19

Initials

SL  Sillery Sanders Incorporated
Lane Construction Corporation
A Joint Venture

There shall be no other monetary or time allowance, direct or indirect, to Subcontractor other than what is specifically written in the change order, including, but not limited to, delays, suspensions, escalations, impact or other cost factors.

23.6    Where unit prices are stipulated in the Contract, all adjustments, whether increases or decreases, shall be made in accordance with said units. Said units shall be deemed to include all general and administrative expenses, overhead, profit, supervision, extended performance cost factors, and all other direct and indirect expenses.

23.7    If Contractor elects the option to direct the changed work to be done by Subcontractor on a time and material basis, Subcontractor shall prepare daily time and material invoices which shall be submitted to Contractor on a daily basis. Said daily time and material invoices shall include only direct out-of-pocket material and labor costs with a maximum total mark-up of ten percent (10%). The 10% mark-up on time and material invoices is deemed to be full and complete compensation to the Subcontractor for all general and administrative expenses, overhead, supervision, and profit.

23.8    The issuance of any change order and payment thereof, prior to completion and acceptance of the Project, shall not preclude Contractor from questioning the validity thereof and recouping payment therefore, where, on final settlement, it is shown the change order work was neither extra nor additional work under a proper interpretation of the Contract.

23.9    No change order shall vary, abrogate, avoid, or otherwise affect the terms, conditions and provisions of the Contract except as specifically set forth in the change order.

## ARTICLE 24 - INSPECTION OF RECORDS

In the event Subcontractor submits a claim for an extension of time, a claim for additional compensation or any request for a price adjustment on account of changes, extras or the like, **"SL" JOINT VENTURE** and the Owner shall have the right to examine all books, records, Documents, and other data of Subcontractor relating to bidding, pricing or performance of this Subcontract or any change or modification thereto for the purpose of evaluating the accuracy and completeness of the cost data submitted.

## ARTICLE 25 - PATENT INFRINGEMENT

25.1    Subcontractor agrees to pay all royalties and license fees and to indemnify and hold harmless **"SL" JOINT VENTURE** and the Owner from loss or damage or expense to which they may be put as a result of claims made or litigation on account of alleged violation or infringement of any letters patent or patented rights arising out of the Work, methods, materials, or things used by **"SL" JOINT VENTURE,** except infringement or alleged infringement resulting from the use of or compliance with designs, drawings and specifications which form a part of this Subcontract and which were not originated or prepared by Subcontractor.

25.2    In the event of any such loss, expense, damage or injury, or if any claim or demand for damages aforesaid is made against **"SL" JOINT VENTURE** or the Owner, **"SL" JOINT VENTURE** may withhold from any payments due or to become due to Subcontractor under the terms of this Subcontract, an amount sufficient in its

Initials                                                                                                               Initials

judgment to protect and indemnify it and the Owner from any and all such claims, expense, loss, damages or injury, or **"SL" JOINT VENTURE** in its discretion may require Subcontractor to furnish a surety bond satisfactory to **"SL" JOINT VENTURE,** providing for such protection and indemnity, which bond shall be furnished by Subcontractor at his own cost within five (5) days after written demand has been made therefor.

## ARTICLE 26 - SUBCONTRACTOR'S OBLIGATIONS TO COOPERATE

26.1    Subcontractor agrees to cooperate with all others on the Project, to the end that the respective works shall constitute one neat workmanlike piece of work and shall lay out and install its work in such manner as not to delay or interfere with the carrying forward of the work of other contractors or subcontractors on the Project. In the event of the failure for any reason of Subcontractor and such other persons to agree as to the extent of such cooperation or the extent of the work to be done by such other persons to insure the proper consummation of items of contiguous work or to insure the carrying out of their respective agreements, such disagreement shall be determined by **"SL" JOINT VENTURE** whose decision shall be final and binding.

26.2    Responsibilities. Subcontractor shall furnish all of the labor, materials, equipment, and services, including but not limited to, competent supervision, shop drawings, samples, tools and scaffolding as are necessary for the proper performance of Subcontractor's work.

26.3    Subcontractor shall provide a list of proposed subcontractors, and suppliers, and shall be responsible for taking field dimensions, providing tests, ordering materials and all other actions as are required to meet the schedule of work.

26.4    Temporary services. As indicated, Subcontractor shall furnish all temporary services or facilities necessary to perform the work. The following common temporary services or facilities are for use of all project personnel and shall be furnished as herein below noted:

|  |  |
|---|---|
| By Contractor: | None |
| By Subcontractor: | None |

26.5    Subcontractor's Representative. Subcontractor shall have a competent representative at the Project at all times who shall have absolute authority to act, in all respects, on behalf of and for Subcontractor. Subcontractor shall replace said representative, without additional charge, if demanded by Contractor.

26.6    Provisions of Inspection. Subcontractor shall notify Contractor when portions of Subcontractor's work are ready for inspection. The Subcontractor shall at all times furnish Contractor adequate facilities for inspecting materials at the site, or any place where materials under this Agreement may be stored in the course of the preparation, process, manufacture or treatment. Subcontractor shall furnish to Contractor full written reports of the progress of Subcontractor's work in such detail and as often as required irrespective of the location of such work.

26.7    Protection of the Work. Subcontractor shall take all necessary precautions to properly protect Subcontractor's work and the work of others from damage caused by Subcontractor's operations or vandalism. Should Subcontractor directly cause or permit preventable vandalism to cause damage to the work or property of

Initials

21

Initials

SL
Lane Construction Corporation
A Joint Venture

the Owner, Contractor or others, Subcontractor shall promptly remedy such damage to the satisfaction of Contractor, or Contractor may remedy the damage caused thereby and deduct the reasonable cost thereof from any amounts due or to become due Subcontractor. Subcontractor shall have primary responsibility and liability for any damages to losses that may be incurred.

26.8    Permits, Fees, and Licenses. Subcontractor shall give adequate notice in writing, with copies furnished to Contractor, to the proper authorities as required for the performance of Subcontractor's work and shall secure and pay for all permits, fees, licenses, assessments, inspections and taxes necessary to complete Subcontractor's work in accordance with the Contract.

26.9    Material Storage and Approvals. Subcontractor must be prepared, at all times, to prove within commercial norms, the exact quantities and qualities of the materials and equipment purchased, used, or to be used on the project. If Subcontractor is assigned a storage area for its equipment, material and tools, it shall not store any item outside of the designated area. Subcontractor shall be responsible for the receipt, delivery, unloading, storage, warehousing, protection, insurance and all other risk of loss relating to any materials or equipment it is to furnish, install, provide, or have provided to it under this Contract.

26.10   If Contractor furnishes material to Subcontractor, Subcontractor shall be obligated to inspect all material and equipment at time of delivery. Subcontractor shall be responsible to immediately notify Contractor, in writing, of any defects or non-conformity in the material or equipment so received or delivered. Failure to notify Contractor shall be deemed an acknowledgement and acceptance of the material as being in accordance with this Contract. Subcontractor shall be liable for any damages incurred by Contractor as a result of its failure to so notify Contractor.

26.11   It is Subcontractor's obligation, upon direction by Contractor, to take all necessary steps, including but not limited to delivery of samples, test and reports, guarantees, drawings, manuals, certificates, details, warranties, or inspections, to obtain any and all required approvals necessary or required under the Contract. If Contractor determines that it will accept non-conforming work, Contractor shall be entitled to a credit for the non-conformity, plus all other costs incurred.

26.12   Subcontractor shall, at its own expense, fully protect, insure and secure its work from injury or damage. Any damage caused to Subcontractor's work prior to final acceptance and payment for the Project shall be immediately corrected and rectified by Subcontractor at its sole expense.

26.13   Inspections or supervisions by Contractor shall not relieve Subcontractor of its obligations herein. Subcontractor shall promptly perform any and all punch list work submitted to it by Contractor.

26.14   Layout Responsibility. Subcontractor shall be responsible to lay out its work and shall be strictly responsible for the accuracy of Subcontractor's work and for any loss or damage to Contractor or others by reason of Subcontractor's failure to set out or perform its work correctly.

26.15   Materials Furnished by Others. In the event the scope of Subcontractor's work includes the installation of materials or equipment furnished by others, it shall be the responsibility of Subcontractor to examine the items so provided, and to handle, store and install the items with such skill and care as to ensure a satisfactory and proper installation. Loss or damage to such items due to acts or omissions of the Subcontractor shall constitute a material


Initials


Initials

breach of the Contract and the amount of such loss or damage shall be deducted from amounts due or to become due to Subcontractor from Contractor.

26.16    Substitutions.  No substitutions shall be permitted in the work or materials specified by the Contract to be provided by Subcontractor unless permitted by the contract  In the event the contract permits a substitution, Subcontractor shall first obtain approval for the substitution, in writing, from Contractor.  Subcontractor shall indemnify Contractor for any increased costs incurred by Contractor as a result of any substitution, whether or not Subcontractor has obtained approval thereof.

26.17    Use of Contractor's or Prime Contractor's Equipment.  Subcontractor, its agents, employees, Subcontractors or suppliers shall not use Contractor's equipment without the express written permission of Contractor.

26.18    Should Subcontractor, or any of its agents, employees, suppliers or Subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items owned, leased or under the control of Contractor, Subcontractor shall be liable to Contractor for any loss or damage (including personal injury or death) which may arise from such use, and shall indemnify Contractor for all damages sustained as a result hereof, including attorney's fees, except where such loss or damage shall be found to have been due solely to the negligence of Contractor's employees operating such equipment.

26.19    Privity.  Until the final completion of the Project, Subcontractor hereby agrees not to perform any work directly for the Owner, or any tenants thereof, or deal directly with any Owner's representatives in connection with the Project, unless otherwise directed or permitted in writing in advance by Contractor.  All work for this Project performed by Subcontractor shall be processed and handled exclusively under Contract with Contractor.

## ARTICLE 27 – BANKRUPTCY

27.1    Termination Absent Cure.  Upon the filing of any Petition for Bankruptcy by Subcontractor, the appointment of a receiver for Subcontractor, or upon Subcontractor making an assignment for the benefit of creditors, Contractor may terminate this Agreement upon providing Subcontractor three (3) days written notice by hand delivery or U.S. Certified Mail, unless Subcontractor, its surety, or the trustee:

      (a)      promptly cures all defaults;

      (b)      provides adequate assurances of future performance;

      (c)      compensates Contractor for actual pecuniary loss resulting from such defaults; and

      (d)      assumes the obligations of the Subcontractor under this contract within the statutory time limit.

27.2    Interim Remedies.  If Subcontractor is not performing in accordance with the schedule of work upon the expiration of the three (3) day notice period, Contractor, while awaiting the decision of Subcontractor or its trustee



Initials

23

Initials



to reject or to accept this Agreement and provide adequate assurance of its ability to perform hereunder, may avail itself of such remedies under this Article as are reasonably necessary to maintain the schedule of work.

27.3    Contractor may offset against any sums due or to become due to Subcontractor all costs incurred in pursuing any of the remedies provided hereunder, including, but not limited to, reasonable overhead, profit and attorney's fees.

27.4    Subcontractor shall be liable for the payment of any amount by which such expense may exceed the unpaid balance of the Contract Price.

## ARTICLE 28 - AUTHORITY CONSENT

This Subcontract shall be of no force or effect until the Owner gives its consent and/or approval in writing to subcontracting the Work to Subcontractor.

## ARTICLE 29 - YEAR 2000 COMPLIANCE

Should the Work or the materials provided under this Agreement include any computer equipment, computer systems, computer software, embedded chips or any computer product of any nature (collectively "computer Work"), Subcontractor warrants that the Computer Work shall be "Year 2000 Complaint", and that the Work, all Computer Work and all components thereof, shall continue to operate and function without interruption as of January 1, 2000 and thereafter. Subcontractor shall fully defend, indemnify and hold harmless **"SL" JOINT VENTURE** and the Owner from any against any and all claims, losses, expenses, costs, liabilities, and damages of any nature, including Work furnished under this Subcontract, to function without interruption as of January 1, 2000 and thereafter and/or to be "Year 2000 Complaint."

## ARTICLE 30 - MISCELLANEOUS

30.1    Subcontractor agrees to indemnify and save harmless **"SL" JOINT VENTURE** and the Owner from and against any costs, expenses, attorneys' fees, loss or damage resulting from the filing of Mechanic's Liens by any person or entity under Subcontractor.

30.2    It is understood that the Owner and/or **"SL" JOINT VENTURE** shall have the right to inspect all material and workmanship, and all possible facilities to enable them to do so shall be given their inspectors, whether at the place of manufacture, building site or any intermediate point.

30.3    Subcontractor shall, at his own expense, make and furnish all details and drawings that may be required for approval by **"SL" JOINT VENTURE** or the Owner, as the case may be, and obtain and furnish all the lines, grades and levels, that may be required to perform his Work properly. Subcontractor using any lines, grades, or levels that may be furnished by others, does so on his own responsibility as to their correctness.



Initials



Initials

30.4    All dimensions and elevations, indicated on the plans, are to be verified in the field by Subcontractor, who shall assume the responsibility for any errors or discrepancies.

30.5    Subcontractor shall keep a competent superintendent or foreman on the work at all times to whom **"SL" JOINT VENTURE's** superintendent may issue instructions and who shall have full authority to carry out all instructions issued by **"SL" JOINT VENTURE's** superintendent.

## ARTICLE 31 - GOVERNING LAWS AND VENUE

The interpretation of this Subcontract, including any alleged breach hereof, shall be governed by the laws of the State of New York. Any action at law or equity commenced by Subcontractor or **"SL" JOINT VENTURE** on causes of action arising under this Subcontract shall be filed, and venue shall lay, exclusively in the Supreme Court of the State of New York, County of Queens, before a Justice of said Court. The Parties hereto hereby waive the right to trial by jury. Further, the parties hereto hereby submit to the jurisdiction of said Court in all matters arising under this Subcontract.

## ARTICLE 32 - COMPLETE AGREEMENT AND / OR ORAL MODIFICATION

Except as expressly set forth herein, there have been no representations by either party to the other to induce execution of this Subcontract, and all prior negotiations and understanding with respect to the subject matter are merged herein. This Subcontract shall be binding on and inure to be benefit of the successors and assigns of the respective parties. This Subcontract cannot be amended or waived except by written instrument signed by the parties or their respective successor in interest.


Initials

25

Initials

SL
Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

IN WITNESS WHEREOF, the parties hereto have duly executed this Subcontract the day and year first above written.

**SL, a JOINT VENTURE** OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION, CONTRACTOR

BY _____

Attest: 9/26/03
_____
Date

Edward F. Hollander, P.E.
_____
Area Manager/Senior Estimator
_____
Name and Title

28 SEPT. 2003
_____
Date

**L & L CONSTRUCTION ASSOCIATES**
SUBCONTRACTOR

BY _____

Attest: 9/26/03
_____
Date

CHARLES E. LANCE
ASST. GEN. MGR.
_____
Name and Title

OFFICE MANAGER

_____
Date


_____
Initials

26

_____
Initials

SL Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

## ACKNOWLEDGEMENT OF CONTRACTOR

State of _Virginia_ )
) ss.:
County of _Pr.William_ )

On this 29ᵀᴴ day of _SEPTEMBER_, 2003, before me personally came and appeared Edward Hollander, P.E., to me known, who, being by me duly sworn, did depose and say that he/she resides at 1384 Old Bridge Road, Woodbridge, Virginia 22192, that he is the Area Manager/ Senior Estimator of "SL" JOINT VENTURE OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION, the corporation described in and which executed the foregoing instrument; and that he is duly authorized to execute the said instrument on behalf of SL, a JOINT VENTURE OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION.

_____
Notary Public

My commission expires: ___8/3,/07___                    (SEAL)


## ACKNOWLEDGEMENT OF SUBCONTRACTOR

State of _Maryland_ )
) ss.:
County of _Prince George's_ )

On this 26 day of _September_, 2003, before me personally came and appeared _Charles E. Nance III_, to me known, who, being by me duly sworn, did depose and say that he/she resides at 12122 Wheeling Ave. Upper Marlboro, Md. 20772, that he/she is the _Assistant General Manager_ of L & L CONSTRUCTION ASSOCIATES, the corporation described in and which executed the foregoing instrument; and that he/she is duly authorized to execute the said instrument on behalf of L & L CONSTRUCTION ASSOCIATES

_____
Notary Public

My commission expires: ___8/7/2006___                    (SEAL)

SANDRA E. LINDER
NOTARY PUBLIC
PRINCE GEORGE'S CO. MD

SANDRA E. LINDER
Notary Public, State of Maryland
Prince George's County
My Commission Expires August 7, 2006

_____        27        _____
Initials                                           Initials


Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

# APPENDIX "A"

### Additional Terms for Subcontractors

1.  All employees shall wear appropriate work shoes, work clothes and hard hats while on the Project site. In addition, personal protection devises shall be used when and wherever warranted or required, i.e., safety glasses/goggles, safety belts and lanyards, etc.

2.  Pay quantities and daily reports shall be turned in <u>daily</u> to "SL" JOINT VENTURE's Project Engineer. Failure to do so may delay payment.

3.  The Subcontractor shall be required to submit proof of full coverage insurance as required by the Contract Documents prior to commencing work. "SL" JOINT VENTURE. and Owner shall be named on the policy as an additional insured. The insurance policy shall provide "SL" JOINT VENTURE with a thirty (30) day notification of insurance termination or change to the policy.

4.  Prior to start of construction, the Subcontract shall be fully executed.

5.  All construction shall be performed in conformance with the Contract Documents and any resource manual or document shown or referenced by the Contract Documents.

6.  The Subcontractor shall participate in progress and schedule update meetings when requested by the Contractor. Reasonable notice shall be given to Subcontractor to allow for their attendance.

7.  Special caution shall be exercised when working near any residential, commercial and public facilities. Utility location services shall be notified sufficiently in advance of work and all personnel shall demonstrate an appropriate and professional attitude towards the public.

8.  Any conduct by Subcontractor's employees which intentionally causes damage to personal or public property or act in a manner disrespectful to the public shall be grounds for terminating Subcontractor's contract.

9.  Particular attention shall be paid to timely submission of EEO and Subcontract Documents required by the Owner. Delay in submitting these documents may cause delay in payment.

Contract No. 1B0035, Section JDC              SL, A Joint Venture of
**Main Construction Package for New**         **Slattery Skanska, Inc. and**
 **Station, Trackwork, and Systems**         **The Lane Construction Corp.**
**NEW YORK AVENUE STATION**
**Phase 2, Glenmont Route (Red Line)**
Wash. Metro. Are Transit Authority         **SUBCONTRACT/VENDOR PROVIDER  SC458-12**

| APPENDIX "B" |
|:---:|

**SUBCONTRACTOR:**        **L and L CONSTRUCTION ASSOCIATES, INC.**
                        **6300 Dower House Road**
                        **Upper Marlboro, Maryland  20772**
                        **Phone (301) 599-0300,  Fax (301) 599-0388**
                        **Contact Person:**    **Mr. Charles Nance**
                                                 **Assistant General Manager**

**SCOPE OF SERVICES TO BE PROVIDED:**

Furnish , Provide, Install the Complete Storm Runoff and Wall Systems throughout the Project Site as Shown on the Construction Plans  provided, as outlined below:

    **A.**        **Mechanically Stabilized Embankment (MSE) Retaining Walls C and E**
    **B.**        **"CONTECH" Storm Detention System, to include Vortechnics Oil/Water**
                   **Separator System Structure,  and all related items of work.**
    **C.**        **Complete Storm Drainage System , to include all manholes, inlets, grates, concrete**
                   **pipe, fittings, and related items of work.**

**DRAWINGS, SPECIFICATIONS, DOCUMENTS, and INFORMATIONAL SCHEDULES:**

The following plans and specifications were utilized by the Subcontractor in the preparation of the "price schedule" outlined and contained within this Subcontract Agreement;

    (1)  Reinforced Earth Company Plans for the New York Avenue Station Project,
           dated September 5, 2003, Sheets 1 through 6 of 6 for WALL C, and Sheets 1 through 4 of 4
           for WALL E, as transmitted to Subcontractor on September 6, 2003.
    (2)  Jacobs Civil Inc. Construction Plans for the New York Avenue Project, dated March 6, 2003,
           as amended, Submittal 13.
    (3)  CONTECH Construction Shop Drawings, Sheets 1 through 6 of 6, dated May 21, 2003, as
           approved,, which outline all work for installation and construction of the "Underground
           Storm Detention System" along the MBT Trail and Inbound Track SubStructure elements of
           the New Station, along the western limits of the Station Structure.
    (4)  WMATA Specifications Sections 04050, 03100, 03200, 03450, 03405, 02635, 02270, 02320,
           and  02325, as provided from the SL Project Site Office.

Contract No. 1B0035, Section JDC
Main Construction Package for New
Station, Trackwork, and Systems
NEW YORK AVENUE STATION
Phase 2, Glenmont Route (Red Line)
Wash. Metro. Are Transit Authority

SL, A Joint Venture of
Slattery Skanska, Inc. and
The Lane Construction Corp.

**SUBCONTRACT/VENDOR PROVIDER   SC458-12**

---

**APPENDIX "B"**

---

**SUBCONTRACTOR:**    **L and L CONSTRUCTION ASSOCIATES, INC.**
**6300 Dower House Road**
**Upper Marlboro, Maryland  20772**
**Phone (301) 599-0300,  Fax (301) 599-0388**
**Contact Person:      Mr. Charles Nance**
**Assistant General Manager**

## SCOPE OF SERVICES TO BE PROVIDED:

Furnish , Provide, Install the Complete Storm Runoff and Wall Systems throughout the Project Site as Shown on the Construction Plans  provided, as outlined below:

    **A.**      **Mechanically Stabilized Embankment (MSE) Retaining Walls C and E**
    **B.**      **"CONTECH" Storm Detention System, to include Vortechnics Oil/Water**
              **Separator System Structure,  and all related items of work.**
    **C.**      **Complete Storm Drainage System , to include all manholes, inlets, grates, concrete**
              **pipe, fittings, and related items of work.**

## DRAWINGS, SPECIFICATIONS, DOCUMENTS, and INFORMATIONAL SCHEDULES:

The following plans and specifications were utilized by the Subcontractor in the preparation of the "price schedule" outlined and contained within this Subcontract Agreement;

    (1)  Reinforced Earth Company Plans for the New York Avenue Station Project,
         dated September 5, 2003, Sheets 1 through 6 of 6 for WALL C, and Sheets 1 through 4 of 4
         for WALL E, as transmitted to Subcontractor on September 6, 2003.
    (2)  Jacobs Civil Inc. Construction Plans for the New York Avenue Project, dated March 6, 2003,
         as amended, Submittal 13.
    (3)  CONTECH Construction Shop Drawings, Sheets 1 through 6 of 6, dated May 21, 2003, as
         approved,, which outline all work for installation and construction of the "Underground
         Storm Detention System" along the MBT Trail and Inbound Track SubStructure elements of
         the New Station, along the western limits of the Station Structure.
    (4)  WMATA Specifications Sections 04050, 03100, 03200, 03450, 03405, 02635, 02270, 02320,
         and  02325, as provided from the SL Project Site Office.

(5) CONTECH Construction Shop Drawings for the VORTECHNICS Model 7000 Stormwater Treatment System **, in lieu of the** "CSR HYDROConduit STORMCEPTOR" shown on the Jacobs Civil plans. The VORTECHNICS unit is an "engineering approved equal" to the "STORMCEPTOR DEVICE" shown on the Jacobs Civil plans.

(6) Rinker Materials, Hydro Conduit Drawings and Plans for the "Concrete Pipe" necessary for the various Class 3 RG round and elliptical pipe needed for the project.

(7) Americast (Valley Blox) Shop Drawings for all Storm Drainage Structures , as submitted by L and L Construction Associates, to the Joint Venture and WMATA.

(8) Aggregate Industries, Inc. "stone" sieve analysis and aggregate mix design sheets for various Aggregates and sources submitted for this project, specifically AASHTO NO. 57 stone and related storm drainage backfill materials.

## DOCUMENTS INCORPORATED INTO SUBCONTRACT AGREEMENT THROUGH CONTRACT "ASSIGNMENT" OF PREVIOUS AGREEMENT BETWEEN ENGINEERING VENDOR AND THE SL JOINT VENTURE:

The following "Vendor/Service Provider Agreements" between the SL Joint Venture and specific Engineering Vendors for certain work outlined within the Subcontractor's Proposal are hereby incorporated by reference with regard to all terms, conditions, pricing, and all other matters between the parties to the agreements. The Subcontractor, "L and L Construction Associates", by virtue of entering into this Subcontract Agreement hereby assumes all responsibilities and requirements outlined within said agreements for the duration of this Subcontract and Project, and pursuant to the terms and conditions outlined within this Subcontract Agreement. The "assigned Vendor/Service Provider Agreements" had been procured earlier in the project by the DIRECTLY with the Engineer/Service Provider in each instance SOLELY FOR THE PURPOSE of advancing all engineering and design related matters for the Project for the SOLE BENEFIT of the Client (WMATA). The Reinforced Earth Company, CONTECH Construction Products, and Rinker Materials/Hydro Conduit specifically provided "early-on" engineering input and assistance with the Joint Venture Team, their Engineer (Jacobs Civil), and the Client (WMATA), with the understanding that their products specified by the Engineer for the project would be utilized for a "fair price". Accordingly, the Vendor/Service Provider Agreements, which currently exist with those Vendors and the Joint Venture, are hereby ASSIGNED to the Subcontractor. As discussed with the Subcontractor, and subsequenrtly agreed upon, this ASSIGNMENT of the Vendors ......"The Reinforced Earth Company", "CONTECH Construction Products", and "Rinker Materials / Hydro Conduit"...... is made for the SOLE EFFORT of transferring "control" of those Vendors/Service Providers to the Subcontractor. This "control" includes all terms and conditions outlined between the parties in the Agreements and in each circumstance, as well as all logistical, payment, quality, shipping, billing, and any other related matters involving the utilization of these specific Vendors/Service Providers for this Project. It is recognized that should any issues arise during the course of the performance of this Subcontract, which may involve difficulties with these Vendors as to any specific terms and conditions of the "assigned agreements", the Contractor will reasonably "settle" any such matters to the satisfaction of all parties.

(A) The Reinforced Earth Company, Vienna, Virginia: Vendor/Service Provider Agreement SC458-56
(see Attached Copy of Agreement, now **"assigned" to Subcontractor**)

(B) <u>CONTECH Construction Products</u>, Columbia, Maryland:  Vendor/Service Provider Agreement SC458-48
               (see Attached Copy of Agreement, **now "assigned" to Subcontractor**)

(C) <u>Rinker Materials / Hydro Conduit,</u> Frederick, Maryland: Vendor./Service Provider Agreement SC458-49
               (see Attached Copy of Agreement, **now "assigned" to Subcontractor**)

(D) <u>Americast / Valley Box</u>, Harrisonburg, Virginia:  ---No Assignment Needed---; Subcontractor procured
                                             precast storm structures completely….no preliminary
                                             engineering required.

(E) <u>Aggregate Industries, Inc.</u>, Greenbelt, Maryland:  --No Asignment Needed---;  Subcontractor procured
                                             aggregate sources….no preliminary engineering needed.

## SPECIFIC WORK AND SERVICES TO BE PERFORMED AND PRICE:

1. The work to be performed and the proposed price for performing such work are described herein.
2. This Agreement is subject to the Terms and Conditions outlined later within this Agreement.  Such Terms and Conditions shall be part of the contract between the parties concerning the Project.
3. The prices contained herein for the work described are in effect for the duration of the Agreement and the Work.
4. Water Mains and Sanitary Sewer construction services work IS NOT INCLUDED as a part of this Subcontract Agreement, except as may be specifically outlined as a part of the storm drainage system work shown on the construction plans.
5. Access to all Work Areas, Ingress, Egress, Adequate Storage and Lay Down Areas for Materials shall be made available to the Subcontractor once work has commenced in earnest.
6. Excavation work for the storm drainage utilities, underground detention system, and level pads for the MSE walls have been calculated from the lines and grades provided on the Jacobs Civil Drawings and RECO Drawings for the MSE Walls.  Any significant "over excavation" as a result of lines and grades which are different than those provided for already on the referenced plans shall be at an additional cost, as to be determined between the Subcontractor and the Contractor., and as provided for later in this Subcontract Agreement.
7. The Subcontractor HAS NOT INCLUDED any costs for "OFF SITE TRUCKING" or "DISPOSAL" of any SURPLUS EXCAVATION MATERIALS OR WASTE DIRT, which result from the storm drainage, underground detention basins, or MSE wall construction operations.  The Subcontractor WILL load trucks provided by the Contractor, or Others, during the course of any excavation operation, if requested by the Contractor, ………..AND/OR IF NECESSARY deposit said "leftover excavated materials and soils" to the "DUMP PILE" located at the northwest region of the project site, for later load out and removal from the project site by the General Contractor.  The "DUMP PILE" located at the northwest region of the project site is approximately 300 to 400 feet away from all significant storm drainage and retention basin construction work, which will be the "generator" of most of the "spoils" requiring handling and removal.
8. Any "PVC under drains and under drain connections" work is to be performed by the Contractor or Others.  The "actual connection" of the under drains, if any, to the new Storm Systems IS INCLUDED

BY THE SUBCONTRACTOR under this Subcontract Agreement. All "under drain piping" is to be installed PRIOR TO the Subcontractor "connecting" any new storm system, as is feasible and practical. This work is to be coordinated in the field between the Contractor and the Subcontractor.

9.    ALL STORM STRUCTURES included, and to be furnished and installed under this Subcontract, are "precast concrete" materials fabricated "off the project site". NO CAST-IN-PLACE CONSTRUCTION of ANY STORM STRUCTURES has been included in the pricing for this Subcontract Agreement, EXCEPT as may be incidental and necessary to complete the "scope of work" herein.

10.    Field Surveying, Layout Engineering, Design Engineering, and construction completion "as-built drawings" ARE NOT INCLUDED as a part of the Subcontractor's Scope of Work. The Contractor WILL PROVIDE all survey control points, field layout, and necessary line and grade control sheets for use by the Subcontractor in constructing his work. CUT SHEET DATA for storm drainage, retention systems, and storm structures as required, **will be calculated by Subcontractor personnel** FROM FIELD SURVEY DATA provided by the Contractor and Others. CONTRACTOR WILL PROVIDE field surveys and field data for Subcontractor's use, which will include storm pipe and storm structure "offsets" at 50 Foot Center stationing and a minimum of two (2) offsets for all storm structures. Control Lines for the Subcontractor's use in constructing the underground storm detention basins and the MSE Walls will be provided by the Contractor, as specifically coordinated in the field between the parties. "RED LINE FIELD DRAWINGS" of the completed installations and work WILL BE PROVIDED BY THE SUBCONTRACTOR, upon completion of the Subcontractor's work in the field at the Project.

11.    Furnishing and Installation of "temporary inlet protection", i.e. erosion controls, at all locations necessary for the Subcontractor's work, IS INCLUDED as a part of this Subcontract Agreement. ALL MAINTENANCE AND LATER REMOVAL of these "temporary inlet protections" will be the Contractor and/or Others.

12.    Dewatering Work which is INCLUDED as a part of this Subcontract is limited to the use of two inch (2") pumps during the course of the work; mainly needed during storm pipe, storm structure, and underground detention basin work. Any dewatering needed which will require "well point systems", main pumps larger than three inch (3"), or other "heavier dewatering means" ARE NOT INCLUDED under the Subcontractor's scope of Work.

13.    SAWCUTTING WORK necessary for storm pipe and system connections at the M Street Region IS INCLUDED as a part of the Subcontractor's Scope of Work. Any other sawcutting needed to complete the Subcontractor's work IS NOT INCLUDED, since no additional cutting is shown on the plans or required to complete the work shown on the plans.

14.    Maintenance and Protection of Traffic, Flagging of Traffic around work areas, and the furnishing of traffic control devices IS NOT INCLUDED as a part of this Subcontract Agreement. ANY TEMPORARY TRAFFIC FLAGGING AT DRIVEWAY LOCATIONS to get trucked materials into the project site, such as concrete pipe or storm structures, will be the responsibility of the Subcontractor. Temporary Steel Plate Protection during the course of the M Street Storm Connection work (Manhole No. 1) CAN BE PROVIDED at an additional cost to the Contractor of $2,500.00 Lump Sum, which will include furnishing and providing all necessary plates, all handling as needed, and any plate removals. The "option" of the "temporary street plates" is for the convenience of the Contractor. IT IS ANTICIPATED BY THE SUBCONTRACTOR THAT "M STREET" WILL BE COMPLETELY CLOSED TO TRAFFIC FOR AT LEAST FIVE (5) WORKING DAYS TO ALLOW FOR THE CONTRUCTION OF MANHOLE NO. 1 WITHIN THE M STREET REGION BY THE SUBOCNTRACTOR.

15. Any QA/QC Testing and inspection work for concrete, backfill, or similar type of operations IS NOT INCLUDED BY THE SUBCONTRACTOR, and is to be provided by the Contractor's On-Site Full Time QC Manager and his laboratory.

16. Surface Restoration in the form of a proper and complete "temporary hot or cold HMA asphalt patch" at the M Street location of Manhole No. 1 (i.e. storm connection) IS INCLUDED BY THE SUBCONTRACTOR. No other surface restoration is shown on the plans, and accordingly is not included as a part of this Subcontract. All work shall conform to D.C.D.P.W. standards for any patch completed here.

17. Street vacuums, wash down and flusher trucks, and any wash facilities of any kind are NOT INCLUDED as a part of this Subcontract Agreement. The Subcontractor WILL CLEAN ITS OWN VEHICLES EXITING THE PROJECT PRIOR TO EXITING WITH ANY DEBRIS, AS NECESSARY AND REQUIRED at no additional cost to the Contractor. Wash down facilities, that may be necessary for heavy washing or cleaning at site, will be provided by the Contractor. A "wash down area" at the Project site already exists, and is available for the Subcontractor's use during the course of the work..

18. Dust Control equipment and /or operations are NOT INCLUDED within this Subcontract Agreement. Subcontractor agrees to limit his "creation" of dust and airborne particulate during the course of his work, as may be reasonable and possible. Aggregate dumping and hauling, excavation stockpiling, etc., is to be conducted so as NOT TO ADD TO that "dust problem" that is normally inherent in construction operations of the type and nature outlined under this Subcontract Agreement.

19. Significant Night Work and Significant Overtime Operations work has NOT BEEN provided for as a part of this Subcontract Agreement. Overtime and Night Work which may be worked for the convenience of the Subcontractor, as determined by the Subcontractor, is included as a part of the price outlined within this Subcontract Agreement.

20. The relocation, protection of, and temporary support of any "existing underground utilities in the vicinity of the Manhole No. 1 construction within existing M Street IS NOT INCLUDED within the pricing of this Subcontract Agreement. ALL TEST PITS for the location and determination of line and grade of existing utilities shown on the Jacobs Civil plans, or others already provided, ARE INCLUDED within the Subcontractor's pricing for the storm systems work. Test pit work on this project is mainly limited ot the M Street region of the Project.

21. Any grading and excavation BEYOND THE LIMITS required for installation and contruction of work included under the Subcontract Agreement IS NOT INCLUDED within the Subcontractor's price.

22. ROCK excavation, demolition, and removal is NOT INCLUDED within the Subcontractor's Scope of Work for this Project. This is based upon the fact that the "soil borings" for the project do not show or indicate any "subsurface rock materials".

23. Video Inspection, as apart of the QC process, for any underground pipe or structures installed as a part of this Subcontract IS NOT INCLUDED within the work scope here. Any video inspection which may required as a result of any disagreement with WMATA or the Contractor, involving backfilling or underground construction processes, IS INCLUDED HERE.

24. The "water cleaning or flushing" of any concrete pipe installed under this Subcontract Agreement is NOT INCLUDED by the Subcontractor **as a matter of course**. However, IF THE SUBCONTRACTOR does not adequately keep clean of soil and debris ALL CONCRETE PIPE INSTALLED DURING THE COURSE OF THIS WORK, then pressure water washing or similar processes may be required to be performed by the Subcontractor.

25.  The construction of any "paved ditches", on this project, are NOT INCLUDED within this Subcontract Agreement. This is due to the fact that NO paved ditches are shown on the construction plans provided to the Subcontractor.

26.  The REMOVAL OFF THE PROJECT SITE of any pipe and/or structures, which must be demolished and removed during the course of the storm drainage and retention system work IS NOT INCLUDED within this Subcontract Agreement. The Subcontractor DOE S AGREE to place any "demolition debris" from the removal of pipe or structures during the work AT THE DUMP AREA LOCATED AT THE NORTHWEST CORNER OF THE PROJECT SITE, for later removal by the Contractor as needed. Only selected project site demolition necessary to perform the storm drainage, underground storm detention basin system, and the MSE walls is INCLUDED by the Subcontractor in this Agreement. All other demolition and removal work at the project is NOT INCLUDED by the Subcontractor.

27.  All quantities of No. 57 backfill stone materials and aggregates have been determined and calculated from information and engineering plans provided by Jacobs Civil and The Reinforced Earth Company for Walls C and E only.

28.  Excavation and Grading for ALL LEVEL PADS, necessary to construct the MSE walls, is INCLUDED by the Subcontractor in the Subcontract Prices. Major excavation and grading for the MSE WALL construction PRIOR to the "level pad construction operations work" is to be performed by the Contractor to a tolerance within 0.2 FT of vertical elevation. The "bottom elevation" of the Wall C and E locations is to excavated by the Contractor to and consistent with the "top of level pad elevation", as shown on the plans provided by The Reinforced Earth Company, and as coordinated with the Jacobs Civil plans for the work.

29.  A "Schedule of Values" is to be provided by the Subcontractor for review and approval of WMATA and the Contractor at the beginning of the work. This "Schedule of Values" will provide for a "mobilization fee" in each Progress Requisition No.1 and No. 2, which is inclusive in the agreed amounts for specific work outlined within this Subcontract Agreement. This "mobilization fee" WILL NOT BE IN ADDITION to those specific amounts agreed upon for the work outlined within this Subcontract. The agreed "mobilization fee" will be allocated across and between the Payment Requisitions Number 1 and 2 for the work, and will be outlined specifically within the Schedule of Prices" to be provided and agreed upon with WMATA and the Contractor. Payment of all "mobilization fees" will be in accordance with all other terms and conditions of the Subcontract Agreement.

### (a)  PRECAST CONCRETE PIPE AND STORM STRUCTURE DRAINAGE SYSTEM, WITH VORTECHNICS MODEL #7000 STORMWATER TREATMENT SYSTEM;

L and L Construction Associates will prepare shop detail drawings, furnish material, shop fabricate, shop prime paint (one coat) where applicable, and deliver FOB trucks point of origin with freight charges allowed and prepaid to the jobsite, and INSTALL one (1) complete precast concrete pipe and storm structure drainage system, with Vortechnics Model #7000 stormwater treatment system for **the Lump Sum Price of Two Hundred Fifty Thousand, Nine Hundred Sixty dollars ($250,960.00) only,** excluding sales tax. THIS IS A TAX EXEMPT PROJECT WITH WMATA.

## SCHEDULE:

Based upon receipt of an acceptable, fully executed contract and Notice To Proceed, delivery is tentatively anticipated to commence **on or about late September, or early October, 2003,** barring any major problems and contingent upon timely receipt of completed "Released For Construction" design drawings; requested information; approved shop detail drawings and all other necessary approvals; materials; and buy-out items. TIME IS OF THE ESSENCE with regard to the actions of and work performed by Others, which affect Subcontractor's work.  It is anticipated that this work may be necessary to be completed for follow-on work by the Contractor **on or about six (6) weeks** from the time of commencement at the site, based upon the current project schedule and effort. **Total  Work Effort is approximately 32 Crew days complete.**

## APPROXIMATE QUANTITIES OF WORK PER PROJECT PLANS:

| | | | | |
|---|---|---|---|---|
| 18 Inch RCCP, Class 3, RG | : | 224 | LF | |
| 21 Inch RCCP, Class 3, RG | : | 56 | LF | |
| 24 Inch RCCP, Class 3, RG | : | 128 | LF | |
| 13.5 Inch x 22 Inch RCCP, Class 3, Elliptical | : | 104 | LF | |
| 13.5 Inch x 22 Inch RCCP, Class 4, Elliptical | : | 80 | LF | |
| Manholes No. 1, 2, 4, 5, and 7 | : | 5 | EA | |
| Catch Basins No. 8, 10, and 11 (with YI-1 Tops) | : | 3 | EA | |
| Manholes No. 12 and 13 | : | 2 | EA | |
| Catch Basin No. 14 (with YI-1 Top) | : | 1 | EA | |
| Manhole Frames and Covers | : | 7 | EA | |
| C.I.P. Concrete and Brick Paver Structure Inverts | : | 11 | EA | |
| Trench Excavation and Backfill | : | 1,200 | CY | +/- |
| Structure Excavation and Backfill | : | 1,450 | CY | +/- |
| Breakdown as follows: | | | | |
| Storm Drain Structures No. 2 thru 13 | : | 850 | CY | Excavation |
| Structure Backfill | : | 120 | CY | Aggregate |
| Structure Backfill | : | 120 | CY | Earth |
| Manhole No. 1 | : | 60 | CY | Excavation |
| Manhole No. 1 | : | 30 | CY | Backfill |
| VORTECHNIC Excavation | : | 140 | CY | Excavation |
| VORTECHNIC Backfill | : | 114 | CY | Backfill |
| Gravel Bedding and Back Filling | : | 1,450 | TON | +/- |
| Hard Surface Excavation | : | 20 | CY | +/- |
| Structure No. 6, VORTECHNICS Treatment Element | : | 1 | EA | |
| Structure Backfill, Stone Aggregate | : | 225 | TON | +/- |

SPOILS AND ON-SITE WASTE EXCAVATION:

| | | | |
|---|---|---|---|
| Storm Drainage Pipe Trenches | : | 608 | CY |
| Storm Drainage Structures and Manholes | : | 120 | CY |
| Manhole No. 1 Structure and Connection | : | 30 | CY |
| VORTECHNICS Treatment Element | : | 114 | CY |

**(b)**     **CONTECH CONSTRUCTION PRODUCTS UNDERGROUND STORM DETENTION SYSTEM USING 66 INCH CMP PIPE, 16 GAUGE, IN COORDINATION WITH THE NEW PRECAST CONCRETE PIPE AND STRUCTURE SYSTEM, AND VORTECHNICS MODEL #7000 STORMWATER TREATMENT SYSTEM:**

L and L Construction Associates will prepare shop detail drawings, furnish material, shop fabricate, shop prime paint (one coat) where applicable, and deliver FOB trucks point of origin with freight charges allowed and prepaid to the jobsite, and INSTALL one (1) c0omplete CONTECH underground storm water retention system for the project for the Lump Sum Price of  **One Hundred Ninety Nine Thousand, Six Hundred and Thirty Eight Dollars Only ($199,638.00)** , excluding sales tax.  THIS IS A TAX EXEMPT PROJECT WITH WMATA.

**SCHEDULE:**

Based upon immediate receipt of an acceptable, fully executed contract and Notice to Proceed, delivery is tentatively anticipated to commence  **on or about late September, 2003 or early October, 2003** barring any major problems and contingent upon timely receipt on completed "Released for Construction" design drawings, requested information, approved shop detail drawings, and all other necessary approvals, materials, and buy-out items.  TIME IS OF THE ESSENCE with regard to the actions of and work performed by Others, which affect Subcontractor's work.  It is anticipated that this "CONTECH Detention System Material" material may be necessary to be delivered to the project site for installation on or about _____September 29, 2003_____, based upon the current project schedule and effort.  **Total Work Effort is approximately 23 Crew Days Complete.**

**APPROXIMATE QUANTITIES OF WORK PER PROJECT PLANS:**

| | | | | | |
|---|---|---|---|---|---|
| Crossover Mains | 5 x 5 | | : | 18 | EA |
| Straights | 5 x 3 | | : | 18 | EA |
| Straights | 5 x 4.53 | | : | 9 | EA |
| Straights | 5.5 x 3 | | : | 12 | EA |
| Straights | 5.5 x 4.53 | | : | 6 | EA |
| Straights | 5.5 x 25 | | : | 2 | EA |
| Main Tee | 5.5 x 5    x | 7 x 1.3 | : | 6 | EA |
| Main Tee | 5.5 x 5    x | 7 x 1.57 | : | 6 | EA |
| Main Tee | 5.5 x 5    x | 8.14 x 1.97 | : | 9 | EA |
| Main Tee | 5.5 x 5.5    x | 8.14 x 1.97 | : | 6 | EA |
| | | | | | |
| Gravel Bedding and Backfill | | | : | 2,200 | TON |
| Excavation and Backfill | | | : | 2,400 | CY |
| Concrete Collars | | | : | 3 | EA |
| Inlet and Manhole Frames and Covers | | | : | 3 | EA |
| Bulkhead Reducers | | | : | 2 | EA |
| Bulkhead Reinforcement | | | : | 15 | EA |
| Miscellaneous Metals | | | : | 1 | JOB, L.S. |
| | | | | | |
| Waste/On-Site Disposal Excavation Material: | | | : | 1,336 | CY |

**c)    MECHANICALLY STABILIZED EMBANKMENT "WALLS C AND E" for the NEW YORK AVENUE STATION between Florida Avenue and M Street, along the existing railroad alignment and R-O-W.**

L and L Construction Associates will prepare shop detail drawings, furnish material, shop fabricate, shop prime paint (one coat) where applicable, and deliver FOB trucks point of origin with freight charges allowed and prepaid to the jobsite, and INSTALL, the MSE WALLS C AND E for the Project which will be manufactured and supplied by The Reinforced Earth Company, of Vienna, Virginia. There is approximately 10,450 Square Feet of MSE walls to be constructed at the project site, at a 1:1 strip ratio. The complete price for furnishing and installation of the MSE Walls C And E to be paid to the **Subcontractor is Six Hundred Twenty Eight Thousand and Eighty Dollars Only ($628,080.00) for complete systems**, excluding sales tax. THIS IS A TAX EXEMPT PROJECT WITH WMATA. **Option No. 2 of RECO's Engineering plans will be utilized, i.e. a one:one (1:1) strip to wall height ration is designed for construction.**

**SCHEDULE:**

Based upon immediate receipt of an acceptable, fully executed contract and Notice To Proceed, delivery is tentatively anticipated to commence on or about late September, 2003 or early October, 2003, barring any major problems and contingent upon timely receipt of: completed "Released For Construction" design drawings; requested information; approved shop detail drawings and all other necessary approvals; materials; and buy-out items. TIME IS OF THE ESSENCE with regard to the actions of and work performed by others, which affect Subcontractor's work. It is anticipated that the completed Wall C and Wall E construction might be completed for follow-up operations at those sites sometime from approximately six (6) weeks from the start of wall erection for WALL C, and from approximately three and one-half (3 ½) weeks from the start of WALL E, based upon the current project schedule and effort. **Total Work Effort is approximately 49 Crew Days for both Wall C and Wall E.**

**APPROXIMATE QUANTITIES OF WORK PER RECO PLANS:**

| | | | |
|---|---|---|---|
| WALL "C", Section A-A, Panels | : | 1,900 | SF |
| WALL "C", Section B-B, Panels | : | 3,800 | SF |
| WALL "C", Section C-C, Panels | : | 1,200 | SF |
| WALL "C", End Wall, Panels | : | 250 | SF |
| WALL "C", Excavation @ Toe of Back Slope | : | 350 | CY |
| WALL "C", CIP Concrete Leveling Pads | : | 600 | LF |
| WALL "C", Gravel Backfill, No. 57 | : | 7,206 | TON |
| | | | |
| WALL "E", Florida Avenue Panels | : | 3,300 | SF |
| WALL "E", Excavation @ Toe of Back Slope | : | 520 | CY (By Others) |
| WALL "E", CIP Concrete Leveling Pads | : | 186 | LF |
| WALL "E", Gravel Backfill, No. 57 | : | 5,044 | TON |

5.     **Work Exclusions by the Subcontractor:**

The following items are excluded and shall not be a part of the work performed by, are not included in the price to be paid to, and shall not be the responsibility of Subcontractor:

cost of taxes; cost of providing a bond, unless requested; work covered by other Bid Items; all finish painting and materials for same; field survey, layout, measurement, and verification work, except as addressed in this agreement; all field work and structural steel erection work; engineering and design work, except as provided for under the RECO and CONTECH agreements; PE stamp on shop drawings, except as provided for under the RECO and CONTECH agreements; railroad insurance or other insurance in excess of Subcontractor's normal limits and coverage's; bearings and attachment of bearings or bearing sole plates to the girder; anchor bolts except as noted; expansion joints; sign supports; light supports; utility supports; shear studs; embedded items; holes, fasteners, hangers, hardware, etc. for attachment of other's work to subcontractor's work; miscellaneous steel; lead paint removal and abatement; salvaging and reworking of existing steel; false work underpinning, and other temporary structures and materials; cost of utilizing teamster or other union delivery personnel or shipping companies; work which is not clearly and specifically shown, sized and dimensioned on the contract construction drawings; and any work which is not specifically noted in this Agreement as being included in Subcontractor's scope of work.

6.     **Subcontractor's price is based upon the following::**

At the time of shipment, Contractor shall designate and have available an adequate and accessible site to which the material shall be delivered. The Contractor shall provide and maintain free of charge: suitable access, site conditions, and staging/storage areas as required by Subcontractor and all necessary traffic control, barricades, flagmen, etc. Delivery to the site shall mean to the nearest accessible point to the site. Subcontractor's price is based on full truckloads only. Rate of delivery and timing shall be mutually agreed to. Materials will be shipped using conventional "over-the-highway" flatbed and pole trailers. Special hauling equipment (such as steerable dollies) is not included unless needed by Subcontractor to deliver the material to the vicinity of the jobsite. The pricing above is based upon substantially complete plans and engineering designs.

**Additional Work for Convenience of the General Contractor**:

(a)     IF THE GENERAL CONTRACTOR has "over-excavated" the "wall volume region", within which the Subcontractor is to construct the MSE walls **beyond a point more than 12 inches** past the end of the metal soil reinforcement straps, THEN the General Contractor WILL REIMBURSE the Subcontractor for any additional gravel aggregate (No. 57) materials placed for the General Contractor's convenience at a **UNIT PRICE OF $18.30 per TON of No. 57 Aggregate, furnished, placed, and compacted in-place.**  This additional No. 57 Aggregate material will be placed as required during the course of the MSE back fill operations, as coordinated during the MSE wall panel erection by the Subcontractor. The "method of measurement" for determination of the "additional quantity required and placed" will be via "truck scale measurement" from the delivery tickets provided by the "aggregate source or quarry" at the time that the aggregate is delivered to the site and installed into the MSE volumes. The Payment Option to the Subcontractor for any additional No. 57 aggregate materials placed will only begin **ONCE THE ESTIMATED BID QUANTITY OF 12,250 TONS OF**

**AGGREGATE HAS BEEN REACHED AND INSTALLED.** This, of course, has anticipated that the Subcontractor has provided for the proper quantity of aggregate materials necessary for MSE Wall Construction , as outlined on the RECO plans for the work at the "metal strip lengths" outlined by RECO. The "density factor" utilized by the Subcontractor and Contractor for the No. 57 Aggregate material "conversion" from CUBIC YARDS TO TONS PLACED is "1.85", as agreed. As such, 1.85 Tons of No. 57 Aggregate PER 1.0 Cubic Yard of Wall Volume has been assumed by both parties, based upon information and data received from Aggregate Industries, Inc., which is furnishing and delivering the No. 57 aggregate material to the project site for the Subcontractor.

(b)     It is recognized by the Contractor and Subcontractor that there **may** exist certain underground conditions at the "subgrade and invert elevations" of "NEW" RCCP Pipe, Storm Water Structures, Underground Detention Basins, etc., which **may be unacceptable** for installation of new underground storm elements, **WITHOUT the need** for some form of "undercutting and replacement" of unsuitable ground which may exist. IF IT IS DETERMINED FOR THE CONVENIENCE OF THE CONTRACTOR THAT "UNDERCUTTING AND REPLACEMENT" OPERATIONS MAY CREATE UNSAFE OR UNWORKABLE CONDITIONS AND SITUATIONS FOR THE SURROUNDING ELEMENTS OF THE NEW STATION CONSTRUCTION, THEN THE CONTRACTOR MAY REQUEST THAT THE SUBCONTRACTOR "INSTALL A CONCRETE CIP MUDMAT" AT THE BOTTOM INVERT OF THE EXCAVATED TRENCHES OR BULK EXCAVATION AREAS DURING THE COURSE OF THE WORK. This "mud mat option" will allow for work to continue WITHOUT THE NEED for any serious "undercutting" of "open trenches, open holes, or other such necessary excavations , which may endanger surrounding work already completed. The UNIT PRICE which will be paid to the Subcontractor for any "mud mat option work", for the convenience of the Contractor, will be as follows:

        MUD MAT OPTION, during TRENCHING OPERATIONS:     $476.00 per CY
        (which includes any excavation, backfill, concrete work, etc. as needed)

        MUD MAT OPTION, during BULK EXCAVATION WORK:     $133.00 per CY
        (which includes any excavation, backfill, concrete work, etc. as needed)

(b)     **Performance and Payment Bond for the Subcontract Amount:**

A Performance and Payment Bond for the "full amount" of the Subcontract Price IS REQUIRED due to policies established by SKANKSA AB, the Parent Company of Slattery Skanska Inc. Accordingly, **the Contractor (SL Joint Venture) will reimburse the Subcontractor the "ACTUAL COST" of the required bonds** upon receipt of an acceptable invoice and approval of the Bonds required. **It has been anticipated that the actual cost of the required bonds to the Subcontractor will not exceed ten thousand dollars ($10,000.00) Lump Sum. The "Subcontract Amount" to be used in determining the amount of for which the Bonds should be written is for at least $1,078,678.00 Lump Sum.**

7.   **TERMS AND CONDITIONS :**

**Subcontract Price:**

(a)   If, in the performance of its work on the Project, Subcontractor encounters concealed conditions at variance with conditions indicated in the agreement(s) with Contractor or concealed or unknown conditions differing materially from those ordinarily encountered, and generally recognized as inherent in work of the character performed by Subcontractor, the Subcontract Price shall be equitably adjusted by Change Order upon reasonable analysis and necessary claim by either party.

(b)   Sales taxes on materials furnished are not included in the Subcontract Price, unless explicitly stated otherwise on the Proposal.

(c)   The Subcontract Price does not include cost of performance and payment bonds or any item of like nature, except as provided for under this Agreement.

(d)   The Subcontract Price includes shop drawings, where required by Project specifications, but not field dimensions or surveys. Contractor shall return approval drawings to Subcontractor within a reasonable time, not to exceed in any event ten (10) working days.

(e)   Unless explicitly stated otherwise in the Subcontract Agreement, all Subcontractor pricing is based on work being performed on the basis of no more than 40 hours per week during standard working hours and days (the "normal working hours"). If the Contractor requires that work be performed at times other than during normal working hours, the hourly wages and insurance charged for such work shall be increased by Subcontractor's actual wage increases plus a reasonable allowance for overhead and profit. Should the Subcontractor work "overtime hours" for HIS CONVENIENCE at any time and for any reason other than authorization by the Contractor, no additional payment will be allowed.

(f)   Under no circumstances does Subcontractor waive its right to payment for extra work or work order changes performed by Subcontractor pursuant to instruction of the Contractor, in so far as reasonable notice has been given to the Contractor. The period for such reasonable notice shall not exceed that provided for within the Base Subcontract Agreement.

(g)   No backcharges or any claim by Contractor for any services shall be valid unless authorized by an agreement in writing executed by both Contractor and Subcontractor, except in the case of Subcontractor's failure to meet any requirement of the agreement between the parties. In such event, Contractor shall notify Subcontractor of such default, in writing, and allow Subcontractor reasonable time to correct any deficiency before incurring any cost chargeable to Subcontractor. Backcharges shall not be deducted from amounts due to Subcontractor, but rather shall be invoiced to the Subcontractor and paid by Subcontractor within thirty (30) days from receipt of the invoice. The "right of offset" will apply in this situation should Subcontractor not make payment for such agreed backcharges in a timely fashion, or as outlined herein.

### ***IMPORTANT NOTE***

The scope of work for the MSE WALL Construction, Storm Drainage Construction, and Underground Storm Detention System outlined and described in the aforementioned paragraphs and schedules is base strictly upon the plans and specifications provided by WMATA during the procurement phase of the project and those plans prepared to-date by Jacobs Civil, Inc., the Engineer-of-Record for the "SL" Joint Venture for this "Design-Build" Project. It is recognized by both the Subcontractor and the Design-Build Contractor (SL Joint Venture) that the above scope, estimated quantities, details, connections, engineering, fabrication requirements, and pricing may be increased and/or decreased, as a direct result of the Design-Build Contractor's engineering efforts, site surveys, location design, station layout, value engineering efforts with the Subcontractor, or other similar reasons. Throughout the various stages of "plan process" and "plan completion" by Jacobs Civil, Inc., the Design-Build Contractor will provide the Subcontractor at least two (2) sets of the new design-build plans for his review and consideration. A revised cost and pricing estimate of the actual work, which more closely outlines the actual work effort, may then be prepared by the Subcontractor and the Design-Build Contractor (SL Joint Venture). Modifications and adjustments to the Schedule of Prices and quantities of work will then be made jointly, in accordance with the terms and conditions of the Subcontract Agreement. Subsequently, a written change order to the Subcontract Agreement will be executed by both parties outlining the modifications to the base Agreement shown here. This Change Order and the revised scope of work will be consistent with the actual construction work to be performed to be performed based solely upon the actual design-build plans and specifications.

---

SL, a JOINT VENTURE OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION, CONTRACTOR

BY _____

Edward F. Hollander, P.E.
Area Manager/Senior Estimator
Name and Title

28 SEPT. 2003
Date

Attest: 9/28/03
Date

LAND L CONSTRUCTION ASSOCIATES, INC.
SUBCONTRACTOR

BY _____

CHARLES E. NANCE, ACM
Name and Title

9/26/03
Date

Attest: 9/26/03
Date

OFFICE MANAGER

**ACKNOWLEDGEMENT OF CONTRACTOR**

State of Virginia        )
                         ) ss.:
County of Pr. William    )

On this _19th_ day of _September_, 2003, before me personally came and appeared Edward F. Hollander, P.E., to me known, who, being by me duly sworn, did depose and say that he/she resides at 1384 Old Bridge Road, Woodbridge, VA 22192, that he/she is the Area Manager/ Senior Estimator of **"SL" JOINT VENTURE** OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION, the corporation described in and which executed the foregoing instrument; and that he/she is duly authorized to execute the said instrument on behalf of **SL, a JOINT VENTURE** OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION.

_____
Notary Public

My commission expires: ___8\31\07___                    (SEAL)


**ACKNOWLEDGEMENT OF SUBCONTRACTOR**

State of _Maryland_          )
                             ) ss.:
County of _Prince George's_  )

On this _26_ day of _September_, 2003, before me personally came and appeared _Charles E. Nance III_, to me known, who, being by me duly sworn, did depose and say that he/she resides at _12122 Wheeling Ave. Upper Marlboro, Md. 20772_, that he/she is the _Assistant General Manager_ of **LAND L CONSTRUCTION ASSOCIATES, INC.**, the corporation described in and which executed the foregoing instrument; and that he/she is duly authorized to execute the said instrument on behalf of **LAND L CONSTRUCTION ASSOCIATES, INC.**

_____
Notary Public

My commission expires: ___8/7/2006___

                                                        (SEAL)
                                        SANDRA E. LINDER
                                        Notary Public, State of Maryland
                                        Prince George's County
                                        My Commission Expires August 7, 2006

SANDRA E. LINDER
NOTARY
PUBLIC
PRINCE GEORGE'S CO., MD

SL Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

# APPENDIX "C"

## EQUAL EMPLOYMENT OPPORTUNITY

A.   In connection with the performance of work under this Subcontract, Subcontractor agrees not to discriminate against any employee or applicant for employment because of race, religion, sex, color, national origin, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, or political affiliation. The aforesaid provision shall include, but not be limited to the following employment: upgrading, demotion, or transfer, recruitment, or recruitment compensation; and selection for training including apprenticeship. Subcontractor agrees to post hereafter in conspicuous places available for employees and applicants for employment, notices prepared by Subcontractor and approved by the applicable government entity when required, setting for the provisions of Appendix "C".

B.   Subcontractor shall include the provisions of this Appendix "C" in every lower-tier subcontract and purchase order. The requirements of this Appendix "C" shall be in addition to any Equal Employment Opportunity provision of the Contract Documents.

C.   In the event of Subcontractor's non-compliance with the Equal Employment Opportunity provisions of this Subcontract, Contractor may immediately terminate this Subcontract.

D.   Subcontractor shall comply fully with the WMATA Contract Provisions attached to this document noted as Pages C-2 through C-16.

**L & L CONSTRUCTION ASSOCIATES**
Subcontractor

By: _____
       (Signature)

CHARLES E. NANCE
ASST. GEN. MGR
_____
Name and Title

**SL, a JOINT VENTURE** OF SLATTERY
SKANSKA, INC. and THE LANE CONSTRUCTION
CORPORATION
Contractor

By: _____
       (Signature)

Edward F. Hollander, P.E.
Area Manager/Senior Estimator
_____
Name and Title

C-1

00811   STANDARD FEDERAL EQUAL EMPLOYMENT OPPORTUNITY CONSTRUCTION CONTRACT
        SPECIFICATIONS (EXECUTIVE ORDER 11246)

A.   As used in these Specifications:

1.   "Covered area" means the geographical area described in the solicitation from which this
     Contract resulted;

2.   "Director" means Director, Office of Federal Contract Compliance Programs, United States
     Department of Labor, or any person to whom the Director delegates authority.

3.   "Employer identification number" means the Federal Social Security number used on the
     Employer's Quarterly Federal Tax Return, U.S. Treasury Department Form 941.

4.   "Minority" includes:

     a.   Black (all persons having origins in any of the black African racial groups not of Hispanic
          origin);

     b.   Hispanic (all persons of Mexican, Puerto Rican, Cuban, Central or South American or
          other Spanish Culture or origin, regardless of race);

     c.   Asian and Pacific Islander (all persons having origins in any of the original peoples of the
          Far East, Southeast Asia, the Indian Subcontinent, or the Pacific Islands); and

     d.   American Indian or Alaskan Native (all persons having origins in any of the original peoples
          of North America and maintaining identifiable tribal affiliations through membership and
          participation or community identification).

5.   "Contractor" means the Design-Builder as defined in the General Provisions of the Design-
     Build Contract (as applied herein).

B.   Whenever the Design-Builder, or any subcontractor at any tier, subcontracts a portion of the work
     involving any construction trade, it shall physically include in each subcontract in excess of
     $10,000 the provisions of these Specifications and the Notice which contains the applicable goals
     for minority and female participation and which is set forth in the solicitations from which this
     Contract resulted.

C.   If the Design-Builder is participating (pursuant to 41 CFR 60-4.5) in a Hometown Plan approved by
     the U.S. Department of Labor in the covered area either individually or through an association, its
     affirmative action obligations on all work in the Plan area (including goals and time tables) shall be
     in accordance with that Plan for those trades which have unions participating in the Plan.
     Contractors must be able to demonstrate their participation in the compliance with the provisions
     of any such Hometown Plan. Each contractor or subcontractor participating in an approved Plan
     is individually required to comply with its obligations under the EEO clause, and to make a good
     faith effort to achieve each goal under the Plan in each trade in which it has employees. The overall
     good faith performance by other Contractors or subcontractors toward a goal in an approved Plan
     does not excuse any covered Contractor's or subcontractor's failure to take good faith efforts to
     achieve the Plan goals and time tables.

D.   The Design-Builder shall implement the specific affirmative action standards provided in Paragraphs
     G.1-16 below in this Section. The goals set forth in the solicitation, in Section 00813 Paragraph.
     B., from which this Contract resulted are expressed as percentage of the total hours of
     employment and training of minority and female utilization the Design-Builder would reasonably

be able to achieve in each construction trade in which it has employees in the covered area. Covered construction contractors performing construction work in geographical areas where they do not have a Federal or Federally assisted construction contract shall apply the minority and female goal established for the geographical area where the work is being performed. Goals are published periodically in the Federal Register in notice form, and such notices may be obtained from any Office of Federal Contract Compliance Programs or from Federal procurement contracting officers. The Design-Builder is expected to make substantially uniform progress toward it goals in each craft during the period specified.

E.   Neither the provisions of any collective bargaining agreement, nor the failure by a union with whom the Design-Builder has a collective bargaining agreement, to refer either minorities or women shall excuse the Contractor's obligations under these Specifications, Executive Order 11246 or the regulations promulgated pursuant thereto.

F.   In order for the non-working training hours of apprentices and trainees to be counted in meeting the goals, such apprentices and trainees must be employed by the Design-Builder during the training period, and the Design-Builder must have made a commitment to employ the apprentices and trainees at the completion of their training, subject to the availability of employment opportunities. Trainees must be trained pursuant to training programs approved by the U.S. Department of Labor.

G.   The Design-Builder shall take specific affirmative actions to ensure equal employment opportunity. The evaluation of the Contractor's compliance with these Specifications shall be based upon its effort to achieve maximum results from its actions. The Design-Builder shall document these efforts fully, and shall implement affirmative action steps at least as extensive as the following:

1.   Ensure and maintain a working environment free of harassment, intimidation and coercion at all sites, and in all facilities at which the Contractor's employees are assigned to work. The Design-Builder, where possible, will assign two or more women to each construction project. The Design-Builder shall specifically ensure that all foremen, superintendents, and other onsite supervisory personnel are aware of and carry out the Contractor's obligation to maintain such a working environment, with specific attention to minority or female individuals working at such sites or in such facilities.

2.   Establish and maintain a current list of minority and female recruitment sources, provide written notification to minority and female recruitment sources and to community organizations when the Design-Builder or its unions have employment opportunities available, and maintain a record of the organization's responses.

3.   Maintain a current file of the names, addresses and telephone numbers of each minority and female off-the-street applicant and minority or female referral from a union, a recruitment source or community organization and of what action was taken with respect to each such individual. If such individual was sent to the union hiring hall for referral and was not referred back to the Design-Builder by the union or, if referred, not employed by the Design-Builder, this shall be documented in the file with the reason therefor, along with whatever additional actions the Design-Builder may have taken.

4.   Provide immediate written notification to the Director when the union or unions with which the Design-Builder has a collective bargaining agreement has not referred to the Design-Builder a minority person or woman sent by the Design-Builder, or when the Design-Builder has other information that the union referral process has impeded the Contractor's efforts to meet its obligations.

5.   Develop on-the-job training opportunities and/or participate in training programs for the area which expressly include minorities and women, including upgrading programs and

C-3

Case 1:05-cv-01289-RCL   Document 9-2   Filed 08/23/2005   Page 49 of 130

apprenticeship and trainee programs relevant to the Contractor's employment needs, especially those programs funded or approved by the Department of Labor. The Design-Builder shall provide notice of these programs to the sources compiled under Section G.2 above.

6.  Disseminate the Contractor's EEO policy by providing notice of the policy to unions and training programs and requesting their cooperation in assisting the Design-Builder in meeting its EEO obligations by including it in any policy manual and collective bargaining agreement; by publicizing it in the company newspaper, annual report, etc.; by specific review of the policy with all management personnel and with all minority and female employees at least once a year; and by posting the company EEO policy on bulletin boards accessible to all employees at each location where construction work is performed.

7.  Review, at least annually, the company's EEO policy and affirmative action obligations under these Specifications with all employees having any responsibility for hiring, assignment, layoff, termination or other employment decisions including specific review of these items with onsite supervisory personnel such as Superintendents, General Foremen, etc., prior to the initiation of construction work at any job-site. A written record shall be made and maintained identifying the time and place of these meetings, persons attending, subject matter discussed, and disposition of the subject matter.

8.  Disseminate the Contractor's EEO policy externally by including it in any advertising in the news media, specifically including minority and female news media, and providing written notification to and discussing the Contractor's EEO policy with other contractors and subcontractors with whom the Design-Builder does or anticipates doing business.

9.  Direct its recruitment efforts, both oral and written, to minority, female and community organizations, to schools with minority and female students and to minority and female recruitment and training organizations serving the Contractor's recruitment area and employment needs. Not later than one month prior to the date for the acceptance of applications for apprenticeship or other training by an recruitment source, the Design-Builder shall send written notification to organization such as the above, describing the openings, screening procedures, and tests to be used in the selection process.

10. Encourage present minority and female employees to recruit other minority persons and women and, where reasonable, provide after-school, summer and vacation employment to minority and female youth both on the site and in other areas of a Contractor's workforce.

11. Validate all tests and other selection requirements where there is an obligation to do so under 41 CFR Part 60-3.

12. Conduct, at least annually, an inventory and evaluation at least of all minority and female personnel for promotional opportunities and encourage these employees to seek or to prepare for, through appropriate training, etc., such opportunities.

13. Ensure that seniority practices, job classification, work assignments and other personnel practices, do not have a discriminatory effect by continually monitoring all personnel and employment- related activities to ensure that the EEO policy and the Contractor's obligations under these Specifications are being carried out.

14. Ensure that all facilities and company activities are non-segregated except that separate or single-user toilet and necessary changing facilities shall be provided to assure privacy between the sexes.

15. Document and maintain a record of all solicitations of offers for subcontracts from minority and

female construction contractors and suppliers, including circulation of solicitation to minority and female contractor associations and other business associations.

16. Conduct a review, at least annually, of all supervisors' adherence to and performance under the Contractor's EEO policies and affirmative action obligations.

H. Contractors are encouraged to participate in voluntary associations which assist in fulfilling one or more of their affirmative action obligations stated above in Paragraphs G.1-16. The efforts of a contractor association, joint contractor-union, contractor-community, or other similar group of which the Design-Builder is a member and participant, may be asserted as fulfilling any one or more of its obligations under Paragraphs G.1-16 of this Specification provided that the Design-Builder actively participates in the group, makes every effort to assure that the group has a positive impact on the employment of minorities and women in the industry, ensure that the concrete benefits of the program are reflected in the Contractor's minority and female workforce participation, makes a good faith effort to meet its individual goals and timetables, and can provide access to documentation which demonstrate the effectiveness of action taken on behalf of the Design-Builder. The obligation to comply, however, is the Contractor's and failure of such a group to fulfill an obligation shall not be a defense for the Contractor's noncompliance.

I. A single goal for minorities and a separate single goal for women have been established in Section 00813 Par. B. The Design-Builder, however, is required to provide equal employment opportunity and to take affirmative action for all minority groups, both male and female, and all women, both minority and non-minority. Consequently, the Design-Builder may be in violation of the Executive Order if a particular group is employed in a substantially disparate manner (for example, even though the Design-Builder has achieved its goal for women generally, the Design-Builder may be in violation of the Executive Order if a specific minority group of women is underutilized).

J. The Design-Builder shall not use the goals and timetable or affirmative action standards to discriminate against any person because of race, color, religion, sex, or national origin.

K. The Design-Builder shall not enter into any subcontract with any person or firm debarred from Government contracts pursuant to Executive Order 11246.

L. The Design-Builder shall carry out such sanctions and penalties for violation of these Specifications and of the Equal Opportunity Clause, including suspension, termination and cancellation of existing subcontracts as may be imposed or ordered pursuant to Executive Order 11246, as amended, and its implementing regulations, by the Office of Federal Contract Compliance Programs. Any contractor who fails to carry out such sanctions and penalties shall be in violation of these Specifications and Executive Order 11246, as amended.

M. The Design-Builder, in fulfilling its obligations under this Contract, shall implement specific affirmative action steps at least as extensive as those standards prescribed in Section G of these Specifications, so as to achieve maximum results from its efforts to ensure equal employment opportunity. If the Design-Builder fails to comply with their requirements of the Executive Order, the implementing regulations, or these Specifications, the Director shall proceed in accordance with 41 CFR 60-4-8.

N. The Design-Builder shall designate a responsible official to monitor all employment-related activity to ensure that the company EEO policy is being carried out, to submit reports relating to the provisions hereof as may be required by the Government and to keep records. Records shall at least include for each employee the name, address, telephone numbers, construction trade, union affiliation it any, employee identification number when assigned, social security number, race, sex, status (e.g. mechanic, apprentice, trainee, helper, or laborer), dates of changes in status, hours worked per week in the indicated trade, rate of pay, and locations at which the work was

C-5

Case 1:05-cv-01289-RCL   Document 9-2   Filed 08/23/2005   Page 39 of 130

performed. Records shall be maintained in an easily understandable and retrievable form; however, to the degree that existing records satisfy this requirement, contractors shall not be required to maintain separate records.

O.  Nothing herein provided shall be construed as a limitation upon the application of other laws which established different standards of compliance or upon the application of requirements for the hiring of local or other area residents (e.g., those under the Public Works Employment Act of 1977 and the Community Development Block Grant Program).

00812   AFFIRMATIVE ACTION PROGRAM

A.  Affirmative Action Program submitted in accordance with the Instructions to Proposers shall be implemented and maintained in force by the Design-Builder during the term of the Contract and be made available to affected disadvantaged groups. If such program is denied a group, the burden shall be on the Design-Builder to show that the group is not an affected group. Emphasis is placed on the following requirements not to the exclusion of other requirements of these instructions or the Contract Documents:

1.  To ensure equal employment opportunity, the Design-Builder shall recruit disadvantaged individuals necessary to meet the requirements of the Affirmative Action Program and involve to the fullest, local vocational institutions, and trade unions in the effort. Disadvantaged individuals shall be afforded every reasonable opportunity for training and advancement to ensure equality with nondisadvantaged employees. The Design-Builder, insofar as practicable, shall employ in the performance of the work, qualified citizens who are residents of the area comprising the Authority Transit Zone.

2.  It is the policy of the Authority that equal opportunity to participate in Authority procurements be provided to disadvantaged business enterprises. In order to ensure that a fair proportion of the purchases and contracts for supplies and services for the Authority are placed with disadvantaged business enterprises, the Design-Builder agrees to take affirmative action to identify qualified disadvantaged firms, solicit bids and quotations from them and, in making awards and purchases, give equitable consideration to disadvantaged business enterprises. The method for accomplishing this shall be in accordance with the Instructions to Proposers.

3.  To implement the Affirmative Action Program on each of those contracts exceeding $5,000,000, the Design-Builder shall provide for, and maintain, an Affirmative Action Officer (AAO) who will be a full-time employee who shall work full time on AAO duties and the Design-Builder may not designate the individual who is approved as AAO for this Contract as an AAO for a concurrent period on any other contract. On contracts of a lesser amount, the Design-Builder shall designate a person part time to act as the AAO. The AAO shall be the liaison between the Design-Builder and the Authority with regard to Equal Employment Opportunity (EEO) and Disadvantaged Business Enterprise (DBE). The AAO shall be subject to approval by the Authority. Once approved, the AAO shall not be replaced without prior written approval of the Authority. An approved AAO, who performs satisfactorily, shall be present at the construction site throughout the duration of the Contract. If, at any time, the project is without the services of an approved AAO for a period exceeding 30 calendar days, or if the Authority notifies the Design-Builder that the AAO's performance is unsatisfactory and if, in the sole judgment of the Authority, that performance remains unsatisfactory for 30 days, the Authority may withhold progress payments until such time as an approved AAO, who performs satisfactorily, is present on the site of the work. The AAO shall:

a.  Submit all required or requested reports and shall record all efforts concerning the implementation of the Design-Builder's EEO Affirmative Action Program.

Downloaded by [ ] at 08/23/2006

   b.  Submit all required or requested reports and shall record all efforts to implement the
       Design-Builder's DBE and WBE Affirmative Action Programs.

   c.  Record all efforts to inform the disadvantaged community of available employment and
       procurement opportunities with the Design-Builder and record their responses.

   d.  Investigate and make every effort to resolve all complaints of discrimination based on race,
       color, sex, religion or national origin within the company or at the construction site. Failure
       to resolve such problems shall be reported in writing to the Authorized Representative of
       the Authority.

4.  The Design-Builder shall implement a uniform method of keeping data concerning ethnic
    classifications of all personnel and furnish all subcontractors with guidelines to develop a
    system of maintaining such records. The company format for such data keeping shall be as
    submitted to the Authority prior to the award of the Contract. Where the Design-Builder, after
    reasonable efforts, is unable to locate sufficient disadvantaged individuals and/or businesses
    to carry out the intent of the Affirmative Action Program, the Authority will:

    a.  Review the documentation recording the Design-Builder's efforts, and

    b.  Offer to the Design-Builder any reasonable alternatives or additional resources.

    The Design-Builder's efforts and Authority's review of these efforts should normally be
    accomplished in a time period of 30 days after Notice to Proceed during which time the
    Design-Builder shall proceed with its adopted construction schedule.

5.  The Design-Builder shall publicly display in every employment advertisement that it practices
    equal opportunity employment. Additionally, posters issued by the Equal Employment
    Opportunity Commission and the Office of Federal Contract Compliance shall be posted in
    places highly visible to all workers, supervisors and employees.

6.  The Design-Builder shall make contact with local Contractor Associations and other
    organizations whose purpose is to promote equal employment opportunity.

7.  The Design-Builder shall maintain a program for the advancement of apprentices. Apprentices
    shall be advanced in the trade as their abilities develop in accordance with the requirements
    of the apprentice training program of the Manpower Development Training Program.

8.  With respect to subcontractors, the Design-Builder shall:

    a.  Determine those areas in which DBE subcontractors may be used.

    b.  Determine if there are DBE subcontractors available to perform such contract work and
        identify them.

    c.  Contact the Authority's Office of Civil Rights if assistance in identifying DBE Subcontractor
        capability is needed.

    d.  Solicit bids from these subcontractors and award as appropriate.

9.  The Design-Builder shall consult with the DBE subcontractors regarding the Design-Builder's
    requirements as they pertain to ability to perform, financial stability, and the utilization of
    subcontracts.

Case 1:05-cv-01289-RCL    Document 9-2    Filed 08/23/2005    Page 53 of 130

10. The primary obligation to establish and maintain a complete and effective program rests with the Design-Builder.

00813   NOTICE OF REQUIREMENT FOR AFFIRMATIVE ACTION TO ENSURE EQUAL EMPLOYMENT OPPORTUNITY (EXECUTIVE ORDER 11246)

A.   The Offeror's or Bidder's attention is called to the "Equal Opportunity Clause", and the "Standard Federal Equal Employment Specifications" set forth herein.  ·

B.   The goals and timetables for minority and female participation, expressed in percentage terms for the Design-Builder's aggregate workforce in each trade on all construction work in the covered area, are as follows:

1. Goal for Minority Participation for Each Trade   28.0%.
2. Goal for Female Participation in Each Trade      6.9%.

These goals are applicable to all the Design-Builder's construction work (whether or not it is Federal or federally assisted) performed in the covered area. If the Design-Builder performs construction work in a geographical area located outside of the covered area, it shall apply the goals established for such geographical area where the work is actually performed. With regard to this second area, the Design-Builder also is subject to the goals for both its federally involved and non-federally involved construction.

The Design-Builder's compliance with the Executive Order and the regulations in 41 CFR Part 60-4 shall be based on its implementation of the Equal Opportunity Clause, specific affirmative action obligations required by the specifications set forth in 41 CFR 60.4.33(a), and its efforts to meet the goals. The hours of minority and female employment and training must be substantially uniform throughout the length of the Contract, and in each trade, and the Design-Builder shall make a good faith effort to employ minorities and women evenly on each of its projects. The transfer of minority or female employees or trainees from contractor to contractor or from project to project for the sole purpose of meeting the Design-Builder's goals shall be a violation of the Contract, the Executive Order and the regulations in 41 CFR Part 60-4. Compliance with the goals will be measured against the total work hours performed.

C.   The Design-Builder shall provide written notification to the Director of the Office of Federal Contract Compliance Programs within 10 working days of award of any construction subcontract in excess of $10,000 at any tier for construction work under the Contract resulting from this solicitation. The notification shall list the name, address and telephone number of the subcontractor, employer identification number, estimated dollar amount of the subcontract; estimated starting and completion dates of the subcontract; and the geographical area in which the Contract is to be performed.

D.   As used in this Notice, and in the Contract resulting from this solicitation, the "covered area" is: District of Columbia; the Virginia Cities of Alexandria, Fairfax, and Falls Church; the Virginia Counties of Arlington, Fairfax, Loudoun and Prince William; and the Maryland Counties.

00814   DISADVANTAGED BUSINESS ENTERPRISE

In connection with the performance of this Contract, the Design-Builder agrees to cooperate with the Authority in meeting its commitments and goals with regard to the maximum utilization of Disadvantaged Business Enterprises (DBE) and further agrees to exert good faith efforts to satisfy the requirements of Appendix B by subcontracting portions of the work to disadvantaged firms, by entering into joint ventures with disadvantaged firms, or both. The percentage goal of DBE participation for this contract is 25%. The DBE policy of the Authority underwent a complete revision October 1, 1999 to

Case 1:05-cv-01289-RCL    Document 9-2    Filed 08/23/2005    Page 54 of 130

meet revised Federal requirements. The DBE provisions of this RFP are subject to revision by amendment. In connection with the performance of this Contract, the Design-Builder agrees to cooperate with the Authority in meeting its commitments and goals with regard to the maximum utilization of disadvantaged business enterprises as set forth in this Contract. The Design-Builder further agrees to exert good faith efforts to satisfy the requirements of the Contract by subcontracting portions of the work to disadvantaged firms, by entering into joint ventures with disadvantaged firms, or both.

00815   UTILIZATION OF SMALL BUSINESS CONCERNS

A.   It is the policy of the Authority that a fair proportion of the purchases and contracts for supplies and services for the Authority be placed with small business concerns.

B.   The Design-Builder agrees to accomplish the maximum amount of subcontracting to small business concerns that the Design-Builder finds to be consistent with the efficient performance of this Contract.

00816   LABOR PROVISIONS

A.   The following provisions B TO L apply only to the Construction portion of the Design-Builder contract.

B.   Minimum Wages

1.   All laborers and mechanics employed or working upon the site of the work (or under the United States Housing Act of 1937 or under the Housing-Act of 1949 in the construction or development of the project), will be paid unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account (except such payroll deductions as are permitted by regulations issued by the Secretary of Labor under the Copeland Act, 29 C.F.R. Part 3), the full amount of wages and bona fide fringe benefits (or cash equivalents thereof) due at the time of payment computed at rates not less than those contained in the wage determination of the Secretary of Labor which is attached hereto and made a part hereof, regardless of any contractual relationship which may be alleged-to exist between the Design-Builder and such laborers and mechanics. Contributions made or costs reasonably anticipated for bona fide fringe benefits under Section 1(b) (2) of the Davis-Bacon Act on behalf of laborers or mechanics are considered wages paid to such laborers or mechanics, subject to the provisions of 29 C.F.R. §5.5(a)(1)(iv); also, regular contributions made or costs incurred for more than a weekly period (but not less often than quarterly) under plans, funds, or programs that cover the particular weekly period, are deemed to be constructively made or incurred during such weekly period. Such laborers and mechanics shall be paid the appropriate wage rate and fringe benefits on the wage determination for the classification of work actually performed, without regard to skill, except as provided at 29 C.F.R. §5.5(a)(4). Laborers or mechanics performing work in more than one classification may be compensated at the rate specified for each classification for the time actually worked therein, provided, that the employer's payroll records accurately set forth the time spent in each classification in which work is performed. The wage determination (including any additional classification and wage rates conformed under 29 C.F.R. §5.5(a)(1)(ii) And the Davis-Bacon poster (WH-1321) shall be posted at all times by the Design-Builder and its Subcontractor at the site of the work in a prominent and accessible place where it can be easily seen by the workers.

a.   The Authority Representative shall require that any class of laborers or mechanics, including helpers, which is not listed in the wage determination and which is to be employed under the contract shall be classified in conformance with the wage

Case 1:05-cv-01289-RCL    Document 9-2    Filed 08/23/2005    Page 55 of 130

determination. The Authority Representative shall approve an additional classification and wage rate and fringe benefits therefore only when the following criteria have been met:

1. The work to be performed by the classification requested is not performed by a classification in the wage determination; and

2. The classification is utilized in the area by the construction industry; and

3. The proposed wage rate, including any bona fide fringe benefits, bears a reasonable relationship to the wage rates contained in the wage determination.

b. If the Design-Builder and the laborers and mechanics to be employed in the classification (if known), or their representatives, and the Authority Representative agree on the classification and wage rate (including the amount designated for fringe benefits where appropriate), a report of the action taken shall be sent by the Authority Representative to the Administrator of the Wage and Hour Division, Employment Standards Administration, Washington, D.C. 20210. The Administrator, or an authorized representative, will approve, modify, or disapprove every additional classification action within 30 days of receipt and so advise the Authority Representative or will notify the Authority Representative within the 30-day period that additional time is necessary.

c. In the event the Design-Builder, the laborers or mechanics to be employed in the classification or their representatives, and the Authority Representative do not agree on the proposed classification and wage rate (including the amount designated for fringe benefits, where appropriate), the Authority Representative shall refer the questions, including the views of all interested parties and the recommendation of the Authority Representative to the administrator for determination. The Administrator, or an authorized representative, will issue a determination with 30 days of receipt and so advise the Authority Representative or will notify the Authority Representative within the 30-day period that additional time is necessary.

d. The wage rate (including fringe benefits where appropriate) determined pursuant to 816 B.1.b. and c. above, shall be paid to all workers including helpers performing work in the classification under this contract from the first day on which work is performed in the classification.

2. Whenever the minimum wage rate prescribed in the contract for a class of laborers or mechanics includes a fringe benefit which is not expressed as an hourly rate, the Design-Builder shall either pay the benefit as stated in the wage determination or shall pay another bona fide fringe benefit or an hourly cash equivalent thereof.

3. If the Design-Builder does not make payments to a trustee or other third person, the Design-Builder may consider as part of the wages of any laborer or mechanic the amount of any costs reasonably anticipated in providing bona fide fringe benefits under a plan or program, provided, that the secretary of labor has found, upon the written request of the Design-Builder, that the applicable standards of the Davis-Bacon act have been met. The Secretary of labor may require the Design-Builder to set aside in a separate account assets for the meeting of obligations under the plan or program.

C. Withholding

1. The Authority shall upon its own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld from the Design-Builder, under this agreement or any other federal contract with the same recipient or any other federally-assisted

C - 10

Washington Metropolitan Area Transit Authority     Contract No. 1B0035
Case 1:05-cv-01289-RCL    Document 9-2    Filed 08/23/2005    Page 56 of 130
Design-Build Contract RFP   C - 1B0035/JDC       Date: July 23 , 2001

contract subject to Davis-Bacon prevailing wage requirement, which is held by the same prime Design-Builder, so much of the accrued payments or advances as may be considered necessary to pay laborers and mechanics, including apprentices, trainees, and helpers, employed by the Design-Builder or any subcontractor the full amount of wages required by the contract. In the event of failure to pay any laborer or mechanic, including any apprentice, trainee, or helper, employed or working on the site of the work (or under the United States Housing Act of 1937 or under the Housing Act of 1949 in the construction or development of the project), all or part of the wages required by the contract, the FTA may, after written notice to the Design-Builder, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee or funds until such violations have ceased.

a.    Payrolls and Basic Records

    1.   Payrolls and basic records relating thereto shall be maintained by the Design-Builder during the course of the work and preserved for a period of three years thereafter for all laborers and mechanics working at the site of the work (or under the United States Housing Act of 1937, or under the Housing Act of 1949, in the construction or development of the project). Such records shall contain the name, address, and social security number of each such worker, his or her correct classification, hourly rates of wages paid (including rates of contributions or costs anticipated for bona fide fringe benefits or cash equivalents thereof of the types described in Section 1(b)(2)(b) of the Davis-Bacon act), daily and weekly number of hours worked, deductions made and actual wages paid. Whenever the Secretary of labor has found under 29 C.F.R. §5 5.5(a)(1)(iv) that the wages of any laborer or mechanic include the amount of any costs reasonably anticipated in providing benefits under a plan or program described in Section 1(b)(2)(b) of the Davis-Bacon Act, the Design-Builder shall maintain records which show that the commitment to provide such benefits is enforceable, that the plan or program is financially responsible, and that the plan or program has been communicated in writing to the laborers or mechanics affected, and records which show the costs anticipated or the actual costs incurred in providing such benefits. Design-Builders employing apprenticeship or trainees under approved programs shall maintain written evidence of the registration of apprenticeship programs and certification of trainee programs, the registration of the apprentices and trainees, and the ratios and wage rates prescribed in the applicable programs.

b.    The Design-Builder shall submit weekly for each week in which any contract work is performed a copy of all payrolls to the FTA if the FTA is a party to the contract; but if not, the Design-Builder shall submit all payrolls weekly to the Authority. The payrolls submitted shall set out accurately and completely all of the information required to be maintained under 29 C.F.R. §5.5(a)(3)(i). This information may be submitted in any form desired. Optional form WH-347 is available for this purpose and may be purchased from the Superintendent of Documents (Federal Stock no. 029-005-00014-1), U.S. Government Printing Office, Washington, D.C. 20402. The Design-Builder is responsible for the submission of copies of payrolls by all Subcontractors.

c.    Each payroll submitted shall be accompanied by a "Statement of Compliance" signed by the Design-Builder or Subcontractor or his or her agent who pays or supervises the payment of the persons employed under the contract and shall certify the following:

    1.   That the payroll for the payroll period contains the information required to be maintained under 29 C.F.R. §5.5.(a)(3)(i) And that such information is correct and complete;

Case 1:05-cv-01289-RCL   Document 9-2   Filed 08/23/2005   Page 57 of 130

2. That each laborer or mechanic (including each helper, apprentice, and trainee) employed on the contract during the payroll period has been paid the full weekly wages earned, without rebate, either directly or indirectly, and that no deductions have been made either directly or indirectly from the full wages earned, other than permissible deductions as set forth at 29 C.F.R. Part 3;

3. That each laborer or mechanic has been paid not less than the applicable wage rates and fringe benefits or cash equivalents for the classification of work performed, as specified in the applicable wage determination incorporated into the contract.

d. The weekly submission of a properly executed certification set forth on the reverse side of optional Form WH-347 shall satisfy the requirement for submission of the "Statement of Compliance" required by 29 C.F.R. §5.5(a)(3)(ii)(B).

e. The falsif)cation of any of the above certifications may subject the Design-Builder or Subcontractor to civil or criminal prosecution under 18 U.S.C. §1001 and 31 U.S.C. §3729.

2. The Design-Builder or Subcontractor shall make the records required under 29 C.F.R. §5.5(a)(3)(i) available for inspection, copying, or transcription by authorized representatives of the Department of Labor, and shall permit such representatives to interview employees during working hours on the job. If the Design-Builder or Subcontractor fails to submit the required records or make them available, the authority may, after written notice to the Design-Builder, sponsor, applicant, or owner, take such action as may be necessary to cause the suspension of any further payment, advance, or guarantee of funds. Furthermore, failure to submit the required records upon request or make such records available may be grounds for debarment action pursuant to 29 C.F.R. §5.12.

a. Apprentices: Apprentices will be permitted to work at less than the predetermined rate for the work they performed when they are employed pursuant to and individually registered in a bona fide apprenticeship program registered with the U.S. Department of Labor, Employment and Training Administration, Office of Apprenticeship, Training and Employer Labor Services, or with a State apprenticeship agency recognized by the Office, or if a person is employed in his or her first 90 days of probationary employment as an apprentice in such an apprenticeship program, who is not individually registered in the program, but who has been certified by the Office of Apprenticeship, Training and Employer Labor Services or a State Apprenticeship Agency (where appropriate) to be eligible for probationary employment as an apprentice. The allowable ratio of apprentices to journeymen on the job site in any craft classification shall not be greater than the ratio permitted to the Design-Builder as to the entire work force under the registered program. Any worker listed on a payroll at an apprentice wage rate, who is not registered or otherwise employed as stated above, shall be paid not less than the applicable wage on the wage, determination for the classification of work actually performed. In addition, any apprentice performing work on the job site in excess of the ratio permitted under the registered program shall be paid not less than the applicable wage rate on the wage determination for the work actually performed. Where a Design-Builder is performing construction on a project in a locality other than that in which its program is registered, the ratios and wage rates (expressed in percentages of the journeyman's hourly rate) specified in the Design-Builder's or Subcontractor's registered program shall be observed. Every apprentice must be paid at not less than the rate specified in the registered program for the apprentice's level of progress, expressed as a percentage of the journeyman hourly rate specified in the applicable wage determination. Apprentices shall be paid fringe benefits in accordance with the provisions of the apprenticeship program. If the apprenticeship program does not specify fringe benefits, apprentices must be paid the full

Case 1.05-cv-01289-RCL   Document 9-2   Filed 08/23/2005   Page 58 of 130

amount of fringe benefits listed on the wage determination for the applicable classification. If the Administrator determines that a different practice prevails for the applicable apprentice classification, fringe benefits shall be paid in accordance with that determination. In the event the Office of Apprenticeship, Training and Employer Labor Services, or a state apprenticeship agency recognized by the Office, withdraws approval of an apprenticeship program, the Design-Builder will no longer be permitted to utilize apprentices at less than the applicable predetermined rate for the work performed until an acceptable program is approved.

b.  Trainees: Except as provided in 29 C.F.R. §5.16, trainees will not be permitted to work at less than the predetermined rate for the work performed unless they are employed pursuant to and individually registered in a program which has received prior approval, evidenced by formal certification by the U.S. Department of Labor, Employment and Training Administration. The ratio of trainees to journeymen on the job site shall not be greater than permitted under the plan approved by the Employment and Training Administration. Every trainee must be paid at not less than the rate specified in the approved program for the trainee's level of progress, expressed as a percentage of the journeyman hourly rate specified in the applicable wage determination. Trainees shall be paid fringe benefits in accordance with the provisions of the trainee program. If the trainee program does not mention fringe benefits, trainees shall be paid the full amount of fringe benefits listed on the wage determination unless the Administrator of the Wage and Hour Division determines that there is an apprenticeship program associated with the corresponding journeyman wage rate on the wage determination that provides for less than full fringe benefits for apprentices. Any employee listed on the payroll at a trainee rate who is not registered and participating in a training plan approved by the employment and training administration shall be paid not less than the applicable wage rate on the wage determination for the classification of work actually performed. In addition, any trainee performing work on the job site in excess of the ratio permitted under the registered program shall be paid not less than the applicable wage rate on the wage determination for the work actually performed. In the event the employment and training administration withdraws approval of a training program, the Design-Builder will no longer be permitted to utilize trainees at less than the applicable predetermined rate for the work performed until an acceptable program is approved.

c.  Equal employment opportunity. The utilization of apprentices, trainees, and journeymen under 29 C.F.R. Part 5 shall be in conformity with the equal employment opportunity requirements of Executive Order No. 11246, as amended 29 C.F.R. Part 30.

D.  Compliance with Copeland Act Requirements. The Design-Builder shall comply with the requirements of 29 C.F.R. Part 3, which are incorporated herein by reference.

E.  Contract Termination: Debarment. A breach of the contract clauses in 29 C.F.R. §5.5 may be grounds for termination of the contract, and for debarment as a Design-Builder and/or a Subcontractor as provided in 29 C.F.R. §5.12.

F.  Compliance with Davis-Bacon and Related Act Requirements. All rulings and interpretations of the Davis-Bacon and related Acts contained in 29 C.F.R. Parts 1, 3 and 5 are incorporated herein by reference.

G.  Disputes Concerning Labor Standards. Disputes arising out of the Labor Standards Provisions of this contract shall not be subject to the general disputes clause of this contract. Such disputes shall be resolved in accordance with the procedures of the Department of Labor set forth in 29 C.F.R. Parts 5, 6, and 7. Disputes within the meaning of this clause include disputes between the Design-Builder (or any of its Subcontractor) and the contracting agency, the U.S. Department of

Labor, or the employees or their representatives.

H.  Certification of Eligibility

1.  By entering into this agreement or a third party contract financed under this agreement the Design-Builder certifies that neither it (nor he nor she) nor any person or firm that has an interest in the Design-Builder's firm is a person or firm ineligible to be awarded government contracts by virtue of Section 3(a) of the Davis-Bacon Act or 29 C.F.R. §5.12(a)(1).

2.  No part of this contract shall be subcontracted to any person or firm ineligible for award of a Government contract by virtue of Section 3(a) of the Davis-Bacon Act or 29 C.F.R. §5.12(a)(1).

3.  The penalty for making false statement is prescribed in the U.S. Criminal code, 18 U.S.C.1001.

I.  Overtime Requirements. Neither the Design-Builder nor any subcontractor contracting for any part of the contract work which may require or involve the employment of laborers or mechanics shall require or permit any such laborer or mechanics in any work week in which he or she is employed on such work to work in excess of forty hours in such work week unless such laborer or mechanics receives compensation at a rate not less than one and one-half times the basic rate of pay for all hours worked in excess of forty hours in such work week.

J.  Violation: Liability for Unpaid Wages: Liquidated Damages. In the event of any violation of the requirements of 29 C.F.R. §5.5(b)(1), the Design-Builder and any Subcontractor responsible therefor shall be liable for the unpaid wages. In addition, such Design-Builder and Subcontractor shall be liable to the United States (in the case of work done under contract for the District of Columbia or a territory, to such district or to such territory) for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer or mechanic, including watchmen and guards, employed in violation of 29 C.F.R. §5.5(b)(1) In the sum of $10 for each calendar day on which such individual was required or permitted to work in excess of the standard work week of forty hours without payment of the overtime wages required by 29 C.F.R. §5.5(b)(1).

K.  Withholding for Unpaid Wages and Liquidated Damages. The FTA or the recipient shall upon its own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld, from any moneys payable on account of work performed by the Design-Builder or Subcontractor under any such contract, or any other Federal contract with the same Design-Builder or any other federally-assisted contract subject to the Contract Work Hours and Safety Standards Act, which is held by the same Design-Builder, such sums as may be determined to be necessary to satisfy any liabilities of such Design-Builder or Subcontractor for unpaid wages and liquidated damages as provided in the clause set forth at 29 C.F.R. §5.5(b)(2).

L.  Subcontracts. The Design-Builder or Subcontractor shall insert in any subcontracts, the clauses set forth in subparagraphs (1) through (13) of this Labor Provisions Article, and also a clause requiring the Subcontractor to include these clauses in any lower tier subcontracts. The Prime Design-Builder shall be responsible for compliance by any Subcontractor with the clauses set forth in subparagraphs (1) through (12) of this Labor Provisions Article.

00817  CONTRACT WORK HOURS STANDARDS ACT

A.  Overtime requirements. Neither the Design-Builder nor any subcontractor contracting for any part of the Contract work which may require or involve the employment of laborers, mechanics, apprentices, trainees, watchmen, and guards shall require or permit any laborer, mechanic apprentice, trainee, watchman or guard in any workweek in which he is employed on such work to work in excess of 40 hours in such work week on work subject to the provisions of the Contract

Case 1:05-cv-01289-RCL    Document 9-2    Filed 08/23/2005    Page 60 of 130

Work Hours and Safety Standards Act, unless such laborer, mechanic, apprentice, trainee, watchman, or guard receives compensation at a rate not less than one and one-half times his or her basic rate of pay for all such hours worked in excess of 40 hours is such work week.

B.   Violation, liability for unpaid wages, and liquidated damages. In the event of any violation of the provisions of Paragraph A. above, the Design-Builder and any subcontractor responsible therefor shall be liable to any affected employee for unpaid wages. In addition, such Design-Builder and subcontractor shall be liable to the Authority for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer, mechanic, apprentice, trainee, watchman, or guard employed in violation of the provisions of Section A in the sum of ten dollars for each calendar day on which such employee was required or permitted to be employed on such work in excess of his or her standard work week of 40 hours without payment of the overtime wages required by Paragraph A.

C.   Withholding for unpaid wages and liquidated damages. The Authority Representative may withhold from the Design-Builder, from any moneys payable on account of work performed by the Design-Builder or subcontractor, such sums as may be administratively determined to be necessary to satisfy any liabilities of such Design-Builder or subcontractor for unpaid wages and liquidated damages as provided in the provisions of Paragraph B.

D.   Subcontracts. The Design-Builder shall insert Paragraph A through E of this clause in all subcontracts and shall require their inclusion in all subcontracts of any tier.

E.   Records. The Design-Builder shall maintain payroll records containing the information specified in 29CFR516.2(a). Such records shall be preserved for three years from completion of this Contract.

## 00818    WAGE RATES

A.   The minimum wages, which in addition to basic hourly rate of pay include fringe benefit payments to be paid laborers and mechanics on this project pursuant to the Labor Provisions of this Contract, as determined by, the Secretary of Labor to prevail for corresponding classes of laborers and mechanics employed on projects similar in character to the Contract work in the pertinent locality, are set forth as an attachment to this Contract.

B.   Any class of laborers and mechanics not listed but employed on this Contract shall be classified or reclassified conformably to the schedule set out therein by mutual agreement between the Design-Builder and class of labor concerned, subject to prior approval of the Authority Representative. In the event the interested parties cannot agree on the proper classification or reclassification of a particular class of laborer and mechanics to be used, the question, accompanied by the recommendation of the Authority Representative, shall be referred to the Secretary of Labor for final determination.

## 00819    NOTICE TO THE AUTHORITY OF LABOR DISPUTES

A.   Whenever the Design-Builder has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this Contract, the Design-Builder shall immediately give notice thereof, including all relevant information with respect thereto, to the Authority Representative.

B.   The Design-Builder agrees to insert the substance of this Section 00819 in any subcontract hereunder as to which a labor dispute may delay the timely performance of this Contract; except that each such subcontract shall provide that in the event its timely performance is delayed or threatened by delay by any actual or potential labor dispute, the subcontractor shall immediately

C - 15

Case 1:85-cv-01289-RCL   Document 9-2   Filed 08/23/2005   Page 61 of 130

notify its next higher tier subcontractor, or the Design-Builder, as the case may be, of all relevant information with respect to such dispute.

00820   CONVICT LABOR

In connection with the performance of work under this Contract, the Design-Builder agrees not to employ any person undergoing sentence of imprisonment at hard labor.

00821   SEISMIC SAFETY

The Design-Builder agrees that any new building or addition to an existing building will be designed and constructed in accordance with the standards for Seismic Safety required in Department of Transportation Seismic Safety Regulations 49 CFR Part 41 and will certify to compliance to the extent required by the regulation. The Design-Builder also agrees to ensure that all work performed under this contract including work performed by a subcontractor is in compliance with the standards required by the Seismic Safety Regulations and the certification of compliance issued on the project.

00822   ENERGY CONSERVATION

The Design-Builder agrees to comply with mandatory standards and policies relating to energy efficiency which are contained in the state energy conservation plan issued in compliance with the Energy Policy and Conservation Act

00823   RECOVERED MATERIALS

The Design-Builder agrees to comply with all the requirements of Section 6002 of the Resource Conservation and Recovery Act (RCRA), as amended (42 U.S.C. 6962), including but not limited to the regulatory provisions of 40 CFR Part 247, and Executive Order 12873, as they apply to the procurement of the items designated in Subpart B of 40 CFR Part 247.

00824   CONTRACTS INVOLVING FEDERAL PRIVACY ACT REQUIREMENTS

A.   The following requirements apply to the Design-Builder and its employees that administer any system of records on behalf of the Federal Government under any contract:

1.   The Design-Builder agrees to comply with, and assures the compliance of its employees with, the information restrictions and other applicable requirements of the Privacy Act of 1974, 5 U.S.C. §§ 552a. Among other things, the Design-Builder agrees to obtain the express consent of the Federal Government before the Design-Builder or its employees operate a system of records on behalf of the Federal Government. The Design-Builder  understands that the requirements of the Privacy Act, including the civil and criminal penalties for violation of that Act, apply to those individuals involved, and that failure to comply with the terms of the Privacy Act may result in termination of the underlying contract.

2.   The Design-Builder also agrees to include these requirements in each subcontract to administer any system of records on behalf of the Federal Government financed in whole or in part with Federal assistance provided by FTA.

00825   SEAT BELT USE POLICY

The Design-Builder agrees to comply with terms of Executive Order No. 13043 "Increasing Seat Belt Use in the United States" and is encouraged to include those requirements in each subcontract awarded for work relating to this contract.

Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

APPENDIX "D"

SAFETY

Providing a safe work environment – injury free – is the Subcontractor's number one priority and responsibility. The following Safety requirements are minimum for all personnel on this project. They are not intended to be all inclusive and may need to be tailored to meet specific project conditions, additional Owner requirements or as agreed to in "SL" JOINT VENTURE pre-award, pre-construction meetings.

The Subcontractor agrees in the performance of this Contract to understand, comply with and enforce the following requirements:

1. ALL applicable Federal, State, Local or other regulatory agency safety rules including but not limited to the Occupational Safety and Health Act of 1970 and amendments and all applicable Hazardous and Waste Management Regulations.

2. "SL" JOINT VENTURE established minimum requirements:

a. ANSI approved hard hats.

b. ANSI approved safety eyewear.

c. Leather safety footwear with minimum of 6" ankle foot support. No sneakers or walking shoes will be allowed.

d. Full Body Harness with two shock absorbing lanyards shall be used for Fall Protection when working at heights greater than six (6) feet but only if other means of Fall Prevention are not practical. Please refer to "SL" JOINT VENTURE Fall Prevention Policy.

e. New Employee Orientations and Weekly Safety meetings shall be conducted specific to the hazard exposure in each phase of work.

f. Observe and comply with the "SL" JOINT VENTURE Project Safety Plan in effect. Subcontractors are required to develop their own Project Safety Plan.

g. Approved lockout procedures shall be used wherever employees could be harmed by an accidental system or equipment start-up.

h. All electric tools will be grounded or double insulated.

i. Only trained, authorized, or licensed personnel will operate or service equipment. Equipment will be operated in accordance with Manufacturer's recommendations.

**SL**
Granite Construction Company
Lane Construction Corporation
A Joint Venture

    j.        All incidents and injuries shall be immediately reported to the "SL" JOINT VENTURE Superintendent and the Subcontractor's Project Supervisor.

    k.        Work areas shall be maintained clean and orderly at all times. Good housekeeping is essential at all times.

    l.        The use, possession or sale of alcohol or regulated drugs is prohibited. Violators will be removed from the project.

    m.       Prior to each demobilization, a copy of the OSHA 200 log shall be provided to the "SL" JOINT VENTURE Project Superintendent and forwarded to the Safety Department.

    n.        A Subcontractor Supervisor shall be designed as the Safety Supervisor for all subcontract work prior to the start of contract work.

3.      "SL" JOINT VENTURE Site Managers/Supervisors shall have the authority to suspend any activity being conducted that could endanger the safety and health of any person until the Subcontractor corrects that unsafe or hazardous condition.

4.      Violation of these requirements may result in termination of the Subcontract Agreement.

**SL** Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

<u>EXHIBIT A</u>

<u>PARTIAL RELEASE</u>
<u>AND PARTIAL WAIVER OF LIEN</u>

WHEREAS, a Subcontract identified as No.**SC458-12** (the "Subcontract"), was entered into on the _____ day of April , 2003, by **SL, a JOINT VENTURE** OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION, (hereinafter **"SL" JOINT VENTURE**) having an office at 1616 Whitestone Expressway, Whitestone, New York 11357, and **L & L CONSTRUCTION ASSOCIATES** of 6300 Dowerhouse Road, Upper Marlboro, Maryland 20772, hereinafter referred to as the "SUBCONTRACTOR"; and

WHEREAS, **"SL" JOINT VENTURE**, had, prior thereto, entered into a contract with Washington Metropolitan Area Transit Authority, hereinafter referred to as the "Owner", to design and construct the new station and associated work in accordance with and pursuant to a contract known and designated as Contract 1B0035, Section JDC, Phase 2, Glenmont Route (the "Prime Contract"); and

WHEREAS, by such Subcontract, Subcontractor and **"SL" JOINT VENTURE** have agreed that SUBCONTRACTOR would, for and in the stead of **"SL" JOINT VENTURE,** fulfill and perform such part of said Prime Contract as is set forth in said Subcontract in consideration for the payment of the amount of $_____ , and in Change Orders numbered _____ to said Subcontract in the amount of $_____ .

NOW, THEREFORE, SUBCONTRACTOR, for and in consideration of a payment made herewith in the sum of _____ DOLLARS ($_____ ), for itself, its successors, heirs and assignees, does hereby state, affirm and agree, with respect to all of such work performed to date and for which payment has been made or is being made pursuant to this Partial Waiver and Release, except as identified in Paragraph 3 that:

1.      All labor employed thereon or in connection therewith and all payroll taxes and charges (such as withholding taxes, social security taxes and worker's compensation, disability and unemployment taxes and/or insurance premiums) have been paid in full; and

2.      All materials, tools, appliances, equipment, supplies and services furnished and used upon or in connection with said work have been paid for in full; and all sales, use, excise and similar taxes on or in connection with the same have been fully paid; and

3.      Upon receipt by the undersigned of a check from **"SL" JOINT VENTURE** in the above amount, payable to the undersigned, and when the check has been paid, this document shall become effective to release and forever discharge **"SL" JOINT VENTURE** and the Owner and their respective officers, directors, agents, servants and employees, and all lands, improvements, chattels, and other real and personal property connected with or a part of said project from any and all claims, demands, liens and claims of lien whatsoever arising out of

SL
Lane Construction Corporation
A Joint Venture

the performance of all work for which payment has been made which it now has or hereafter might or could have except for the following:

(If there are not exceptions, write "None" in the following space:

_____

_____

_____

_____

_____

Before any recipient of this document relies upon it, he should verify evidence of payment to SUBCONTRACTOR; and

4.      Except as provided in paragraph 3 above, SUBCONTRACTOR warrants that it has completed all work performed to date as required under the above-identified Subcontract and all changes and amendments hereto, if any; and that it has complied with all the terms and conditions of said Subcontract; and

5.      SUBCONTRACTOR will, at its sole cost and expense, forever defend and hold harmless **"SL" JOINT VENTURE** and the Owner from any and all claims and demands and will defend against and obtain the discharge of any and all liens and claims of lien of others arising out of or in connection with said work, including, without limitation, those claimed or asserted by any employee, supplier or subcontractor of the SUBCONTRACTOR (or by any employee or supplier of any subcontractor of the undersigned) or by any governmental agency or an insurance carrier; and

6.      In the event that any of the work performed by the SUBCONTRACTOR on said project (including the materials used or incorporated therein and the workmanship thereof), is the subject of any guarantee or warranty by the undersigned, the giving of this Release and Waiver of Lien by the undersigned shall not operate in any way to reduce or modify such guarantee or warranty or to release the undersigned therefrom.  SUBCONTRACTOR further agrees that if it hereafter performs any labor or furnished any materials, tools, equipment, supplies or services pursuant to such guarantee or warranty, it will fully pay for the same, will pay any and all taxes and charges in connection therewith and will release, discharge, defend and hold harmless **"SL" JOINT VENTURE** and the Owner, and the said lands, improvements, chattels and other real and personal property from any and all claims, demands, liens and claims of lien arising in connection therewith all in like manner and to the same extent as is herein provided with respect to labor, materials, etc., heretofore furnished.  This Partial Release and Waiver of Lien shall inure to the benefit of **"SL" JOINT VENTURE** and the Owner and their respective successors and assigns and shall be binding upon the undersigned SUBCONTRACTOR and its or their successors, heirs and assigns.

SL
Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

7.    The work covered by this Partial Release and Partial Wavier of Lien includes all work for which payment has been received.

Dated this _____ day of _____, 200__, at _____.

<div align="right">

**L & L CONSTRUCTION ASSOCIATES**
Subcontractor

By: _____
(Name and Title)

</div>

STATE OF _____          )
          ) ss:
COUNTY OF _____          )

        On this _____ day of _____, 200__, before me personally appeared _____, to me personally known and known to me to be the same person described in and who executed the within instrument, consisting of 3 pages, of his own free will and duly acknowledged that he executed the same with full power to do so.

_____
Notary Public

My commission expires: _____                              (SEAL)



**EXHIBIT B**

**FULL AND FINAL RELEASE
AND WAIVER OF LIEN**

WHEREAS, a Subcontract identified as No. **SC458-12** (the "Subcontract"), was entered into on the _____ day of April, 2003, by **SL, a JOINT VENTURE** OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION, (hereinafter referred to as **"SL" JOINT VENTURE**), having an office at 1616 Whitestone Expressway, Whitestone, New York 11357, and **L & L CONSTRUCTION ASSOCIATES.** of 6300 Dowerhouse Road, Upper Marlboro, Maryland 20772, hereinafter referred to as the "SUBCONTRACTOR"; and

WHEREAS, the parties, by such Subcontract, have agreed that the SUBCONTRACTOR would, for and in the stead of **"SL" JOINT VENTURE,** fulfill and perform such part of said Prime Contract as is set forth in said Subcontract in the amount of $_____, and in Change Orders numbered _____ to said Subcontract in the amount of _____ Dollars ($_____); and

WHEREAS, the work under said Subcontract and Change Orders has been completed and finally accepted by **"SL" JOINT VENTURE** and the Owner.

NOW, THEREFORE, SUBCONTRACTOR, for and in consideration of FINAL PAYMENT in the sum of _____ DOLLARS ($_____ ), does for itself, its successors, heirs and assignees, hereby state, affirm and agree that, with respect to all of such work:

1.    All labor employed thereon or in connection therewith and all payroll taxes and charges (such as withholding taxes, social security taxes and worker's compensation, disability and unemployment taxes and/or insurance premiums) have been paid in full; and

2.    All materials, tools, equipment, supplies and services furnished and used upon or in connection with said work have been paid in full; and all sales, use, excise and similar taxes on or in connection with the same have been fully paid; and

3.    Upon receipt by the undersigned of a check from **"SL" JOINT VENTURE** in the above amount, payable to the undersigned, and when the check has been paid, this document shall become effective to release and forever discharge **"SL" JOINT VENTURE,** its SURETY and the Owner and their respective officers, directors, agents, servants and employees, and all lands, improvements, chattels, and other real and personal property connected with or a part of said project from any and all claims, demands, liens and claims of liens and whatsoever arising out of said Subcontract and/or said work and which it now has or hereafter might or could have except for the following:

(If there are no exceptions, write "None" in the following spaces):

_____

_____
_____
_____
_____

Before any recipient of this document relies upon it, he should verify evidence of payment to SUBCONTRACTOR; and

4.     SUBCONTRACTOR warrants that it has completed all work required under the above-identified Subcontract and all changes and amendments thereto, if any; and that it has complied with all the terms and conditions of said Subcontract; and

5.     SUBCONTRACTOR will, at SUBCONTRACTOR'S sole cost and expense, forever defend and hold harmless **"SL" JOINT VENTURE**, its SURETY and the Owner from any and all claims and demands and will defend against and obtain the discharge of any and all claims, demands, actions, damages, losses, costs, expenses, liens and claims of liens of others arising out of or in connection with said work, including, without limitation, those claimed or asserted by any employee, supplier or subcontractor of SUBCONTRACTOR (or by any employee or supplier of any subcontractor of the undersigned) or by any governmental agency or an insurance carrier; and

6.     In the event that any of the work performed by SUBCONTRACTOR on said Project (including the materials used or incorporated therein and the workmanship thereof) is the subject of any guarantee or warranty by the undersigned, neither the giving of this Release and Waiver of Lien by the undersigned nor its acceptance by **"SL" JOINT VENTURE** shall operate in any way to reduce or modify such guarantee or warranty or to release the undersigned therefrom. SUBCONTRACTOR further agrees that if it hereafter performs any labor or furnishes any materials, tools, equipment, supplies or services pursuant to such guarantee or warranty, it will fully pay for the same, will pay any and all taxes and charges in connection therewith and will release, discharge, defend and hold harmless **"SL" JOINT VENTURE** and the Owner, and the said lands, improvements, chattels and other real and personal property from any and all claims, demands, liens and claims of liens arising in connection therewith all in like manner and to the same extent as is herein provided with respect to labor, materials, etc., heretofore furnished. This Release and Waiver of Lien shall inure to the benefit of **"SL" JOINT VENTURE** and the Owner and their respective successors and assigns and shall be binding upon the undersigned SUBCONTRACTOR and its or their successors, heirs and assigns.

SL

Jeffrey Atlantica Incorporated
Lane Construction Corporation
A Joint Venture

Dated this _____ day of _____, 200__, at _____.

**L & L CONSTRUCTION ASSOCIATES**
Subcontractor)

BY:_____
(Name and Title)

STATE OF _____ )
) ss.:
COUNTY OF _____ )

On this _____ day of _____, 200__, before me personally appeared
_____, to me personally know and known to me to be the same person described in and who executed the within instrument, consisting of 3 pages, of his own free will and duly acknowledged that he executed the same with full authority to do so.

_____
Notary Public

My commission expires: _____                    (SEAL)

FLW-3 of 3
Final Lien Waiver



# EXHIBIT C

## CONTRACT MODIFICATION

Subcontractor:  L & L CONSTRUCTION ASSOCIATES
6300 Dowerhouse Road
Upper Marlboro, Maryland 20772

Modification No. _____
Date _____
Contract No. SC458-12

Project:    CONTRACT NO. 1B0035, SECTION JDC, NEW YORK AVENUE STATION,
Phase 2, Glenmont Route (Red Line)

( )  Contract Modification Issued Pursuant to:

( )  Supplemental Agreement to Contract

( )  Pending Change Nos. Included in this Modification:

The contract is hereby changed as follows and as agreed:

| Change in Contract Time: | Change in Contract Amount: |
|---|---|
| Except as provided herein all terms and conditions of the Contract as heretofore modified remain unchanged. | |
| Accepted:<br>**L & L CONSTRUCTION ASSOCIATES** | **SL, a JOINT VENTURE OF SLATERY SKANSKA, INC. and THE LANE CONSTRUCTION COMPANY** |
| By: _____ | By: _____ |
| Typed Name                    Title<br>Date: | Typed Name                    Title<br>Date: |
| | |

CM-1
Contract Modification

Contract No. 1B0035, Section JDC
**Main Construction Package for New**
  **Station, Trackwork, and Systems**
**NEW YORK AVENUE STATION**
**Phase 2, Glenmont Route (Red Line)**
Wash. Metro. Are Transit Authority

SL, A Joint Venture of
Slattery Skanska, Inc. and
The Lane Construction Corp.

**SUBCONTRACT/VENDOR PROVIDER  SC458-12**



**SUBCONTRACTOR:**    **L and L CONSTRUCTION ASSOCIATES, INC.**
  **6300 Dower House Road**
  **Upper Marlboro, Maryland  20772**
  **Phone (301) 599-0300,  Fax (301) 599-0388**
  **Contact Person:    Mr. Charles Nance**
      **Assistant General Manager**

ARTICLE 5.6:  Add the following:    Delete the first sentence of this Paragraph 5.6.

ARTICLE 5.10:  Add the following:    The Subcontractor shall  have the opportunity for review and comment of any schedule changes applicable to Subcontractor.

ARTICLE 6.2:  Add the following:    "Claims related to the Project will be presented to the Contractor, pursuant to this paragraph.

ARTICLE 6.4:  Add the following:    Delete this Article 6.4.

ARTICLE 8:    Add the following:    "except as may be amended by the Scope of Work outlined, between the Subcontractor and Contractor.  The Subcontractor's responsibility for "Guarantee" shall cease to be in effect following the completion of the period outlined by WMATA for the Project for such warranty and guarantee, OR WMATA's acceptance of the work and release from warranties and guarantees IF SOONER.

ARTICLE 9:    Add the following:    "For L and L Construction Inc. negligence only."

ARTICLE 12.2:    Add the following:    "Subcontractor (if not negligent) will be able to seek Compensation in time and money."

ARTICLE 14:    Add the following:    "If it may be determined that Subcontractor is liable or negligent."

ARTICLE 16:    Add the following:    "The Building Permit for the Project will be obtained by the General Contractor.  This ARTICLE is intended to apply to those Permits which would normally be incidental to Subcontractor's

such as equipment hauling permits.

ARTICLE 17:   Add the following:            "Except as may be paid by Others".

ARTICLE 26.4:  Add the following:           "Temporary Services to be provided by the Contractor are to
                                             INCLUDE a Temporary Toilet Portajohn and a Trash Dumpster
                                             for the Subcontractors use at site.  It is anticipated that no more
                                             than one (1) or two (2) dumpsters will be necessary for
                                             construction packing debris disposal, that is generated by the
                                             Subcontractor as a result of his work at the project site.

ARTICLE 26.8:  Add the following:           "Building Permits are to be obtained by the Contractor for the
                                             Project.  There are NO City or Municipal Work Inspection Fees
                                             included in the Subcontractor's Price for the Project "

ARTICLE 26.12:  Add the following:          "Damage and negligence by OTHERS on the Project is not
                                             included under this Clause."

CPM Schedules:                              "Subcontractor shall be provided with a copy of the CPM
                                             Schedule for the Project for review and reference, upon request.

---

SL, a JOINT VENTURE OF SLATTERY SKANSKA, INC.
and  THE LANE CONSTRUCTION CORPORATION,
CONTRACTOR

BY _____

Attest: _9/28/03_____
            Date

_____            Edward F. Hollander, P.E.
                                  Area Manager/Senior Estimator
                                 _____
                                          Name and Title

                                  _28 SEPT. 2003_____
                                          Date

LAND L CONSTRUCTION ASSOCIATES, INC.
SUBCONTRACTOR

BY _____
    CHARLES E. NANCE 31
    ASST. GEN. MGR
Attest: _9/26/03_____
            Date                          Name and Title

_____            _SEPT 26, '03_____
OFFICE MANAGER                            Date

Page 2 of 3

## ACKNOWLEDGEMENT OF CONTRACTOR

State of Virginia                    )
                                     ) ss.:
County of Pr. William                )

On this 29th day of September, 2003, before me personally came and appeared Edward F. Hollander, P.E., to me known, who, being by me duly sworn, did depose and say that he/she resides at 1384 Old Bridge Road, Woodbridge, VA 22192, that he/she is the Area Manager/ Senior Estimator of "SL" JOINT VENTURE OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION, the corporation described in and which executed the foregoing instrument; and that he/she is duly authorized to execute the said instrument on behalf of SL, a JOINT VENTURE OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION.

_____
Notary Public

My commission expires: 8/31/07                              (SEAL)


## ACKNOWLEDGEMENT OF SUBCONTRACTOR

State of Maryland                    )
                                     ) ss.:
County of Prince George's            )

On this 26 day of September, 2003, before me personally came and appeared Charles E. Nance III, to me known, who, being by me duly sworn, did depose and say that he/she resides at 12122 Wheeling Ave. Upper Marlboro, Md. 20772, that he/she is the Assistant General Manager of L AND L CONSTRUCTION ASSOCIATES, INC., the corporation described in and which executed the foregoing instrument; and that he/she is duly authorized to execute the said instrument on behalf of L AND L CONSTRUCTION ASSOCIATES, INC.

_____
Notary Public

My commission expires: 8/7/2006

SANDRA E. LINDER
NOTARY PUBLIC
PRINCE GEORGE'S CO.

SANDRA E. LINDER (SEAL)
Notary Public, State of Maryland
Prince George's County
My Commission Expires August 7, 2006



# Slattery Skanska Incorporated
# Lane Construction Corporation
# A Joint Venture

## VENDOR / SERVICE PROVIDER AGREEMENT

This **AGREEMENT** made this _22 day of May, 2003, by and between **SL, A JOINT VENTURE OF SLATTERY SKANSKA, INC. AND THE LANE CONSTRUCTION CORPORATION,** of 1616 Whitestone Expressway, Whitestone, New York, 11357 hereinafter called the Contractor, and **CONTECH CONSTRUCTION PRODUCTS, 8950 Route 108, Suite 220, Columbia, Maryland, 21045,** hereinafter called the Vendor / Service Provider.

    **WITNESSETH,** that, **WHEREAS,** the Contractor has heretofore entered into a contract with WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, hereinafter called the Owner, to perform certain labor and furnish certain services and material for the erection and completion of Contract No. 1B0035, Section JDC, Main Construction Package for New Station, Track Work, and Systems; New York Avenue "Pocket" Station, Phase 2: Glenmont Route (Red Line) as per plans and specifications.

## THE VENDOR / SERVICE PROVIDER AGREES AS FOLLOWS:

    **Article I.** To furnish and deliver F.O.B. ~~Jobsite~~ *Plant with freight Allowed to Jobsite* via truck all the services and material necessary to complete the following portions of the work included in said contract between the Contractor and Owner in all respects, as the Contractor is required by said plans and specifications to do, Namely:

<div style="border:1px solid;">

**SEE EXHIBIT 1 FOR SC458-48**

</div>

    **Article II.** That the services and material called for in this contract are to be furnished promptly when requested by the Contractor so that the work will not be delayed waiting for such, and the Vendor / Service Provider agrees to complete the delivery of services and material covered by this contract at such times and in such manner that the Contractor can complete all of work included in its contract with the Owner. ~~If delivery is not made as herein provided, it is hereby agreed that damages arising from the nonfulfillment of this contract as regards time shall be deducted from the contract price, and be as liquidated damages and not in the nature of a penalty and shall be as per contract per calendar day.~~

*If delivery is not made as herein provided, contractor and vendor to negotiate potential back charges with maximum amount of any backcharge limited to total dollar amount of contract.*

<p style="text-align:center">Page 1 of 3</p>



The following schedule of delivery dates shall be effective in this contract:

> As per Contractor's construction schedule and request

For delivery instructions please contact **Damian Ruppert, Ryan Kuntz, or Wah Chan at (202) 962-0034**

**Article III.** To pay for all services and materials, skill, labor and instrumentals used in, or in connection with, the performance of this contract, when and as bills or claims therefore become due, and to save and protect the premises, the Owner, and the Contractor from all claims and mechanics' liens on account thereof, and to furnish satisfactory evidence to the Contractor when and if required, that he has complied with the above requirements. This provision shall not be construed as a waiver of the right of the Vendor / Service Provider to file and enforce a lien claim as against the Owner in the event of the Contractor's failure to pay the Vendor / service provider.

**Article IV.** That he has examined all the plans and read all the specifications and *Addenda No. 1 thru 7* supplied by the Owner, for the entire work, of which the services and materials covered by this contract is a part, and that he will be bound by any and all parts of said plans and specifications and addenda insofar as they relate to the services and material herein undertaken to be furnished.

**Article V.** That the services and material to be furnished under this contract will be in strict accordance with the requirements of the plans, specifications and addenda, and that samples of such services and materials, shop drawings, erection drawings and mock-ups as required will be furnished for the approval of the Contractor and the Owner and that all services and materials furnished shall be in strict accordance with such approved samples and/or shop drawings.

**Article VI.** To make any and all changes, furnishing the services and materials that the Contractor may require without nullifying this agreement, at a reasonable addition to or reduction from, the contract price, hereinafter named. NO ALTERATIONS OR CHANGES SHALL BE MADE, HOWEVER, EXCEPT UPON THE WRITTEN ORDER OF THE CONTRACTOR. The amount to be paid by the Contractor, or allowed by the Vendor / service provider, by virtue of such alterations, shall be stated in such written order.

**Article VII.** To comply with all Federal and State laws, codes and regulations and all municipal ordinances and regulations effective where the work is to be performed under this contract and to pay all fees, taxes including sales and use taxes, and expenses connected with such compliance.

**Article VIII.** This contract is contingent upon the Vendor / Service Provider being approved by the Owner.

## THE CONTRACTOR AGREES AS FOLLOWS:

**Article IX.** To pay the Vendor / Service Provider for such services and material herein undertaken to be furnished the sum of

> **SEE EXHIBIT 1 FOR SC458-48**

Page 2 of 3

This sum includes (or excludes) D.C. Sales Tax. Please be advised that "permanent materials" to be incorporated into the project are not subject to "D.C. Sales Tax" for this Project. Subject to additions and deductions as herein before provided and such sum shall be paid by the Contractor to the Vendor / Service Provider as the services and material is delivered in monthly installments, as follows:

Payment terms:

> **SEE EXHIBIT 1 FOR SC458-48**

Original invoices must be sent to the **SL, a Joint Venture of Slattery Skanska, Inc. and The Lane Construction Corporation Field Office, 1111 2nd Street, NE, Washington, D.C. 20001, Phone: (202) 962-0034; Fax: (202) 962-0045.**

   **Article X.** It is mutually agreed between the parties hereto, that no payment made under this contract, except the final payment, shall be conclusive evidence of the performance of this contract, either in whole or in part, and that no payment shall be construed to be an acceptance of improper services and materials.

**AGREED TO AND ACCEPTED:**

**CONTECH CONSTRUCTION PRODUCTS, INC.**
Vendor / Service Provider

**SL, a JOINT VENTURE OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION**

BY: _____

BY: _____

TITLE: Regional Vice President

TITLE: Area Manager

DATE: June 18, 2003

DATE: 30 JUNE 2003

Contract No. 1B0035, Section JDC
**Main Construction Package for New
Station, Trackwork, and Systems**
NEW YORK AVENUE STATION
Phase 2, Glenmont Route (Red Line)
Wash. Metro. Are Transit Authority

SL, A Joint Venture of
Slattery Skanska, Inc. and
The Lane Construction Corp.

SUBCONTRACT/VENDOR PROVIDER  SC458-48

| EXHIBIT "1" |
|---|

**SUBCONTRACTOR:**  CONTECH Construction Products, Inc.
8950 Route 108, Suite 220
Columbia, Maryland  21045
(410) 740-8490  Phone
(410) 740-8492  Fax

Attention:   **Mr. Ed Rodriguez
Sales Engineer**

## SCOPE OF SERVICES TO BE PROVIDED:

Furnish, fabricate, manufacture, assemble as necessary at shop, and deliver the **Underground Detention System** shown on the attached drawings and as described and outlined within this Agreement.  The work to be performed by CONTECH Construction Products will include the following:

587.5 LF @ 66 Inch Diameter, 16 gauge, ALT 2  5 x 1 CSP, (22 each)  66 Inch Diameter 16 gauge ALT 2 5 x 1 Tee, (6 each) 66 Inch Diameter 16 gauge 5 x 1 Elbow, (4 each) 15 Inch Diameter x 66 Inch Diameter Saddle Tee, (2)  24 Inch Diameter x 66 Inch Diameter Stub, (3 each) 48 Inch Diameter Manhole Risers with steps and sleeves, (2 each) 48 Inch Catch Basins.   Also included are Hugger Bands, O-Ring Gaskets, the appropriate and necessary Bulkheads, and Reducers.

Work will include all engineering detailing and shop drawings for fabrication, manufacturing, and shop assembly for fit-up as necessary to complete the work. properly.

Optional Item, as directed by SL Joint Venture at later date:  (see attachments)
    Vortechnics Stormwater Treatment System, Model # 7000

## SPECIFIC WORK AND SERVICES TO BE PERFORMED AND PRICE:

1.    The work to be performed at the proposed price for performing such work are described herein.

2.    This Agreement is subject to the Terms and Conditions outlined later within this Agreement.   Such Terms and Conditions shall be part of the contract between the parties concerning the Project.

3.  This Agreement is subject to the Contractor's providing to Vendor/Subcontractor, at Vendor's/Subcontractor's request, evidence reasonably acceptable to the Vendor/Subcontractor of the Contractor's financial responsibility.

4.  The prices contained herein for the work described are in effect for the duration of the Agreement and the Work.

### (a)    UNDERGROUND DETENTION SYSTEM USING 66 INCH CMP PIPE, 16 GAUGE:

CONTECH Construction Products, Inc. will prepare shop detail drawings, furnish material, shop fabricate, shop prime paint (one coat) where applicable, and deliver FOB trucks point of origin with freight charges allowed and prepaid to the jobsite one (1) complete Underground Detention System as outlined specifically below and as shown on the attached plan sheets from CONTECH (totaling approximately _____ Tons) **the Lump Sum Price of Forty Six Thousand Three Hundred Thirty-Four Dollars and Fifty Cents ($46,334.50),** excluding sales tax.

### SCHEDULE:

Based upon receipt of an acceptable, fully executed contract and Notice To Proceed, delivery is tentatively anticipated to commence **approximately Three (3) Weeks after receipt of Approved Shop Drawings** barring any major problems and contingent upon timely receipt of completed "Released For Construction" design drawings; requested information; approved shop detail drawings and all other necessary approvals; materials; and buy-out items. ~~TIME IS OF THE ESSENCE with regard to the actions of and work performed by Others, which affect Subcontractor's work.~~ It is anticipated that this "Underground Detention System" material may be necessary to be delivered to the project site for installation **on or about     July 7, 2003    ,** based upon the current project schedule and effort.



### (b)    OPTIONAL ITEM:    VORTECHNICS STORMWATER TREATMENT SYSTEM, MODEL #7000:

CONTECH Construction Products, Inc. will prepare shop detail drawings, furnish material, shop fabricate, shop prime paint (one coat) where applicable, and deliver FOB trucks point of origin with freight charges allowed and prepaid to the jobsite one (1) Vortechnics Stormwater Treatment System, Model #7000, (totaling approximately _19_ Tons) in lieu of the HydroConduit Brand Precast Concrete Stormceptor STC 7200, presently shown on the Project Design Plans prepared by Jacobs Civil, Inc. and "approved" by WMATA, **for the Lump Sum Price of Twenty Thousand Dollars Only ($20,000.00),** excluding sales tax.

**(OPTIONAL ITEM MUST BE DIRECTED IN WRITING BY THE SL JOINT VENTURE PROJECT MANAGER OR SENIOR ESTIMATOR PRIOR TO WORK COMMENCEMENT. A FORMAL CHANGE ORDER TO THIS VENDOR / SUBCONTRACT AGREEMENT MUST BE EXECUTED BY BOTH PARTIES PRIOR TO PROCEEDING WITH ANY OPTIONAL WORK HERE.)**

**SCHEDULE:**

Based upon immediate receipt of an acceptable, fully executed contract and Notice to Proceed, delivery is tentatively anticipated to commence **approximately three (3) to four (4) weeks after receipt of "approved shop drawings" from Jacobs Civil, Inc. and WMATA** barring any major problems and contingent upon timely receipt on completed "Released for Construction" design drawings, requested information, approved shop detail drawings, and all other necessary approvals, materials, and buy-out items. TIME IS OF THE ESSENCE with regard to the actions of and work performed by Others, which affect Subcontractor's work. It is anticipated that this "Vortechnics Stormwater Treatment System" material may be necessary to be delivered to the project site for installation **on or about _July 14, 2003__,** based upon the current project schedule and effort.

---

5.    **Work Exclusions by the Vendor / Subcontractor:**

The following items are excluded and shall not be a part of the work performed by, are not included in the price to be paid to, and shall not be the responsibility of Vendor / Subcontractor:

cost of taxes; cost of providing a bond; work covered by other Bid Items; all finish painting and materials for same; field survey, layout, measurement, and verification work; all field work and structural steel field erection work; railroad insurance or other insurance in excess of Vendor's / Subcontractor's normal limits and coverage's; anchor bolts except as noted; sign supports; light supports; furnishing and installing caulk, grout, and shims; miscellaneous steel; items which do not shop attach directly to the Underground Detention System; salvaging and reworking of existing steel; false work underpinning, and other temporary structures and materials; unloading trucks;  responsibility or liability for liquidated damages; work which is not clearly and specifically shown,  and any work which is not specifically noted in this Agreement as being included in Subcontractor's scope of work. These exclusions  shall not be limited by any other provisions.

6.    **Special Conditions by Vendor / Subcontractor:**

Vendor / Subcontractor's price is based upon the following::

 No retention being withheld; sequential, continuous, and uninterrupted fabrication; work being performed in accordance with the current AASHTO Welding Codes; and mutually acceptable details that provide for efficient fabrication operations.

At the time of shipment, Contractor shall designate and have available an adequate and accessible site to which the material shall be delivered. The Contractor shall provide and maintain free of charge: suitable access, site conditions, and staging/storage areas as required by Vendor / Subcontractor and all necessary traffic control, barricades, flagmen, etc. Upon delivery, Contractor assumes full responsibility for any damages to the material, which are incurred after delivery to the site designed by Contractor. Delivery to the site shall mean to the nearest accessible point to the site.  All trucks shall be unloaded timely, not to exceed two (2) hours.  Vendor's /

Subcontractor's price is based on full truckloads only. Rate of delivery and timing shall be mutually agreed to. Materials will be shipped using conventional "over-the-highway" flatbed and pole trailers. Girders may be shipped with webs horizontal if in Subcontractor's opinion this is necessary due to size, depth or other considerations. Special hauling equipment (such as steerable dollies) is not included unless needed by Vendor / Subcontractor to deliver the material to the vicinity of the jobsite. Contractor shall "double deck" the Vendor's / Subcontractor's trailers free of charge in a timely manner if required to do so.

L and L Construction Associates, Inc. provided the "SL" Joint Venture (i.e Slattery Skanska and Lane Construction Corporation) with pricing support at the time of bid and will provide a formal quotation once the designs and scope of work have been finalized. It is the intent of the parties that consideration be given for the subcontracting of the Underground Detention System work to "L and L Construction Associates, Inc."

This Subcontract/Vendor Provider Agreement SC458-48 may possibly be "assigned" to a drainage installation Subcontractor for the utility work on the project. This assignment may be necessary due to the requirement of WMATA that a certain and specific "goal" for the utilization of DBE/MBE/WBE businesses be achieved. If necessary, a "two party" check payment schedule and agreement will be established between CONTECH Construction Products, "SL" Joint Venture, and the Installation Subcontractor, so as to insure timely and proper payment to CONTECH Construction Products. The specific terms of this "two party" check payment schedule will be outlined within the Subcontract Agreement between the "SL" Joint Venture and the Installation Subcontractor, and will be additionally signed off as acceptable by CONTECH Construction Products. ANY checks issued through this process will be endorsed at the jobsite by the "Installation Subcontractor" and forwarded directly to CONTECH Construction Products by the "SL" Joint Venture Project Manager, or his appointed representative.

7.    **TERMS AND CONDITIONS :**

**Vendor / Subcontract Price:**

(a)    The Vendor / Subcontract Price does not include field paint, touch up, sandblasting, cleaning or other surface preparation work performed in the field.   This exclusion applies even though applicable section of the project specifications may call for such service.  This exclusion is not intended to limit such work with regards to materials, which may be delivered improperly "primed" at the shop.

(b)    If, in the performance of its work on the Project, Vendor / Subcontractor encounters concealed conditions at variance with conditions indicated in the agreement(s) with Contractor  or concealed or unknown conditions differing materially from those ordinarily encountered, and generally recognized as inherent in work of the character performed by Vendor / Subcontractor, the Vendor / Subcontract Price shall be equitably adjusted by Change Order upon reasonable analysis and necessary claim by either party.

(c)    Sales taxes on materials furnished are not included in the Vendor / Subcontract Price, unless explicitly stated otherwise on the Proposal.

(d)    The Vendor / Subcontract Price does not include cost of performance and payment bonds or any item of like nature.

(e)    The Vendor / Subcontract Price includes shop drawings, where required by Project specifications, but not field dimensions or surveys. Contractor shall return approval drawings to Vendor / Subcontractor within a reasonable time, not to exceed in any event ten (10) working days.

(f)    Under no circumstances does Vendor / Subcontractor waive its right to payment for extra work or work order changes performed by Vendor / Subcontractor pursuant to instruction of the Contractor, in so far as reasonable notice has been given to the Contractor. The period for such reasonable notice shall not exceed two (2) working days.

(g)    No backcharges or claim by Contractor for any services shall be valid unless authorized by an agreement in writing executed by both Contractor and Vendor / Subcontractor, ~~except in the case of Vendor / Subcontractor's failure to meet any requirement of the agreement between the parties.~~ In such event, Contractor shall notify Vendor / Subcontractor of such default, in writing, and allow Vendor / Subcontractor reasonable time to correct any deficiency before incurring any cost chargeable to Vendor / Subcontractor. ~~Backcharges shall not be deducted from amounts due to Vendor / Subcontractor, but rather shall be invoiced to the Vendor / Subcontractor and paid by Vendor / Subcontractor within thirty (30) days from receipt of the invoice. The "right of offset" will apply in this situation should Vendor / Subcontractor not make payment for such agreed backcharges in a timely fashion, or as outlined herein.~~



**<u>Prepayment Terms</u>:**

(h)    Progress payments shall be made to Vendor / Subcontractor no later than ten (10) days after Contractor's receipt of payment from Owner for the work completed by Vendor / Subcontractor, but in no event later than forty-five ~~(45) days~~ *30days* after submission to Contractor of each Vendor / Subcontractor invoice. Timely submittal of ALL invoices by Vendor / Subcontractor to Contractor is required.



(i)    ~~In the event the parties agree to a retainage, such retainage shall not apply to amounts due for materials. In no event shall the Contractor withhold from Vendor / Subcontractor a percentage retainage that is greater than that withheld by the Owner from the Contractor with respect to Vendor / Subcontractor's work.~~

(j)    Full and final payment shall be made to Vendor / Subcontractor no later than ~~sixty (60) days after Vendor / Subcontractor substantially completes its work.~~ *thirty days of invoice* Payment shall in no way be contingent upon receipt by Contractor of payment from Owner, except for any matters involving "quality and/or plan conformance" issues.

(k)    If, at any time prior to final payment being made by Contractor to Vendor / Subcontractor, Contractor believes in good faith that it has a claim for damages against Vendor / Subcontractor, including but not limited to liquidated damages, Contractor shall promptly notify Vendor / Subcontractor in writing of the details of such claim, including the amount thereof, the nature of

the event upon which such claim is made, and a specific description of the damages alleged to have been suffered. Upon receipt of such claim, Vendor / Subcontractor shall have the option of posting a bond in the amount of the claim, within thirty (30) days thereof in which case Contractor shall have no right to withhold any payments due to Vendor / Subcontractor in connection therewith. In the event it is subsequently determined by a court of law or other legal authority that the claim in question lacks merit, Contractor shall reimburse Vendor / Subcontractor for the cost of the bond. In no event shall Vendor / Subcontractor be liable to Contractor for liquidated damages in excess of amounts ~~actually paid by Contractor as liquidated damages to Owner or any other party in connection with the Project.~~ *of vendor invoices.*

### Other Conditions:

(l)     Vendor / Subcontractor will provide a "Certificate of Insurance" applicable to normal Workmen's Compensation, Employers' Liability and Comprehensive General Liability coverage, which Vendor / Subcontractor will purchase from its insurance carrier at no cost to the Contractor.

(m)     Contractors shall, at Contractor's expense, provide adequate access roads for materials and equipment and shall provide paved, graveled, or other suitable storage areas for materials. Contractor shall be responsible for managing traffic through and around the Project, when necessary, including but not limited to providing a railroad flagman.

(n)     Vendor / Subcontractor shall not be responsible for delays or defaults where occasioned by any causes of any kind and extent beyond its control, including but not limited to delays caused by the Owner, General Contractor, Architect and/or Engineers, delays in transportation, shortages of raw materials, civil disorders, labor difficulties, vendor allocations, war, fires, floods, accidents and acts of God.

(o)     Vendor / Subcontractor agrees to indemnify and hold harmless the Contractor and Owner against claims damages, bodily injury, or property damage arising out of Vendor's / Subcontractor's work solely to the extent caused by the negligence or intentional act of omission of Vendor / Subcontractor, its agents or employees. Nothing in the agreement(s) between the parties shall be deemed to require Vendor / Subcontractor to be responsible for the negligent or intentional acts or omissions of the Contractor, Owner, Architect, or any other third party.

(p)     All workmanship is guaranteed against defects in workmanship for a period of two (2) years from the date of delivery of the materials, in the case of fabrication work, or from the date of substantial completion by Vendor / Subcontractor of its work, in all other cases. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. In the event any of the Subcontractor" work is found to be defective, then, at the option of Vendor / Subcontractor, the exclusive remedy shall be either (1) the replacement or repair of the defective work or (2) the furnishing by Vendor / Subcontractor of new material similar or identical to the material originally furnished by Vendor / Subcontractor under this agreement with the costs of installation to be incurred by Contractor. Vendor / Subcontractor shall not be responsible for

special, incidental, or consequential damages. Vendor / Subcontractor shall not be responsible for repair of damage to its work by other parties or for improper use of equipment by others.

(q)    Nothing in the agreement(s) between the parties shall serve to void Vendor / Subcontractor's right to file a lien or claim on its behalf in the event that any payment to Vendor / Subcontractor is not timely made.

(r)    This agreement (s) between the parties shall be governed by the Laws of the State of New York.

**IN THE EVENT THE PROJECT CALLS FOR FABRICATION SERVICES BY VENDOR / SUBCONTRACTOR, THE FOLLOWING ADDITIONAL TERMS, AND CONDITIONS SHALL APPLY:**

(s)    Delivery commitments, if any, represent estimated time required to deliver under normal conditions and under conditions as they exist as of the date of the Agreement. They do not represent any intent on the part of Vendor / Subcontractor to accept responsibility for delays due to abnormal mill conditions which develop after the order is placed or due to commitment of mill production capacity to others after the Proposal is submitted and before the order is placed.

(t)    In the event Subcontractor includes the cost of freight in its Proposal, Vendor / Subcontractor shall determine the routing. Contractor must provide and bear the expense of labor to unload the material and must bear the cost of any delays in unloading.

(u)    If delays in the Contractor's schedule prevent delivery of materials to the jobsite, all materials which have been fabricated according to the schedule originally agreed upon by Contractor and Vendor / Subcontractor shall be stored in areas provided by the Contractor and shall be paid for as though the material had been delivered to the jobsite.    The freight shall not be invoiced until such time that the fabricated materials have been delivered to the point of destination.

(v)    Title to material shall ~~remain with Vendor / Subcontractor until payment in completed in full by Contractor and Owner.~~ transfer to contractor / owner upon delivery and unloading.

**SL, a JOINT VENTURE** OF SLATTERY SKANSKA, INC. and  THE LANE CONSTRUCTION CORPORATION, CONTRACTOR

BY _____

Edward F. Hollander, P.E.
Area Manager/Senior Estimator
_____
            Name and Title

_____30 JUNE 2003_____
            Date

Attest: _____
            Date

_____


**CONTECH CONSTRUCTION PRODUCTS, INC.**
VENDOR/SUBCONTRACTOR

BY _____

Steve R. Spanagel, Regional Vice President
_____
            Name and Title

_____June 18, 2003_____
            Date

Attest: __6/18/03__
            Date

_____

## ACKNOWLEDGEMENT OF CONTRACTOR

State of Virginia                              )
                                               ) ss.:
County of Pr William                           )

On this **30th** day of ~~June~~, 2003, before me personally came and appeared <u>Edward F. Hollander,</u>
<u>P.E.</u>, to me known, who, being by me duly sworn, did depose and say that he/she <u>resides at 1384 Old Bridge Road,</u>
<u>Woodbridge, VA 22192,</u> that he/she is the <u>Area Manager/ Senior Estimator</u> of **"SL" JOINT VENTURE** OF
SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION, the corporation
described in and which executed the foregoing instrument; and that he/she is duly authorized to execute the said
instrument on behalf of **SL, a JOINT VENTURE** OF SLATTERY SKANSKA, INC. and THE LANE
CONSTRUCTION CORPORATION.

_____
Notary Public

My commission expires: _8\31\03_                            (SEAL)


## ACKNOWLEDGEMENT OF SUBCONTRACTOR

State of *Maryland*                            )
                                               ) ss.:
County of *Anne Arundel*                       )

On this **18** day of *June*, 200**3**, before me personally came and appeared
*Steve R. Spangel*, to me known, who, being by me duly sworn, did depose and say that
he/she resides at *Columbia, MD* , that
he/she is the *Regional Vice President* of **CONTECH Construction Products,**
**Inc.** , the corporation described in and which executed the foregoing instrument; and that he/she is duly authorized
to execute the said instrument on behalf of **CONTECH Construction Products, Inc.** .

_____
Notary Public

My commission expires: _11-01-03_                            (SEAL)

**CONTECH**
CONSTRUCTION PRODUCTS INC.

(48)

Date: 05/22/03
Sheet 1-2

# QUOTATION
## Contech Construction Products Inc.

| | | |
|---|---|---|
| **To:** | **Slattery Skanska** | |
| **Attention:** | **Ed Hollander** | |
| **Phone:** | **703-497-7923** | |
| **Fax:** | **703-497-7933** | |
| **PROJECT:** | **Glenmont Route, NY Ave Station** | |

Ed Rodriguez
**Sales Engineer**
8950 Route 108, Suite 220
Columbia, MD 21045
ph. 410-740-8490
fax. 410-740-8492

Seller has based its quoted prices upon all of the (estimated, not guaranteed) quantities listed in this quotation. If Buyer elects to purchase from Seller only a portion of the material quoted, Seller shall have the right to adjust its prices to reflect the impact of all resulting cost.

We are pleased to offer this quotation for the following products and/or services for this project:

| Item No. | Approx. Qty. | Description | Unit | Price |
|---|---|---|---|---|
| 1 | | **Underground Detension System to include delivery and** | | |
| | | 587.5LF 66" 16ga Alt2 5x1 CSP, (22) 66" 16ga Alt2 5x1 Tee, | | |
| | | (6) 66" 16ga 5x1 Elbow, (4) 15" x 66" Saddle Tee, (2) 24" x 66 Stub, | | |
| | | (3) 48" Manhole Risers with steps and sleeves, (2) 48" Catch Basin. | | |
| | | Also included are Hugger Bands, O-Ring Gaskets, | | |
| | | the appropriate Bulkheads, and Reducers. | LS | $46,334.60 |
| 2 | 1 | **Vortechnics Stormwater Treatment System, Model #7000** | EA | $20,000.00 |
| | | *Votechnics specific terms and conditions incorporated and* | | |
| | | *attached to this quotation.* | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Thank you for considering Contech products for use on this project. If you have any questions, please give me a call.

**Prices:**  F.O.B. plant with freight allowed to jobsite, to be unloaded by others.
**Terms:**  1/2% - 10 Days; NET 30 Days from date of invoice, subject to credit approval.
**TAXES:**  Not Included. Please add all applicable sales taxes.

Prices quoted apply only to the project specified herein. Prices are firm with an order within 30 days of the date of this quotation and shipment 60 days thereafter. Seller reserves the right to adjust the prices after 30 days from date of quotation, but any such adjustment shall have no effect on the applicability of the conditions of sale set forth on the reverse side of this quotation. Prices quoted for CMP and plastic pipe are based on nesting diameters whenever possible. If unnested loads are required, additional freight charges will be added. For shipments of less than one truckload, pricing is based on one delivery. If additional shipments are requested, additional freight charges will apply. LTL orders carry a $29.50 processing fee. Our standard lead-time on fabricated CMP items is two to four weeks. Rush orders carry a 20% additional charge for overtime. All orders must be shipped within four weeks of manufacture. Beyond four weeks, a storage charge will be added to your order. A fuel surcharge will apply to for all shipments on this quotation.

This quote contains the parties' entire agreement with respect to the purchase and sale of the products described above, and supersedes all previous communications. CONTECH'S offer to sell the products described above is expressly conditional upon buyers assent to the conditions of sale (including those relating to Warranties and "Buyer's Remedies and Seller's Liability") that appear on the reverse side to this form. Buyers signature below, or acceptance of delivery of the goods described above, shall be deemed an acceptance of those conditions of sale. Seller expressly rejects any terms and conditions that are different from or in addition to the terms and conditions set forth on the front and reverse side of this quotation.

| **ACCEPTANCE** | **CONTECH CONSTRUCTION PRODUCTS INC.** |
|---|---|
| Subject to being awarded the contract, we hereby order required material at the above unit price, at the prices specified, subject to all terms and conditions appearing on the front and reverse side of this quotation. | By: _____ |
| By: _____ | TITLE: SALES ENGINEER |
| Title: _____ Date: _____ | |

RECEIVED
MAY 2 2 2003
Slattery Skanska, Inc.
Virginia Office

**Vortechnics**
*Total Stormwater Solutions*

# FAX TRANSMITTAL

To:     Scott Hensley
        CONTECH Construction Products
        8950 Route 108
        Suite 220
        Columbia, MD 21045

Phone:  800-628-8348

Fax:    410-740-8492

E-mail: SIH@contech-cpi.com

Project Name:     New York Avenue Station

Project Location: Washington, DC

4 Pages including cover

□ Urgent    □ For Review    □ Please Comment    □ Please Reply    □ Please Recycle

Attached please find our quotation for the above referenced project.

One thing that we're missing is the finished grade elevation. I have a cryptic note that I made that says it might be 46.5'. If that is the case, there will be no added cost for deep cover. If the rim elevation is more than 49.0' or so (more than 5' of cover over the system as a result), the system may need structural reinforcements that could affect the cost. I will be happy to let you know if this quote needs to be revised once we get that information.

Average lead-time for Vortechs System manufacture is 4 weeks from approved shop drawings. Vortechnics may be able to accelerate the production schedule to accommodate specific project scheduling needs, but advance planning by purchasers is greatly appreciated.

We appreciate the opportunity to work with you on this project. Please don't hesitate to call with any further questions or requests.

Sincerely,


Erin Henry
Account Manager
Phone: 207-885-9830 x211
Fax: 207-885-9825
email: ehenry@vortechnics.com
Vortechnics, Inc

---

*Committed to clean water*

---

Vortechnics, Inc ▼ 200 Enterprise Drive ▼ Scarborough, Maine 04074



**Vortechnics**
*Total Stormwater Solutions*

# Terms and Conditions

## Quotation is subject to the following terms and conditions:

### 1.0 Standard Terms and Conditions

1.1 Price quoted is valid 30 days from quote date.

1.2 Terms of payment: 50% with order, balance paid upon delivery.

1.3 The prices given do not include any Federal, State, local taxes, duties, tariffs or other expenses or assessments imposed on products and shipments of Seller. Any such taxes in effect at the time of shipment shall be paid by the Purchaser. Consequently, in addition to the quoted prices in effect at the time of sale, the amount of any such taxes shall be paid by Purchaser, or in lieu thereof, the Purchaser shall provide the Seller with a tax exemption certificate and/or resale certificate acceptable to the taxing authorities.

1.4 Payment for purchases of Vortechs systems shall not be subject to retainage under any circumstances.

1.5 Final price is subject to change upon confirmation of System design parameters

### 2.0 Manufacturing Specifications

2.1 Vortechs Systems shall be manufactured to withstand AASHTO HS20-44 Loading criteria.

2.2 The following are excluded from the unit price unless otherwise stated:
- Internal or external concrete coatings of any kind
- pipe connection boots at inlet or outlet
- anti-flotation measures of any type
- flow control devices other than standard weir & orifice plates
- external bypass structures
- internal System height greater than 7 feet
- structural design/construction for Systems with depths of cover greater than 5'-0"

2.3 Price includes manhole frames and covers but does not include risers or grade rings. Manhole frames and covers of a type other than Vortechnics Standard, if required, may be provided at an additional cost.

2.4 Average lead time for Vortechs System manufacture is 4-6 weeks after shop drawing approval; please plan accordingly.

### 3.0 Installation

3.1 Unit price does not include lifting equipment. Customer is responsible for supplying crane and rigging for lifting System(s) and/or System components off delivery trucks, setting in place and all related construction and site activity to and from the System including bed preparation of crushed stone or other.

3.2 Vortechnics' supervision of tank assembly is limited to attaching aluminum structures to inside of tank and sealing/grouting of tank and interior wall joints.

3.3 Price includes one hour waiting time; additional time will be billed at $125.00/hr.

3.4 Usually, high ground water provisions consist of engineered inserts around the base of the tank. These inserts shall be provided and engineered by Vortechnics. The contractor is responsible for pouring a collar after placement. Generally, this collar requires 2-6 yards of concrete per unit and is generally 12 inches by 12 inches. All materials and labor is by others.

3.5 Vortechnics will under no circumstances accept back charges without prior written approval.

*Committed to clean water*

**Vortechnics**

*Total Stormwater Solutions*

**Project Name: New York Avenue Station**
**Quote Number: 05/22/2003- 4227**

| Quote Date | Issued By | | Ship Via | F.O.B Point | TERMS |
|---|---|---|---|---|---|
| 05/22/2003 | Erin Henry | | Truck | Jobsite | 50/50 |
| Item | Description | Heaviest Pick Wgt (Approx.) | Qty | Unit Price | Subtotal |
| 1.00 | Vortechs ™ Stormwater Treatment System: Model 7000<br><br>Rim Elevation:      46.5' (??)<br>Invert Elevation:      39.1'<br>High Groundwater Elevation: n/a | *19 Tons | 1 | $20,000.00 | $20,000.00 |

| | | **Grand Total** | **$20,000.00** |
|---|---|---|---|

This system includes:
- ☐ Provisions for high ground water (see Terms and Conditions 3.4)
- ☐ Provisions for deep cover
- ☐ Provisions for both deep cover AND high ground water (see Terms and Conditions 3.4)
- ☒ Provisions for neither deep cover NOR high ground water

This system is assumed to be:
- ☒ On-line
- ☐ Off-line (see Terms & Conditions 2.2)
- ☐ Currently unknown

---

**Note:** Unless otherwise specified above, quotation assumes all conditions and exclusions per Terms & Conditions on page 2 of this document. Each System is of standard dimensions per the attached typical details. Any requirements beyond these assumptions may result in additional costs not included in this quotation.
*Unit price does not include lifting equipment. See Terms & Conditions Section 3.1 listed on Page 3.

---

*Committed to clean water*

**Vortechnics**

**Total Stormwater Solutions**



PLAN VIEW B-B

SECTION A-A

| Vortechs™ Model | Grit Chamber Diameter/Area ft / ft² | Treated Flow cfs | Sediment Storage yds³ | Approx. Size L x W ft |
|---|---|---|---|---|
| 1000 | 3/7 | 1.6 | 0.7 | 9 x 3 |
| 2000 | 4/13 | 2.2 | 1.2 | 10 x 4 |
| 3000 | 5/20 | 4.3 | 1.8 | 11 x 5 |
| 4000 | 6/28 | 6.0 | 2.4 | 12 x 6 |
| 5000 | 7/38 | 8.5 | 3.2 | 13 x 7 |
| 7000 | 8/50 | 11.0 | 4.0 | 14 x 8 |
| 9000 | 9/64 | 14.0 | 4.8 | 16 x 8 |
| 11000 | 10/78 | 17.5 | 5.9 | 16 x 10 |
| 16000 | 12/113 | 25.0 | 7.5 | 18 x 12 |

This CADD file is for the purpose of specifying stormwater treatment equipment to be furnished by Vortechnics, Inc. and may only be transferred to other documents exactly as provided by Vortechnics. The block information, including the Vortechnics logo and the Vortechs™ Stormwater Treatment System designation and patent number, may be deleted if necessary. Revisions to any part of this CADD file without prior coordination with Vortechnics shall be considered unauthorized use of proprietary information.

**Vortechnics™**
41 Evergreen Drive
Portland, ME 04103
Tel.: 207-878-3662
Fax: 207-878-5507

GENERAL DETAIL
VORTECHS™ STORMWATER TREATMENT SYSTEM (U.S. Patent No. 5,759,415)
TYPICAL SIZING CRITERIA

PROPRIETARY INFORMATION – NOT TO BE USED FOR CONSTRUCTION PURPOSES

| DATE: 11/21/00 | SCALE: NONE | FILE NAME: typtbci | DRAWN BY: NDG | CHECKED BY: JWA |
|---|---|---|---|---|

---

*Committed to clean water*

Vortechnics, Inc. ▼ 200 Enterprise Drive ▼ Scarborough, Maine 04074

6/18/2003

# LETTER OF QUALITY ASSURANCE

6/19/2003

To:    Mr. Edward Hollander
       Slattery Skanska Incorporated
       1384 Old Bridge Road
       Woodbridge, VA   22192


Re:    Contract No. 1B0035 Section JDC
       New York Station Phase 2
       Underground Detention System


Contech Construction Products Inc. hereby proposes to furnish corrugated metal pipe material for the referenced project manufactured in accordance with AASHTO M36 and Aluminized Steel Type 2 per AASHTO M 274. All welding will be performed according to applicable AASHTO and OSHA specifications at our third party fabrication facility in Greencastle, PA. No field welding will be necessary.

Should Mill Certifications be required, they can be provided when the materials are manufactured and supplied. Please notify us prior to manufacturing of materials to obtain Mill Certifications.

Scott Hensley
Sales Manager
Contech Construction Products Inc.

RECEIVED
JUN 3 0 2003
Slattery Skanska, Inc.
Virginia Office

6/18/2003

# LETTER OF QUALITY ASSURANCE

6/19/2003

To:    Mr. Edward Hollander
       Slattery Skanska Incorporated
       1384 Old Bridge Road
       Woodbridge, VA   22192

Re:    Contract No. 1B0035 Section JDC
       New York Station Phase 2
       Underground Detention System

Contech Construction Products Inc. hereby proposes to furnish corrugated metal pipe material for the referenced project manufactured in accordance with AASHTO M36 and Aluminized Steel Type 2 per AASHTO M 274. All welding will be performed according to applicable AASHTO and OSHA specifications at our third party fabrication facility in Greencastle, PA. No field welding will be necessary.

Should Mill Certifications be required, they can be provided when the materials are manufactured and supplied. Please notify us prior to manufacturing of materials to obtain Mill Certifications.

Scott Hensley
Sales Manager
Contech Construction Products Inc.

# Total Stormwater Solutions



*Committed to clean water*



Vortechnics™

# Vortechs System
## Proven, reliable product performance

The Vortechnics flagship product, the Vortechs Stormwater Treatment System is the anchor for stormwater solutions chosen by most customers . The EPA award-winning design efficiently removes contaminated sediment, floating hydrocarbons, and debris from surface runoff. The Vortechs System's swirl-concentrator and flow-controls work together to eliminate turbulence and to provide positive removal efficiencies throughout the full range of operation.

### Vortechs System Features and Benefits



**Unobstructed access** to the grit chamber allows for easy clean-out.

**Unique grit chamber** design effectively removes solid pollutants.

**Shallow design** reduces installation costs and maintenance pump-out volume.

**Low Flow Control** prevents floatable re-entrainment and optimizes swirling action during low intensity storms.

**High Flow Control** provides surge protection during peak flows.

**Floatables Baffle Wall** traps hydrocarbons and debris.

4

▶ *Meets treatment needs of commercial, residential and municipal sites*

▶ *Optimizes above-ground use of real estate on high value sites*

▶ *"Pre-approved" in most areas which means faster site permitting*

▶ *Enables owners to comply with stricter stormwater regulations including NPDES Phase II and TMDLs*

"The systems were pre-approved for stormwater treatment by the DEP. This eased the permitting and kept the process moving along...the design of the Vortechs System was flexible enough that we could specify inlet and discharge locations without causing any problems with manufacturing and delivery schedules."

TIM REID P.E.
MOFFAT & NICHOL ENGINEERS
RALEIGH, NORTH CAROLINA

▶ *To see a Vortechs System in action go to www.vortechnics.com*

# Vortechs System
## A system sized for every application

Vortechs Systems are custom designed and sized to meet specific water quality objectives; precast models are available to treat flow rates from 1.6 cfs (45 l/s) to 25 cfs (700 l/s). Larger design storms are treated using Vortechs Systems that are constructed on site using cast-in-place concrete structures.

### Sizing

Vortechs System sizing criteria is based on the removal efficiency goal as well as site-specific parameters including: site location, particle size, drainage area, runoff coefficient, time of concentration and design flow.

### Specifying

To size a Vortechs System for your site, simply complete the Specifier's Worksheet (included with this brochure) and fax or mail it to your local Vortechnics sales representative. Alternatively, you can also use the Vortechs System Sizing Calculator located on our website at www.vortechnics.com.

### Configuration

Vortechs Systems can be configured in both online and offline orientations to best suit the water quality objectives and site constraints.

> *"The low profile of the Vortechs System allows for quick excavation and fast installation, saving time and money."*
>
> **CARL ENGLE**
> **VICE PRESIDENT AND CHIEF ENGINEER**
> **CARDI CORPORATION**
> **(GENERAL CONTRACTORS)**
> **WARWICK, RHODE ISLAND**

| Vortechs Model | Size (L x W) feet (mm) |
|----------------|------------------------|
| 1000 | 9 x 3 (2743 x 914) |
| 2000 | 10 x 4 (3048 x 1219) |
| 3000 | 11 x 5 (3353 x 1524) |
| 4000 | 12 x 6 (3658 x 1829) |
| 5000 | 13 x 7 (3962 x 2134) |
| 7000 | 14 x 8 (4267 x 2438) |
| 9000 | 15 x 9 (4572 x 2743) |
| 11000 | 16 x 10 (4878 x 3048) |
| 16000 | 18 x 12 (5486 x 3658) |

**5**



PLAN VIEW



ELEVATION VIEW

To use the Vortechs System Sizing Calculator, go to www.vortechnics.com

Contract SC458-49



**Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture**

# VENDOR / SERVICE PROVIDER AGREEMENT

This **AGREEMENT** made this *23* day of June, 2003, by and between **SL, A JOINT VENTURE OF SLATTERY SKANSKA, INC. AND THE LANE CONSTRUCTION CORPORATION**, of 1616 Whitestone Expressway, Whitestone, New York, 11357 hereinafter called the Contractor, and **CSR HYDRO CONDUIT**, of 1751 Monocacy Boulevard, Frederick, MD 21701, hereinafter called the Vendor / Service Provider.

 **WITNESSETH**, that, **WHEREAS**, the Contractor has heretofore entered into a contract with WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, hereinafter called the Owner, to perform certain labor and furnish certain services and material for the erection and completion of Contract No. 1B0035, Section JDC, Main Construction Package for new Station, Trackwork, and Systems, New York Avenue "Pocket" Station, Phase 2: Glenmont Route (Red Line) as per plans and specifications.

## THE VENDOR / SERVICE PROVIDER AGREES AS FOLLOWS:

 **Article I.** To furnish and deliver F.O.B. **Jobsite** via truck all the services and material necessary to complete the following portions of the work included in said contract between the Contractor and Owner in all respects, as the Contractor is required by said plans and specifications to do, Namely:

> **SEE EXHIBIT 1 FOR SC458-49**

 **Article II.** That the services and material called for in this contract are to be furnished promptly when requested by the Contractor so that the work will not be delayed waiting for such, and the Vendor / Service Provider agrees to complete the delivery of services and material covered by this contract at such times and in such manner that the Contractor can complete all of work included in its contract with the Owner. If delivery is not made as herein provided, it is hereby agreed that damages arising from the nonfulfillment of this contract as regards time shall be deducted from the contract price, and be as liquidated damages and not in the nature of a penalty and shall be **as per contract** per calendar day.



Page 1 of 3



The following schedule of delivery dates shall be effective in this contract:

> As per Contractor's construction schedule and request

For delivery instructions please contact **Damian Ruppert, Ryan Kuntz, or Wah Chan at (202) 962-0034**

**Article III.** To pay for all services and materials, skill, labor and instrumentalities used in, or in connection with, the performance of this contract, when and as bills or claims therefore become due, and to save and protect the premises, the Owner, and the Contractor from all claims and mechanics' liens on account thereof, and to furnish satisfactory evidence to the Contractor when and if required, that he has complied with the above requirements. This provision shall not be construed as a waiver of the right of the Vendor / Service Provider to file and enforce a lien claim as against the Owner in the event of the Contractor's failure to pay the Vendor / service provider.

**Article IV.** That he has examined all the plans and read all the specifications and *Addenda No. 1 thru 7* supplied by the Owner, for the entire work, of which the services and materials covered by this contract is a part, and that he will be bound by any and all parts of said plans and specifications and addenda insofar as they relate to the services and material herein undertaken to be furnished.

**Article V.** That the services and material to be furnished under this contract will be in strict accordance with the requirements of the plans, specifications and addenda, and that samples of such services and materials, shop drawings, erection drawings and mock-ups as required will be furnished for the approval of the Contractor and the Owner and that all services and materials furnished shall be in strict accordance with such approved samples and/or shop drawings.

**Article VI.** To make any and all changes, furnishing the services and materials that the Contractor June require without nullifying this agreement, at a reasonable addition to or reduction from, the contract price, hereinafter named. NO ALTERATIONS OR CHANGES SHALL BE MADE, HOWEVER, EXCEPT UPON THE WRITTEN ORDER OF THE CONTRACTOR.  The amount to be paid by the Contractor, or allowed by the Vendor / service provider, by virtue of such alterations, shall be stated in such written order.

**Article VII.** To comply with all Federal and State laws, codes and regulations and all municipal ordinances and regulations effective where the work is to be performed under this contract and to pay all fees, taxes including sales and use taxes, and expenses connected with such compliance.

**Article VIII.** This contract is contingent upon the Vendor / Service Provider being approved by the Owner.


**THE CONTRACTOR AGREES AS FOLLOWS**:

**Article IX.** To pay the Vendor / Service Provider for such services and material herein undertaken to be furnished the sum of

> **SEE EXHIBIT 1 FOR SC458-49**

Page 2 of 3

Contract SC458-49

This sum includes (or excludes) D.C. Sales Tax. Please be advised that "permanent materials" to be incorporated into the project are not subject to "D.C. Sales Tax" for this Project. Subject to additions and deductions as herein before provided and such sum shall be paid by the Contractor to the Vendor / Service Provider as the services and material is delivered in monthly installments, as follows:

Payment terms:

> **SEE EXHIBIT 1 FOR SC458-49**

Original invoices must be sent to the **SL, a Joint Venture of Slattery Skanska, Inc. and The Lane Construction Corporation Field Office, 1111 2nd Street, NE, Washington, D.C. 20001, Phone: (202) 962-0034; Fax: (202) 962-0045.**

**Article X.** It is mutually agreed between the parties hereto, that no payment made under this contract, except the final payment, shall be conclusive evidence of the performance of this contract, either in whole or in part, and that no payment shall be construed to be an acceptance of improper services and materials.

**AGREED TO AND ACCEPTED:**

**CSR HYDRO CONDUIT**
Vendor / Service Provider

**SL, a JOINT VENTURE OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION**

BY: _D. Michael Berg_

BY: _____

TITLE: _Sales Manager_

TITLE: _Area Manager_

DATE: _6/23/03_

DATE: _24 June 2003_

"CONTRACTOR TO PROVIDE SIX (6) WEEKS NOTICE PRIOR TO DELIVERY FOR RCP REQUIRING DCDPW/WASA INSPECTION."

Page 3 of 3

Contract No. 1B0035, Section JDC
Main Construction Package for New
 Station, Trackwork, and Systems
NEW YORK AVENUE STATION
Phase 2, Glenmont Route (Red Line)
Wash. Metro. Are Transit Authority

SL, A Joint Venture of
Slattery Skanska, Inc. and
The Lane Construction Corp.

**VENDOR AGREEMENT SC458-49**

| EXHIBIT 1 |
|:---:|

**Vendor/Service Provider:**

**RINKER MATERIALS, HYDRO CONDUIT**
**1751 Monocacy Boulevard**
**Frederick, MD 21701**
**(301) 439-3266  (Phone)**
**(540) 439-1232  (Fax)**
Attention:     Ms. Patricia Shipley
                    Sales Representative

**Materials to be provided:**

**Furnish, Manufacture, and Deliver Reinforced Concrete Pipe,**
**Gaskets, Pipe Lube, and Joint Mastic for Construction of Storm**
**Drainage Piping at the Job Site.**

**Scope of Material to be provided:**

A.)    **Furnish, Manufacture, and Deliver Concrete Pipe in accordance with the following price schedule:**

| DESCRIPTION | Approximate QUANTITY | | UP | TOTAL |
|---|---|---|---|---|
| 24" X 8' RCP Class 3 Rubber Gasket | 128 | FT | 29.45 | 3,769.60 |
| Gasket 24 Profile | 16 | PC | 0 | 0.00 |
| 21" X 8' RCP Class 3 Rubber Gasket | 56 | FT | 28.05 | 1,570.80 |
| Gasket 21 Profile | 7 | PC | 0 | 0.00 |
| 18" X 8' RCP Class 3 Rubber Gasket | 224 | FT | 19.40 | 4,345.60 |
| Gasket 18 Profile | 28 | PC | 0 | 0.00 |
| 18" RCP Elliptical  C507 C4 PF | 80 | FT | 34.85 | 2,788.00 |
| (Elliptical Pipe is not manufactured for Rubber Gasket Joints) | | | | |
| 18" RCP Elliptical  C507 HE-III PF | 104 | FT | 29.55 | 3,073.20 |
| (Elliptical Pipe is not manufactured for Rubber Gasket Joints) | | | | |
| Pipe Lube, #8 Pail | 3 | PL | 0 | 0.00 |
| Joint Mastic, 5 Gallon Pail | 2 | PL | 0 | 0.00 |

**B.)**    **OPTIONAL ITEM:  Precast Concrete Stormceptor, Model  STC 7200**:

Furnish, Engineer, Manufacture, and Deliver to Project Site one (1) each Model STC 7200 Precast Concrete Stormceptor Structure and Device for the **agreed price of $35,520.00 F.O.B. Job Site**, excluding Sales Tax.  (Approximately 52 Tons, shipped in five (5) sections/pieces.)

Rinker Materials, Hydro Conduit will prepare all shop and engineering drawings, furnish materials, shop fabricate, shop coat (where applicable), and deliver F.O.B. trucks point of origin with freight charges allowed and prepaid to job site One (1) Each Model STC 7200 Stormceptor Structure and Device.

**OPTIONAL ITEM MUST BE DIRECTED IN WRITING BY THE "SL" JOINT VENTURE PROJECT MANAGER OR SENIOR ESTIMATOR PRIOR TO WORK COMMENCEMENT. A FORMAL CHANGE ORDER TO THIS VENDOR AGREEMENT MUST BE EXECUTED BY BOTH PARTIES,  PRIOR TO PROCEEDING WITH ANY OPTIONAL WORK HERE.**

**C.)**    **Additional Terms and Conditions of Agreement**:

1.    All Gaskets and Joint Mastic needed for pipe is included in the prices outlined above.

2.    ENTIRE AGREEMENT. The agreement formed by Contractor's acceptance of this offer ("Quotation") prior to expiration shall consist of all documentation contained herein, and any exhibits and riders attached hereto and made a part hereof ("Agreement").  This Agreement sets forth the sole and entree agreement between the parties with regard to the subject matter hereof and supersedes any and all prior or contemporaneous oral or written agreements between the parties regarding the same. No subsequent alteration of this Agreement shall be binding upon Vendor unless reduced to writing and signed by both Vendor and Contractor.

3.    CREDIT: CONDITION PRECEDENT TO VENDOR'S OBLIGATION TO PERFORM.  Any and all credit terms of payment must be set forth in this Agreement. In the absence of any such credit terms, all deliveries under this Agreement are "Collect on Delivery" (C.O.D.) Contractor agrees upon request to furnish Vendor such information as is reasonably necessary for Vendor to determine Contractor's financial condition. Vendor's obligation to perform under this Agreement is subject to the condition precedent that Vendor does not notify Contractor within thirty (30) days of receipt from Contractor of this Agreement that Vendor's Credit Department has disapproved any credit terms of payment specified in this Agreement.

4.    PRICES.  The prices shall remain firm through December 31, 2003 after the date of the Quotation. Thereafter, said prices are subject to change by Vendor. The prices quoted are based on minimum truckload lots and therefore are subject to increase, should Contractor request delivery in lots smaller than truckload.

5.    PAYMENT.  Contractor shall make all payments due herein in United States currency and in accordance with the terms of this Agreement, without any right of setoff or retention and without regard to any agreement Contractor may have with other parties. If delivery is to be delayed either at the request of Contractor or through no fault of Vendor, for all construction materials sold

hereunder which remain undelivered thirty (30) days after the delivery date specified in this Agreement. Contractor promptly shall make payment in full.  If no due date is stated elsewhere in this Agreement, payment of all invoices is due within thirty (30) days of the receipt of a proper invoice for materials delivered to the project site.

6.    PAST DUE ACCOUNTS. Should Contractor fail to pay when due any amount payable to Vendor under the terms of this Agreement or should Contractor's financial condition become impaired or unsatisfactory to Vendor, Vendor may, at its option, make written demand upon Contractor for: (1) immediate payment of all amounts then due and owing to Vendor under this Agreement, (2) payment in advance or at the time of delivery of all future amounts to become due under this Agreement, and or (3) such other assurances as Vendor shall deem necessary to adequately assure Vendor that Contractor will perform its obligations under this Agreement. Until Vendor receives the same Vendor may suspend its performance of this Agreement, and if such assurances are not received from Contractor within a reasonable time not exceeding ten (10) days, Vendor may, at its option, deem this Agreement to have been repudiated by Contractor.

7.    TAXES. In the absence of an exemption or resale certificate acceptable to Vendor and to the respective taxing authority, all federal, state and local taxes, assessments, fees, duties and charges levied by reason of this Agreement are in addition to the prices quoted herein and shall be paid by Contractor.  THIS IS A TAX EXEMPT PROJECT FOR ALL PERMANENT MATERIAL, SINCE THIS IS A WMATA PROJECT FOR THE DISTRICT OF COLUMBIA.  A copy of the certificate of such exemption will be furnished upon request.

8.    TESTS. Vendor reserves the right to levy an additional charge on Contractor for any nonstandard tests that Contractor may require to be performed on the construction materials sold under this Agreement. Failure of Contractor to witness any tests shall be deemed a waiver by Contractor of its right to do so and of any right to require repetition of such tests.

9.    DELIVERY. In the absence of a specific delivery date on Vendor's quotation or acknowledgement to which this is attached. Vendor will commence delivery of the construction materials on a date and at a rate mutually agreed upon by both Vendor and Contractor, subject to the conditions of Section 4 above. Unless otherwise set forth herein, whenever this delivery will be by tractor-trailer trucks to the nearest point clearly accessible to such trucks operating under their own power and Contractor shall perform unloading of the materials and any special fittings, at its sole expense. Vendor reserves the right to charge Contractor at the rate of Sixty Dollars ($60.00) per hour, for any waiting time at the jobsite in excess of one (1) hour.

10.    TITLE. Unless otherwise expressly stated in this Agreement, title to the construction materials shall transfer to the Contractor FOB Destination or upon payment, whichever occurs earlier, and Contractor hereby grants Vendor a first priority security interest in all such materials until such time as Vendor is paid in full all amounts due under this Agreement. Contractor further agrees to execute any and all documents that may be required for Vendor to perfect such security interest.

11.    RISK OF LOSS. Risk of loss of the construction materials shall pas to the Contractor. FOB Destination or upon payment, whichever occurs earlier. Thereafter, in addition to assuming all risk

of loss, Contractor shall be responsible for compliance with all governmental regulations and ordinances with regard to storage of placement of the same and shall indemnify and hold Vendor harmless against all claims for personal injuries, including death, and property damage arising from the storage, use or handling of said materials.

12.    EXCUSABLE DELAYS. In the event Vendor shall be delayed in or prevented from the performance of any act required under this Agreement by reason of government allocations, priorities, restrictions or regulations now or hereafter in effect, storm, flood, fire, earthquake or other Acts of God, war, terrorism, riot, insurrection or other civil disturbance, strikes, lockouts or other labor disturbances.

13.    CLAIMS. Contractor's exclusive procedure for commencing claims under this Agreement against Vendor shall be as follows: Notice of claims against Vendor for any reason, including but not limited to breach of warranty, must be given to Vendor promptly upon discovery and must be supported in writing within seven (7) days after discovery to afford Vendor an opportunity to investigate such claims promptly and mitigate any potential damages. Failure of Contractor to give such notice shall constitute a waiver by Contractor of its right to later make such a claim. No claims shall be allowed after the materials purchased hereunder are incorporated, modified, or processed by Contractor in any manner. Vendor's liability in connection with this Agreement, whether arising in contract, equity, tort, or otherwise, shall be limited to direct damages in an amount not to exceed the purchase price of the material sold under this Agreement.

14.    RETURNS. Standard construction materials sold under this Agreement may be returned for credit only with Vendor's prior written consent and only if, in Vendor's sole opinion, the construction materials to be returned are in re-saleable condition. Vendor will deduct from any such credit all loading and unloading costs and any costs of repair and delivery costs to and from Contractor's jobsite that were paid by Vendor. Special items of other than normal and standard design regularly sold by Vendor cannot be returned.

15.    WARRANTY. Vendor warrants that the construction materials sold under this Agreement meet the description and specifications for the same set forth in this Agreement, but no other express warranties are made with respect to said construction materials. Acceptance by Contractor of the materials that are the subject of this Agreement shall constitute fulfillment of the warranty contained herein. The foregoing warranty is subject to standard manufacturing variations, tolerances, and classifications. Vendor is not responsible for installation or defective connections caused by installation. Contractor's exclusive remedy for breach of this warranty shall be to require Vendor, at Vendor's option, to refund the purchase price for the materials sold hereunder, to repair or to provide Contractor with conforming replacements for any nonconforming materials. Vendor shall not be responsible for any removal or installation costs. THIS WARRANTY IS IN LIEU OF, AND VENDOR HEREBY EXPRESSLY DISCLAIMS ALL OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND OF FITNESS FOR ANY PARTICULAR PURPOSE.

16.    INDEMNIFICATION. Without limitation as to amount and anything to the contrary in this Agreement notwithstanding, Contractor shall indemnify and hold Vendor and its officers,

directors, employees, subcontractors and agents (each an "Indemnitee") harmless for damage, destruction or loss, consequential or otherwise, to or of any and all property, real and personal, including without limitation, property of Contractor of or any person or persons, **directly or indirectly arising out of the specification(s) provided to Vendor and the design of the project into which Vendor's product is being incorporated**.

17. INSURANCE. Vendor will provide insurance coverage for itself and its employees in an amount required by law or, if no such requirement exists, in an amount Vendor deems appropriate. Notwithstanding any request in the bid documents or any contract documents to the contrary, Vendor will not provide a "Waiver of Subrogation" clause under any circumstances.

18. ASSIGNMENT AND RESTRICTED USE. Contractor may assign this Agreement or any interest herein to an experienced "drainage subcontractor" with the prior written consent of Vendor. Any assignment shall be void, without such prior written consent. Further, until Vendor has received full payment for the construction materials sold under this Agreement, Contractor shall not remove nor allow the removal of said materials from the jobsite, nor shall Contractor use or allow the use of any such materials for any project other than the one specified in this Agreement. L and L Construction Associates, Inc. had provided the "SL" Joint Venture with pricing support at the time of bid and will provide a formal quotation once the designs and scope of work have been finalized. It is the intent of the parties that consideration be given for the subcontracting of the storm drainage work to L and L Construction Associates, Inc. Any assignment may be due to the requirement of WMATA that a certain and specific "goal" for the utilization of DBE/MBE/WBE businesses be achieved. If necessary, a "two party" check payment schedule and agreement will be established between Rinker Materials, Hydro Conduit, the "SL" Joint Venture, and the Installation Subcontractor, so as to insure timely and proper payment to the Vendor. The specific terms of any "two party" check payment schedule will be outlined within the Subcontract Agreement between the "SL" Joint Venture and the Installation Subcontractor, and will be additionally signed off as acceptable by Rinker Materials, Hydro Conduit. ANY checks issued through this process will be endorsed at the jobsite by the "Installation Subcontractor" and forwarded directly to Rinker Materials, Hydro Conduit by the "SL" Project Manager, or his appointed representative.

19. APPLICABLE LAW. This Agreement shall be governed by and shall be construed in accordance with the laws of the State of New York. Any and all actions brought by Contractor under this Agreement shall be brought within one (1) year of the date of this Agreement.

20. See attached "Submittal Package" for Details of Materials to be furnished and supplied to project.

SL, A JOINT VENTURE OF SLATTERY SKANSKA,
INC. and THE LANE CONSTRUCTION CORPORATION,
—CONTRACTOR—

BY

Edward F. Hollander, P.E.
Area Manager/Senior Estimator
Name and Title

Attest: 6/24/03
Date

24 JUNE 2003
Date

RINKER MATERIALS, HYDRO CONDUIT
—VENDOR—

BY  G. Michael Barg

Attest: 6/23/03
Date

G. MICHAEL BARG/SALES MANAGER
Name and Title

6/23/03
Date

"CONTRACTOR TO PROVIDE SIX (6) WEEKS NOTICE
PRIOR TO DELIVERY FOR RCP REQUIRING
DCDPW/WASA INSPECTION."

Page 6 of 6

Hydro Conduit

**Rinker**
MATERIALS

1751 Monocacy Blvd., Frederick, Md. 21701    (301) 698-7373

STC 7200
PRECAST CONCRETE STORMCEPTOR

PROJECT: GLENMONT ROUTE – NEW YORK AVENUE STATION    STRUCTURE#: 6
CONTRACTOR: SLATTERY SKANSKA, INC.    LOCATION: WASHINGTON, DC

DR. BY: BNG
CK. BY:
NOT TO SCALE
DWG.# STC 7200-S



168"⌀ O.D.

24" RCP
INLET INVERT
ELEVATION= 39.10

OUTLET
24" RCP
OUTLET INVERT
ELEVATION= 39.02

OUTLET TO INLET
PIPE ANGLE= 180°

<u>PLAN</u>
(FRAME AND COVER NOT SHOWN FOR CLARITY)

STORMCEPTOR
FRAME AND COVER

TOP ELEV.= 46.08

72" X 1'-1"
FLATTOP
2.22 TONS

72" X 7'-0" ☆

24" RCP
INLET INVERT
ELEV 39.10

6"⌀ VENT
PIPE

WEIR

144" X 1'-5"
RED SLAB
10.96 TONS

144" X 4'-0"
RISER
12.25 TONS

INLET
DROP PIPE

24" OUTLET
RISER PIPE

144" X 4'-0"
RISER
12.25 TONS

144" X 1'-2"
E SLAB
.47 TONS

BOTTOM ELEV.= 28.09

2–3" GRADE ADJUSTERS
TO SUIT FINISHED GRADE

30"⌀

72"

FLEXIBLE PIPE
CONNECTORS
(WHERE APPLICABLE)

24" RCP
OUTLET INVERT
ELEV.= 39.02

17.99

144"⌀

<u>SECTION</u>

<u>GENERAL NOTES</u>

1. STORMCEPTOR SECTIONS SHALL
   CONFORM TO ASTM C 478, PROFILE
   GASKETED JOINTS CONFORMING TO
   ASTM C 443.

2. MANHOLE STEPS PROVIDED ABOVE
   INSERT @ 12" O.C. AND SHALL BE
   COPOLYMER POLYPROPYLENE
   PLASTIC ENCAPSULATED GR. 60 STEEL.

3. MINIMUM CONCRETE STRENGTH
   f'c= 4,000 PSI
   MINIMUM STEEL STRENGTH
   fy= 60,000 PSI

4. REINFORCEMENT DESIGN SHALL
   MEET ASTM C 478.

5. FLEXIBLE PIPE CONNECTORS
   SHALL MEET ASTM C 923.

6. HANDLING:
   A. ALL RISERS SHALL HAVE 2 EA.
      1 1/2"⌀ HOLES FOR LIFTING
      @ 1/3 WAY DOWN FROM SPIGOT.
   B. ALL LG. DIAM. BASE SECTIONS
      FLATTOPS, AND REDUCERS
      TO HAVE LIFT HOOKS.

7. DESIGNED FOR AASHTO H-20 LOADING.

8. FIBERGLASS STORMCEPTOR INSERT
   REFERENCE DRAWING # CA-0225-U.

9. DIMENSIONS ARE BASED ON USING
   1/4" JOINT GAP.

| ALL LIFTING DEVICES TO BE |
| SUPPLIED BY CONTRACTOR |

☆ 72" RISER SECTION = 1  72" X 5'-0" RISER(S)
                        1  72" X 2'-0" RISER(S)

| REV. | DESCRIPTION | BY: | DATE |

# Rinker

**MATERIALS™**
Hydro Conduit

Horizontal Eliptical Reinforced
Conrete Pipe Design Data





Span = 23"

Rise = 14"

MAX. SPACING ON CIRCUMFERENTIAL IS 4"

Project: NEW YORK AVENUE STATION
Contractor: SLATTERY SKANSKA, INC.

PIPE OD

BELL DEPTH

WALL

PIPE ID

SPIGOT LENGTH

1" MIN.

## Section Thru Joint

## Table of Dimensions and Weights

| Pipe Size (Inches) | Equivalent Round Size (Inches) | Pipe Class | Wall Thickness (Inches) | Concrete Strength (PSI) | Bell Depth (Inches) | Spigot Length (Inches) | Length (Feet) | Weight (Lbs./Ft.) | Steel Reinforcement Inner Cage in2/LF | Steel Reinforcement Outer Cage in2/LF |
|---|---|---|---|---|---|---|---|---|---|---|
| 14x23 | 18 | 3 | 2 3/4 | 4,000 | 2 | 2 | 8 | 225 | | 0.19 |

Notes:

1. General specification: ASTM C507

2. This drawing is not intended to show reinforcment design – either as to placement or steel area. DC WASA project specification will govern.

3. Consult Hydro Conduit for further details not listed.

4. DCDPW / WASA Storm Sewer.

Hydro Conduit, 1751 Monocacy Blvd., Frederick, MD 21701
Telephone 800–414–7960    Facsimile 301–698–5351

**Rinker**
MATERIALS"
Hydro Conduit

Horizonal Eliptical Reinforced
Concrete Pipe Design Data

Project:    NEW YORK AVENUE STATION
Contractor:    SLATTERY SKANSKA, INC.



Span= 23"

Rise = 14"

MAX. SPACING ON
CIRCUMFERENTIAL IS 4"

SPIGOT LENGTH

1" MIN.

BELL DEPTH

PIPE OD

PIPE ID

WALL

Section Thru Joint

## Table of Dimensions and Weights

| Pipe Size (Inches) | Equivalent Round Size (Inches) | Pipe Class | Wall Thickness (Inches) | Concrete Strength (PSI) | Bell Depth (Inches) | Spigot Length (Inches) | Length (Feet) | Weight (Lbs./Ft.) | Steel Reinforcement Inner Cage in2/LF | Steel Reinforcement Outer Cage in2/LF |
|---|---|---|---|---|---|---|---|---|---|---|
| 14x23 | 18 | 4 | 2 3/4 | 4,000 | 2 | 2 | 8 | 225 | | 0.27 |

Notes:

1. General specification: ASTM C507
2. This drawing is not intended to show reinforcement design — either as to placement or steel area. DC WASA project specification will govern.
3. Consult Hydro Conduit for further details not listed.
4. DCDPW / WASA Storm Sewer.

Hydro Conduit, 1751 Monocacy Blvd., Frederick, MD 21701
Telephone 800-414-7960    Facsimile 301-698-5351

# Rinker
## MATERIALS℠
### Hydro Conduit

## Profile Rubber Gasket
## Reinforced Concrete Pipe Design Data



### Section Thru Joint

| Table of Dimensions and Weights | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Pipe Inside Diameter (Inches) | Pipe Class | Wall Thickness (Inches) | Concrete Strenght (PSI) | Pipe Outside Diameter (Inches) | Bell Outside Diameter (Inches) | Joint Depth (Inches) | Length (Feet) | Weight (Lbs./Ft.) | Steel Reinforcement in2/LF |
| 24 | 3 | 3 | 4,000 | 30 | 34 | 5 1/8 | 8 | 300 | .07 |

Project: _____

Contractor: _____

Notes:
1. General Specifications: ASTM C 76 & C 443
2. This drawing is not intended to show reinforcement design — either as to placement or steel area. District of Columbia WASA project specification will govern.
3. Consult Hydro Conduit for further details not listed.
4. DCDPW / WASA Storm Sewer.

Hydro Conduit, 1751 Monocacy Blvd., Frederick, Md. 21701
Telephone 800-414-7960    Facsimile 301-698-5351



Hydro Conduit

## Profile Rubber Gasket
## Reinforced Concrete Pipe Design Data



### Section Thru Joint

| Pipe Inside Diameter (Inches) | Pipe Class | Wall Thickness (Inches) | Concrete Strenght (PSI) | Pipe Outside Diameter (Inches) | Bell Outside Diameter (Inches) | Joint Depth (Inches) | Length (Feet) | Weight (Lbs./Ft.) | Steel Reinforcement in2/LF |
|---|---|---|---|---|---|---|---|---|---|
| 21 | 3 | 2 3/4 | 4,000 | 26 1/2 | 30 1/4 | 4 1/8 | 8 | 245 | .07 |

Table of Dimensions and Weights

Project: _____

Contractor: _____

Notes:

1. General Specifications: ASTM C 76 & C 443
2. This drawing is not intended to show reinforcment design – either as to placement or steel area. District of Columbia WASA project specification will govern.
3. Consult Hydro Conduit for further details not listed.
4. DCDPW / WASA Storm Sewer.

Hydro Conduit, 1751 Monocacy Blvd., Frederick, Md. 21701
Telephone 800-414-7960    Facsimile 301-698-5351

# Rinker
### MATERIALS ℠

Hydro Conduit

## Profile Rubber Gasket
## Reinforced Concrete Pipe Design Data



### Section Thru Joint

| Table of Dimensions and Weights | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Pipe Inside Diameter (Inches) | Pipe Class | Wall Thickness (Inches) | Concrete Strength (PSI) | Pipe Outside Diameter (Inches) | Bell Outside Diameter (Inches) | Joint Depth (Inches) | Length (Feet) | Weight (Lbs./Ft.) | Steel Reinforcement in2/LF |
| 18 | 3 | 2 1/2 | 4,000 | 23 | 27 | 4 1/8 | 8 | 195 | .07 |

Project: _____

Contractor: _____

Notes:
1. General Specifications: ASTM C 76 & C 443
2. This drawing is not intended to show reinforcement design — either as to placement or steel area. District of Columbia WASA project specification will govern.
3. Consult Hydro Conduit for further details not listed.
4. DCDPW / WASA Storm Sewer.

Hydro Conduit, 1751 Monocacy Blvd., Frederick, Md. 21701
Telephone 800-414-7960    Facsimile 301-698-5351



**Hydro Conduit Division**

1751 Monocacy Blvd.
Frederick, Maryland 21701
Telephone (301) 698-7373
Facsimile (301) 698-5351

## *Fax / Memorandum*

| To: | Ed Hollander | From: | Mike Barg |
|-----|--------------|-------|-----------|
| Fax: | 703-497-7933 | Date: | 4/10/03 |
| Subject: | New York Avenue Station | Pages: | 1 |

Ed,

The storm drain pipe schedule for the above referenced project shows some 13.5" x 22" concrete arch pipe. Arch pipe is not available in this area. To the best of my knowledge, the closest manufacturing plant is in Louisiana. All manufacturers in this area do manufacture Elliptical concrete pipe meeting the requirements of ASTM C507. The smallest size manufactured is 14" x 23" elliptical and has a 2.75 inch wall thickness. This pipe is manufactured with a tongue and groove joint.

Please advise if this is acceptable.

Thank You

# Rinker

**MATERIALS™**

**Hydro Conduit**

## Quotation    0020346420

| | | | |
|---|---|---|---|
| Date: | 04/09/2003 | Sales Office: | MidAtlantic Area |
| Offer expires: | 06/15/2003 | Sales Employee: | LON MCNEIL |

| | |
|---|---|
| Terms of Sale: | 2% 15th prox, net EOM |
| Delivery Terms: | Delivered |
| Customer Job #: | |

1751 Monocacy Boulevard
Frederick,  MD 21701
301-698-7373
301-698-5359 (fax)

Prepared for:    0004007077
SLATTERY SKANSKA INC.
16-16 WHITESTONE EXPRESSWAY
WHITESTONE NY  11357
USA

Ship To:    0004007077
SLATTERY SKANSKA INC.
NEW YORK AVENUE STATION PHASE 2
WASHINGTON DC  20001
USA
Bill To:    0004007077
SLATTERY SKANSKA INC.
16-16 WHITESTONE EXPRESSWAY
WHITESTONE NY  11357
USA



THE PRICES STATED HEREIN ARE BASED ON THE ATTACHED TERMS AND CONDITIONS, WHICH SHALL CONTROL AND TAKE PRECEDENCE OVER ANY TERMS AND CONDITIONS TO THE CONTRARY IN ANY PURCHASE ORDER OR OTHER DOCUMENT.

| Item | QTY | Material | Description | Price | Per UOM | Total |
|---|---|---|---|---|---|---|
| 10 | 128.000 FT | 1257384 | 24" X 8'  RCP CL3 RG | 29.45 | 1 FT | 3,769.60 |
| 20 | 16 PC | 1212198 | GASKET 24 PROFILE | | 0 | |
| 30 | 56.000 FT | 1257379 | 21" X 8' RCP CL3 RG | 28.05 | 1 FT | 1,570.80 |
| 40 | 7 PC | 1229466 | GASKET 21 PROFILE | | 0 | |
| 50 | 224.000 FT | 1257371 | 18" X 8'  RCP CL3 RG | 19.40 | 1 FT | 4,345.60 |
| 60 | 28 PC | 1212197 | GASKET 18 PROFILE | | 0 | |
| 70 | 3 PAI | 1181891 | PIPE LUBE, 8# PAIL | | 0 | |
| 80 | 80.000 FT | 1290632 | 18" RCP ELIP C507 C4 PF | 34.85 | 1 FT | 2,788.00 |
| | | | PLEASE NOTE THAT ELLIPTICAL PIPE IS NOT MANUFACTURED FOR RUBBER GASKET JOINT | | | |
| 90 | 104.000 FT | 1290631 | 18" RCP ELIP C507 HE-III PF | 29.55 | 1 FT | 3,073.20 |
| | | | PLEASE NOTE THAT ELLIPTICAL PIPE IS NOT MANUFACTURED FOR RUBBER GASKET JOINT | | | |
| 100 | 2 PAI | 1201025 | JOINT MASTIC,5GAL | | 0 | |

Quotation Total          15,547.20

Applicable sales taxes are not included

*ADD*
*STC 7200 PRECAST*
*STORMCEPTOR*          *$35,520.⁰⁰*
                        *DELIVERED!*

Entered by: PSHIPLEY
Document date: 04/09/2003                    1 / 2



Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

1111 2ⁿᵈ Street, NE
Washington, DC 20001
Phone    202-962-0034
Fax       202-962-0045

## Request for Information                          No. 026

---

**DATE SENT:** April 23, 2003                    **SPEC SECTION:**

**DATE REQUIRED:** April 24, 2003                    **Article:**

**JOB:** 1B0035                                  **DATE COMPLETED:** April 23, 2003

**TITLE:** Elliptical Pipe in lieu of Arch Pipe

**PROJECT:** NEW YORK AVENUE STATION

**TO:**    Adel Kotb

Jacobs Civil Inc

1100 North Glebe Road, Suite 500

Arlington, VA 22201

**RECEIVED**
APR 2 4 2003
Slattery Skanska, Inc.
Virginia Office

**REQUEST:**

Please address the fax from Rinker Materials (Hydro Conduit) dated 4/10/03. Is it
acceptable to use the 14" x 23" elliptical in lieu of the arch pipe shown on B3e-U-013S?

**Signed:** _____
**David Gallo**
Senior Project Engineer
Slattery/Lane Joint Venture

**RESPONSE:**

With respect to the storm pipe between drainage structures 14-13-12 shown on U-012S &
U-013S, it is acceptable to replace the 13.5"x22" concrete CL IV arch pipe with a 14"x23"
concrete CL IV elliptical pipe.



Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

1111 2nd Street, NE
Washington, DC  20001
Phone    202-962-0034
Fax       202-962-0045

# RFI Transmittal                                      No. 026

**PROJECT:**  NEW YORK AVENUE STATION          **DATE:** 4/24/2003

**TO:**

☐ Alstom Signaling - Attn: Marc Cremoux          ☐ Fujitec America, Inc. - Attn: Kent McCord
☐ Barry's Plumbing - John Sitler                 ☐ Form Services Inc. - Attn: JC Neal
☐ Capitol Development Design, Inc. - Attn: Hugh Hughes     ☐ Hager Electric Service, Inc. - Attn: Karl Hager
☐ Conesco Doka, Ltd. - Bill Publicover           ☐ Piping & Corrosion Specialties, Inc. - Attn: Tom Mollica
☐ Cortez Bros. Rebar, Inc. - Eliezer Cortez      ☐ Traction Power Systems Division - Attn: Don Lemoine
☐ CTI/DC Ready Mix Concrete - Attn: Ron Leoni    ☐ Truland Walker Seal Joint Venture - Attn: Tim Cooke
☐ Delta Railroad Construction - Attn: Larry Laurello      ☐ Williams Bridge Co. - Attn: Richard Johnson
☐ Dynatran - Attn: Bill Smith                    _____ Attn: _____
☐ Environmental Resolutions, Inc. - Attn: Peggy Farrell   ☐ _____ Attn: _____
☐ The Eddy Group - Dana Eddy                     ☒ Spec. Sections   O2635

**DESCRIPTION:**

Please find the response to Request for Information (RFI) No. 026 concerning *Elliptical Pipe in lieu of Arch Pipe* dated 4/23/03 attached.  Please incorporate the response into your work.  This RFI is meant to *clarify* the contract documents only.  Should you feel that the response to this RFI will result in a change to your scope of work or impact your schedule please notify this office in writing within 5 (five) business days.

Signed: _____

David Gallo
Senior Project Engineer
Slattery/Lane Joint Venture

Cc:     Office:                              Field:
        Damian Ruppert - Slattery/Lane       Dick Carr - Slattery/Lane
        Wah Chan - Slattery/Lane             Mike Attardo - Slattery/Lane
        Rob Farrell - Slattery/Lane          Ryan Kuntz - Slattery/Lane
        Samuel Millick - Slattery/Lane
        Cindi Butchko - Slattery/Lane
        File
        Ed Hollender via fax



Hydro Conduit Division
Virginia Sales Office
4331 Ridgewood Center Dr.
Woodbridge, Virginia  22192
Telephone (703) 580-9993
Facsimile (703) 580-5192

## *Fax / Memorandum*

| *To:* | Ed Hollander | *From:* | Mike Barg |
|---|---|---|---|
| *Fax:* | 703-497-7933 | *Date:* | 6/23/03 |
| *Subject:* | New York Avenue Station | *Pages:* | 1 |

As mentioned in our phone conversation, I will write on the bottom of page 3 of 3 and page 6 of 6 below the signature block, the following:

"Contractor to provide six(6) weeks notice prior to delivery for RCP requiring DCDPW/WASA inspection."

If this is acceptable to you, please sign and fax to (703)580-5192.

Thank You

FAXED
10:30Am.
6/23/03

OK
6/23/03.
10:00 AM

*FULLY EXECUTED AGREEMENT*

Contract SC458-56

RECEIVED

JUL 2 2 2003

RECO - MA REGION



# Slattery Skanska Incorporated
# Lane Construction Corporation
# A Joint Venture

## VENDOR / SERVICE PROVIDER AGREEMENT

This **AGREEMENT** made this *1* day of July, 2003, by and between **SL, A JOINT VENTURE OF SLATTERY SKANSKA, INC. AND THE LANE CONSTRUCTION CORPORATION,** of 1616 Whitestone Expressway, Whitestone, New York, 11357 hereinafter called the Contractor, and **THE REINFORCED EARTH COMPANY,** 8614 Westwood Center Drive, Vienna, Virginia 22182, the Vendor / Service Provider.

    **WITNESSETH,** that, **WHEREAS,** the Contractor has heretofore entered into a contract with WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, hereinafter called the Owner, to perform certain labor and furnish certain services and material for the erection and completion of Contract No. 1B0035, Section JDC, Main Construction Package for new Station, Trackwork, and Systems, New York Avenue "Pocket" Station, Phase 2: Glenmont Route (Red Line) as per plans and specifications.

## THE VENDOR / SERVICE PROVIDER AGREES AS FOLLOWS:

    **Article I.** To furnish and deliver F.O.B. **Jobsite** via truck all the services and material necessary to complete the following portions of the work included in said contract between the Contractor and Owner in all respects, as the Contractor is required by said plans and specifications to do, Namely:

<div style="border:1px solid black; text-align:center;">

### SEE EXHIBIT 1 FOR SC458-56

</div>

    **Article II.** That the services and material called for in this contract are to be furnished promptly when requested by the Contractor so that the work will not be delayed waiting for such, and the Vendor / Service Provider agrees to complete the delivery of services and material covered by this contract at such times and in such manner that the Contractor can complete all of work included in its contract with the Owner. If delivery is not made as herein provided, it is hereby agreed that damages arising from the nonfulfillment of this contract as regards time shall be deducted from the contract price, and be as liquidated damages and not in the nature of a penalty and shall be **as per contract** per calendar day.



RECEIVED

SEP 1 2 2003

Slattery Skanska, Inc.
Virginia Office

The following schedule of delivery dates shall be effective in this contract:

> As per Contractor's construction schedule and request

For delivery instructions please contact **Damian Ruppert, Ryan Kuntz, or Wah Chan at (202) 962-0034**

**Article III.** To pay for all services and materials, skill, labor and instrumentalities used in, or in connection with, the performance of this contract, when and as bills or claims therefore become due, and to save and protect the premises, the Owner, and the Contractor from all claims and mechanics' liens on account thereof, and to furnish satisfactory evidence to the Contractor when and if required, that he has complied with the above requirements. This provision shall not be construed as a waiver of the right of the Vendor / Service Provider to file and enforce a lien claim as against the Owner in the event of the Contractor's failure to pay the Vendor / service provider.

**Article IV.** That he has examined all the plans and read all the specifications and *Addenda No. 1 thru 7* supplied by the Owner, for the entire work, of which the services and materials covered by this contract is a part, and that he will be bound by any and all parts of said plans and specifications and addenda insofar as they relate to the services and material herein undertaken to be furnished.

**Article V.** That the services and material to be furnished under this contract will be in strict accordance with the requirements of the plans, specifications and addenda, and that samples of such services and materials, shop drawings, erection drawings and mock-ups as required will be furnished for the approval of the Contractor and the Owner and that all services and materials furnished shall be in strict accordance with such approved samples and/or shop drawings.

**Article VI.** To make any and all changes, furnishing the services and materials that the Contractor June require without nullifying this agreement, at a reasonable addition to or reduction from, the contract price, hereinafter named. NO ALTERATIONS OR CHANGES SHALL BE MADE, HOWEVER, EXCEPT UPON THE WRITTEN ORDER OF THE CONTRACTOR. The amount to be paid by the Contractor, or allowed by the Vendor / service provider, by virtue of such alterations, shall be stated in such written order.

**Article VII.** To comply with all Federal and State laws, codes and regulations and all municipal ordinances and regulations effective where the work is to be performed under this contract and to pay all fees, taxes including sales and use taxes, and expenses connected with such compliance.

**Article VIII.** This contract is contingent upon the Vendor / Service Provider being approved by the Owner.

## THE CONTRACTOR AGREES AS FOLLOWS:

**Article IX.** To pay the Vendor / Service Provider for such services and material herein undertaken to be furnished the sum of

> **SEE EXHIBIT 1 FOR SC458-56**

Page 2 of 3

This sum includes (or excludes) D.C. Sales Tax. Please be advised that "permanent materials" to be incorporated into the project are not subject to "D.C. Sales Tax" for this Project. Subject to additions and deductions as herein before provided and such sum shall be paid by the Contractor to the Vendor / Service Provider as the services and material is delivered in monthly installments, as follows:

Payment terms:

> **SEE EXHIBIT 1 FOR SC 458-56**

Original invoices must be sent to the **SL, a Joint Venture of Slattery Skanska, Inc. and The Lane Construction Corporation Field Office, 1111 2nd Street, NE, Washington, D.C. 20001, Phone: (202) 962-0034; Fax: (202) 962-0045.**

 **Article X.** It is mutually agreed between the parties hereto, that no payment made under this contract, except the final payment, shall be conclusive evidence of the performance of this contract, either in whole or in part, and that no payment shall be construed to be an acceptance of improper services and materials.

**AGREED TO AND ACCEPTED:**

**THE REINFORCED EARTH COMPANY**
Vendor / Service Provider

BY: _____

TITLE: _____Rom_____

DATE: ___8/10/03_____

**SL, a JOINT VENTURE OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION**

BY: _____

TITLE: Area Manager/Senior Estimator

DATE: _12 SEPT. 2003___

Contract No. 1B0035, Section JDC
Main Construction Package for New
  Station, Trackwork, and Systems
NEW YORK AVENUE STATION
Phase 2, Glenmont Route (Red Line)
Wash. Metro. Are Transit Authority

**SL, A Joint Venture** of
Slattery Skanska, Inc. and
The Lane Construction Corp.

**VENDOR/SERVICE PROVIDER AGREEMENT SC458-56**

---

| **EXHIBIT 1** |
| --- |

**Vendor/Service Provider:**   **THE REINFORCED EARTH COMPANY**
**8614 WESTWOOD CENTER DRIVE, SUITE 1100**
**VIENNA, VIRGINIA 22182**
**Contact Person:**   **Eric Hilberath**
**Regional Manager**
**(703) 821-1175  Telephone Number**
**(703) 749-4323  Direct Sales Fax Number**

**Material be provided:**   **Design, Engineering., Drawings, Furnish, Supply, and Delivery
of Mechanically Stabilized Embankment (MSE) Retaining
Walls in accordance with The Reinforced Earth Company's
proprietary systems for construction of embankment retaining
walls. All work is to be in strict accordance with the drawings,
specifications, and standards outlined by the Washington
Metropolitan Transit Authority requirements for the project.**

**Scope of Engineering, Design, Drawings, and Permanent Material to be provided:**

The Reinforced Earth Company (Vendor/Service Provider) shall engineer, design, prepare MSE drawings, furnish,
supply, and deliver materials in accordance with the Project Specifications, Plans and other bid documents
identified above in the Vendor/Service Provider Agreement subject to the terms and conditions set forth in the
executed Agreement. The material quantities and Vendor/Service Provider Agreement price outlined herein is
based upon the Project Specifications, Plans and other Bid Documents that have been provided to The Reinforced
Earth Company (RECO) by the Slattery-Lane Joint Venture (Contractor).

**<u>MATERIALS TO BE FURNISHED AND SUPPLIED, AND AMOUNT OF PURCHASE ORDER</u>:**

**<u>Purchase Order Agreement and Pricing is determined upon a "Lump Sum" Basis:</u>**

Reinforced Earth Structures:    Estimated Quantity for Two (2) Wall Structures is <u>**10,394 SQ.FT.**</u>

**<u>Purchase Order Price:   (ONLY OPTION 1 OR OPTION 2 IS TO BE CHOSEN BY CONTRACTOR FOR THE PROJECT)</u>**

**<u>OPTION NUMBER 1: 75 Year Service Life, 0.7H Reinforcing Strip Length, No Special Loading:</u>**

10,394 SQ.FT. @ $12.10 per SQ.FT. = <u>$125,767.40 Lump Sum</u>.

**OR**

**<u>OPTION NUMBER 2:  100 Year Service Life, 1.0H Reinforcing Strip Length, w/Reqd Loading:</u>**

10,394 SQ.FT. @ $14.00 per SQ.FT. = <u>$145,516.00 Lump Sum</u>

**Note:**  The Purchase Order Price is strictly based upon the estimated quantity of retaining wall structures which are to be constructed.  The Agreement for all work is Lump Sum.  Should the Contractor modify or change the surface area of the MSE retaining structures to be constructed prior to or during the course of the final design or construction, a "Contract Modification" will be issued to adjust the Vendor/Service Provider Agreement on the basis of a "UNIT PRICE".  This "UNIT PRICE" will be as already established above for the initial pricing of the MSE walls BASED ON THE OPTION CHOSEN.

**D.C. Sales Taxes:**        NO D.C. SALES TAXES ARE TO BE CHARGED TO THE CONTRACTOR FOR ANY MATERIALS PROVIDED UNDER THIS AGREEMENT.  This project is TAX EXEMPT in the District of Columbia as a result of an agreement between WMATA and the D.C. government.  A copy of the Tax Exempt Letter establishing this agreement is available upon request for use by the Vendor.

## Terms and Conditions of the Vendor/Service Provider Agreement:

1. Contractor shall make available to RECO, a copy of each of the Project Specifications, Plans, or other bid documents. Any document not so provided to RECO shall not be binding upon RECO, and shall not become any part of the Vendor Agreement, notwithstanding any language to the contrary.

2. **Technical , Engineering, and Design :**

    a. Design Assistance. Any technical or design services provided are incidental to the supply of the materials. If and to the extend RECO participates in the selection of the materials to be provided, RECO relies entirely on the drawings, specifications, and survey date provided by the Owner and the Contractor. In the absence of site specific design criteria, the material supplied are based on a default design life of 75 years per AASHTO and assumed design parameters of 2125 pcf unit weight and 34 degree friction angle for the MSE select backfill. RECO has not performed any independent investigation of the project conditions. RECO's material selection relates only to the internal stability of the structure for which its materials are used. RECO is not responsible fore the overall stability of the foundation soils below, or soils otherwise surrounding the structure, or any slip surfaces external to the structure.

    b. Technical Assistance. Any technical assistance provided by RECO at the request of Contractor is of a consulting nature and shall not at any time relieve Contractor of its sole responsibility to construct the structure, including the installation of the materials provided, in accordance with the project specifications and all applicable local, state or federal statutes and regulations, including, without limitation, the responsibility to use backfill material and compaction procedures conforming to the project specifications. Such technical assistance also shall not shift the responsibility for project design or any part thereof, to RECO. The provision of technical assistance is for the benefit of the Contractor only and shall not be for the benefit of any other party, including the Owner.

    c. Quantities. If and to the extent that RECO participates in the estimating of the quantities to be provided, the parties acknowledge that RECO has relied entirely on the drawings, specifications, and survey data provided by the Owner and the Contractor. RECO has not performed any independent investigation of the project conditions. Such assistance shall not shift the responsibility for the estimation of quantities to RECO.

3. **Delivery of Materials Manufactured and Supplied.**

    a. Terms of Delivery. Delivery shall be in full truckload quantities, FOB job site or as near to job site as trucks can reasonably be driven under their own power, or, at Contractor's option, to storage. Contractor shall be responsible to provide suitable facilities for storage and unload. All charges for unloading beyond two hours per truck and for storage and transfer of materials after delivery shall be paid by Contractor. Contractor will return all dunnage to RECO for future use.

b.   Control. Contractor shall verify quantities and condition of materials received with trucker's bill of lading upon receipt. Any discrepancy must be reported to RECO in writing either on the trucker's bill of lading or otherwise within 24 hours of delivery. Such written notice is a condition precedent to any remedial action by, or claims against, RECO. If notice is not provided with the said period of time, or otherwise in accordance with this provision, Contractor waives its right to claim.

c.   Acceptance. Installation by Contractor constitutes acceptance of the material, the product dimensions and appearance, so far as the Project Specifications will allow and provide for with the Contractor.

d.   Transfer of Title. The title to the materials is deemed to pass to the Contractor at the time of delivery. Thereafter, Contractor shall bear sole responsibility to store and handle the materials with reasonable skill and care, and shall be liable for any loss or damage to the materials.

**4.   Engineering, Production, and Delivery Time:**

a.   Schedule. The Vendor Agreement is established based on the schedule provided by the Contractor at the time of bidding. The Contractor is required to confirm such schedule within 30 days from the date of the execution of the Vendor Agreement, in order for RECO to plan for the mobilization and performance of its production facilities. Subsequently during the course of the project, Contractor will confirm from time to time the progress of the works in accordance with the schedule, and shall provide a minimum of seven (7) days notice and leaf time for the start-up and/or restart of panel delivery to the job site. Panel load sheets, prepared by Contractor, must be received by the precaster a minimum of two business days prior to the requested time of delivery.

b.   Changes to the Schedule. Any change to the schedule for the delivery of materials shall be treated in accordance with Article 6, Changes.

c.   RECO Delay. If Contractor contends that RECO is delaying the project, or any portion thereof, Contractor shall notify RECO in writing within 48 hours of the start of the delay, and allow seven (7) business days for correction of such delay. Such notice is a condition precedent to the Contractor's right to claim against RECO for such delay. If notice is not provided in accordance with the terms of this agreement, Contractor waives its right to claim for delay.

d.   Excusable Delays. RECO shall not be liable for delays in design, delivery, construction, or completion of the project due to causes beyond its reasonable control, including but no limited to, delays in the approval of drawings, or acts or failure to act by the Contractor, the Architect, the Owner and/or any other contractor. Excusable delays also shall include, without limitation, strikes, fires, floods, acts of God, acts of government, failure of supplier's truckers, or civil strife. In the event of such delays, the delivery schedule shall be adjusted. Such delays shall not relieve Contractor of its obligation to accept and pay for the materials under this Vendor Agreement and in accordance with the payment schedule.

e.   Shop Drawings for the engineering, construction, manufacture, and delivery of the MSE retaining walls are to commence at once, and are to be delivered pursuant to a mutually agreed schedule for the project.

TIME IS OF THE ESSENCE, so the Vendor is to proceed post haste with all engineering and shop drawing processes, as needed.

f.  It is anticipated that the fabrication and supply of the approximately 10,394  Square Feet of Precast Wall Panels will require approximately 20 to 22 casting days, at a location within reasonable trucking distance to the Project.  It is also anticipated that approximately  22 to 24 truckloads of precast panels are to be delivered to the project site, all based strictly upon the "final nomenclature" of the panel design.  The "metal reinforcing strips and wall accessories" are to be delivered at least two (2) days prior to the "first" precast panel delivery to the project site.  Approximately 1 or 2 truckloads of such materials are expected, and will be delivered from locations within the mid-western and western parts of the United States.

g.  The Price for this Work is FIRM THROUGH December 31, 2004.

h.  The Purchase Order Price for this Work outlined here, INCLUDES AT LEAST THREE (3) DAYS of ON-SITE technical assistance during construction of the MSE retaining walls.  All assistance is to be scheduled with reasonable scheduling and requests.

## 5.  Payment for Engineering and Delivery of Materials:

a.  Terms for Payment, Regardless of whether RECO invoices are prepared and submitted on a lump sum or unit price basis, payment in full shall be made by Contractor not later than thirty (30 day following receipt by Contractor of RECO's invoice. No retention shall be withheld from payments due and owing to RECO for material quantities invoiced on production, delivery to the project site or approved in storage. PAYMENTS TO RECO SHALL NOT BE DEPENDENT UPON, OR OTHERWISE SUBJECT TO OR CONDITIONED UPON, THE RECEIPT BY CONTRACTOR OF PAYMENT FROM THE OWNER OR ANY OTHER SOURCE, except as may be required by the Owner with regard to matters involving "quality deficiencies".

b.  Late Payments. A service charge of  1.0% per month or the maximum amount allowed by law, whichever is lower, shall apply to late payments.

c.  Remedies for Nonpayment. Without prejudice to any other remedy, it may have at law or under the Vendor Agreement, if any payment is more than 30 days late, RECO may suspend fabrication, and delivery of materials until payments are brought current. Thereafter, the purchase price may be increased to compensate for RECO's cost associated with the interruption or alteration of the fabrication sequence or schedule, or the schedule for delivery of materials

## 6.  Changes to the Agreement and the Work:

a.  Writing Required. RECO may be directed in writing, without invalidating the Vendor Agreement, to make changes in the work within the scope of this Agreement, consisting of additions, deletions or other revisions, including those required by any Prime Contract, issued subsequent to the execution of the

Vendor Agreement. The value of all such changes shall be ascertained in accordance with the following provisions.

b.  Changes to the Design. Changes to the design requirements or parameters including, without limitation, revisions in the geometry, lines and levels, changes in the wall height and foundation and loading conditions or any other modifications to the old design shall entitle RECO to an adjustment to the Purchase Price, including any and all additional engineering and material costs. The rates for any additional design work are as set forth in the Vendor Agreement.

c.  Changes to the Schedule. Changes in the schedule for delivery of materials, which affect the sequence or schedule for the fabrication of materials or any arrangements for the transportation or shipping of materials, shall entitle RECO to an adjustment in the Purchase Price including, without limitation, idle time for the production facilities, storage of panels, additional shipping costs, plus reasonable overhead and profit.

d.  Other Changes. Other changes to the Vendor Agreement, which reasonably cause RECO to incur additional costs, shall entitle RECO to an adjustment in the Purchase Price, plus reasonable overhead and profit.

e.  Payment of Claims. Any claim for additional payment for changes to the agreed upon scope of work, the delivery or fabrication schedule, or other change to the Vendor Agreement, shall be paid within 30 days of the date of the invoice. In the event that payment is more than 30 days late, RECO reserves the right to suspend the fabrication or delivery of any work that is the subject of a claim for additional payment unless RECO determines, upon notification in writing from the Contractor, that the claim is the subject of a good faith dispute.

f.  The Rates for all "changes" to the design, production, and manufacture and supply of materials for this project is as follows:

| | |
|---|---|
| Designer: | $50.00 per Hour Worked |
| Registered Engineer: | $75.00 per Hour Worked |
| Additional Technician At Site: | $450.00 per Day Worked, plus expenses |

g.  The Rates for all "replacement materials" requried as a result of damages, abuse, loss, or other reason that is not the fault of RECO is as follows:

| | |
|---|---|
| MSE Precast Facing Panels: | $12.00 per Square Foot Delivered |
| Metallic Soil Reinforcement Strips: | $1.80 per Linear Foot Delivered |
| MSE Bolt Sets: | $0.80 per Each Delivered |
| MSE Panel Bearing Blocks: | $2.00 per Each Delivered |
| MSE Panel Filter Cloth: | $0.25 per Square Foot Delivered |
| Contact Adhesive Glue: | $4.99 per 2 LBS Tube, delivered |

## 7.  Warranty:

a.  Warranty. RECO warrants that the materials furnished hereunder shall conform to the project specifications and shall be free from defects in material and workmanship. Vendor's exclusive remedy for any defects in the materials shall be limited to replacement ore repair, at RECO's sole option.

b.  No Statutory Warranty. The warranties set forth herein are made by RECO and accepted by Contractor in lieu of all statutory or implied warranties other than as to title.

c.  Notice. This warranty shall apply only when Contractor has given RECO written notice of defect or nonconformity upon delivery of the materials to Contractor in accordance with the Vendor Agreement and these general conditions of contract.

d.  EXCLUSION OF WARRANTIES. THE PARTIES AGREE THAT THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL OTHER WARRANTIES OTHER THAN AS SET FORTH ABOVE, BE THEY EXPRESS OR IMPLIED ARE EXCLUDED FROM THIS TRANSACTION AND SHALL NOT APPLY TO THE MATERIALS FURNISHED BY RECO.

## 8.  Other Terms and Conditions:

a.  Purchase Order for Exclusive Benefit of Contractor. This Vendor Agreement, including the general conditions of contract, is for the exclusive benefit of the Contractor. It confers no rights by way of third party beneficiary or otherwise on any other party.

b.  **Assignment. This Vendor Agreement cannot be assigned without RECO's prior written consent. This Agreement WILL BE ASSIGNED TO THE "WMATA DBE" MSE WALL INSTALLER. The assignment will include a "payment protection clause" for the benefit of RECO.**

c.  Limitation of Liability. RECO's liability for any damages or default under the terms of this Vendor Agreement shall not exceed the Purchase Price. In no event shall RECO be liable for incidental, consequential, or liquidated damages.

d.  Indemnification. RECO shall only be responsible for loss or damage caused by its own negligence. Contractor agrees to indemnify RECO for any other claim of loss or damage.

e.  Patents, Trademarks, and Proprietary Rights. RECO has actual or pending patents, trademarks, and proprietary rights in certain of the materials, processes, and configurations (i.e., cruciform shape) supplied to Contractor. The drawings and other information supplied to Contractor remain the property of RECO and may not be disclosed or provided to any other person or used for any other purpose without RECO's written consent.

f.  Dispute Resolution. Any dispute related to this Vendor Agreement shall be resolved first, by mutual agreement between the principals of the parties to this agreement.  If no mutual agreement between the

principals of the parties can be reached, then the parties will resolve said disputes by arbitration conducted pursuant to the Construction Industry Arbitration Rules of the American Arbitration Association.

g.  No Limitation of Rights or Remedies. Nothing in the Vendor Agreement or these general conditions of contract shall be deemed a limitation of any rights or remedies that RECO may have under any Federal or State mechanics' lien laws or under any applicable labor and material payment bonds, unless such rights or remedies are expressly waived in writing, or as outlined within WMATA's standard specifications.

h.  Governing Law. The laws of the State of New York shall govern this Vendor Agreement.

i.  Headings. The headings in this Vendor Agreement are solely for the convenience of the parties and shall be used neither in the interpretation of the Agreement, nor to impose or lessen any obligation on either of the parties.

j.  Enforceability of Agreement. If any article, paragraph, term, covenant, or condition of this Vendor Agreement, including the general conditions of contract, is determined to be invalid or unenforceable, the remainder of this Vendor Agreement including the general conditions of contract, and the application of the remaining articles, paragraphs, terms, covenants, or conditions shall be unaffected thereby, and shall be valid and enforceable to the fullest extent permitted by law.

SL, a JOINT VENTURE OF SLATTERY SKANSKA, INC. and THE LANE CONSTRUCTION CORPORATION, —CONTRACTOR—

BY _____

Edward F. Hollander, P.E.
Area Manager/Senior Estimator
Name and Title

_12 SEPT. 2003_
Date

Attest: _9\12\03_
Date

THE REINFORCED EARTH COMPANY —VENDOR /SERVICE PROVIDER—

BY _____

Eric P. Hilberath
Mid Atlantic Regional Manager
Name and Title

_9/12/03_
Date

Attest: _9\12\03_
Date

Page 8 of 8

**The Reinforced Earth Company**

8614 Westwood Center Drive
Suite 1100
Vienna, VA 22182-2233
Telephone: (703) 821-1175
Telefax: (703) 821-1815
www.reinforcedearth.com

August 28, 2003

Mr. Edward Hollander
Slattery Skanska Inc. And The Lane Construction Corporation
1616 White Stone Expressway
White Stone, New York 11357

SUBJECT:    New York Avenue Metro Station
            Contract No. 1B0035
            RECo project No. 10359

Dear Mr. Hollander:

Enclosed, please find six copies of your purchase order for the above-mentioned project. Upon receipt, please return a fully executed copy for our files.

Sherif Aziz will be The Reinforced Earth Company's project manager for this project. You may contact him at 703-821-1175 to schedule delivery of materials and on site assistance. We are enclosing a few construction manuals and a getting started check list to help you get started.

We look forward to working with you on this project. Please do not hesitate to call if you should have any questions or require any additional information.

Sincerely,

THE REINFORCED EARTH COMPANY

Eric P. Hilberath
Mid-Atlantic Regional Manager

Enclosures

EPH:jb



RECEIVED
SEP 0 9 2003
SLATTERY SKANSKA INC
NEW YORK AVENUE STATION

RECEIVED
SEP 1 2 2003
Slattery Skanska, Inc.
Virginia Office

Atlanta    Boston    Chicago    Dallas/Ft. Worth    Irvine, CA    Orlando    Seattle    Vienna, VA



Slattery Skanska Incorporated
Lane Construction Corporation
A Joint Venture

**Slattery Skanska Inc.**
Virginia Office
1384 Old Bridge Road
Woodbridge, VA 22192
Phone  703-497-7923
Fax  703-497-7933
Web  www.slattery.skanska.com

C. NANCE

September 16, 2003    Fax (703) 749-4323
and  U.S. Mail

**The Reinforced Earth Company**
**8614 Westwood Center Drive**
**Vienna, Virginia 22182**

Attn:        Mr. Eric P. Hilberath
             Mid-Atlantic Regional Manager

Reference:   Contract No. 1B0035, Section JDC
             Main Construction Package for New
                Station, Trackwork, and Systems
             NEW YORK AVENUE STATION
             Phase 2, Glenmont Route (Red Line)
             Wash. Metropolitan Area Transit Authority

Subject:     **"ASSIGNMENT" OF SUBCONTRACT/VENDOR PROVIDER**
             **AGREEMENT SC458-56 for Mechanically Stabilized Embankment**
             **(MSE) Walls, to include delivery:  Materials Engineered, Designed,**
             **Furnished and Delivered For Project per WMATA Specifications**
             **and SL Requirements, and RECO "Approved Drawings"**

             Letter No. 458-RECO-445-2003

Dear Eric:

Reference is made to the many and various recent telephone conversations and
meetings between ourselves, regarding the above subject matter for the referenced
project.  Thank you once again for your patience and that of your staff with regard to
the review process with this "design-build" procurement by WMATA on this project.
This current letter is forwarded to you in follow up to those discussions.

As discussed and agreed, pursuant to Article 8.b.of Exhibit 1 of the Vendor/Service
Provider Agreement No. SC458-56, dated July 1, 2003, we are "assigning" your
Vendor Agreement to the "DBE Wall Installation Subcontractor", which is "L and L
Construction Associates, Inc." of Upper Marlboro, Maryland.  All terms and

September 19, 2003

conditions of the Agreement made with the SL Joint Venture, dated July 1, 2003, remain in full force and effect. The Wall Subcontractor will now be coordinating all matters relative to your supply of the MSE Wall System, and administration of documents, QA/QC, and payment therefore from hereon forward. We have included clauses within the Subcontract Agreement, which will insure payment to The Reinforced Earth Company for all engineering work performed to-date, materials manufactured and supplied, and systems provided to the project on behalf of the SL Joint Venture and WMATA. Additionally, we have incorporated all Pricing and related Terms and Conditions agreed to between RECO and the SL Joint Venture previously BY INCLUDING such language and a full copy of the SC458-56 Vendor Agreement into their Subcontract Agreement.

Accordingly, please forward all future correspondence and documents relative to this project directly to Mr.Charlie Nance at L and L Construction Associates from now on, with a file copy directly to the SL Joint Venture at the Field Office and the Woodbridge Office. This will include all such information as your insurance binders, WMATA precast procedures, materials certifications, QA/QC documentation, and any other such early action documents. The Wall Subcontractor will be in contact with you directly to arrange for upcoming field coordination of deliveries and panel shipment. We anticipate beginning construction of WALL C Lower Tier on or about September 29, 2003 at the Project Site. Thank you in advance for your timely attention to this matter. Your written confirmation of this "assignment" is requested.

Please call me directly if you have any questions with regard to this matter, or any other matter relative to this Project.

Very Truly Yours,

Edward F. Hollander, P.E.
Area Manager/Senior Estimator

Cc:
| | | |
|---|---|---|
| Damian Ruppert, SL JV | Rich Cavallaro, SSI | Sub File 458-56 & 12 |
| Gary Winsper, SSI | Charlie Nance, L and L Constr. | Chrono File |

# Slattery
# SKANSKA

Slattery Skanska, Inc.
1584 Old Bridge Road
Woodbridge VA 22192
Phone    703-497-7923
Fax      703-497-7933
Web      www.slattery.skanska.com

## Fax


FAXED
4:15pm
9-19-03

| Date 19 SEPT. 03 | Reference NEW YORK AVE. STATION | Pages (including cover) 2 + 1 = 3 |
| To ERIC HILBERATH / DEB REYNOLDS | | Fax (703) 749-4323 |
| From ED HOLLANDER. | | Fax (dir) 703-497-7933 |
| E-mail | | |

Message:

LETTER OF "ASSIGNMENT" AS DISCUSSED WITH

DEBBIE REYNOLDS.   CALL ME.

ED

CC: C. NALCE, L & L CONST.

R. RUPPERT

R.C., G.W.  FILE COPIES.

IF THERE ARE ANY PROBLEMS RECEIVING THIS FAX PLEASE CALL (703) 497-7923