**UNITED STATES DISTRICT OF COLUMBIA
FOR THE DISTRICT OF COLUMBIA**

L&L CONSTRUCTION ASSOCIATES, INC    :
    :
                  Plaintiff,    :
    :
v.    :    Civil No. 1:05CV01289
    :    Judge Royce C. Lamberth
SLATTERY SKANSKA, INC.    :
    :
                Defendant.    :


**PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE AMENDED COMPLAINT**


September 12, 2005                **RESPECTFULLY SUBMITTED**


Bradshaw Rost, Esq. (D.C. Bar #376064)
***Tenenbaum & Saas, P.C.***
4504 Walsh Street, Suite 200
Chevy Chase, Maryland 20815
(301) 961-5300 (office)
(301) 961-5305 (facsimile)
Counsel for Plaintiff L&L Construction
Associates, Inc.
**Email to be noticed: BRost@tspclaw.com**

## TABLE OF CONTENTS

**I.**    **Introduction**..................................................................................................... 1

**II.**    **Slattery Has Waived Any Objection to Venue.**.................................................... 3

*1.*    *Any Objection to Venue Had to Be Raised In Slattery's "First Defensive Move".*.......... 3

*2.*    *The Court Does Not Have the Authority To Modify Rule 12(g) and (h)(1)(A).*.............. 5

*3.*    *The Filing of the Amended Complaint Does Not Resurrect Any Waived Defenses.*...... 10

*4.*    *The Venue Objection Was Available to Slattery on July 19, 2005*................................. 13

*5.*    *Allowing Slattery to Raise the Waived Venue Objection Would Promote Piecemeal Litigation*.................................................................................................................. 17

*6.*    *Conclusion*............................................................................................................. 19

**III.**   **L&L's Complaint is Not Governed by The Subcontract**.................................. 19

*1.*    *L&L's Claim Does Not "Arise" Under the Subcontract*................................... 19

*2.*    *The October 3, 2001 Document Is An Enforceable Agreement*........................ 20

*3.*    *Any Deficiency in the October 3, 2001 Document Is Cured By Reference to the Other Documents.*.................................................................................................. 24

*(A)*   *The Request for Proposal Issued by WMATA*............................................ 25

*(B)*   *The Prime Contract between Slattery and L&L.*.......................................... 25

*(C)*   *The October 3, 2001 Agreement Between L&L and Slattery*........................ 26

**IV.**   **The Integration Clause Does Not Apply to the October 3, 2001 Agreement**............. 29

*1.*    *The Court Must Consider Extrinsic Evidence In Interpreting the Impact of the Integration Clause Upon the October 3, 2001 Agreement.*............................... 29

*2.*    *The Limited Extrinsic Evidence Available from the Documents Demonstrates that the Integration Clause Unambiguously Does Not Apply to the October 3, 2001 Agreement.*.................................................................................................................. 32

*3.*    *The Subcontract is Collateral to the October 3, 2001 Agreement*................... 35

*4.*    *Parol Evidence is Admissible to Interpret the Phrase "Subject Matter".*........ 38

***5.  Slattery Agreed Subsequent to the Subcontract that L&L Would Perform the Remaining Underground Utility Work.*** ........................................................................ 39

***6.  The Integration Clause May Be Invalidated Based Upon Fraud in the Inducement.*** ... 40

***7.  Conclusion*** ..................................................................................................... 41

## TABLE OF AUTHORITIES

2215 Fifth Street Associates vs. U-Haul International, Inc., 148 F.Supp.2d 50, 56 (D.C. 2001)... 4

*Albany Insurance Company vs. Almacenadora Somex, S.A., 5 F.3d 907 (5th Cir. 1993) ........... 5

*Arok Construction Company vs. Indian Construction Services, 174 Ariz. 291, 848 P.2d 870
      (1993) ................................................................................................................. 21

Barnstead Broadcasting Corporation vs. Offshore Broadcasting Corporation, 869 F.Supp. 35, 38
      (D.D.C. 1994) ...................................................................................................... 4

Basch v. George Washington University, 370 A.2d 1364, 1369 (D.C. 1977) ............................ 23

*Bridgeport Restoration Co., Inc. v. A. Petrucci Const. Co. 211 Conn. 230, 230-231, 557 A.2d
      1263, 1264 (1989) ................................................................................................ 28

Brohan on Behalf of Brohan v. Volkswagen Mfg. Corp. of America, 97 F.R.D. 46,
      48 (D.C.N.Y.,1983) ............................................................................................... 12

Building Services Co. vs. National Railroad Passenger Corporation, 305 F.Supp.2d 85, 94
      (D.D.C. 2004) ...................................................................................................... 29

Castelli vs. Tolibia, 83 N.Y.S.2d 554, 564 (1948) ...................................................... 27

Catlin vs. P.B. Commissariat, 127 Ariz. 289, 290, 619 P.2d 1066 (1980) .................................. 10

Cirillo vs. Slomnmni, 196 Misc.2d 759, 768 N.Y.S.2d 759 (2003) ............................................ 41

Clark v. Clark, 535 A.2d 872, 877 (D.C.1987) ............................................................... 40

Copulsk vs. Boruchow, 545 F.Supp. 126, 128 (E.D.N.Y. 1982) .................................................. 10

*D.C. Area Community Council vs. Jackson, 385 A.2d 185, 187 (D.C. 1978). ........................... 21

*Dee-K Enterprises, Inc. v. Heveafil Sdn. Bhd., 985 F.Supp. 640, 643 (E.D.Va.,1997) ............ 12

Detroit, Toledo & Ironton Railway vs. Maxine Potato Service, Inc., 13 Ohio.App.3d 157, 468
      N.E.2d 361 (1983)................................................................................................. 10

Electrical Construction & Maintenance Company, Inc. vs. Maeda Pacific Corporation, 764 F.2d
      619 (9th Cir. 1985)................................................................................................. 28

Four Seasons Hotels Limited vs. Vinnik, 127 A.D.2d 310, 318, 515 N.Y.S.2d 1 (1987)............ 21

Frohman Amusement Corp. vs. Blinkhorn, 178 A.D. 431, 165 N.Y.S. 509 (1917).................... 38

\*Gem Corrugated Box Corporation vs. Kraft Container Corp., 427 F.2d 499, 503 (2nd Cir. 1970) ............................................................................................................................ 37

\*George Washington University vs. Diad, Inc. 1996 WL 470363 (Judge Royce C. Lamberth, D.D.C. 1996 ................................................................................................................... 4

\*Glater v. Eli Lilly & Co., 712 F.2d 735, 738 (1st Cir. 1983)......................................................... 9

Hartling vs. Woodloch Pines, 1998 WL 575138 (S.D.N.Y. 1998).............................................. 10

Havens Steel Co. v. Randolph Engineering Co. 613 F.Supp. 514 (D.C.Mo.1985).................... 28

Heywood v. Samaritan Health System, 902 F.Supp. 1076 (D.Ariz.,1995) ................................ 13

\*Howard University v. Good Food Services, Inc. 608 A.2d 116, 126 (D.C. 1992)................... 30

I.Oliver Engebretson, Inc. v. Aruba Palm Beach Hotel & Casino, 575 F.Supp. 1262, 1264 (D.C.N.Y.,1984)............................................................................................................... 10

Jack Baker Inc. vs. Office Space Development Corporation, 664 A.2d 1236 (D.C. 1995) ......... 21

\*Konigsberg vs. Shute, 435 F.2d 551 (3d Cir. 1970) ..................................................................... 9

Kontokosta vs. Village of Greenport, 1988 WL 132834 (S.D.N.Y. 1988) ................................ 12

\*Lederman vs. United States, 131 F.Supp.2d 46 (D.D.C. 2001)................................................... 11

\*Lee vs. Joseph E. Seagram & Sons, Inc., 413 F.Supp. 693, 701 (S.D.N.Y. 1976).................... 31

Obelisk Corp. v. Riggs Nat. Bank of Washington, D.C. 668 A.2d 847, 855 (D.C. 1995) .......... 23

Park Inn Hotel, Inc vs. Messing, 31 Misc.2d 961, 224 N.Y.S.2d 179, 184 (1962) ..................... 21

\*Piedmont Resolution, L.L.C. v. Johnston, Rivlin & Foley 999 F.Supp. 34 (D.D.C.1998) ....... 29

Potomac Elec. Power Co. v. Mirant Corp., 251 F.Supp.2d 144, 150 (D.D.C.2003) ................... 30

Primex International Corp., 89 N.Y.2d 594, 679 N.E. 2d 624 (1997)......................................... 38

Rauch v. Day & Night Manufacturing Corp., 576 F.2d 697, 701 (6th Cir.1978).......................... 4

\*Ray v. William G. Eurice & Bros. 201 Md. 115, 128, 93 A.2d 272, 279 (1952)...................... 27

Rodas vs. Manitaras, 159 A.D. 2d 341, 552 N.Y.S.2d 618, 621 (1990)....................................... 41

*Rosenthal vs. National Produce Company, Inc., 573 A.2d 365, 369 (D.C. 1990) .................... 23

*Rowley v. McMillan,  502 F.2d 1326 (4th Cir. 1974) ................................................................ 11

Sabo vs. Delman, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957) ...................................................... 40

Seelson v. Rackfay Const. Co.  300 N.Y. 334, 338, 90 N.E.2d 881, 882-883 (1950)................. 35

*Seretse-Khama v. Ashcroft, 215 F.Supp.2d 37 (D.D.C., 2002)..................................................... 6

*Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ................. 8

Texas v. New Mexico  482 U.S. 124, 129, 107 S.Ct. 2279, 2284 (1987) .................................... 23

Thayer v. Dial Indus. Sales, Inc. 85 F.Supp.2d 263, 269 (S.D.N.Y. 2000).................................. 38

Trans-Bay Engineers & Builders, Inc. v. Hills  551 F.2d 370, 379, 179 U.S.App.D.C. 184 (1976) ........................................................................................................................................ 26

Vicki Bagley Realty, Inc. v. Laufer  482 A.2d 359, 366 (D.C., 1984)........................................ 26

*Weber vs. Turner, 1981 WL 26999 (D.D.C. 1981) ....................................................................... 9

W.R. Townsend Construction, Inc. vs. Jensen Civil Construction, Inc., 728 So. 2d 297 (Dist. App. Fla. 1999) ........................................................................................................................ 28

Wurz vs. Santa Fe International Corporation, 423 F.Supp. 91 (D.Del. 1976).............................. 9

**UNITED STATES DISTRICT OF COLUMBIA**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| L&L CONSTRUCTION ASSOCIATES, INC | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 1:05CV01289 |
| | : | Judge Royce C. Lamberth |
| SLATTERY SKANSKA, INC. | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

Plaintiff L&L Construction Associates, Inc. ("L&L"), by and through its counsel, hereby files its Opposition to the Motion by Defendant Slattery Skanska, Inc. ("Slattery") to Dismiss L&L's Amended Complaint under Fed.R.Civ.12(b)(1), 12(b)(3), or 12(b)(6) (the "Second Motion to Dismiss"). In support thereof, the following is stated.

**I.    Introduction.**

At issue in this case is whether a private contractor, in order to satisfy the legal mandate of a government contracting authority that the private contractor must include participation by a disadvantaged business enterprise ("DBE") as a subcontractor to be awarded the prime contract, can enter into an agreement with the DBE subcontractor to award that work and then be allowed to repudiate that promise after being awarded the prime contract. Slattery was able to obtain the prime contract ("Prime Contract") from the Washington Metropolitan Area Transit Authority ("WMATA") to construct certain public improvements described as the New York Avenue Station Construction Project (the "New York Avenue Project") by securing a binding agreement from L&L, a DBE subcontractor, to perform all of the underground utilities work needed to complete the New York Avenue Project at a cost of $4.25 million dollars.

After securing the Prime Contract, Slattery repudiated its promise to award all of the underground utilities work to L&L. Despite having several opportunities thus far, Slattery has not bothered to reassure the Court that it in fact fulfilled its legal obligation to WMATA to have 25% of the Prime Contract work performed by DBE contractors. (<u>See</u> Exhibit No. 2 to Sur-Reply at p. 00800-12; §00814.) In would have been a simple enough matter to state such compliance if true. The only fair inference from this continuing omission is the conclusion that Slattery in fact failed to fulfill its legal duty to have 25% of the Prime Contract work performed by DBE contractors.[1] The equitable considerations relevant to the claims of promissory estoppel and unjust enrichment pled in L&L's Amended Complaint will be greatly influenced by the disclosure that Slattery failed to follow through on its representations and legal obligation that 25% of the work under the Prime Contract would be performed by DBE contractors.

In an effort to avoid a full and illuminating examination of the legal consequences of repudiating its promise to L&L, Slattery initially filed on July 19, 2005 a Motion to Dismiss the initial Complaint (the "First Motion to Dismiss") based upon the erroneous assertion that in order to state a cause of action for breach of contract a plaintiff must allege in the body of the complaint each "material" term of the contract. Only after the parties had extensively briefed that issue did Slattery elect to abandon that argument.[2] (<u>See</u> Second Motion to Dismiss at p. 17, n. 7;

---

[1] The failure by Slattery to follow through on this important legal obligation, if known to WMATA, would have been deemed a material breach of the Prime Contract and could have resulted in termination of the Prime Contract and such other remedies that WMATA may have elected to pursue, including but not limited to, declaring Slattery to be ineligible to receive further contracts from WMATA for three years. Further, this breach – if disclosed – could result in further legal action from the second place bidder, Clark Construction Group, who would have secured the lucrative Prime Contract if Slattery had been unable to satisfy the 25% requirement for DBE participation as part of its bid.

[2] On August 2, 2005, L&L filed its Opposition to the First Motion to Dismiss (the "Opposition"). Slattery filed its Reply on August 12, 2005, to which L&L was obliged to file a Sur-Reply (the "Sur-Reply") on August 23, 2005. As explained in L&L's Motion for Leave to File a Sur-Reply filed on August 25, 2005, Slattery did not raise in its First Motion to Dismiss its defense based upon the merger clause in Article 31 of the Subcontract, but waited until it filed its Reply to assert this defense for the first time.

"Slattery elects not to assert that defense given the extremely liberal pleading rules and the extremely deferential stance towards . . . complaints such as the one filed by L&L".)

Instead, Slattery's Second Motion to Dismiss raises an entirely new argument – not previously advanced in its First Motion to Dismiss – that venue before this Court is improper. In addition, the Second Motion to Dismiss reiterates the additional argument first raised in Slattery's Reply filed on August 12, 2005 in support of its First Motion to Dismiss that the merger clause found in Article 32 of the Subcontract bars L&L's claim. Slattery's third argument, which is interwined with its reliance upon the merger clause, is the contention that the October 3, 2001 document is an unenforceable letter of intent. As discussed below, Slattery has waived its venue objection. Fed.R.Civ.P. 12(g) provides that "[i]f a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party **shall not** thereafter make a motion based on the defense or objection so omitted." [Emphasis Added]. Moreover, for the same reasons discussed at length in L&L's Opposition and Sur-Reply, L&L's claim **does not arise** under the Subcontract. Therefore, the venue clause found in Article 31 and merger clause found in Article 32 of Subcontract does not apply to the instant dispute. Finally, the October 3, 2001 document is, on its face, an enforceable agreement and to the extent needed, is properly supplemented by reference to the RFP and Prime Contract.

## II.    **Slattery Has Waived Any Objection to Venue**.

### 1.    *Any Objection to Venue Had to Be Raised In Slattery's "First Defensive Move".*

Assuming *arguendo* that L&L's claim arises under the Subcontract, (which it does not), Slattery has waived its venue objection. Slattery has not addressed in any way in its Second Motion to Dismiss the self-evident fact that its objection to venue has been waived due to its

failure to raise the defense in its First Motion to Dismiss. Nor has Slattery elected to address the threshold requirement for the relief it seeks by making any attempt to demonstrate that the venue objection was not "then available" to Slattery when it filed its First Motion to Dismiss. This glaring omission can only be explained by the fact that there is no credible argument that can be made by Slattery which would demonstrate that the venue objection was not available to Slattery on July 19, 2005.

Fed.R.Civ.P. 12(h)(1), entitled "Waiver or Preservation of Certain Defenses", states as follows:

> A defense of lack of jurisdiction over the person, improper venue, insufficient of process, or insufficiency of service of process *is waived (A) if omitted from a motion in the circumstances described in described in subdivision (g)*, or (B) if it is neither made by motion under this rule nor included in a responsive pleading or amendment thereof permitted by Rule 15(a) to be made as a matter of course.

Fed.R.Civ.P. 12(g) plainly states that if Slattery made a motion under Rule 12, which it did pursuant to its First Motion to Dismiss, then Slattery "***shall not*** thereafter make a motion based on the defense or objection so omitted." This Court has previously ruled that: "A defendant asserting lack of personal jurisdiction or improper venue must do so in its first defensive move" George Washington University vs. Diad, Inc. 1996 WL 470363 (Judge Royce C. Lamberth, D.D.C. 1996) *citing* Barnstead Broadcasting Corporation vs. Offshore Broadcasting Corporation, 869 F.Supp. 35, 38 (D.D.C. 1994) (same); 2215 Fifth Street Associates vs. U-Haul International, Inc., 148 F.Supp.2d 50, 56 (D.C. 2001) ("a party asserting improper venue must do so in its first defensive move."); See Also Rauch v. Day & Night Manufacturing Corp., 576 F.2d 697, 701 (6th Cir.1978) ("Case law is unanimous in holding, both before and after enactment of the present court rule, that where a defendant files a pre-answer motion to dismiss or an answer,

without raising the defense of a lack of in personam jurisdiction, he waives any objection to that defect.")

The language of Rule 12(g) and 12(h)(1) is mandatory and unambiguous. A new motion raising the omitted defense "shall not" be made and the defense "is waived". The Rule does not provide the Court with any authority to modify or alter the effect of the Rule. There is no qualifying language in the Rule which states that its applicability is conditioned upon the Court first ruling upon the motion to dismiss which omitted the waived defense. There can be no dispute that Slattery failed to object to venue in its First Motion to Dismiss filed on July 19, 2005 and therefore the venue defense is deemed waived under Rule 12(h)(1)(A).

### 2. *The Court Does Not Have the Authority To Modify Rule 12(g) and (h)(1)(A).*

The only exception to the mandatory language of the Rule and the unambiguous consequences of failing to include the venue objection in the First Motion to Dismiss is subpart (h)(1)(B) which allows a party to cure the omission by an amendment made as a matter of right under Fed.R.Civ.P. 15(a). However, Rule 15(a) applies only to responsive pleadings and a motion to dismiss is not considered a responsive pleading. In Albany Insurance Company vs. Almacenadora Somex, S.A., 5 F.3d 907 (5th Cir. 1993) the defendant Somex filed a Rule 12(b)(6) motion seeking dismissal based upon, *inter alia*, improper venue and *forum non conveniens*. While the first motion was still pending for resolution by the Court, the defendant Somex filed a second motion asking the Court to enforce a forum selection clause contained in the operative agreement between the parties. The second defendant Sanfer also filed a Rule 12 motion which sought dismissal only for lack of personal jurisdiction, and then nine (9) days later filed a second Rule 12 motion also asserting the forum selection clause as an additional basis for

dismissal. The trial court granted the second motions dismissing the action based upon the forum

selection clause, and denied as moot the first motions to dismiss.

>   The U.S. Court of Appeals for the Fifth Circuit reversed, holding as follows:

> ***The meaning of subdivision (g) is clear***. If a party seeks dismissal in a pretrial
> motion based on any of the defenses set out in Rule 12(b), he must include in
> such motion any other defense or objection then available which Rule 12
> permits to be raised by motion. If the party omits such defense or objection,
> Rule 12(g) precludes him from making a further motion seeking dismissal
> based on the omitted defense or objection. The advisory committee notes
> following the text of Rule 12 explain the policy behind this consolidation
> requirement: "This required consolidation of defenses and objections in a Rule
> 12 motion is salutary in that it works against piecemeal consideration of a case.
> . . . A party who by motion invites the court to pass upon a threshold defense
> should bring forward all the specified defenses he then has and thus allow the
> court to do a reasonably complete job. The waiver [under subdivision
> (h)(1)(A)] reinforces the policy of subdivision (g) forbidding successive
> motions." [emphasis added].

Albany Ins. Co. v. Almacenadora Somex, S.A., 5 F.3d 907, 909 (5th Cir. 1993). The Sanfer

defendant argued on appeal "that since their second motion was served within 20 days of service

of their first motion, their second motion may be construed as a timely amendment of their first

under Fed.R.Civ.P. 15(a)." Id. at 910. The Fifth Circuit rejected this argument, holding "that a

motion to dismiss is not a pleading for the purposes of Rule 15(a)" and therefore held that

defendants had waived the venue objection. This holding is consistent with the case authority

cited by Slattery in this District that a motion to dismiss is not considered a pleading for purposes

of Rule 15(a).[3]

>   Similarly, in Seretse-Khama v. Ashcroft, 215 F.Supp.2d 37 (D.D.C., 2002) the defendant

filed an opposition to plaintiff's petition for habeas corpus, and then eight days later filed a

motion to dismiss based upon lack of personal jurisdiction of the defendant Edward L. Crosley,

---

[3] Slattery's position is contrary to the position it initially took when it advised L&L's counsel that it would oppose
L&L's attempt to file an Amended Complaint. See L&L's Motion for Leave to File Amended Complaint at ¶1 and
Local Rule 7(m) certification therein.

which defense had been omitted from the opposition previously filed. At a hearing four days later, the defendant sought to amend that motion by contending that the Court did not have personal jurisdiction over another defendant, Warren Lewis, rather than Edward L. Crosley. The plaintiff argued that the defendant had waived the defense, and the defendant countered that they could amend their initial opposition to the habeas petition by including the omitted defense. The Court rejected the argument ruling as follows:

> On June 20, 2002, respondents filed a motion to dismiss asserting that there was not personal jurisdiction over Crosley. But respondents did not raise, and thus "omitted", the defenses that the Court did not have personal jurisdiction over respondent Lewis. Rule 12(g) unequivocally states that respondents cannot make a second motion--whether written or oral--to raise the omitted defense of lack of personal jurisdiction over Lewis."

Id. at 40.

The holdings in Albany and Seretse-Khama are significant for two reasons. First, they make clear what is already clear in the language of subdivision (g) that the waiver of the omitted defense occurs when the motion is filed – and the waiver is not conditioned upon or effective until a court rules upon the first motion. Second, the rulings make clear that a second motion or an attempt to amend the first motion, raising the omitted defense within 20 days of the first motion, does not cure the omission and allow the defendant to resurrect the omitted defense. In other words, the Rule does not empower the Court with the discretionary authority to modify or alter the plain meaning of subdivision (g) by allowing an amendment of the first motion to include the omitted defense. Nor is the waiver consequence of the Rule dependent upon the court first ruling upon the first motion to dismiss. In that regard, the U.S. Supreme Court has made clear that the Courts do not have the authority to modify the plain meaning of the Federal Rules of Procedure. See Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1

(2002) ("A requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation.")

The lack of authority by the Court to allow amendments to pending motions which have omitted waived defenses is made clear by the abundance of cases which have addressed the sole exception in which a party may resurrect a waived defense under Rule 12(h)(1)(b). Rule 12(h)(1)(B) permits amendments to cure omitted defenses only for those amendments allowed as a matter of right under Fed.R.Civ.P. 15(a), which rule allows such amendments only within 20 days the filing of the initial pleading. The First Motion to Dismiss was filed on July 19, 2005. Assuming *arguendo* the First Motion to Dismiss is a pleading governed by Rule 15(a), the 20 day period expired on August 8, 2005. The Slattery's Second Motion to Dismiss raising the venue objection for the first time was filed on August 29, 2005 – twenty-one days too late. A trial court does not have the authority under Rule 12(h)(1)(b) to grant leave to permit an amendment to allow a waived defense once the 20 day period has expired. As explained by the U.S. Court of Appeals for the First Circuit,

> It is clear under this rule that defendants wishing to raise any of these four defenses must do so in their first defensive move, be it a Rule 12 motion or a responsive pleading. See, e. g., Myers v. American Dental Association, 695 F.2d 716, 720-21 (3d Cir.1982), cert. denied, 462 U.S. 1106, 103 S.Ct. 2453, 76 L.Ed.2d ---- (1983); Rauch v. Day & Night Manufacturing Corp., 576 F.2d 697, 701 (6th Cir.1978); Pila v. G.R. Leasing and Rental Corp., 551 F.2d 941, 942-43 (1st Cir.1977); Bethlehem Steel Corp. v. Devers, 389 F.2d 44, 46 (4th Cir.1968). If they fail to do so, the only manner in which to salvage the defense is by an amendment made as a matter of course. Such an amendment was not available to Lilly here because the requisite time period set forth in Rule 15(a) had expired. Although Rule 15(a) also provides for amendments to pleadings by leave of the court and states that "leave will be freely given when justice requires," it follows from the language of Rule 12(h)(1) that this amendment procedure is not available to raise the personal jurisdiction defense. Fed.R.Civ.P. 12(h)(1); Konigsberg v. Shute, 435 F.2d 551, 552 (3rd Cir.1970) (per curiam). See generally *C. Wright & A. Miller*, Federal Practice and Procedure § 1391, at 855 (1969).

Glater v. Eli Lilly & Co., 712 F.2d 735, 738 (1st Cir. 1983).

Time and time again the Courts have ruled that they do not have the authority to permit defendants to resurrect waived defenses asserted more than 20 days after the initial answer or responsive motion is first filed. For example, in Konigsberg vs. Shute, 435 F.2d 551 (3d Cir. 1970), the district court had granted the defendant's motion for leave to amend its answer to assert for the first time the defense that the court lacked jurisdiction, and then dismissed the complaint based upon lack of jurisdiction. The U.S. Court of Appeals for the Third Circuit reversed, holding that: "[Defendant's] court-authorized amended answer did not qualify as one described in waiver Rule 12(h)(1) as an amendment thereof permitted by Rule 15(a) to made as a matter of course" since the amendment was made more than 20 days after the initial answer was filed. Id. at 552. Similalry, in Wurz vs. Santa Fe International Corporation, 423 F.Supp. 91 (D.Del. 1976) the Court rejected the defendant's attempt to assert an omitted objection to venue by a motion to amend made only 27 days after the initial answer was filed holding that:

> Defendants' amended answer was filed September 8, 27 days after the answer was served on the plaintiffs on August 12, 197. Thus the challenge to venue, raised for the first time in the amended answer, did not qualify as one described in waiver Rule 12(h) as an amendment thereof permitted by Rule 12(h) as an "an amendment thereof permitted by Rule 15(a) to be made as a matter of course."

Id at 93. The rule prohibiting amendments after 20 days to assert omitted and waived defenses has been applied in the District of Columbia. In Weber vs. Turner, 1981 WL 26999 (D.D.C. 1981) the Court had initially permitted the defendant to amend its answer more than 20 days after the initial answer was filed to assert an omitted objection to venue and then granted defendant's motion to transfer venue. Upon a motion for reconsideration, the Court reversed

itself recognizing that: "A defense available at the time of an initial response to a pleading may not be asserted when the initial pleading is amended." Id.[4]

Thus, as a matter of law, the Court does not have the discretion under the liberal standards of Rule 15(a) to "freely" grant amendments "when justice so requires" to permit a defendant to amend his pleadings to resurrect a waived defense requested more than 20 days after the initial pleading is filed. The language of Rule 12(g) and 12(h)(1)(A) is plan and unambiguous and does not authorize judicial discretion to modify the consequences of that Rule by allowing a defendant to amend a motion to dismiss to assert a waived defense before the motion is ruled upon.

### 3.    *The Filing of the Amended Complaint Does Not Resurrect Any Waived Defenses.*

The applicability of the waiver rule is not any different simply because L&L has filed an Amended Complaint thereby providing Slattery with the opportunity to file a new motion to dismiss. The filing of an amended complaint, which in turns afford the defendant an opportunity to file a second motion to dismiss or amended answer, does not permit the defendant to resurrect

---

[4]  See Also I.Oliver Engebretson, Inc. v. Aruba Palm Beach Hotel & Casino, 575 F.Supp. 1262, 1264 (D.C.N.Y.,1984) ("Muzii seeks to escape the consequences of its failed pleading by obtaining leave to amend its answer to raise this defense. Given the clear language of Rule 12(h)(1) limiting the use of amended pleadings to raise this defense for the first time to those amendments made as of right, this Court does not have the authority to grant Muzii's request."); Copulsk vs. Boruchow, 545 F.Supp. 126, 128 (E.D.N.Y.1982) ("Since defendant has waived the objection to jurisdiction over his person, it would be an abuse of discretion to permit him to resurrect the defense by way of an amendment."); Hartling vs. Woodloch Pines, 1998 WL 575138 (S.D.N.Y.,1998)("A defendant who wishes to raise the defense of no jurisdiction or improper venue must do so in its first defensive move, be it a Rule 12 motion or an answer. If it fails to do so, the only way to save the defenses is to make an amendment as a matter of course. Rule 15(a) states that a party may amend an answer as a matter of course only within 20 days of the answer. Therefore, a defendant may only amend his answer to include a Rule 12(h)(1) defense such as lack of personal jurisdiction or improper venue within 20 days of service of the answer.') Similarly, state courts whose rules are patterned after the federal rules have adopted the same interpretation and holdings. See Detroit, Toledo & Ironton Railway vs. Maxine Potato Service, Inc., 13 Ohio.App.3d 157, 468 N.E.2d 361 (1983) ("In order to file his amended answer, St. Germain required leave of court, which he sought and received. However, such a court-authorized amended answer does not qualify as the type allowed by Civ.R. 12(h) as an amendment thereof made as a matter of course under Rule 15(A)."); Catlin vs. P.B. Commissariat, 127 Ariz. 289, 290, 619 P.2d 1066 (1980) ("Until 1966 a party might escape the consequences of his failure to plead the defenses set forth in Rule 12(b)(2) through 12(b)(3) by amending his pleadings. However, present Rule 12(h)(1) severely restricts this practice. The court no longer has the authority to grant leave to amend in order add one of these four defenses; this may be done only by an amendment permitted as a matter of course under Rule 15(a).")

defenses not asserted in the first motion to dismiss or answer. The U.S. Court of Appeals for the

Fourth Circuit made this clear in Rowley v. McMillan,  502 F.2d 1326 (4th Cir. 1974), holding as

follows:

> In response to the original complaint, Rowley appeared and filed a motion to dismiss, questioning the jurisdiction of the district court over the subject matter of the action and the sufficiency of the complaint to state a claim upon which relief could be granted, but not challenging the court's jurisdiction over his person. Rule 12(b), F.R.Civ.P., provides that the defense of lack of jurisdiction over the person shall be asserted in the pleading in response to the one in which jurisdiction is claimed, or by motion in lieu of a responsive pleading, and Rule 12(h)(1) says that if a defense of lack of jurisdiction over the person is not so asserted, it is waived. Rowley does not appear seriously to contest the conclusion that his failure to assert the lack of jurisdiction over his person in his response to the initial complaint constituted a waiver of that defense, ***but he argues that he had a right to revive the defense because plaintiffs amended their complaint several times. His response to one of these amended complaints included a claim that the action be dismissed for lack of jurisdiction over his person. We think the argument is foreclosed, however, by the language of Rule 12(g)***, which states that if a party makes a motion under this rule but omits therefrom any defense or objection then available to him which this rule permits to be raised by motion, he shall not thereafter make a motion based on the defense or objection so omitted . . .. The leading commentators are in accord that, once having waived the defense of lack of jurisdiction over the person, as Rowley clearly did, ***Rule 12(g) prevents the defense from being revitalized even though plaintiffs amended their complaint and provided Rowley with an opportunity to file a new motion under Rule 12, or an answer setting forth a defense which Rule 12 would permit to be presented by motion.*** 2A Moore's Federal Practice P12.22, pp. 2442-43 (1974); Wright and Miller, Federal Practice and Procedure 1388, p. 845 (1969). ***They conclude, and we agree, that an amendment to the pleadings permits the responding pleader to assert only such of those defenses which may be presented in a motion under Rule 12 as were not available at the time of his response to the initial pleading. An unasserted defense available at the time of response to an initial pleading may not be asserted when the initial pleading is amended.*** [Emphasis added]

Rowley v. McMillan,  502 F.2d 1326, 1332 -1333 (4th Cir. 1974). Further, courts in this District

have followed the holding in Rowley. In Lederman vs. United States, 131 F.Supp.2d 46 (D.D.C.

2001) the same issue was presented and following the holding in Rowley, the Court denied the

defendant's attempt to assert a waived defense for the first time in response to an amended

complaint, adopting the ruling in <u>Rowley</u> that "Rule 12(g) prevents the defense from being revitalized even though plaintiffs amended their complaint and provided [the defendant] with an opportunity to file a new motion under Rule 12." <u>Id</u> at 58.[5]

The Courts appear to be uniform in their holding that an amended complaint does not give the defendant a "second bite at the apple" to assert a defense previously omitted from the first motion to dismiss and waived. <u>See</u>  <u>Albany Ins. Co. v. Almacenadora Somex</u>, S.A.  5 F.3d 907, 909-910 (5th Cir. 1993) ("Thus, having failed to raise in its first motion a specific objection to venue based on the forum clauses, Somex was precluded under Rule 12(g) from raising the objection in a second pretrial motion to dismiss."); <u>Dee-K Enterprises, Inc. v. Heveafil Sdn. Bhd.</u>, 985 F.Supp. 640, 643 (E.D.Va.,1997) ("Moreover, [t]he filing of an amended complaint [does] not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to amendment."); <u>Brohan on Behalf of Brohan v. Volkswagen Mfg. Corp. of America</u>, 97 F.R.D. 46, 48 (D.C.N.Y.,1983) ("Under Federal Rule of Civil Procedure 12(b), (h)(1)(B), ACE waived its jurisdictional contention by failing to assert it in a Rule 12 motion or in its answer to the original complaint. The fact that plaintiff thereafter filed an amended complaint does not revive the right to assert the defense.")

What is particularly significant about these holdings is that the decisions make clear that even though the first motion to dismiss is rendered moot as a result of the filing of an amended complaint, and thus the first motion to dismiss is not ruled upon, the defendant may not resurrect

---

[5] In that regard, it is relevant to point out that the factual allegations in the Amended Complaint, and Count I asserting a Breach of Contract claim, are identical to the initial Complaint. The only difference in the Amended Complaint was to add Count II alleging Promissory Estoppel, and Count III alleging Unjust Enrichment, based upon the identical factual allegations contained in the initial Complaint. In <u>Kontokosta vs. Village of Greenport</u>, 1988 WL 132834 (S.D.N.Y. 1988) the Court explained that the "amended complaint was based on the identical subject matter and the identical parties" and since the venue objection was "waived by defendant's failure to raise those objections in response to the original complaint, [the venue objection] may not be resurrected merely because a plaintiff has amended the complaint." Thus, the instant case is not a situation where the Amended Complaint has raised an entirely new set of facts and circumstances triggering for the first time the applicability of the omitted defense.

an omitted and waived defense by filing a new and second motion to dismiss the amended complaint. This, of course, is the exact procedural posture of the instant case and to permit Slattery to raise the omitted and the waived venue objection would be contrary to the aforementioned decisions.

### 4.     The Venue Objection Was Available to Slattery on July 19, 2005.

It can not be seriously contended that the objection to venue was not known to Slattery at the time it filed its First Motion to Dismiss on July 19, 2005. As a preliminary matter, it should be noted that Slattery has not argued or demonstrated in any way in its Second Motion to Dismiss that the venue objection was not "available" to it at the time the First Motion to Dismiss was filed – despite being well aware of the fact that this issue presented a fatal impediment to its ability to raise a belated objection to venue. Having had the opportunity to address this important and threshold issue in its Second Motion to Dismiss, and having failed to do so, Slattery has waived the right to make such an argument in its Reply to be filed. See Heywood v. Samaritan Health System, 902 F.Supp. 1076 (D.Ariz.,1995) (Defendant's motion for insufficiency of service of process was waived where it was first raised in defendant's reply to plaintiffs' response to defendant's motion to dismiss.) Thus, the issue of whether the objection to venue was available to Slattery at the time it filed its First Motion to Dismiss should be deemed conceded.[6]

---

[6] L&L makes this point in light of Slattery's previously demonstrated motion practice of piece-meal litigation by raising substantive arguments in support of requested relief for the first time in its reply papers rather than in the initial moving papers. As reflected in the briefing of the First Motion to Dismiss, Slattery sought for the first time in its Reply in Support of the First Motion to Dismiss that the Complaint be dismissed with prejudice based upon the merger clause found in Article 31 of the Subcontract, which argument had not been raised in the First Motion to Dismiss. This haphazard method of pleading required that L&L petition the Court for leave to file a Sur-Reply to address this entirely new argument. Similarly, Slattery should not be allowed to raise for the first time in its Reply pleading to be filed in support of it Second Motion to Dismiss the threshold requirements for the relief it seeks (i.e, the Second Motion to Dismiss is not barred by Rule 12(g) and (h)(1)(A)), which issue should have been addressed as part of its Second Motion to Dismiss. Indeed, Slattery's inexplicable failure to address in any manner the waiver problem – clearly evident to Slattery at the time it filed its Second to Motion to Dismiss – has placed L&L in the untenable position of having to guess and anticipate what arguments or positions Slattery will take in its Reply papers in an effort to avoid the consequences of the waiver issue. Inevitably, this will result in L&L having to seek leave again to file another sur-reply since L&L does not have a crystal ball and can not possibly anticipate each and

Assuming the Court decides to indulge Slattery in considering any arguments it elects to advance for the first time in its reply pleading to be filed concerning the issue of whether the venue objection was available, it is beyond dispute that the venue objection was known to Slattery, or that Slattery reasonably could have known of the facts relevant to the venue objection, when it filed its First Motion to Dismiss. See Hartling vs. Woodloch Pines, 1998 WL 575138 (S.D.N.Y. 1998) (Defendant "could not overcome the fundamental problem that the defendant knew or reasonably could have known the facts relevant to the defenses when it made its answer.") Slattery has offered no credible explanation as to why it did not know of the Subcontract at the time it filed its First Motion to Dismiss. Paragraph 12 of the initial Complaint specifically referred to the Subcontract, stating that: "Slattery only awarded contract work to L&L in the amount of approximately $1.1 million, which amount was approximately $3.1 million dollars short of its commitment under the Agreement." Slattery, in its First Motion to Dismiss, specifically acknowledged the existence of the Subcontract by stating that pursuant to ¶12 of the Complaint "the parties eventually assented to terms and conditions for a binding contract." Motion at p. 6, n.1. Thus, Slattery obviously knew about the Subcontract at the time it filed its First Motion to Dismiss.

Moreover, it is inconceivable that anyone experienced in the construction industry would not have recognized and understood that in any contractual dispute between a subcontractor and prime contractor, arising out of or related to a request for proposal issued by a quasi-governmental authority, that the request for proposal, the documents referenced in the request for proposal, the prime contract, ***and any subcontract actually executed by the subcontractor***, would be potentially significant to any contractual claim raised by a subcontractor. Thus, Slattery

every argument Slattery intends to assert it in Reply. Nor is this L&L's burden to do so, rather it was Slattery's obligation to demonstrate that the venue objection was not waived when it filed its Second Motion to Dismiss. Having failed to do so, Slattery should be deemed to have conceded the waiver issue.

can not argue that it was not aware of the potential significance of the Subcontract at the time it filed its First Motion to Dismiss. As such, the venue objection was available to Slattery at the time it filed its First Motion to Dismiss.

A comparison of the holdings in <u>Dee-K Enterprises, Inc. vs. Heveafi Sdn. Bhd.</u>, 985 F.Supp. 640 (E.D.1997), <u>Hartling vs. Woodloch Pines, Inc.</u>, 1998 WL 575138 (S.D.N.Y. 1998), and <u>Glater vs. Eil Lilly & Co.</u>, 712 F.2d 735 (1st Cir. 1983), illustrates the distinction between when a defense is "available" and "not available" for purposes of Rule 12(g) and (h)(1)(A). In <u>Dee-K Entrprises</u>, defendants filed a Rule 12 motion to dismiss which did not challenge venue. The defendants contended that they were not required to raise an improper-venue defense at the time because the defense was not then available. As explained by the Court,

> These domestic defendants base their contention on the erroneous proposition that simply because the original complaint was sufficiently vague to warrant dismissal for lack of specificity, it must also have been so vague as to obscure whatever basis for venue might have existed at that time. Thus, the domestic defendants argue they were not able to discern whether venue was proper in this District until plaintiffs filed their more specific, amended complaint and indicated precisely which of defendants' acts constituted the alleged conspiracy. This argument amounts to the assertion that the domestic defendants could not, on their own, have known whether or not they conducted *any* business in this District such that venue here would be proper until plaintiffs identified *specific* alleged conduct in this District that they believed violated the antitrust laws.

<u>Dee-K Enterprises, Inc.</u>, 985 F.Supp. at 642. The Court rejected this argument, holding as follows:

> This argument is unpersuasive. First, these domestic defendants certainly knew the scope and details of their business activities, and thus they knew whether they resided, transacted business, or could be found in this District. Therefore, they cannot now claim that they were unaware of a potential objection to venue at the time the original complaint was filed. Had a venue objection then been available, they could and should have raised it at that time.FN2 Second, and more important, because improper venue is an affirmative defense, allegations showing that venue is proper need not be included in the complaint. It follows

15

> that the Malaysian defendants have waived any objection to venue they might
> have had.

Id. Similarly, it would be absurd to contend that Slattery was not sufficiently familiar with its

business relationship with L&L to know about the Subcontract. Indeed, the Complaint

specifically referenced the Subcontract. Being aware of the Subcontract, Slattery is certainly

charged with the knowledge of the contents of the Subcontract, including the forum selection

clause therein. Thus, it would be incredulous for Slattery to argue that the contractual basis for its

venue objection was not known, or was not reasonably known to it, and thus not available to

Slattery at the time it filed its Motion to Dismss. As in Dee-K Enterprises, any lament Slattery

had as to the sufficiency of the allegations in the initial Complaint (which argument Slattery has

now abandoned) does not eliminate the fact that Slattery is charged with the knowledge of its

business relationship with L&L and the Subcontract, and the contents therein – especially in light

of the fact that the Subcontract was specifically referenced in the initial Complaint and its

existence acknowledged in the First Motion to Dismiss.

Similarly, in Hartling vs. Woodloch Pines, Inc., 1998 WL 575138 (S.D.N.Y.1998), the

Court rejected the defendant's argument that the venue objection was not available to it "because

the operative facts at issue here are the defendant's contacts with New York. These are facts

naturally within the defendant's knowledge." Id. Moreover, the Court pointed out that the facts

relied upon by defendant in support of the venue objection were derived either from the

complaint or the testimony of an executive employee for the defendant. As held by the Court;

"The defendant cannot argue that these facts relevant to the omitted defenses of which it was

unaware when its very motion on the merits of these defenses relies almost entirely upon facts

provided from the defendant itself" The Court concluded that "the fundamental problem [is] that

the defendant knew or reasonably could have known the facts relevant to the defenses when it

made its answer." Id. Similarly, the operative facts here concern Slattery's business relationship with L&L, which are facts naturally within Slattery's knowledge and thus were available to Slattery. Moreover, it was Slattery who initially submitted portions of the Subcontract as part of its Reply in support of its First Motion to Dismiss. Clearly, Slattery knew or reasonably could have known of the venue objection based upon the Subcontract at the time it filed its First Motion to Dismiss.

In contrast, in Glater vs. Eil Lilly & Co., 712 F.2d 735 (1st Cir. 1983), the plaintiff had alleged that her domicile was in a state which provided diversity jurisdiction before the federal court. Subsequent to responding to the complaint, the defendant found out that plaintiff's allegation as to her domicile was incorrect and moved to dismiss for lack of personal jurisdiction. The U.S Court of Appeals for the First Circuit stated that the federal rules "do provide [for] a strict waiver rule with respect to this defense", but the defense was not available to the defendant because "the complaint did not put it on it notice that her New Hampshire domicile was at least questionable." Id at. 738. The Court held that the defendant "could not waive a defense involving facts of which it was not, and could not have been expected to have been, aware." Id. As noted by the Court in Hartling, in Glater "the complaint affirmatively misled the defendants into believing that there was personal jurisdiction premised upon facts that turned out to be untrue, facts that initially were clearly not with the defendant's ken." Hartling vs. Woodloch Pines, Inc., 1998 WL 575138 (S.D.N.Y. 1998). In the instant case, however, the Complaint clearly identified the Subcontract and Slattery is charged with knowledge of its business relationship with L&L.

### 5.    Allowing Slattery to Raise the Waived Venue Objection Would Promote Piecemeal Litigation.

As discussed above, the Court does not have the discretionary authority to allow Slattery to escape the consequences of Rule 12(g) and (h)(1)(A). However, assuming *arguendo* that

17

Slattery may argue for such discretionary authority in its Reply pleading to be filed, L&L respectfully submits that the circumstances counsel against exercising such discretion in favor of Slattery. As made abundantly clear by the rapidly increasing volume of paper filed in this proceeding, L&L has already incurred substantial expense and time in defending and briefing a variety of other substantive defenses and arguments raised by Slattery in its First Motion to Dismiss. Such effort will be largely wasted if the Court were to allow Slattery to resurrect its omitted and waived venue objection and dismiss this action, thereby requiring L&L to refile the action in New York. The First Motion to Dismiss was focused primarily upon the flawed argument that a complaint must allege the material terms of a contract in order to state a cause of action for breach of contract. Slattery, however, has abandoned this argument in its Second Motion for Dismiss thereby rendering the substantial effort devoted on that issue a waste of time and money. This is exactly the type of piecemeal litigation and successive motions that Rule 12(g) and (h)(1)(A) was intended to prevent.

In addition, dismissal of the action now could have a material impact upon any time related defenses that Slattery may wish to raise in that the filing of the Complaint tolled the running of any such defenses. There is no savings clause statute in effect in the District of Columbia, and thus dismissal of the action would resurrect any time related defenses that Slattery might have otherwise acquired had the Complaint not been filed.

Finally, Slattery can offer no excuse for having failed to raise the venue objection in its First Motion for Dismiss. The absolute absence of any extenuating circumstances justifying the omission of the venue objection from the First Motion to Dismiss strongly militates against the Court exercising any discretionary authority to save Slattery from its own mistake.

In sum, L&L would be prejudiced by the belated assertion of the omitted and waived venue objection. Moreover, there is no reason to excuse this omission since there is absolutely no extenuating circumstances which could justify the omission of the venue objection from the First Motion to Dismiss.

### 6.    Conclusion.

The venue objection was available to Slattery on July 19, 2005. The defense was waived due to Slattery's failure to raise it in its initial Motion to Dismiss filed on July 19, 2005. The filing of the Amended Complaint does not resurrect Slattery's right to raise the waived defense in response to the Amended Complaint. The plain and unambiguous language of Rule 12(g) and (h)(1)(A), as interpreted and applied by many Courts, makes clear that the Court does not have the discretionary authority to alter the mandatory consequences of failing to raise the omitted venue objection in the First Motion to Dismiss. The Rule does not permit for any exception to its operation simply because the First Motion to Dismiss has not been ruled upon and is still pending at the time the Second Motion to Dismiss was filed.

## III.    L&L's Complaint is Not Governed by The Subcontract.

### 1.    L&L's Claim Does Not "Arise" Under the Subcontract.

Article 31 states that the forum selection clause only applies to "causes of action arising under this Subcontract". Slattery incorrectly states that the dispute is governed by the Subcontract. The dispute is not governed by the Subcontract and therefore it follows that neither Article 31, the forum selection clause, (nor Article 32, the merger clause), is applicable to L&L's claim. Rather, as previously stated in L&L's Opposition and Sur-Reply, L&L's claim is based upon the fact that the October 3, 2001 document is an enforceable agreement which on its face contains sufficient material terms agreed to by L&L and Slattery so as to render the agreement

enforceable. Since L&L's claim does not arise under the Subcontract, if follows that the forum selection clause in Article 31 does not apply to this dispute.

> 2.    *The October 3, 2001 Document Is An Enforceable Agreement.*

The agreement by L&L and Slattery that L&L would be allowed to do the underground utility work was conditioned upon Slattery entering into the Prime Contract with WMATA. The conditional agreement reached on October 3, 2001 was enforceable in that the price and the scope of work had been agreed upon and therefore, at that point there was a lawful subject matter, legal consideration, mutuality of assent and mutuality of obligation which would become binding at such time that Slattery executed the Prime Contract with WMATA. There was an agreement as the minimum amount of material terms necessary for the Court to determine that there has been a breach (i.e. failure to award the subcontract work to L&L) and fashion an appropriate remedy for the breach (i.e. award of lost profits.).

The October 3, 2001 document signed by both Slattery and L&L states unambiguously that L&L "will enter into a formal agreement with [Slattery] for the [underground utility] work upon [Slattery's] execution of a contract with [WMATA]." (See Exhibit #2 to Slattery's Reply in Support of [First] Motion to Dismiss filed on August 12, 2005). Slattery's signature to the October 3, 2001 document is expressly identified as an "acceptance" of this offer and promise by L&L to enter into a formal agreement. Id. Moreover, in the "Schedule of DBE Participation" submitted by Slattery to WMATA, Slattery represented that it "agrees to enter into a formal agreement with [L&L] for the work and at, or greater than, the prices listed in this Schedule subject to award of a Contract with [WMATA]." (See Exhibit #2 to L&L's Sur-Reply at p. 00400-B-12.)

It is settled that "[p]arties may make an enforceable contract binding them to prepare and execute a subsequent documentary agreement." <u>D.C. Area Community Council vs. Jackson</u>, 385 A.2d 185, 187 (D.C. 1978).[7] It is significant to note that the quoted statement in the October 3, 2001 document does not say that the agreement is subject to, conditioned upon, or in any way dependent upon the execution of another written agreement. Rather, the sentence simply states that L&L and Slattery will enter into a "formal agreement", which clearly indicates that the subsequent written agreement was intended and agreed to simply memorialize the agreement that had been entered into as of October 3, 2001 and was to be binding once Slattery was awarded the Prime Contract from WMATA. <u>Accord</u> <u>Park Inn Hotel, Inc vs. Messing</u>, 31 Misc.2d 961, 224 N.Y.S.2d 179, 184 (1962) ("A statement that the parties contemplate the signing of a formal contract does not render a writing unenforceable."); <u>Four Seasons Hotels Limited vs. Vinnik</u>, 127 A.D.2d 310, 318, 515 N.Y.S.2d 1 (1987) ("A contract does not necessarily lack all effect merely because it expresses the idea that something is left to future agreement.)

For example, in <u>Arok Construction Company vs. Indian Construction Services</u>, 174 Ariz. 291, 848 P.2d 870 (1993), the general contractor ICS had promised the subcontractor AROK that if the general contractor ICS was awarded the prime contract that ICS would enter into a subcontract with AROK. The trial court had entered summary judgment in favor of ICS ruling there was not a meeting of the minds as to the required material terms. The Arizona Appellate Court reversed, and in doing so cited the test from the Restatement (Second) of Contracts, §33(2), (adopted by the D.C. Court of Appeals as discussed *infra* at p 23), that: "Any

---

[7] <u>See</u> <u>Also</u> <u>Jack Baker Inc. vs. Office Space Development Corporation</u>, 664 A.2d 1236 (D.C. 1995) ("Even if the parties intend to subsequently enter into a written contract, as was indisputably the case here, it does not necessarily follow that they have not made any contract until the writing is completed and signed. The parties may be bound by their oral agreement if it meets the dual requirements of intent and completeness.") Unlike the facts in <u>Jack Baker</u> which involved an oral agreement to enter into a future agreement subject to approval by a third party (i.e., the owner), the instant case involves a written agreement signed by both parties which on its face was enforceable and conditioned only upon Slattery being awarded the Prime Contract.

requirement of reasonable certainty is satisfied if the agreement that was made simply provides a basis for determining the existence of a breach and for giving an appropriate remedy." 174 Ariz. 295, 848 P.2d 874; citing Restatement (Second) of Contracts §33(2). In rejecting any notion that the test of enforceability is based upon satisfying a list of material terms, the Arizona Appellate Court explained that the test contained in the Restatement,

> [R]eflects a clear and overwhelming trend in the law. The old "formalist" view limited the agreement to written terms and emphasized rules of contract, such as the requirement that the agreement include all material terms. This has long since give way to the "realist" approach, exemplified by the Uniform Commercial Code and the Second Restatement of Contracts. The latter emphasizes standards rather than rules, and assigns to courts the task of upholding the agreements parties intended to make.

Id. The Court went on to hold that:

> The standard for contract enforceability is not whether the agreement included a resolution of every matter and anticipated every contingency. The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. *Restatement (Second) Contracts* §33(2) (1981). If a court can determine the existence of a breach by ICS and fashion an appropriate remedy for AROK, then the terms of their agreement are reasonably certain and enforceable. Thus, "gaps" or omitted terms, or vague and indefinite terms, are not invariably fatal to the rights of the parties to obtain enforcement of their bargain.

174 Ariz. 297, 848 P.2d 876. As in the instant case, in Arok there had been an agreement as to the scope of work and the agreed upon price for the work, which the Court held was sufficient for purposes of stating a cause of action for breach of contract, holding as follows:

> The terms of this contract are sufficiently certain for two independent reasons. First, ICS breached the contract at a point when the only terms necessary to determine the existence of the breach (scope of work) and for giving an appropriate remedy (agreed-upon price) were present. Second, there was evidence of a course of dealing involving a standard form contract which could be used to supply any missing terms. Because the breach by ICS was a total breach of contract – ICS refused to allow AROK to perform the work – the absence of contract terms such as bonding is not fatal to AROK's claim. . . . If ICS made a binding promise to pay AROK for this work, there is sufficient basis for deciding whether a breach occurred without "gap-filling" by a court. .

> . . The agreed price, together with other evidence such as the cost to AROK of
> performing the work, will enable the court to give an appropriate remedy.

Id.

The D.C. Court of Appeals has cited and relied upon §33 of the Restatement of Contracts (1981) for purposes of determining whether there is an enforceable contract. See Rosenthal vs. National Produce Company, Inc., 573 A.2d 365, 369 (D.C. 1990) (The test for determining whether there has been a meeting of the minds as to a sufficient number of material terms "is met when the contract provides a sufficient basis for determining whether a breach has occurred and for identifying an appropriate remedy." citing Restatement (Second) of Contracts §33 (1981)); Obelisk Corp. v. Riggs Nat. Bank of Washington, D.C. 668 A.2d 847, 855 (D.C. 1995) ("Restatement (Second) of Contracts § 33(2) (1979) (the terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy)"); Basch v. George Washington University, 370 A.2d 1364, 1369 (D.C. 1977) (citing the Restatement (Second) of Contracts, §32, and holding that "Our decision today does not commit us to a standard of certainty so restrictive that it might frustrate reasonable expectations in another case. The authorities whom I cite do give guidance on clarifying uncertainty. Moreover, this jurisdiction long ago imposed upon contracting parties who have left terms open for subsequent decision a good faith duty to reach agreement.") Even the U.S. Supreme Court has cited this test with approval. See Texas v. New Mexico 482 U.S. 124, 129, 107 S.Ct. 2279, 2284 (1987) ("A court should provide a remedy if the parties intended to make a contract and the contract's terms provide a sufficiently certain basis for determining both that a breach has in fact occurred and the nature of the remedy called for. Restatement (Second) of Contracts § 33(2), and Comment b (1981).").

In the instant case, the October 3, 2001 document sets forth an agreement as to the "scope of work" (i.e. underground utilities work) and an "agreed upon price" (i.e. $4.25 million dollars). The breach by Slattery was total – refusing to allow L&L to perform the work. The remedy for this breach is straightforward, the lost profits on a $4.25 million dollar contract. Under the Restatement (Second) of Contracts, §33(2), the October 3, 2001 document identifies the required material terms on which there was mutual assent so as to render the agreement enforceable.

> **3.      *Any Deficiency in the October 3, 2001 Document Is Cured By Reference to the Other Documents.***

Only in the event it becomes necessary to establish an agreement as to other material terms not specifically set forth in the October 3, 2001 document, then reference can be made to not only the Subcontract, but also the RFP, the documents referenced in the RFP, the Prime Contract, and plans and specifications, as evidence of the other material terms and conditions agreed to by Slattery and L&L at the time the October 3, 2001 document was executed. Only portions of the Subcontract are potentially relevant to the extent needed to provide evidence as to the agreement by L&L and Slattery to other material terms and conditions.

Slattery has chosen to ignore the decision in Arok Construction vs. Indian Construction Services, 174 Ariz. 291, 848 P.2d 870 (1993). As held in Arok, "there was evidence of a course of dealing involving a standard form contract which could be used to supply any missing terms." 848 P.2d at 876. Therefore, as in Arok, the Subcontract entered into between L&L and Slattery may provide evidence of a course of dealing which can be used, if needed, to supply any missing terms from the October 3, 2001 document. The Subcontract, however, is not the basis of L&L's

claim. L&L has not filed suit for any breach arising from the Subcontract. L&L seeks no remedy

for non-performance of the contractual commitments set forth in the Subcontract.[8]

### (A)     The Request for Proposal Issued by WMATA.

The RFP contained specific requirements as to the material terms and conditions of any

Prime Contract and in turn specified the material terms and conditions that had to be contained in

any subcontract entered into between Slattery and its subcontractors. The RFP specifically states

that "the [Prime] Contract consists of this RFP and its amendments . . . [and] all documents

referenced or attached to the RFP." (See Exhibit No. 2 to Sur-Reply at p. 00500-1.) Moreover,

the RFP specifically states that Slattery "shall incorporate the obligations of this contract into its

respective *subcontracts*, supply agreements, and purchase orders." [emphasis added] (See

Exhibit No. 2 to Sur-Reply at p. 00700-4 at ¶F.). Thus, the RFP dictated that the October 3, 2001

Agreement would have to be bound by the terms and conditions of the Prime Contract, RFP and

all other documents referenced in the RFP. Therefore, at the time the October 3, 2001 document

was executed it was understood and agreed by the prime contractor, Slattery, and the

subcontractor, L&L, that if Slattery was awarded the Prime Contract the subcontract between

Slattery and L&L would contain the same material terms specified in and required by the RFP.

### (B)     The Prime Contract between Slattery and L&L.

As is standard in the construction industry, and specified in the RFP and Prime Contract,

any subcontract awarded by Slattery as part of the New York Avenue Station Project would have

to incorporate and adopt by reference the Prime Contract between Slattery and WMATA, along

with the plans, specifications, drawings, and schedule of work. The RFP dictated that Slattery

---

[8] Although the parties have casually referred to the Subcontract as being between L&L and Slattery, this is not
correct in that the Subcontract was also executed by entities that were not parties to the October 3, 2001 Agreement
and October 3, 2001 document. The Subcontract was executed by L&L and "SL, A Joint Venture", an entity
comprising both Slattery and The Lane Construction Corporation. SL, a Joint Venture, and The Lane Construction
Corporaton did not execute the October 3, 2001 document.

"shall incorporate the obligations" of the Prime Contract into its subcontract with L&L. (See Exhibit No. 2 to Sur-Reply at p. 00700-4 at ¶F.) It was agreed and understood as of October 3, 2001 that in the subcontract L&L would assume towards Slattery all of the obligations and responsibilities applicable to the underground utility work which Slattery assumed towards WMATA under the Prime Contract. Similarly, it was agreed that Slattery would have the same rights and remedies against L&L with respect to the underground utility work as WMATA had against Slattery under the Prime Contract. (This agreement as of October 3, 2001 was later validated by the terms of the Subcontract which contained this operative provision; See Exhibit #1 to Sur-Reply at p.1, §1.1(b) and p.2, §1.2). Thus, the Prime Contract set forth in detail the material terms and conditions of any subcontract between L&L and Slattery.

(*C*)    ***The October 3, 2001 Agreement Between L&L and Slattery.***

In sum, the October 3, 2001 document, the subcontract executed by Slattery and L&L, the Prime Contract between WMATA and Slattery, and the RFP issued by WMATA defined the respective duties and obligations of L&L and Slattery in their subcontract for L&L to perform the underground utilities work. It is of course well settled that: "When a written agreement incorporates a second writing, the two documents must be read together as constituting the contract between the parties." Vicki Bagley Realty, Inc. v. Laufer 482 A.2d 359, 366 (D.C., 1984). Moreover, the rule applies even if the other document is not signed by the contracting parties. See Trans-Bay Engineers & Builders, Inc. v. Hills 551 F.2d 370, 379, 179 U.S.App.D.C. 184 (1976) ("Where two or more written agreements are contemporaneously executed as part of one complete package, they should be construed together and should be construed as consistent with each other, even if not all the agreements are signed by the same parties.")

The significance of this rule of contract interpretation for construction contracts was demonstrated in Ray v. William G. Eurice & Bros. 201 Md. 115, 128, 93 A.2d 272, 279 (1952), where plaintiff had contracted with defendant to build a home. There arose a subsequent disagreement as to the exact plans and specifications from which the home was to be built, which plans and specifications were referenced in the contract as being attached, but in fact were not attached at the time the contract was signed. The trial court ruled that there had been a failure of a meeting of the minds as to the exact plans and specifications, and the Maryland Court of Appeals reversed ruling as follows:

> The lower court seemingly attached significance to the fact that the plans and specifications were not physically fastened to the contract document which was executed, although it specifically and explicitly referred to both. In this situation physical attachment has not the significance so attributed to it. It is settled that where writing refers to another document that other document, or so much of it as is referred to, is to be interpreted as part of the writing.

L&L and Slattery agreed as of October 3, 2001, that the material terms and conditions of their subcontract for the underground utility work would (i) contain the material terms and conditions specified in and mandated by the RFP; and (ii) would mirror, incorporate and reflect the same material terms and conditions contained in the Prime Contract between Slattery and WMATA pertaining to the underground utility work. See Castelli vs. Tolibia, 83 N.Y.S.2d 554, 564 (1948) ("Nor can a contract be rejected as uncertain, if it can be rendered certain by reference to something certain.") Indeed, Slattery and L&L had no choice but to agree as of October 3, 2001 to those material terms and conditions since it was a condition of WMATA awarding the Prime Contract to Slattery and it was required that any subcontract to be awarded by Slattery to L&L would contain these same material terms and conditions. The subsequent Subcontract executed by L&L and Slattery reflected and adhered to this requirement by

including the material terms of the RFP and incorporating the material terms of the Prime Contract.

There are many published decisions (discussed in detail in L&L's Opposition) which have ruled that a subcontractor has a viable claim against a general contractor for refusing to award the subcontract to the subcontractor that had been promised as part of the bidding process. See Bridgeport Restoration Co., Inc. v. A. Petrucci Const. Co. 211 Conn. 230, 230-231, 557 A.2d 1263, 1264 (1989); Electrical Construction & Maintenance Company, Inc. vs. Maeda Pacific Corporation, 764 F.2d 619 (9th Cir. 1985); W.R. Townsend Construction, Inc. vs. Jensen Civil Construction, Inc., 728 So. 2d 297 (Dist. App. Fla. 1999); Arok Construction Company vs. Indian Construction Services, 174 Ariz. 291, 848 P.2d 870 (1993) (Court reversed summary judgment, holding that subcontract stated a claim for trial when the general contractor had told the subcontractor that `If we get the job, you get the job'".); Havens Steel Co. v. Randolph Engineering Co., 613 F.Supp. 514 (D.C.Mo.1985) (A proposed contract, as modified by the terms of subcontractor's letter, became a complete, substituted contract with reference to duct work project, defining extent of parties' right and duties in connection with that project, even though agreement had only been reached upon details, price and schedule of work itself and other respects of relationship were left to future negotiation.)

A review of these opinions demonstrates that each case is unique and its resolution depends upon the facts and circumstances of each transaction. Suffice it to say that until the matter is fully explored in discovery and all the evidence presented to the trier of fact it is premature to form any opinion much less reach a final adjudication on this issue in the context of a Rule 12(b) motion. However, it is abundantly clear that L&L has stated a cause of action for

breach of a contract based upon the agreement reached as of October 3, 2001 by and between L&L and Slattery, or alternatively a claim for promissory estoppel and/or unjust enrichment.[9]

**IV.**    **The Integration Clause Does Not Apply to the October 3, 2001 Agreement.**

    ***1.***    ***The Court Must Consider Extrinsic Evidence In Interpreting the Impact of the Integration Clause Upon the October 3, 2001 Agreement.***

L&L's claim is not based upon nor does it arise out of a breach of the Subcontract and therefore the integration clause found in Article 32 of the Subcontract does not apply to the instant dispute. The analytical framework in which the Court must determine whether the Subcontract is a fully integrated document and whether the parties intended the Subcontract to supercede the October 3, 2001 Agreement is well summarized by Judge Attridge in <u>Piedmont Resolution, L.L.C. v. Johnston, Rivlin & Foley</u> 999 F.Supp. 34 (D.D.C.1998) as follows:

> A completely integrated agreement is one adopted by the parties as the complete and exclusive statement of the terms of the agreement. The Court's first step in determining whether [the agreement] exclusively establishes the rights and duties of the parties is to address whether that was what [the contracting parties] intended of the Agreement. If so, the contract is completely integrated, and no additional terms may be considered; if not, the agreement is partially integrated and *consistent* additional terms may be shown. [Emphasis in original] This preliminary question of fact, that courts have long called a question of law for the trial court, focuses on the intent of the parties at the time they entered into the agreement. ***This intent must be sought where always intent must be sought, namely, in the conduct and language of the parties and the surrounding circumstances. The document alone will not suffice. In addition to the written Agreement, the Court reviews agreements or negotiations prior to or contemporaneous with the adoption of a writing to determine whether the contract is completely or only partially integrated. A merger clause-the presence or absence thereof, is only a factor in discerning the parties' intent.*** In this preliminary assessment, the parol evidence rule does not apply; it will only come into play after (and if) the Court determines that

---

[9] To the extent there is an issue as to whether the agreement reached as of October 3, 2001 rises to an enforceable contractual agreement, then the alternative claims of promissory estoppel and unjust enrichment have been properly pled as causes of action that exist in the absence of an enforceable contract. See <u>Building Services Co. vs. National Railroad Passenger Corporation</u>, 305 F.Supp.2d 85, 94 (D.D.C. 2004) ("Promissory Estoppel is recognized in the law of the District of Columbia as a theory allowing recovery in contract where there may have been a failure of proof of certain elements necessary to the formation of an express contract, if a refusal to enforce a promise admittedly made would in the circumstances (usually reliance) result in injustice".)

> the Agreement is completely integrated. Thus, the inquiry into whether the
> contract is completely integrated includes a review of extrinsic-parol-evidence
> that will have to be excluded at trial if the court concludes the contract indeed
> is completely integrated. [Citations omitted; emphasis added].

Id. at 50. Thus, the Court must engage in a multi-layered analysis in interpreting the Subcontract

for purposes of determining the applicability of the integration clause to L&L's stated claim in

the Complaint.

First, the Court must determine whether the Subcontract is a fully integrated agreement

extending to all matters arising from and related to the New York Avenue Station Project. Parol

evidence that would otherwise be excludable at trial shall be considered for purposes of

determining whether the Subcontract was intended to be a fully integrated agreement with

respect to all the Underground Utility Work at the New York Avenue Station Project. The

presence or absence of a merger clause is but one factor in discerning that intent. See Howard

University v. Good Food Services, Inc., 608 A.2d 116, 127 (D.C. 1992) ("In considering such

evidence and in determining the preliminary factual issue of whether the parties intended a

writing to be integrated, the trial court does not apply the parol evidence rule."). The "types of

evidence that the court may consider are the circumstances before and contemporaneous with the

making of the contract, all habitual and customary practices which either party knows or has

reason to know, the circumstances surrounding the transaction, and the course of conduct of the

parties to the contract." Potomac Elec. Power Co. v. Mirant Corp., 251 F.Supp.2d 144,

150 (D.D.C.2003).

Second, if the Court determines that the Subcontract was not fully integrated, then

consistent additional terms may be introduced. See Howard University v. Good Food Services,

Inc. 608 A.2d 116, 126 (D.C. 1992) ("If, however, the parties did not intend for the 1987

agreement to be exclusive on all matters of their contractual relationship, the agreement was "partially integrated" and "consistent additional terms may be shown".")

Third, even if the Court determines that the Subcontract is fully integrated, it does not preclude the existence of any collateral agreement between L&L and Slattery. See Howard University v. Good Food Services, Inc., 608 A.2d 116, 127 (D.C.1992) ("even the finding of a completely integrated agreement does not preclude a showing of a 'collateral agreement,' as long as it does not contradict the main agreement.") As noted by one Court, "even where there is a complete integration, the rule will not rise up to bar the admission of evidence in support of a prior oral agreement if the terms of the prior agreement are not inconsistent with the terms of the written integration. This latter statement is true despite the fact that both agreements touch on the same or similar subject matter." Lee vs. Joseph E. Seagram & Sons, Inc., 413 F.Supp. 693, 701 (S.D.N.Y. 1976).

Finally, assuming *arguendo* that the Subcontract is deemed fully integrated and not collateral to the October 3, 2001 Agreement, the Court is then required to make a determination as to whether the phrase "subject matter" is ambiguous or not. In making the threshold legal determination as to whether the phrase "subject matter" is ambiguous or not, the Court must consider extrinsic evidence regarding all the circumstances surrounding the execution of the Subcontract. See Potomac Electric Power Co. vs. Mirant Corporation, 251 F.Supp. 2d 144, 151 (D.D.C. 2003) ("[W]hen contract is ambiguous, the court can consider extrinsic evidence.")

Thus, it is not possible simply based upon the submission of the Subcontract to determine whether the parties intended the Subcontract to be a fully integrated agreement, and if so, the meaning of the phrase "subject matter". The presence of a merger clause is only a factor in discerning the parties' intent, and the Court must consider the extrinsic circumstances

surrounding the execution of the Subcontract. This is not a determination that can be made in the context of a Rule 12(b)(6) Motion.

> **2.      *The Limited Extrinsic Evidence Available from the Documents Demonstrates that the Integration Clause Unambiguously Does Not Apply to the October 3, 2001 Agreement.***

The plain language of Article 32 of the Subcontract clearly provides that the Subcontract was not intended to supersede the October 3, 2001 Agreement. The pertinent portion of the integration clause simply states that "all prior negotiations and understandings with respect to the ***subject matter*** are merged herein. [Emphasis added]". However, the term "subject matter" is not defined in the Subcontract as consisting of all the Underground Utility Work for the New York Avenue Station Project, but refers only to the work that was to be performed ***as defined and set forth in the Subcontract*** – and did not extend to other matters outside the four corners of the Subcontract. Had Slattery and L&L intended the Subcontract to represent their complete and final agreement as to any and all work for the New York Avenue Station Project, including the Underground Utility Work, then it would have been a simple enough matter to have clearly and expressly stated such a broad and sweeping scope of the integration clause by defining the phrase "subject matter" in that matter. In the absence of doing so, it is not reasonable to subscribe such a sweeping and overly broad interpretation of the phrase "subject matter" which according to Slattery's proffered interpretation would be unlimited in scope.

In that regard, it is important to understand that the entire scope of work for the Underground Utility Work promised in the October 3, 2001 Agreement for the New York Avenue Station Project consisted of (i) Water Distribution Systems (item #02515 in the RFP); (ii) Sanitary Sewer (item #02535 in the RFP); (iii) Underground Electrical and Communication Distribution Systems (item #02585 in the RFP); (iv) Subway Drainage Systems (item #02625 in

the RFP); and (v) Storm Sewer (item #02635 in the RFP). (See Exhibit No. 2 to Sur-Reply at TOC-6). The Subcontract was only for work pertaining to the Storm Sewer and did not include the other four components of Underground Utility Work. The Subcontract also included work for the Retaining Walls, which was not part of the Underground Utility Work and not the subject of the October 3, 2001 Agreement. Specifically, Article 2 of the Subcontract entitled "Scope of Work", states that the "scope of services to be provided" consists of the following: "Furnish, Provide, Install the Complete Storm Runoff and Wall Systems throughout the Project Site as Shown on the Construction Plans provided, as outlined below." Thus, the "scope of work" for the Subcontract, which is the "subject matter" of the Subcontract, related only to the Storm Sewer (which is part of the Underground Utility Work) and the retaining wall (which is not part of the Underground Utility Work), and did not include the remaining four components of the Underground Utility Work.

It is equally important to understand that the Prime Contract was a design-build project and at the time the Prime Contract was executed the five components of the Underground Utility Work still needed to be designed before any written subcontract could be executed. At the time the Subcontract was executed, only the plans and specifications for the Storm Sewer portion of the Underground Utility Work were completed and ready for contracting. As noted previously, supra at p. 3, L&L does not have the plans and specifications for the (i) Water Distribution Systems; (ii) Sanitary Sewer; (iii) Underground Electrical and Communication Distribution Systems; and (iv) Subway Drainage Systems. Thus, the "subject matter" of the Subcontract was the Storm Sewer and Retaining Wall to be built as part of the New York Avenue Station Project which was the only portion of the Underground Utility Work that was ready for a subcontract to be executed. The "subject matter" did not include the remaining components of the Underground

Utility Work for which the plans and specifications had yet to be finalized and for which a subcontract could not have been executed.

In light of the fact that the design and plans for the remaining Underground Utility Work had yet to be completed, and therefore was not ready to be contracted for under a subcontract, it was understood that at the time the Subcontract was executed it pertained only to the work to be performed under the Subcontract (i.e. the "subject matter" of the Subcontract) and did not extend to all of the remaining Underground Utility Work. It would not have been typical to understand that by executing the Subcontract that the parties were referring to the remaining components of the Underground Utility Work for which the design and plans had yet to be completed and which were not ready for formal subcontracting. This understanding is consistent with industry practice and custom, the circumstances of the transaction, and the course of conduct of the parties.

Finally, and equally significant to the determination that the Subcontract is not a fully integrated agreement which nullifies the October 3, 2001 Agreement, is the fact that the parties to the Subcontract are not the same as those who signed the October 3, document. The Subcontract was executed between L&L and "SL, a Joint Venture", an entity comprising both Slattery and The Lane Construction Corporation. This new entity "SL, a Joint Venture", and The Lane Construction Corporation, did not execute and were not parties to the October 3, 2001 document and agreement. Indeed, L&L has not sued "SL, a Joint Venture" or joined The Lane Construction Corporation as a defendant since neither entity was a party to the October 3, 2001 Agreement. The very fact that different parties signed the October 3, 2001 document and Subcontract provides compelling evidence in support of the position that Article 32 was not intended by L&L and Slattery to extend to their agreement embodied by the October 3, 2001 document which had signed by different parties.

In sum, the Subcontract was not intended to be a fully integrated agreement regarding the parties' intent and understanding with respect to the October 3, 2001 Agreement that L&L would be awarded all of the Underground Utility Work once the design phase was completed by Slattery and this additional work was ready for construction and subcontracting. The parties understood and agreed that the phrase "subject matter" was limited to the scope of the work to be performed under the Subcontract and did not extend to the other yet to be designed components of the Underground Utility Work.[10]

### 3.    The Subcontract is Collateral to the October 3, 2001 Agreement.

As noted by the D.C. Court of Appeals, "even the finding of a completely integrated agreement does not preclude a showing of a collateral agreement, as long as it does not contradict the main agreement." Howard University vs. Good Food Services, Inc., 608 A.2d 116, 127, n. 7, (1992). In Lee vs. Joseph E. Seagram & Sons, Inc., 413 F.Supp. 693 (S.D.N.Y. 1976), the Court explained that: "A collateral agreement is one which is separate, independent and complete . . . although relating to the same object." Whether an agreement is collateral is a decision which "must, of course, turn upon the type of transaction involved, the scope of the written contract and the content of the oral agreement asserted." Seelson v. Rackfay Const. Co. 300 N.Y. 334, 338, 90 N.E.2d 881, 882-883 (1950).

In Lee, plaintiff Lee, owner of a wholesale liquor distributorship, sold his business to defendant Seagram, a distiller of alcoholic beverages, pursuant to a written agreement. Plaintiff alleged that there was an oral agreement which conditioned the agreement to sell upon defendant's promise to relocate plaintiff to a new distributorship. Following the sale, the plaintiff brought suit on the oral promise. The defendant filed a motion for summary judgment,

---

[10] Alternatively, if the Court determines that the limited extrinsic evidence derived from a review of a portion of the operative documents available at this time is insufficient to reach a determination as to whether the Subcontract was a fully integrated agreement, then the issue must await final adjudication pending discovery in this proceeding.

contending that plaintiff's proof of the alleged oral agreement is barred by the parol evidence rule. The Court denied the motion and found the oral agreement to be collateral to the written agreement. In so holding, the Court pointed out that one of the main considerations in reaching this determination is that the agreement "must be one that parties would not ordinarily be expected to embody in the writing." Id. at 702.

In the instant case, as discussed above, it would not have been expected that L&L and Slattery would have set forth in the Subcontract -- which discussed only the work for the Storm Sewer and Retaining Wall for which the design and plans had been completed -- their collateral agreement for the remaining work for the (i) Water Distribution Systems; (ii) Sanitary Sewer; (iii) Underground Electrical and Communication Distribution Systems; and (iv) Subway Drainage Systems, for which the designs and plans had yet been finalized and was not ready for a formal subcontract. Further, the Court in Lee was persuaded by the additional consideration that "the parties to the two agreements were different." Id. at 703. As noted above, the signatories to the Subcontract were different from the signatories to the October 3, 2001 document. Thus, although the two agreements at issue in Lee arose out of the same transaction they concerned sufficiently different matters so as to be deemed agreements collateral to each other. It is also pertinent to note that in Lee, the Court was persuaded by the consideration that the relationship between plaintiff and defendant had existed for thirty years and "the often expressed mutual regard which the parties had for each other led to the conclusion that the agreement to relocate was more likely to be sealed with a handshake then with a pen." Id. The point being that the Court was obliged to consider extrinsic evidence of the transaction and relationship of the parties for purposes of reaching a fair and full understanding of the agreement between the parties.

Similarly, in <u>Gem Corrugated Box Corporation vs. Kraft Container Corp.</u>, 427 F.2d 499, 503 (2nd Cir. 1970), plaintiff had entered into a written agreement with defendant to purchase its paper products from defendant, which plaintiff alleged had been entered into in reliance upon an oral agreement to sell to plaintiff a stock interest in defendant. A judgment had been entered in favor of plaintiff, and on appeal the defendant had argued that the integration clause and parol evidence rule should have barred proof of the oral agreement to sell the stock. The U.S. Court of Appeals for the Second Circuit affirmed, holding as follows:

> The proposed sale of stock was not merely an ancillary, contemporaneous agreement; it was the vital element of the overall transaction. Viewed in this proper perspective, it is plain that the provision in the requirements contract that it contains the entire agreement of the parties means that the writing contains the entire agreement as to its limited subject matter alone; and it is equally plain that the parties ordinarily would not embody the stock purchase agreement in a writing concerned only with box materials purchase terms. In short, defendants' reliance upon the parol evidence rule is misplaced, for the stock agreement and not the requirements contract was the "principal transaction".

427 F.2d at 503. The Court explained that the "principal transaction" was the stock agreement not the purchase agreement, and held that: "the parol evidence rule simply has no application in these circumstances; the oral agreement does not serve to vary or modify the engagement of the parties with respect to the terms of purchase of box materials." <u>Id</u>. Similarly, in the instant case, the "principal transaction" was the promised work for all of the Underground Utility Work set forth in the October 3, 2001 Agreement. The agreement to allow L&L to perform the work for the yet to be finalized design for the (i) Water Distribution Systems; (ii) Sanitary Sewer; (iii) Underground Electrical and Communication Distribution Systems; and (iv) Subway Drainage Systems does not seek to vary or modify the engagement of L&L and Slattery with respect to the Sewer System and Retaining Wall. The October 3, 2001 Agreement does not alter the consideration to be paid for that work, the manner in which the work was to be performed, or any

of the other terms and conditions pertaining to the performance of the work. <u>See Also</u> <u>Primex</u> <u>International Corp</u>., 89 N.Y.2d 594, 679 N.E. 2d 624 (1997) ("the fact that this other contract relates to what is, in important aspects, the same transaction, does not extend this merger paragraph to the destruction of that other contract. Its effect is limited to the contract sued upon."); <u>Frohman Amusement Corp. vs. Blinkhorn</u>, 178 A.D. 431, 165 N.Y.S. 509 (1917) (verbal contract being as to sale of pictures, produced and to be produced, reduction in writing of part as to pictures produced will not prevent proof of oral contact as to pictures to be produced.)

Thus, although the scope of work under the Subcontract which is the subject thereof relates to an important aspect of the New York Avenue Station Project, the merger clause does not extend to the "destruction" of the October 3, 2001 Agreement between Slattery and L&L and the promise to provide the work for the other four components of the Underground Utility Work for which the design and plans had not been finalized and was not ready for formal subcontracting.

### 4. *Parol Evidence is Admissible to Interpret the Phrase "Subject Matter".*

Alternatively, at a minimum, the phrase "subject matter" is ambiguous and under well settled principles of contract law parol evidence is admissible to construe the meaning of the term. <u>See</u> <u>Thayer v. Dial Indus. Sales, Inc</u>. 85 F.Supp.2d 263, 269 (S.D.N.Y. 2000) ("A contractual provision is ambiguous as a matter of law if it is capable of "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."); <u>Potomac Electric</u> <u>Power Co. vs. Mirant Corporation</u>, 251 F.Supp. 2d 144, 148 (D.D.C. 2003) ("a contract is ambiguous when it or its provisions are reasonably or fairly susceptible of different constructions

or interpretations, or of two or more different meanings.") As discussed above, the limited extrinsic evidence available from the limited evidence available certainly demonstrates, at a minimum, that the circumstances of this transaction in conjunction with the customs, practices and usages, raises a bona fide issue of whether the term "subject matter" was intended to be limited to only the work for the Storm Water and Retaining Wall, or was intended to extend to the yet to be finalized work for the (i) Water Distribution Systems; (ii) Sanitary Sewer; (iii) Underground Electrical and Communication Distribution Systems; and (iv) Subway Drainage Systems.

As noted in L&L's Opposition, there were discussions between L&L and Slattery before and concurrently with the execution of the Subcontract wherein it was understood and agreed that the Subcontract and the "subject matter" thereof was not intended to include all of the other Underground Utility Work for which the plans had not been finalized as promised under the October 3, 2001 Agreement. Further, in view of the fact that the Subcontract is a form contract prepared by Slattery, any ambiguity in the clause should be construed against Slattery. Without considering the extrinsic circumstances surrounding the negotiations and execution of the Subcontract it is impossible to make a definitive determination as to whether the Subcontract is fully integrated and the meaning of the term "subject matter". The very fact that Slattery requests the Court to disregard these material facts in ruling upon the 12(b)(6) motion demonstrates that dismissal of the Amended Complaint with prejudice at this early juncture without considering all of the relevant extrinsic evidence would be premature and improper.

**5.      *Slattery Agreed Subsequent to the Subcontract that L&L Would Perform the Remaining Underground Utility Work.***

In addition, as noted in the Opposition, there were continued discussions and promises made after the execution of the Subcontract repeating the agreement to award all of the

39

underground utility work to L&L. Based upon those promises and representations, L&L continued to decline to undertake new business in the expectation of receiving the remaining underground utility work promised by Slattery, so as to be in the position of having adequate resources to perform when Slattery had finished the design of the rest of the Underground Utility Work. Thus, these discussions either serve as the basis for an entirely new agreement entered into subsequent to the execution of the Subcontract, or a subsequent modification of the Subcontract, either of which provides another independent reason why the integration clause is not dispositive of this case at this early juncture. See, e.g., Howard University v. Good Food Services, Inc., 608 A.2d 116, 127 (D.C.1992) citing Clark v. Clark, 535 A.2d 872, 877 (D.C.1987) ("oral modification of term in written agreement still binding even if subsequent negotiations to modify agreement in writing do not result in further modification of the orally modified term. An oral modification to a written contract may be binding even if the written agreement includes a provision, as in this case, expressly prohibiting oral modification.")

### 6. The Integration Clause May Be Invalidated Based Upon Fraud in the Inducement.

Finally, to the extent it is determined that Article 32 applies as an integration clause to the October 3, 2001 Agreement, then that integration clause may still be invalidated based upon the false promises and representations made by Slattery that the remaining yet to be designed Underground Utility Work would be awarded to L&L after execution of the Subcontract. See Sabo vs. Delman, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957) ("the parol evidence rule has no application in a suit brought to rescind a contract on the ground of fraud. In such a case, it is clear that evidence of the assertedly fraudulent oral misrepresentation may be introduced to avoid the agreement."). Further, the disclaimer language in Article 32 is far too vague to bar any claim for fraud in the inducement. See Cirillo vs. Slomnmni, 196 Misc.2d 759, 768 N.Y.S.2d

759 (2003) (clauses which disclaim reliance upon any oral representation which "do not identify any particular subject matter" do not bar fraud in the inducement claims). Finally, a disclaimer clause will not bar a fraud in the inducement claim when "the facts alleged to have been fraudulently concealed could not be discovered through the exercise of reasonable diligence." Rodas vs. Manitaras, 159 A.D. 2d 341, 552 N.Y.S.2d 618, 621 (1990). Slattery's false representation that it intended to perform under the October 3, 2001 Agreement was not a fact that L&L could have discovered through the exercise of reasonable diligence.

       *7.    Conclusion.*

       Although L&L submits that it is clear that Article 32 of the Subcontract was not intended to supercede the October 3, 2001 Agreement, at a minimum it is evident that Slattery's interpretation of Article 32 can not be decided in the context of a Rule 12(b)(6) motion. Discovery must be conducted in order for the Court to have a proper record to make a decision that either (i) the Subcontract is not a fully integrated agreement and the facts and circumstances surrounding the transaction demonstrate that the parties intended the phrase "subject matter" to only mean the scope of work to be performed under the Subcontract; and/or (ii) the Subcontract was collateral to the October 3, 2001 Agreement; and/or (iii) if ambiguous, the phrase "subject matter" was intended by the parties to mean only the scope of work under the Subcontract; and/or (iv) there was a subsequent agreement and/or oral modification of the Subcontract whereby Slattery promised to award L&L the remaining yet to be designed components of the Underground Utility Work; and (v) there was fraud-in-the-inducement by Slattery which would invalidate the application of Article 32 to the instant dispute. Accordingly, disposition of these important issues in a 12(b)(6) motion, which is dependent upon the consideration of extrinsic evidence, would be improper.

**WHEREFORE**, Plaintiff L&L Construction Associates, Inc. respectfully request that the

Defendant Slattery Skanska, Inc.'s Motion to Dismiss the Amended Complaint be denied.

September 12, 2005                                    **RESPECTFULLY SUBMITTED**


_____/s/_____
Bradshaw Rost, Esq. (D.C. Bar #376064)
*Tenenbaum & Saas, P.C.*
4504 Walsh Street, Suite 200
Chevy Chase, Maryland 20815
(301) 961-5300 (office)
(301) 961-5305 (facsimile)
Counsel for Plaintiff L&L Construction
Associates, Inc.
**Email to be noticed: BRost@tspclaw.com**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 12, 2005, I electronically filed the foregoing Opposition to Defendant's Second Motion to Dismiss with the Clerk of the District Court using its CM/ECF System. Service of these papers was perfected electronically, as provided for under Local Civil Rule 5.4(d), on the following:

Val S. McWhorter
Edmund M. Amorosi
W. Stephen Dale
SMITH, PACHTER, MCWHORTER & ALLEN, PLC
8000 Towers Crescent Drive, Suite 900
Vienna, Virginia 22182


_____
Bradshaw Rost